**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| JOHN M. ERWIN, Individually and on Behalf of All Others Similarly Situated, <br><br> Plaintiff, <br><br> v. <br><br> VERADIGM INC., PAUL M. BLACK, RICHARD J. POULTON, and LEAH S. JONES, <br><br> Defendants. | Case No. 1:23-cv-16205 <br><br> Judge Lindsay C. Jenkins <br> Magistrate Judge Jeffrey Cole |

**GERALD HOGAN'S RESPONSE TO COMPETING MOTION**
**FOR APPOINTMENT AS LEAD PLAINTIFF**

Two lead motions were filed by investors in Veradigm Inc. ("Veradigm" or the "Company"): Gerald Hogan ("Hogan") and Alameda County Employees' Retirement Association ("ACERA"). Hogan does not dispute that ACERA has a larger financial interest. ACERA, however, is subject to unique defenses that make it atypical of the class it seeks to represent. As such, ACERA's motion should be denied and Hogan, who does not suffer from any typicality issues, should be appointed lead plaintiff.

## I. ACERA IS ATYPICAL AND SUBJECT TO UNIQUE DEFENSES

"The 'most capable' plaintiff—and hence the lead plaintiff—is the one who has the greatest financial stake in the outcome of the case, ***so long as*** he meets the requirements of Rule 23." *In re Cavanaugh*, 306 F.3d 726, 729 (9th Cir. 2002).[1] "[The Court] must then focus its attention on ***that*** plaintiff and determine, based on the information he has provided in his pleadings and declarations, whether he satisfies the requirements of Rule 23(a), in particular those of 'typicality' and 'adequacy.'" *Id*. (emphasis in original). "If the plaintiff with the largest financial stake in the controversy provides information that satisfies these requirements, he becomes the presumptively most adequate plaintiff." *Id.* If, however, "the plaintiff with the greatest financial stake does not satisfy the Rule 23(a) criteria, the court must repeat the inquiry, this time considering the plaintiff with the next-largest financial stake, until it finds a plaintiff who is both willing to serve and satisfies the requirements of Rule 23." *Id.* Here, ACERA is atypical and subject to unique defenses that preclude it from serving as lead plaintiff.

Though there are several partial corrective disclosures alleged in the amended complaint, the first two disclosures are the most significant because they revealed that investors should not rely on Veradigm's financial statements and that the Company lacked effective internal controls

---

[1] All emphasis herein is added unless otherwise specified.

over financial reporting. *See* Dkt. No. 10. Specifically, on February 28, 2023, Veradigm disclosed that it "***detected certain internal control failures related to revenue recognition*** that have occurred over the prior six quarters, resulting in a mis-statement to reported revenues during those periods," and that as a result, the Company expects "***a reduction in revenue from continuing operations of approximately $20 million dollars*** in the aggregate from what it otherwise reported since the 3rd quarter of 2021 and expected to report for the 4th quarter of 2022."[2] *See* Dkt. No. 10 at ¶¶56-57. The Company explained why it could not file its annual report on time:

> The principal reason for the delay is that recently identified internal control failures relating to the Company's revenue recognition processes over the prior six quarters, primarily stemming from a software tool the Company implemented in 2021, as testing during the current period highlighted some system generated duplicative transactions and other errors impacting the results the Company was receiving from the tool, ***resulting in a mis-statement to reported revenues during those periods, have created the need to conduct additional review and testing prior to finalizing the assessment and the audits of the effectiveness of internal control over financial reporting*** as of December 31, 2022 and of the Company's financial statements as of and for the year ended December 31, 2022. The Company is also ***continuing to evaluate the materiality of the mis-statement to determine whether prior periods will require adjustment, but as of the date hereof, no conclusion has been reached.***

This was an admission that, without further review of its internal controls, Veradigm was unable to determine if its financial results, both past, present or future, were or could be accurate.

