**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| JOHN M. ERWIN, Individually and on Behalf of All Others Similarly Situated, | ) ) ) | Case No. 1:23-cv-16205 |
| | ) | CLASS ACTION |
| Plaintiff, | ) ) | |
| | ) | Hon. Lindsey C. Jenkins |
| vs. | ) ) | |
| VERADIGM INC., *et al.*, | ) ) | |
| | ) | |
| Defendants. | ) ) | |
| | ) | |

**REPLY BRIEF IN RESPONSE TO GERALD HOGAN'S RESPONSE AND IN FURTHER SUPPORT OF THE MOTION OF ALAMEDA COUNTY EMPLOYEES' RETIREMENT ASSOCIATION FOR APPOINTMENT AS LEAD PLAINTIFF AND APPROVAL OF SELECTION OF LEAD COUNSEL AND LIAISON COUNSEL**

Pursuant to the Court's February 8, 2024 Order (ECF No. 36), Alameda County Employees' Retirement Association ("ACERA") respectfully submits this reply to Gerald Hogan's Response to ACERA's motion ("Motion") for appointment as Lead Plaintiff (ECF No. 33) ("Hogan Resp.").

## I. MR. HOGAN HAS FAILED TO REBUT THE PRESUMPTION THAT ACERA IS THE MOST ADEQUATE PLAINTIFF

Mr. Hogan concedes that ACERA has the largest financial interest in this action. Hogan Resp. 1. He argues, however, that ACERA's Motion should be denied solely because approximately 25% of ACERA's class period purchases occurred after Veradigm Inc.'s ("Veradigm") first two alleged partial disclosures. But these two were the first of a *series of partial* corrective disclosures that first revealed accounting issues and later revealed that those accounting issues were the result of fraud. Nevertheless, according to Mr. Hogan, the purchases made after the first two partial disclosures subject ACERA to a unique defense because of "the mere prospect that ACERA's reliance will become a focus of discovery[.]" Hogan Resp. 1–3, 5. This argument is both factually misguided and legally incorrect.

While arguing that ACERA's trading subjects it to a unique defense of nonreliance, Mr. Hogan fails to point to any special knowledge or unique trading pattern that is counter to the *fraud-on-the-market* theory at the core of securities fraud claims like those here. Rather, Mr. Hogan is essentially carrying the banner for defendants, suggesting that any investor who purchased after the first two disclosures did not rely on the integrity of the market. However, the overwhelming weight of authority holds that "purchasing stock after a corrective disclosure does not, on its own, subject a Plaintiff to a unique defense." *Pub. Emps.' Ret. Sys. of Miss. v. TreeHouse Foods, Inc.*, No. 16-CV-10632, 2020 WL 919249, at *5 (N.D. Ill. Feb. 26, 2020) (collecting cases).

While the Seventh Circuit has not yet ruled on the issue, several courts in this District have endorsed this "majority approach." *See TreeHouse Foods*, 2020 WL 919249, at *5 (citing *Fry v. UAL Corp.*, 136 F.R.D. 626, 632 (N.D. Ill. 1991)); *In re Northfield Lab'ys, Inc. Sec. Litig.*, 267

F.R.D. 536, 542 (N.D. Ill. 2010) ("[T]he fact that an individual found it reasonable to purchase shares at a lower price after the alleged fraud was disclosed does not mean the individual failed to rely on the market price when s/he made purchases during the class period."); *Silverman v. Motorola, Inc.*, 259 F.R.D. 163, 172 (N.D. Ill. 2009) (**post-class period** purchases did not affect typicality); *In re Bally Mfg. Sec. Corp. Litig.*, 141 F.R.D. 262, 269 n.7 (N.D. Ill.) (argument attacking post-class period purchases deemed "unavailing").

This majority position is founded in the bedrock of a proper and logical analysis of investor trading patterns and an understanding of the *fraud-on-the-market* theory.