After this shocking disclosure, ACERA decided to purchase 2,470 shares on March 10, 2023, before the Company had provided any additional clarification on the internal control issues or the scope of financial misstatements. *See* Dkt. No. 21-2.

---

[2] On this news, Veradigm's share price fell $2.12, or 12.8%, to close at $14.49 per share on March 1, 2023, thereby injuring investors. Dkt. No. 10 at ¶58.

2

Then, on March 22, 2023, Veradigm disclosed that its financial results for fiscal 2021 and 2022, including interim quarters,[3] "should no longer be relied upon because of misstatements to the Company's previously reported revenue resulting from certain internal control failures." The Company claimed the cumulative impact of its corrections "will increase to approximately $40 million" and that "the impact for 2021 will require a restatement of the Company's financial statements as of and for the year ended December 31, 2021." *See* Dkt. No. 10 at ¶59.[4]

Even after the Company announced that its financial statements should no longer be relied upon and that it expected to file restated financial results in the future, ACERA continued to buy thousands of shares. In fact, between March 22, 2023 and the end of the Class Period, ***ACERA purchased 34,470 shares, representing 24.4% of its total holdings purchased during the Class Period***. *See* Dkt. No. 21-2. Thus, a material portion of ACERA's purported financial interest in this case stems from purchases after Veradigm had already said its statements should not be relied upon. These purchases are facial evidence that ACERA is subject to unique defenses.

Defendants will almost certainly contest ACERA's typicality at class certification because courts have held that making substantial purchases after the revelation of the fraud is disqualifying. *GAMCO Invs., Inc. v. Vivendi, S.A.*, 917 F. Supp. 2d 246, 261 (S.D.N.Y. 2013) ("[P]ost-disclosure purchases can defeat the typicality requirement for class certification when plaintiffs made a

_____

[3] As the Company explained, the restatement applied to "the Company's consolidated financial statements and related disclosures as of and for the year ended December 31, 2021 included in its Annual Report on Form 10-K for the fiscal year ended December 31, 2021, as of and for the interim periods ended March 31, 2021, June 30, 2021 and September 30, 2021 included in its Quarterly Reports on Form 10-Q for the fiscal quarters ended March 31, 2021, June 30, 2021 and September 30, 2021, respectively, and as of and for the interim periods ended March 31, 2022, June 30, 2022, and September 30, 2022 included in its Quarterly Reports on Form 10-Q for the fiscal quarters ended March 31, 2022, June 30, 2022, and September 30, 2022, respectively….":

[4] On this news, Veradigm's stock price fell $0.39, or 2.9%, to close at $12.98 per share on March 22, 2023.

disproportionately large percentage of their purchases post-disclosure.") (cleaned up) (emphasis omitted); *Rocco v. Nam Tai Electronics, Inc.*, 245 F.R.D. 131, 136 (S.D.N.Y. 2007).

While some courts in this District have disagreed, the facts in those cases involved situations where the purchases were after the fraud was fully disclosed. *See Silverman v. Motorola, Inc.*, 259 F.R.D. 163, 172 (N.D. Ill. 2009) (citing cases). In *Silverman*, the court found that the putative class representative's post-Class Period purchases "alone" are not automatically disqualifying. *Id.* at 171-72. In so holding, *Silverman* expressly distinguished from *Rocco*, where plaintiffs purchased shares "after he became aware of the alleged inventory fraud and before any public disclosure of correction." *Id.* at 172 ("'The fact that Ward … still made his post-class purchases while this ongoing issue was known to him makes him subject to potential unique defenses at trial,' namely, nonreliance.") (quoting *Rocco*, 245 F.R.D. at 136). That is, where the fraud has not been fully disclosed and the investor was attempting to "capitaliz[e] on uncorrected and on-going fraud," purchases after a partial corrective disclosure suggests the investor was not relying on the integrity of the stock's price and is disqualifying. *Id.*; *see also Rocco*, 245 F.R.D. at 136 ("this Court has consistently held that a person that increases his holdings in a security after revelation of an alleged fraud involving that security is subject to a unique defense that precludes him from serving as a class representative") (citing cases). Here, as ACERA admits, the fraud was not fully disclosed until the end of the Class Period (December 8, 2023),[5] and ACERA was buying