First, as courts in the majority have reasoned, the fact that an investor purchases additional shares after a corrective disclosure does not make it unique or atypical because "subsequent purchases by the plaintiffs are irrelevant to the liability of [the defendant] with regard to alleged misrepresentations [a]ffecting the earlier sales of securities." *TreeHouse Foods*, 2020 WL 919249, at *5 (citations omitted); *Northfield Lab'ys*, 267 F.R.D. at 542 (same) (citations omitted)); *Loc. 703, I.B. of T. Grocery & Food Emps. Welfare Fund v. Regions Fin. Corp.*, 762 F.3d 1248, 1260 (11th Cir. 2014) (same); *Feder v. Elec. Data Sys. Corp.*, 429 F.3d 125, 138 (5th Cir. 2005) (same); *In re DVI Inc. Sec. Litig.*, 249 F.R.D. 196, 203–04 (E.D. Pa. 2008) (same), *aff'd sub nom. In re DVI, Inc. Sec. Litig.*, 639 F.3d 623 (3d Cir. 2011); *Menaldi v. Och-Ziff Cap. Mgmt. Grp. LLC*, 328 F.R.D. 86, 92 (S.D.N.Y. 2018) (purchases made after corrective disclosures "do[] not create a conflict" nor subject a presumptive lead plaintiff to unique defenses (citing *In re: Petrobras Sec. Litig.*, 312 F.R.D. 354, 360 (S.D.N.Y. 2016) (noting the "irrelevance of post-disclosure purchases to earlier reliance"))); *In re Connetics Corp. Sec. Litig.*, 257 F.R.D. 572, 576–77 (N.D. Cal. 2009) (collecting additional cases).

Second, as courts in the majority overwhelmingly hold, the timing of an investor's purchases—including those made after negative announcements or even the end of the class period—do not as a rule make an investor atypical or unique because many investors employ different trading strategies while still relying on the integrity of the market. *See, e.g., S. Ferry LP No. 2 v. Killinger*, 271 F.R.D. 653, 659–61 (W.D. Wash. 2011) (finding named plaintiff typical

2

even though he purchased securities after the date the defendants claimed they made a fully corrective disclosure); *Connetics Corp.*, 257 F.R.D. at 576–77 ("Defendants do not explain why the timing of lead plaintiff's purchases automatically make it unique—other class members may also have purchased Connetics stock after partial adverse disclosures by the company."); *Lawrence E. Jaffe Pension Plan v. Household Int'l, Inc.*, No. 02 C 5893, 2012 WL 4343223, at *3 (N.D. Ill. Sept. 21, 2012) (purchasers relying on an index strategy not atypical because no evidence the "index" did not rely on the integrity of the market), *vacated in part on other grounds*, No. 02 C 5893, 2012 WL 13338798 (N.D. Ill. Dec. 6, 2012); *Dodge v. Cambrex Corp.*, No. CIVA 03-CV-4896 PGS, 2007 WL 608365, at *6 (D.N.J. Feb. 23, 2007) ("proposed class representatives who purchased shares mid-stream, i.e. during the course of a series of disclosures may satisfy the typicality test"); *In re Zillow Grp., Inc. Sec. Litig.*, No. C17-1387-JCC, 2020 WL 6318692, at *5 (W.D. Wash. Oct. 28, 2020) (noting courts in the majority "have found ... that the timing of the transactions does not necessarily create fundamentally divergent interests with the putative class" (alteration in original)).

Indeed, as courts note, many investors purchase additional shares at depressed prices after negative disclosures, *e.g.*, to dollar-cost average their investment. *See*, *e.g.*, *Roofer's Pension Fund v. Papa*, 333 F.R.D. 66, 77 (D.N.J. 2019) (noting that many class members commonly employ a dollar-cost averaging strategy "to take advantage of lower prices for [the defendant's] shares following … disclosures"); *In re Novatel Wireless Sec. Litig.*, No. 08-cv-1689 H (RBB), 2010 WL 11470156, at *5 (S.D. Cal. May 12, 2010) (no evidence to prove post-disclosure purchases were "truly a unique defense applicable only to Plaintiff, because other members of the proposed class could also have bought stock after the alleged disclosures"); *In re Moody's Corp. Sec. Litig.*, 274 F.R.D. 480, 488 (S.D.N.Y. 2011) (purchases "after a fraud is revealed" did not make investor's post-disclosure purchases unique, especially given the "common investment strategy" of "cost averaging down"); *Turocy v. El Pollo Loco Holdings, Inc.*, No. SA CV 15-1343-DOC (KESx), 2018 WL 3343493, at *19–20 (C.D. Cal. July 3, 2018) (noting dollar-cost averaging and that it is not "unusual" for an investor to purchase after negative disclosure resulting in large price drop).