---

[5] On December 8, 2023, Veradigm issued a press release stating that both its Chief Executive Officer and its Chief Financial Officer had been forced to resign at the request of Veradigm's Board of Directors. The release stated that the resignations were the direct result of the investigation by the Audit Committee of the Board into the accounting proprieties that form the subject of this case. The release also suggested that the scope of the historical misstatements of Veradigm's financial reporting may be larger than previously disclosed. On this news, the price of Veradigm stock closed down more than 20% on December 8, 2023 on heavy trading volume.

thousands of shares of stock even though it was aware that it could not rely on Veradigm's public disclosures and that more news regarding the fraud was still to come.

Other courts have found that post-disclosure purchases are disqualifying when combined with a trading strategy that disclaimed reliance on the market price. *See, e.g.*, *In re Safeguard Scientifics*, 216 F.R.D. 577, 582–83 (E.D. Pa. 2003) (disqualifying day trader with post-disclosure purchases); *see also Pub. Employees' Ret. Sys. of Mississippi v. TreeHouse Foods, Inc.*, 2020 WL 919249, at *5 (N.D. Ill. Feb. 26, 2020) (declining to disqualify proposed class representative **after discovery** found "no evidence that MSPERS (and its broker Wedgewood) employed a trading strategy independent of market price") (citing cases). Here, there has been no discovery into whether ACERA's trading strategy relied on the price of the Company's stock. However, at this stage, it appears that ACERA was purchasing the stock regardless of the Company's disclosures, demonstrating it was not relying on the price.

Whether the inevitable challenge by Defendants to ACERA at class certification would ultimately prove successful is not the issue. Rather, the mere prospect that ACERA's reliance will become a focus of discovery that will unnecessarily burden the putative class is sufficient to disqualify ACERA from consideration as the lead plaintiff. *In re Bally Total Fitness Sec. Litig.*, 2005 WL 627960, at *6 (N.D. Ill. Mar. 15, 2005) (lead plaintiff presumption rebutted due to "the time and attention [movant] would be required to devote [an] issue (not to rebut a defense, but to prove its case)"); *see In re Hebron Tech. Co., Ltd. Sec. Litig.*, 2020 WL 5548856, at *7 (S.D.N.Y. Sept. 16, 2020) ("a potential that the presumptively most adequate lead plaintiff will be subject to unique defenses" is sufficient to disqualify him).[6]

---

[6] ACERA may argue that the fact that it is an institution somehow militates against the finding that it is subject to a unique defenses. But "status as an institutional investor" "does not trump the

Hogan is the movant with the next-largest financial stake that is both willing to serve and satisfies the requirements of Rule 23. And unlike ACERA, Hogan is not subject to any unique defenses. In fact, he purchased 7,500 shares in March of 2021 and continued to hold 5,500 of those shares through the end of the Class Period. He also did not purchase any additional shares after March 2021 and as such, he did not purchase any shares after the Company began disclosing that their financial statements should no longer be relied upon. Accordingly, Hogan's motion should be granted.

## II.     IN THE ALTERATIVE, HOGAN SHOULD BE APPOINTED CO-LEAD PLAINTIFF TO ENSURE THE CLASS IS ADEQUATELY REPRESENTED

The Court should deny ACERA's motion because it is subject to unique defenses. However, if the Court does not deem ACERA's unique defenses to be fatal to its motion, Hogan should be appointed co-lead plaintiff in order to protect the Class and ensure that a class member that did move for lead plaintiff is able to control the litigation.