3

Moreover, even if ACERA's post-February 28, 2023 and/or post-March 22, 2023 purchases were deemed to be unique to ACERA—which the majority approach strongly supports that they *would not* be—it would not follow that ACERA's claims are atypical based on "the mere prospect" that its post-disclosure purchases "will become a focus of discovery." Hogan Resp. 5. "Rather, typicality is destroyed only when a unique defense becomes *such a focus of litigation that it will 'consume the merits' of the case*." *Rogers v. Baxter Int'l Inc.*, No. 04 C 6476, 2006 WL 794734, at *3 (N.D. Ill. Mar. 22, 2006) (emphasis added); *Feder,* 429 F.3d at 138 ("the key typicality inquiry is whether a class representative would be required to devote considerable time to rebut Defendants' claims"); *Connetics Corp.*, 257 F.R.D. at 576–77 ("Even if lead plaintiff is revealed to be the only class member that bought additional stocks after the disclosures, [there is no evidence it] 'threaten[s] to become the focus of the litigation" (alteration in original)); *Dougherty v. Esperion Therapeutics, Inc.*, No. 16-10089, 2020 WL 6793326, at *8 (E.D. Mich. Nov. 19, 2020) (same); *Novatel Wireless*, 2010 WL 11470156, at *5 (same); *Middlesex Cnty. Ret. Sys. v. Semtech Corp.*, No. CV 07-7114 CAS (FMOx), 2010 WL 11507255, at *4 (C.D. Cal. Aug. 27, 2010) (same). In this case, Mr. Hogan offers nothing to show that the issue of ACERA's post-disclosure purchases would become the focus of the litigation, subsuming other class-wide issues.

Even more, as Mr. Hogan concedes (Hogan Resp. 4–5), the initial corrective disclosures (which are causally related to damages) were disclosures of the accounting issues, but not admissions that the accounting issues stemmed from fraud. The Complaint alleges that the first two partial disclosures—which Mr. Hogan characterizes as the "most significant" (*id.* at 1)—chalked up the accounting misstatements to internal control deficiencies and the "recording [of] duplicate sales transactions" caused by a software tool which in turn caused the Company's revenue to be overstated. *See, e.g.*, Am. Compl., ECF No. 10, ¶¶4–5, 56, 59. Only in later disclosures did the Company make evident that these issues may have been the result of fraud by senior executives. Most notably, on December 8, 2023, in an additional disclosure, the Company announced that the CEO and CFO were forced to resign as a direct result of the investigation by the Board into the accounting issues. That same release also stated that the scope of Veradigm's

4

historical misstatements may be larger than previously disclosed. *Id.* at ¶¶12, 68–69. ACERA made *no* purchases after that December 8, 2023 release, but rather started selling on December 8 after the news came out, selling all of its holdings during the following weeks. *See* Exhibit 3 to the Declaration of Nicole Lavallee in support of ACERA's motion, ECF No. 21-3, at 3.