Defendants will argue that ACERA is subject to a unique defense and that it is not an acceptable class representative. This will become a focus of discovery and, at this point, there is no way to know what discovery will reveal and whether the Court will deny ACERA serving as a class representative. To safeguard against this, ACERA's counsel may seek to add another investor as an additional named plaintiff or proposed class representative, but such a proposal could lead to the litigation being controlled by a shareholder that was not appointed by the Court— which would contravene the stated purposes of the Private Securities Litigation Reform Act. The best way to avoid such a situation is to appoint Hogan as co-lead plaintiff, as he timely moved to be appointed and does not suffer the same potential defects as ACERA.

---

explicit language of the PSLRA." *In re Groupon, Inc. Sec. Litig.*, 2012 WL 3779311, at *5 (N.D. Ill. Aug. 28, 2012).

6

Courts often appoint co-lead plaintiffs to ensure that all class members are properly represented and that the potential recovery for all class members is maximized. *See, e.g.*, *In re Oxford Health Plans, Inc., Sec. Litig.*, 182 F.R.D. 42, 49 (S.D.N.Y. 1998) (appointing co-lead plaintiffs "ensures that the interests of all class members will be adequately represented in the prosecution of the action and in the negotiation and approval of a fair settlement, and that the settlement process will not be distorted by the differing aims of differently situated claimants"). In fact, it is common for courts to appoint co-lead plaintiffs comprised of institutional and individual investors with substantial losses as this arrangement protects the class from potential class certification issues, such as any potential conflict between institutional and individual investors, provides strategic flexibility in litigating the action, and ensures the class is represented by investors with unique perspectives. *See, e.g.*, *Sokolow v. LJM Funds Mgmt., Ltd.*, 2018 WL 3141814, at *5 (N.D. Ill. June 26, 2018) ("appointing a lead plaintiff group including both investment advisors and individual investors helps ensure that there is a check on the investment advisors while respecting the PSLRA's preference for institutional investors. Indeed, other courts have recognized that more diverse groups can better serve the interests of class members in securities class actions.").[7] The Court should do so here in the event that the Court does not deny ACERA's motion in its entirety.

---

[7] *See also In re Lucent Techs., Inc. Sec. Litig.*, 221 F. Supp. 2d 472, 483 (D.N.J. 2001) (finding that appointing a co-lead plaintiff would provide "additional representation [that] may benefit the class and provide flexibility, if needed, in the future"); *Johnson v. Pozen Inc.*, 2008 WL 474334, at *3 (M.D.N.C. Feb. 15, 2008) ("[A]n institution/individual Co–Lead Plaintiff structure will provide a diversity of representation and also protect the interests of the class at class certification in the event that either Rodriguez or the Pension Fund later leaves the action for whatever reason.") (citing cases).

### III.    CONCLUSION

For the foregoing reasons, Hogan respectfully requests that the Court grant his Motion and appoint Hogan lead plaintiff.  In the event that the Court does not deem ACERA's unique defenses to be fatal to its motion, Hogan requests to be appointed co-lead plaintiff in order to protect the Class and ensure that a class member that moved for lead plaintiff will control the litigation.

Dated: February 7, 2024

Respectfully submitted,

By: */s/ J. Alexander Hood II*
J. Alexander Hood II
**POMERANTZ LLP**
600 Third Avenue, 20th Floor
New York, NY 10016
Telephone: (212) 661-1100
Facsimile: (917) 463-1044
ahood@pomlaw.com

*Liaison Counsel for Gerald Hogan and Proposed Liaison Counsel for the Class*

Robert V. Prongay
Charles H. Linehan
Pavithra Rajesh
**GLANCY PRONGAY & MURRAY LLP**
1925 Century Park East, Suite 2100
Los Angeles, CA 90067
Telephone: (310) 201-9150
Facsimile: (310) 201-9160

*Counsel for Gerald Hogan and Proposed Lead Counsel for the Class*

**THE LAW OFFICES OF FRANK R. CRUZ**
Frank R. Cruz
1999 Avenue of the Stars, Suite 1100
Los Angeles, CA 90067
Telephone: (310) 914-5007

*Additional Counsel*

8