Consistent with the majority approach, courts faced with similar factual scenarios have held that post "partial disclosure" purchases do not subject a plaintiff to unique defenses. *In re Pfizer Inc. Sec. Litig.*, 282 F.R.D. 38, 46–47 (S.D.N.Y. 2012) (collecting cases); *In re JPMorgan Chase & Co. Sec. Litig.*, No. 12 Civ. 03852 (GBD), 2015 WL 10433433, at *4 (S.D.N.Y. Sept. 29, 2015) ("Defendants do not cite a single case—nor is this Court aware of one—holding that a lead plaintiff seeking class certification in a securities fraud suit fails to establish adequacy or typicality where that plaintiff made securities purchases after an alleged partial corrective disclosure but before the final corrective disclosure."); *In re Tronox, Inc. Sec. Litig.*, 262 F.R.D. 338, 345–46 (S.D.N.Y. 2009) (shares purchased after partial corrective disclosure not atypical since the "true extent" of the fraud had not yet been revealed). Moreover, many courts have rejected the same arguments Mr. Hogan raises here even when the presumptive lead plaintiff ***purchased after the fraud was fully disclosed***. *See, e.g.*, *Silverman*, 259 F.R.D. at 171–72.

Finally, Mr. Hogan's characterization of ACERA's post-March 22, 2023 purchases as "substantial" and "material" (Hogan Resp. 3) is both factually and legally flawed. For the question before the Court, 24.4% is hardly "substantial" or "material" considering that, even excluding ACERA's purchases made after those first two disclosures, ACERA expended far more money ($1,736,264) to purchase many more shares (103,556 net) than Mr. Hogan, suffering losses magnitudes greater on those shares ($412,766) than Mr. Hogan. *See* ECF No. 21-3, at 3. Moreover, courts have deemed investors with a much higher percentage of post-disclosure purchases than those of ACERA here (24.4%) as sufficiently typical and adequate. *See, e.g.*, *Karinski v. Stamps.com, Inc.*, No. CV 19-1828-MWF (SKx), 2020 WL 6572660, at *4 (C.D. Cal. Nov. 9, 2020) (71% purchased after two disclosures); *Ark. Tchr. Ret. Sys. v. Insulet Corp.*, 177 F. Supp. 3d 618, 624–25 (D. Mass. 2016) (60% purchased after partial disclosures); *Pfizer*, 282

F.R.D. at 46 n.5 (44% purchased after first disclosure); *In re Recoton Corp. Sec. Litig.*, 248 F.R.D. 606, 619 (M.D. Fla. 2006) ("majority" of shares purchased after first disclosure).

## II. MR. HOGAN'S RELIANCE ON INAPPOSITE AUTHORITY FURTHER UNDERMINES HIS POSITION

Mr. Hogan's position is further undermined by his reliance on outlier cases that have since been rejected by the majority of courts. For example, *Rocco v. Nam Tai Electronics, Inc*., 245 F.R.D. 131 (S.D.N.Y. 2007), is distinguishable on several grounds. First, the court held that the named plaintiff was atypical at the class certification stage because the evidence presented cast doubts on his credibility, including evidence that his purported rationale for why he purchased shares post-class-period did not make sense. *Id*. at 135–36. Second, as subsequent courts have repeatedly held, *Rocco* does not support the bold proposition that the mere purchase of shares after a disclosure renders an investor subject to unique defenses because the *Rocco* court based its ruling on the fact that the named plaintiff had made his post-class-period purchases with personal knowledge of a second, undisclosed fraud. *See Silverman*, 259 F.R.D. at 171–72; *Pfizer*, 282 F.R.S. at 46–47; *see also TreeHouse Foods*, 2020 WL 919249, at *5 (noting that *Rocco* is a minority approach).

Mr. Hogan's reliance on *GAMCO Investors, Inc. v. Vivendi, S.A.*, 927 F. Supp. 2d 88 (SDNY 2013), and *In re Safeguard Scientifics*, 216 F.R.D. 577 (E.D. Pa. 2003), are equally misplaced. As Judge Dow explained in *Treehouse Foods*, both cases "found that post-disclosure purchases defeated typicality and adequacy [only] when combined with a trading strategy that disclaimed reliance on the market price." *TreeHouse Foods*, 2020 WL 919249, at *5 (citing *Safeguard Scientifics*, 216 F.R.D. at 582–83 (plaintiff was day-trader who focused on technical price movements rather than price); *GAMCO Investors*, 927 F. Supp. 2d at 100–102 (plaintiff had separate valuation algorithm unrelated to stock price and did not factor in fraudulent statements)).

Mr. Hogan's other authority is similarly distinguishable. Hogan Resp. 5. In *In re Hebron Tech. Co., Ltd. Sec. Litig.*, No. 20 Civ. 4420 (PAE), 2020 WL 5548856, at *7 n.7 (S.D.N.Y. Sept. 16, 2020), the presumptive lead plaintiff purchased shares during and after a damaging, privately

6

held investor presentation leaked to the market. And in *In re Bally Total Fitness Sec. Litig.*, No. 04C3530, 2005 WL 627960, at *6 (N.D. Ill. Mar. 15, 2005), the presumptive lead plaintiff was an "in-and-out trader" who sold nearly 2 years before the fraud was disclosed.

Given that Mr. Hogan has failed to offer the requisite "proof"—*In re Turquoise Hill Res. Ltd. Sec. Litig.*, No. 20-CV-8585 (LJL), 2021 WL 148752, at *10 (S.D.N.Y. Jan. 15, 2021) (citing 15 U.S.C. 78u-4(a)(3)(iii)(II))—that ACERA, a public pension fund, adopted any trading strategy that disclaims reliance on the market price or had any non-public knowledge, his attacks fail.

ACERA would be remiss if it did not mention that, on behalf of other clients in different cases, Mr. Hogan's counsel and local counsel have both made the counter-argument to that which they are making here and prevailed. *See, e.g.*, *Wilson v. LSB Indus., Inc.*, No. 15 Civ. 7614 (RA) (GWG), 2018 WL 3913115, at *6 (S.D.N.Y. Aug. 13, 2018); *In re: Petrobras Sec. Litig.*, 312 F.R.D. at 360.

### III. MR. HOGAN, WITH SCANT LOSSES AND AN UNSOUND OBJECTION TO ACERA'S LEAD PLAINTIFF MOTION, SHOULD NOT BE APPOINTED CO-LEAD PLAINTIFF

The Court should also reject Mr. Hogan's backdoor attempt to be appointed co-lead plaintiff here despite minimal losses and raising an unpersuasive argument in opposition to ACERA's appointment. ACERA alone has demonstrated that it is the most adequate plaintiff. It did not assent to Mr. Hogan's request, nor has Mr. Hogan shown that "any marginal value he would add would justify the cost and risks of his participation." *Insulet Corp.*, 177 F. Supp. 3d at 625–26 (rejecting a request by an investor represented by Mr. Hogan's counsel here to be appointed co-lead plaintiff in a nearly identical situation where the presumptive lead plaintiff "ha[d] not assented to [the movant's] request" and where appointing a co-plaintiff would "potentially complicat[e] the coordination of th[e] litigation").

### IV. CONCLUSION

For these reasons, ACERA respectfully requests that it be appointed Lead Plaintiff and that its selection of counsel be approved.

Dated:  February 22, 2024

Respectfully submitted,

**BERMAN TABACCO**

By:  */s/ Nicole Lavallee*
       Nicole Lavallee (Admitted *Pro Hac Vice)*

Daniel E. Barenbaum (Admitted *Pro Hac Vice)*
Jeffrey V. Rocha (Admitted *Pro Hac Vice)*
425 California Street, Suite 2300
San Francisco, CA  94104
Telephone: (415) 433-3200
Email: nlavallee@bermantabacco.com
      dbarenbaum@bermantabacco.com
      jrocha@bermantabacco.com

*Counsel for Movant Alameda County Employees'
Retirement Association and Proposed Lead Counsel
for the Class*

**COHEN MILSTEIN SELLERS
   & TOLL, PLLC**
Carol V. Gilden (Ill. Bar No. 6185530)
190 South LaSalle Street, Suite 1705
Chicago, IL 60603
Telephone: (312) 357-0370
Email: cgilden@cohenmilstein.com

*Proposed Liaison Counsel for the Class*