**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| JOHN M. ERWIN, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>vs.<br><br>VERADIGM INC., PAUL M. BLACK, RICHARD J. POULTON, LEAH S. JONES, GRANT THORNTON LLP, *et al.*,<br><br>Defendants. | ) | Case No. 1:23-cv-16205<br><br><u>CLASS ACTION</u><br><br>Hon. Sharon J. Coleman |

**SECOND AMENDED COMPLAINT**

# TABLE OF CONTENTS

I. SUMMARY OF THE ACTION ........ 1

II. JURISDICTION AND VENUE ........ 9

III. PARTIES ........ 10

A. THE LEAD PLAINTIFF – ALAMEDA COUNTY EMPLOYEES' RETIREMENT ASSOCIATION ........ 10

B. THE COMPANY DEFENDANT – VERADIGM INC. ........ 10

C. THE INDIVIDUAL DEFENDANTS ........ 11

D. THE AUDITOR DEFENDANT – GRANT THORNTON LLP ........ 14

IV. BACKGROUND FACTS AND SUMMARY OF THE FRAUDULENT MISCONDUCT ........ 14

A. COMPANY BACKGROUND ........ 14

B. THROUGHOUT THE CLASS PERIOD, THE VERADIGM DEFENDANTS TOUTED ROBUST AND REGULAR GROWTH THROUGH GAAP, NON-GAAP, AND OTHER KEY FINANCIAL METRICS TO ARTIFICIALLY INFLATE VERADIGM'S STOCK PRICE ........ 17

C. TRUTH STARTS TO BE REVEALED ........ 28

1. Veradigm Delays the Filing of Its 2022 Form 10-K, Pointing to Internal Control Deficiencies Stemming From a Newly-Implemented Software Tool That Had "Generated Duplicative Billing" ........ 29

2. Veradigm Admits That Certain 2021 and 2022 Financial Statements "Should No Longer Be Relied Upon Because of Misstatements to the Company's Previously Reported Revenue Resulting From Certain Internal Control Failures" ........ 31

3. Veradigm Delays the Filing of Its Q1 2023 Form 10-Q ........ 33

4. Veradigm Admits That Misstatements Extend Back to 2020; Nasdaq Grants Veradigm 180 Days to Regain Compliance ........ 33

5. Delaying the Filing of Its Q2 2023 Form 10-Q, Veradigm Announces the Need to Restate the 2021 Form 10-K ........ 35

6. Nasdaq Notifies Veradigm of Continued, Broader Non-Compliance; Veradigm Seeks Further Extension of Deadline to Regain Compliance ........ 36

7. Veradigm Receives a Delisting Notice From Nasdaq and Revises Its Expected Cumulative Impact of the Misstatements........ 37

8. In Delaying Filing of Its Q3 2023 Form 10-Q, Veradigm Discloses a Second Independent Investigation—Initiated by the Audit Committee and Relating to "Financial Reporting" and "Internal Controls" ........ 39

9. Nasdaq Notifies Veradigm of Yet Broader Non-Compliance; Veradigm Stops Targeting Specific Dates for the Filing of Its Delinquent 2022 and 2023 Financial Statements........ 41

10. Veradigm's CEO and CFO "Resign" at the Request of Veradigm's Board as a Result of the Audit Committee's "Ongoing Independent Investigation" ........ 42

11. Nasdaq Sets a Deadline of February 27, 2024 to Either Cure Non-Compliance by Filing Delinquent SEC Filings or Face Delisting ........ 43

12. Veradigm Reports Information About the Audit Committee Investigation Into "Financial Reporting" and "Internal Controls" to the SEC, and Discloses Further Nasdaq Non-Compliance ........ 43

13. A Year Into Its Investigations and Without Having Filed Delinquent or Restated Financials, Veradigm Common Stock is Halted From Trading on Nasdaq During the Delisting Process After Missing the Compliance Deadline........ 45

14. With Mounting Problems and Investigations, and Delinquent Restated and Yet-To-Be-Issued SEC Filings, Veradigm Delays the Filing of Its 2023 Form 10-K. ........ 46

15. Veradigm (MDRX) is Delisted From Nasdaq........ 48

16. Veradigm Delays the Filing of Its Q1 2024 Form 10-Q ........ 48

17. Veradigm Delays the Filing of Its Q2 2024 Form 10-Q ........ 50

18. While Delaying the Filing of Its Q3 2024 Form 10-Q, Veradigm Discloses That "Other Matters Relating to Its Internal Controls Over Financial Reporting and Disclosure Controls" Are Being Reviewed........ 51

19. More Than Two Years After First Announcing Internal Control Issues, and with All Delinquent Restated and Delayed SEC Filings

Yet to Be Issued, Veradigm Delays the Filing of Its 2024 Form 10-K and Extends Restatements to Include 2020 .......... 52

20. Veradigm Announces Its Anticipated Restatement Financial Statements and Its 2022 Form 10-K .......... 54

21. Veradigm Files Its 2022 Form 10-K With Restated Financials—a Filing That Provides Guidance Into the Nature, Scope, and Magnitude of the Material Misrepresentations Made .......... 55

22. After Issuing Its Restatement, Veradigm Dismisses Its Auditor, Grant Thornton .......... 59

D. THE VERADIGM DEFENDANTS' FRAUDULENT CONDUCT .......... 59

1. Despite Their Duty to Ensure That Veradigm Had Effective Internal Controls, the Company's Controls Were Materially and Deeply Deficient .......... 59

a. As They Acknowledged, Veradigm Defendants Were Required to Ensure That Veradigm's Internal Controls Were Effective .......... 59

b. As Veradigm Admits in the Restatement, the Company's Internal Controls Were Ineffective and Materially Deficient .......... 68

2. These Extensive and Material Internal Control Deficiencies Allowed Veradigm Defendants to Issue Materially False and Misleading Financials That Violated GAAP .......... 70

a. The Veradigm Defendants Were Responsible for Preparing Financials in Compliance with GAAP .......... 71

b. Restatements Are Made to Correct Errors .......... 72

c. The Veradigm Defendants Violated Key FASB Rules, Requiring Restatement of the Admitted False Financials .......... 75

d. The Veradigm Defendants' Revenue Manipulations Allowed the Company to Beat Revenue Consensus Estimates in All but One of the Quarters for Which It Has Provided Sufficient Information to Evaluate This .......... 81

e. Defendant's Earnings Manipulations Allowed the Company to Beat Non-GAAP EPS Consensus Estimates in All but One of the Quarters during the Three Respective Quarters Ended September 30, 2022 .......... 82

f. Veradigm Defendants Misled Investors Regarding Both the Growth and Profitability of the Veradigm Segment...................... 83

3. These Material Deficiencies and Financial Misstatements Had, and Continue to Have, Significant and Material Impact on Veradigm............ 85

V. THE VERADIGM DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS .............................................................................................. 89

A. THE VERADIGM DEFENDANTS ISSUED MATERIALLY FALSE AND MISLEADING STATEMENTS REGARDING VERADIGM'S INTERNAL CONTROLS........................................................................ 90

B. THE VERADIGM DEFENDANTS ISSUED MATERIALLY FALSE AND MISLEADING STATEMENTS REGARDING ITS COMPLIANCE WITH GAAP AND FINANCIAL RESULTS ........................................................... 105

1. The Veradigm Defendants Issued Materially False and Misleading Statements Regarding Compliance with GAAP, Including Recently-Implemented ASC 606 ............................................................... 105

2. Having Failed to Comply with GAAP, and Having Failed to Maintain Effective Internal Controls, Veradigm Defendants' Class Period Financial Statements and Related Comments Were Materially False and Misleading ..................................................................117

a. Summary of the Restated Figures ...............................................117

b. The Materially False and Misleading Statements Regarding the Financial Figures and Performance...................................... 122

VI. ADDITIONAL ALLEGATIONS OF THE VERADIGM DEFENDANTS' SCIENTER ............................................................................................... 169

A. THE INDIVIDUAL DEFENDANTS' ROLE IN THE IMPLEMENTATION, REVIEW, AND MAINTENANCE OF VERADIGM'S ADMITTED DEFICIENT INTERNAL CONTROLS AND DISCLOSURE CONTROLS, AND PROCEDURES STRONGLY SUPPORTS AN INFERENCE OF SCIENTER ................................................ 169

B. THE NATURE, SCOPE, AND MAGNITUDE OF THE DEFICIENCIES IN BOTH THE INTERNAL CONTROLS AND DISCLOSURE CONTROLS AND PROCEDURES FURTHER BOLSTER A FINDING OF SCIENTER ........................................................................................... 172

C. THE EXTENT OF THE RESTATEMENT FURTHER BOLSTERS A FINDING OF SCIENTER.................................................................... 177

D. THE FACT THAT THE BOARD FORCED POULTON AND JONES TO "RESIGN" WITHOUT INCENTIVE PAY AFTER LEARNING OF THE AUDIT COMMITTEE'S FINDINGS, INCLUDING FINDINGS OF IMPROPER CONDUCT BY THEN SENIOR MANAGEMENT, STRONGLY SUPPORTS AN INFERENCE THAT THEY ACTED WITH SCIENTER ........ 177

E. THE AUDIT COMMITTEE'S DISCLOSURE OF ITS FINDINGS TO THE SEC AND THE SEC'S INVESTIGATION STRONGLY SUPPORTS AN INFERENCE OF SCIENTER........ 178

F. INDIVIDUAL DEFENDANTS WERE MOTIVATED TO ARTIFICIALLY INFLATE THE STOCK PRICE TO SIGNIFICANTLY INCREASE STOCK-SALE PROCEEDS DURING THE CLASS PERIOD........ 179

G. INDIVIDUAL DEFENDANTS WERE MOTIVATED TO ISSUE THE MATERIALLY FALSE AND MILEADING STATEMENTS BY THEIR COMPENSATION PACKAGES........ 184

1. Compensation Based on Company and Individual Performance ........ 185

2. Adjustments to Bonus Accruals Caused by the Restatement........ 187

VII. GRANT THORNTON KNOWINGLY AND/OR RECKLESSLY VIOLATED THE EXCHANGE ACT BY FAILING TO COMPLY WITH AUDITING STANDARDS AND ISSUING CLEAN AUDIT REPORTS THAT CONTAINED MATERIALLY FALSE AND MISLEADING STATEMENTS........ 188

A. AS THE GATEKEEPER PROTECTNG VERADIGM'S INVESTORS, GRANT THORNTON WAS REQUIRED TO COMPLY WITH PCAOB AUDITING STANDARDS ........ 189

B. GRANT THORNTON VIOLATED THE PCAOB AUDITING STANDARDS IN CONDUCTING ITS AUDITS FOR VERADIGM ........ 191

1. PCAOB Standards Applicable to Grant Thornton's Internal Control Audits........ 191

2. PCAOB Standards Applicable to Grant Thornton's Financial Statement Audits ........ 193

3. Grant Thornton Violated Applicable PCAOB Rules in Issuing Clean Audit Reports as Evidenced by Various Red Flags and Other Facts ........ 195

a. The Red Flags ........ 195

b. Other Facts ........ 198

4. These Red Flags and Other Facts Support a Finding That Grant Thornton Violated PCAOB Rules ..... 201

C. GRANT THORNTON'S CLASS PERIOD STATEMENTS WERE MATERIALLY FALSE AND MISLEADING ..... 210

1. Grant Thornton's 2020 Audit Reports ..... 210

2. Grant Thornton's 2021 Audit Reports ..... 213

3. Grant Thornton's Class Period Audit Reports Were Materially False and Misleading ..... 215

a. Grant Thornton' Statements That It Conducted Its Audits in Conformity with PCAOB Guidelines Were Materially False and Misleading ..... 215

b. Grant Thornton's Statements Regarding Veradigm's Internal Controls Were Materially False and Misleading ..... 216

c. Grant Thornton's Statements Regarding Veradigm's Financial Statements Were Materially False and Misleading ..... 219

VIII. LOSS CAUSATION ..... 220

IX. APPLICATION OF THE PRESUMPTION OF RELIANCE ..... 225

X. CLASS ACTION ALLEGATIONS ..... 228

XI. NO SAFE HARBOR ..... 230

XII. COUNTS ..... 231

XIII. PRAYER FOR RELIEF ..... 234

XIV. DEMAND FOR TRIAL BY JURY ..... 235

## DEFINED TERMS AND OTHER KEY TERMS

**LEAD PLAINTIFF:**

| | |
|---|---|
| Lead Plaintiff or ACERA | Alameda County Employees' Retirement Association |

**VERADIGM DEFENDANTS:**

| | |
|---|---|
| Veradigm or Company | Veradigm Inc., which was formerly known as Allscripts until January 2023 |
| Black | Paul M. Black |
| Poulton | Richard J. Poulton |
| Jones | Leah S. Jones |
| Individual Defendants | Collectively, Black, Poulton, and Jones |

**AUDITOR DEFENDANT:**

| | |
|---|---|
| Grant Thornton | Grant Thornton LLP |

**OTHER KEY ENTITIES:**

| | |
|---|---|
| Altera | Altera Digital Health Inc. (f/k/a/ Harris Dawn Holdings Inc.), a wholly owned subsidiary of Ontario corporation Constellation Software Inc. |

**INVESTIGATIONS:**

| | |
|---|---|
| Restatement Review | Detailed in the Restatement, Veradigm's first evaluation and review of certain accounting and internal control matters, resulting in certain restatement adjustments |
| Audit Committee Investigation | The second investigation detailed in the Restatement, an independent investigation conducted by the Audit Committee of the Board into matters relating to Veradigm's financial reporting and internal controls |

| | |
|---|---|
| Internal Review | Detailed in the Restatement, the third investigation, an internal review that Veradigm conducted, engaging counsel as well as forensic and technical accountants to re-evaluate certain accounting transactions and scouting practices identified as part of the Audit Committee Investigation, as well as to conduct additional review |
| Investigations | Collectively, Restatement Review, Audit Committee Investigation, and Internal Review |

**OTHER KEY TERMS:**

| | |
|---|---|
| Admitted False Financial Statements | – Q1 2020 Form 10-Q<br>– Q2 2020 Form 10-Q<br>– Q3 2020 Form 10-Q<br>– 2020 Form 10-K<br>– Q1 2021 Form 10-Q<br>– Q2 2021 Form 10-Q<br>– Q3 2021 Form 10-Q<br>– 2021 Form 10-K<br>– Q1 2022 Form 10-Q<br>– Q2 2022 Form 10-Q<br>– Q3 2022 Form 10-Q |
| AS | PCAOB Auditing Standards |
| ASC 326 | Accounting Standards Codification Topic 326, *Financial Instruments – Credit Losses*, issued by FASB |
| ASC 606 | Accounting Standards Codification Topic 606, *Revenue from Contracts with Customers*, issued by FASB |
| Board | Veradigm Board of Directors |
| Cash Bonus | Cash incentive bonus opportunities for named executive officers |
| CEO | Chief Executive Officer |
| CFO | Chief Financial Officer |
| Class Period | May 8, 2020 and January 26, 2024, inclusive |
| Class Period Audit Reports | Grant Thornton LLP's audit reports for the years ended December 31, 2020 and December 31, 2021 |

| | |
|---|---|
| EBITDA | Earnings Before Interest, Taxes, Depreciation, and Amortization |
| EHR | Electronic health records |
| EPS | Earnings per share |
| Exchange Act | Securities Exchange Act of 1934, 15 U.S.C. § 78(a) et seq. |
| FASB | Financial Accounting Standards Board |
| Form 4 | Statement of changes in beneficial ownership of securities pursuant to Section 16(a) of the Securities Exchange Act of 1934 filed with the SEC |
| Form 10-K | Annual Report pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934 filed with the SEC |
| Form 10-Q | Quarterly Report pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934 filed with the SEC |
| Form 8-K | Current Report pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934 filed with the SEC |
| Form 12b-25 or Notification of Late Filing | Notification of Late Filing pursuant to Rule 12b-25 (17 CFR 240.12b-25) of the Securities Exchange Act of 1934 filed with the SEC |
| FY | Fiscal Year |
| GAAP | Generally Accepted Accounting Principles |
| Non-GAAP metrics | Financial performance measures reported by companies that are not defined by GAAP, and can be adjusted by excluding or including certain items from the most directly comparable GAAP measure |
| March 18, 2025 Audit Report | Grant Thornton LLP's March 18, 2025 Audit Report |
| Gross Margin | A profitability measure consisting of the percentage of revenue left over after subtracting the company's direct costs |
| HLPP | Veradigm's *Hospitals and Large Physician Practices* business segment |

| | |
|---|---|
| Item 308 | Item 308 of SEC Regulation S-K, 17 CFR § 229.308(a)(3) |
| Other Key Financial Metrics | Certain quantifiable indicators that assess and evaluate a company's financial performance, health, and stability |
| Nasdaq | The Nasdaq Global Select Market exchange |
| OTC | Over-the-counter |
| PCAOB | Public Company Accounting Oversight Board |
| PCAOB Auditing Standards | Auditing Standards of the Public Company Accounting Oversight Board |
| PCAOB Inspection Reports | Inspections of Grant Thornton LLP by the Public Company Accounting Oversight Board pursuant to the Sarbanes-Oxley Act of 2002 |
| PSU | Preferred stock unit |
| Q1, Q2, Q3, Q4 | Refers to the fiscal year "first quarter," "second quarter," "third quarter," and "fourth quarter," respectively |
| Remediation Plan | The remediation plan identified and outlined in the 2022 Form 10-K with restated financials that the Company's management, with oversight from the Audit Committee, has developed and is implementing |
| Restatement | The Restatements of the Admitted False Financial Statements (published in the 2022 Form 10-K filed on March 18, 2025) |
| RSU | Restricted stock unit |
| Rule 10b-5 | SEC Rule 10b-5, 17 C.F.R. § 240.10b-5 |
| SEC | U.S. Securities and Exchange Commission |
| SOX or Sarbanes-Oxley | Sarbanes-Oxley Act of 2002, 15 U.S.C. § 7241 |
| SOX Certification | Quarterly and annual certification by the CEO and CFO under Sarbanes-Oxley Act of 2002 that they established and maintained disclosure controls and internal controls, disclosed any material weakness in internal controls and that, to the best of their knowledge, the financials fairly |

| | |
|---|---|
| | present the financial condition and operations of the company |
| YE | Year ended |

Lead Plaintiff Alameda County Employees' Retirement Association ("Lead Plaintiff" or "ACERA"), by and through its attorneys, and on behalf of all others similarly situated, alleges the following upon information and belief, except as to those allegations concerning Plaintiff, which are alleged upon personal knowledge. Plaintiff's information and belief are based on, among other things, their counsel's investigation, which includes without limitation: (a) a review and analysis of U.S. Securities and Exchange Commission ("SEC") filings by Veradigm Inc. ("Veradigm" or the "Company")[1]; (b) a review and analysis of press releases, earnings conference call transcripts, and other public statements; (c) a review and analysis of securities analyst reports, media reports, and published insights about the Company; and (d) consultation with consulting experts.

## I. SUMMARY OF THE ACTION

1. Lead Plaintiff brings claims for violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. §§ 78j(b) and 78t(a) (the "Exchange Act"), and the rules and regulations promulgated thereunder, including SEC Rule 10b-5, 17 C.F.R. § 240.10b-5 ("Rule 10b-5") against Veradigm; its former officers, Paul M. Black ("Black"), Richard J. Poulton ("Poulton"), and Leah S. Jones ("Jones") (collectively, "Individual Defendants", and with Veradigm, the "Veradigm Defendants"); and its former auditor, Grant Thornton LLP ("Grant Thornton" or "Auditor Defendant"). Lead Plaintiff asserts these claims individually and on behalf of investors who purchased or otherwise acquired common stock of Veradigm between May 8, 2020 and January 26, 2024, inclusive (the "Class Period"), and were damaged as a result (the "Class").

[1] Veradigm was formerly known as Allscripts Healthcare Solutions, Inc. ("Allscripts") until March 2022. For clarity and ease of reference, when referring to the Company, Plaintiff refers to "Veradigm" irrespective of the date.

2. Veradigm is a national healthcare technology company founded in 1986. Until its delisting was announced on February 28, 2024, Veradigm's common stock traded on the Nasdaq Global Select Market stock exchange ("Nasdaq").

3. This case arises out of a two-plus year odyssey—one that started in February of 2023 with Veradigm delaying the filing of its 2022 Form 10-K and culminating in the filing on March 18, 2025 of that Form 10-K with restated financials for nearly three years ("Restatement"). The problems sprouted and spread out like weeds from the seeds of broadly deficient (if not absent) internal controls that led to the need to restate the financial results for FY 2020, FY 2021, and each quarter of 2020, 2021, and 2022.

4. Indeed, in Veradigm's recent 2022 Form 10-K with restated financials, the Company articulated the severity of the problem and the impact of its misstated financials for those three years:

> The failures in internal controls and associated restatements of the financial statements for the Affected Periods have … ***negatively affected investor confidence in our management and the accuracy of our financial statements and disclosures***. ***This has had a negative effect on the price of our Common Stock, adversely affected our business, financial condition and operating results and resulted in the other risks and*** uncertainties….[2]

In that same recent restatement filing, the Company identified 23 specific remediation steps that needed to be implemented, including developing a stronger control environment and designing and implementing entirely new controls. Despite the efforts to date, most of these remediation steps are not expected to be completed until 2026.

5. The Veradigm Defendants exploited these internal control deficiencies quarter after quarter during those restated quarters and years to tout strong financial results under Generally

[2] 2022 Form 10-k, at 17; all emphasis is added and internal quotations omitted unless otherwise noted.

Accepted Accounting Principles ("GAAP") and Non-GAAP metrics and build a narrative of Company growth and momentum for investors and analysts.[3] They did so while attesting to working and comprehensive internal controls. Meanwhile, Grant Thornton eschewed its responsibilities as gatekeepers by issuing unqualified, clean audit reports affirming the efficacy of Veradigm's internal controls and that Veradigm's financial statements fairly presented the financial position of the Company, thereby providing the necessary assurances to investors. The market embraced those assurances and that narrative, and the common stock traded accordingly.

6. But on February 28, 2023, Veradigm made an announcement calling into question the strength and veracity of previously-reported results and revealing that the Company had identified internal control failures stemming from the implementation of a revenue recognition software tool over the prior year and a half that had generated duplicative billing transactions and other errors impacting financial results, and that the Company was thus delaying the filing of its 2022 Annual Report on SEC Form 10-K by at least 15 days.

7. In fact, that 2022 Form 10-K remained unfiled for not 15 days, but rather for over two years—years where the Company filed no SEC reports on Forms 10-K and 10-Q. In those two years, the Veradigm Defendants also confirmed the certain SEC-filed financial statements on Forms 10-K and 10-Q—ultimately for 2020, 2021, and the first three quarters of 2022 ("Admitted False Financial Statements")—could not be relied upon and would need to be restated. The Company further filed Forms 12b-25 with the SEC announcing that financial reports coming due on Forms 10-K and 10-Q would be delayed.

[3] Non-GAAP metrics are financial performance measures reported by companies that are not defined by GAAP, and can be adjusted by excluding or including certain items from the most directly comparable GAAP measure.

8. The silence created by the lack of reported results was deafening, and the ongoing delay without cure went unexplained. In fact, the breadth of the inquiry and the severity of internal-control and revenue-recognition problems ballooned. The need to investigate and restate led to not one or two, but three separate and unrelated internal investigations:

a. Restatement Review: An initial investigation was launched as a result of the restatement announcement into the double-billing internal-control issues, which included "an analysis of our historical financial statements, accounting policies, and financial reporting, as well as our disclosure controls and procedures and our internal control over financial reporting and was conducted with the assistance of third-party forensic and technical accountants." (the "Restatement Review")

b. Audit Committee Investigation: That Restatement Review led to a second, unrelated Audit Committee investigation later that year "relating to the Company's financial reporting, internal controls over financial reporting, and disclosure controls," where outside counsel and forensic auditors were retained. (the "Audit Committee Investigation")

c. Internal Review: Issues raised as part of the Audit Committee Investigation then led to a third, unrelated investigation in 2024 and 2025, which required bringing in outside counsel and forensic and technical accountants to, among other things, evaluate "each such transaction or accounting practice to determine among other things, whether any such transaction or practice may have had a material financial reporting impact. As part of the Company's Internal Review, other accounting matters were also evaluated,

focused on identifying transactions recognized in a manner that may have been inconsistent with GAAP…." (the "Internal Review")

9. The severity and expanding nature of the issues identified were further highlighted by three separate events:

a. First, the Audit Committee Investigation led to the Company's Board-of-Directors ("Board") demanding the resignation in December 2023 of the then-chief executive officer ("CEO"), Defendant Poulton, and then-chief financial officer ("CFO"), Defendant Jones. Defendant Black had already resigned from the Company, where, prior to Poulton, he had been CEO for most of the Class Period with Poulton as his CFO.

b. Second, Nasdaq announced the delisting of Veradigm's common stock on February 28, 2024, and halted trading immediately thereafter, on February 29, 2024.

c. And third, Veradigm voluntarily reported "information concerning the Audit Committee Investigation" to the SEC and later acknowledged that the SEC had opened an investigation into the matter and that the Company, under new management, was cooperating with it.

10. As critical information shedding light on the truth was disclosed during this two-year period, investors reacted. For example, after the Company disclosed Poulton's and Jones's forced resignations, shares the next day closed down $2.52, or more than 20%. And after announcing the Nasdaq delisting, shares closed down the next day $0.79, or over 10%, and the following day $0.82, or over an additional 12%. All told, after the two-plus years within which the truth came partially to light and following significant partial corrective disclosures, Veradigm's

stock price fell from a Class Period high of $23.25 to $4.43 on March 20, 2025. On April 29, 2025, the stock closed at $4.22.

11. Finally, on March 18, 2025, over two years after making its initial February 2023 announcement identifying internal control and revenue recognition issues, Veradigm released its long-delayed 2022 Form 10-K, which contained restated financials for 2020, 2021, and the first three quarters of 2022. The misstatements that had been identified through the three investigations and two years of work were ***broad*** and ***far-reaching***.

12. Both the financial results reported in the 2022 Form 10-K with restated financials and the restatement narrative contained therein ***were admissions by Veradigm***—admissions that the Company lacked widespread, material and key internal controls, admissions that it recognized *revenue* improperly and not in accordance with GAAP, and, therefore, admissions that Veradigm Defendants' statements to the contrary were false and misleading.

13. Those misstatements regarding internal control and GAAP compliance, as well as the financial results reported, were both <u>quantitatively</u> and <u>qualitatively</u> material:

14. <u>Quantitatively</u>, many restated results impacted previously-reported metrics by well more than a starting-point threshold of 5%. For example:

a. On the restated *balance sheet* for those years, *accounts receivables* was affected by 6.0%, 16.6%, and 48.1% for the year ended ("YE") 2020, YE 2021, and Q1-Q3 2022, respectively; *contract assets* was affected by 40.3%, 45.7%, and 17.3% for YE 2020, YE 2021, and Q1-Q3 2022, respectively; and *deferred revenue* was affected by 25.6% and 59.9% for YE 2021 and Q1-Q3 2022, respectively. Indeed, *long-term deferred*

*revenue* was affected by 3,371.0% and 2,269.4% for YE 2020 and YE 2021, and fully eliminated for Q1-Q3 2022.

b. On the restated *statement of operations* for those years, *income (loss) from operations* was affected by 15.8% and 248.6% for YE 2021 and Q1-Q3 2022, respectively; *income (loss) from continuing operations before income taxes* was affected by 6.7% and 142.8% for YE 2021 and Q1-Q3 2022, respectively; and *other income (loss)* was affected by 107.1% and 116.4% for YE 2020 and Q1-Q3 2022, respectively. Remarkably, *net income (loss)* was affected by 55.5% for Q1-Q3 2022.

15. Qualitatively, the restated financials and misrepresentations associated with them were undoubtedly material. For misstatements about having and utilizing appropriate internal controls, the Veradigm Defendants admitted a lack and failure of internal controls relating to revenue recognition, restated three years of financials, devised a multitude of remediation efforts still yet to have been implemented, and have yet to file eight long-delinquent annual and quarterly statements for all of 2023 and 2024.

16. And statements about GAAP compliance as well as the GAAP and Non-GAAP Financial Reporting were also qualitatively material because, among other reasons:

a. Veradigm Defendants held out certain GAAP, Non-GAAP, and other key metrics ("Other Key Financial Metrics")[4] as critical—e.g., *GAAP revenue*, *gross margins*, *earnings before interest, taxes, depreciation, and amortization* ("*EBITDA*"), and *earnings per share ("EPS")*, among others.

[4] Other Key Financial Metrics are quantifiable indicators that assess and evaluate a company's financial performance, health, and stability.

b. Analysts focused on these metrics and results, and the market reacted accordingly.

c. The CEO and CFO were forced to resign by the Board, Nasdaq delisted Veradigm Common Stock, and the SEC opened an investigation into Veradigm based on the Company's own voluntary reporting to the agency.

d. The Company admitted that the depth of its internal control deficiencies (which required three separate internal investigations) was one of the reasons it took over 24 months to prepare the 2022 Form 10-K, which included the restated financials for 2020 through 2022. Indeed, as a result of the restatement, the Company's previously reported net income for periods prior to January 1, 2020 was overstated by $48.5 million.

17. The Individual Defendants had direct responsibility for the design and implementation of the internal controls, which were incomplete and non-working. Instead of protecting the veracity of the reported results and safeguarding the common stock investors as they were required to do, the Individual Defendants profited off of the misrepresentations. They engaged in suspiciously-timed stock sales made at inflated prices. And the misstatements boasted metrics used to increase the Individual Defendants' bonus compensation, such as *Non-GAAP EPS* and completed corporate sales and purchases for which they knew they would receive bonuses. In fact, the Company admitted that a lack of internal controls over bonusing caused overpayment of bonuses. In the 2022 Form 10-K with restated financials, the Company reported an internal-control error related to compensation:

> "Bonus Accruals: The Company did not consistently maintain effective internal controls over financial reporting with respect to the accurate recording, accounting for, and presentation of annual corporate performance bonus accruals, which in certain instances, ***resulted in***

> ***quarterly bonus accrual amounts being adjusted and recorded based on management's inappropriate exercise of judgment."***

The Company further announced the implementation of a remediation effort to target that issue: "designing and implementing additional internal controls … in accounting for bonus accruals."

18. All told, Veradigm's admissions here together with the scope of the restatements are damning. Investors were substantially injured by actions of the Veradigm Defendants and Grant Thornton, and they seek to recover under the Exchange Act for the material misrepresentations made regarding internal controls, GAAP compliance, and financial results.

## II. JURISDICTION AND VENUE

19. Lead Plaintiff's claims arise under Sections 10(b), 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b), 78t(a), and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. § 240.10b-5.

20. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act, 15 U.S.C. § 78aa. This Court has jurisdiction over Defendants because each Defendant has sufficient minimum contacts with this district, particularly since Veradigm's and Grant Thornton's principal places of business are both located in Chicago, Illinois.

21. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act because many of the false and misleading statements were made in or issued from this district. Many of Defendants' acts and practices that give rise to this complaint substantially occurred in this district.

22. In connection with the acts, conduct, and other wrongs that Lead Plaintiff alleges, Defendants, directly and indirectly, used the means and instrumentalities of interstate commerce,

including, but not limited to, the United States mail, interstate telephone communications, and national securities markets.

## III. PARTIES

### A. THE LEAD PLAINTIFF – ALAMEDA COUNTY EMPLOYEES' RETIREMENT ASSOCIATION

23. Established in 1947 and operational January 1948, ACERA is a public pension fund that provides retirement, disability, and death benefits for Alameda County public employees, serving more than 26,000 members and 6 employers, including employees of the County of Alameda and other local agencies. It is headquartered at 475 14th Street, Suite 1000, Oakland, California 94612. As of March 31, 2025, ACERA had a total of $12.0 billion in assets under management. As set forth in its Certification attached as Exhibit 1, ACERA purchased Veradigm common stock during the Class Period and was damaged as a result.

### B. THE COMPANY DEFENDANT – VERADIGM INC.

24. Defendant Veradigm is a healthcare technology company that provides point-of-care clinical and financial services to healthcare providers. Formerly known as Allscripts Healthcare Solutions, Inc., the Company was formed in 1986 and incorporated under the laws of Delaware. Veradigm's headquarters are located at 222 W Merchandise Mart Plaza, Chicago, Illinois 60654.

25. Veradigm's stock traded on Nasdaq under the symbol "MDRX" during the Class Period until its delisting was announced on February 28, 2024, and it ceased trading the next day. After being delisted and through the date of this complaint, Veradigm's common stock traded on the over-the-counter ("OTC") Expert Market Exchange.

**C. THE INDIVIDUAL DEFENDANTS**

26. Defendant Black was Veradigm's CEO and President from December 19, 2012 through May 5, 2022, and served on the Company's Board of Directors from May 16, 2012 through June 20, 2022. After resigning as CEO, Black continued as an Executive Consultant to the Company through June 30, 2022.

27. Defendant Poulton was Veradigm's CFO from March 3, 2020 through May 6, 2022, its CEO from May 6, 2022 until December 6, 2023, and a board member from June 21, 2022 through December 6, 2023. Prior to becoming CFO in March 2020, Poulton had been Vice President from October 29, 2012 to September 30, 2015, and President from October 1, 2015 to May 6, 2022. On December 8, 2023, the Board requested his resignation as a direct result of the Audit Committee Investigation.

28. Defendant Jones was Veradigm's CFO and principal accounting officer from May 6, 2022 until December 6, 2023, when the Board requested her resignation as a direct result of the Audit Committee Investigation. Prior to her appointment as CFO, Jones had served in a variety of capacities starting in January 2011, most recently as Senior Vice President and General Manager of the Company's Ambulatory business unit from January 2020 to May 6, 2022.

29. Defendants Black, Poulton, and Jones are collectively referred to as the "Individual Defendants." The Individual Defendants, together with Veradigm, are collectively referred to as the "Veradigm Defendants."

30. As senior officers and controlling persons of a publicly-held company whose securities were, during the relevant time, registered with the SEC pursuant to the Exchange Act and traded on Nasdaq or OTC, the Individual Defendants each had a duty to promptly disseminate accurate and truthful information with respect to the Company's operations and business, and to correct any previously issued statements that were or had become materially misleading or untrue,

so that the market price of the Company's publicly-traded securities would be based upon truthful and accurate information. Moreover, as CEO and/or CFO, the Individual Defendants were responsible for establishing and maintaining adequate internal control over financial reporting that provides reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external reporting purposes in accordance with GAAP. They were required to review and evaluate the effectiveness of those controls quarterly.

31. The Individual Defendants, because of their positions of control and authority as senior executive officers, were able to and did control the contents of the Company's reports to the SEC, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors, *i.e.*, the market. During their tenure, each of the Individual Defendants participated in the management of the Company and was directly involved in the day-to-day operations of the Company at the highest levels.

32. Indeed, the Individual Defendants participated in drafting, preparing, and/or approving the financial statements and public communications complained of herein. Moreover, they each signed certain of the quarterly Forms 10-Q and annual Forms 10-K that contained materially false and misleading statements during the Class Period. Specifically, (a) Black signed the 2020 Form 10-K and 2021 Form 10-K; (b) Poulton signed the Q1 2020 Form 10-Q, Q2 2020 Form 10-Q, Q3 2020 Form 10-Q, 2020 Form 10-K, Q1 2021 Form 10-Q, Q2 2021 Form 10-Q, Q3 2021 Form 10-Q, 2021 Form 10-K, and Q1 2022 Form 10-Q; and (c) Jones signed the Q1 2022 Form 10-Q, Q2 2022 Form 10-Q, and Q3 2022 Form 10-Q. In addition, they each made statements and representations in certain earnings calls with analysts during the Class Period. Specifically, (a) Black made statements in the Q2 2021 earnings call, Q3 2021 earnings call, FY 2021 earnings call, and Q1 2022 earnings call, and spoke and participated in the Q1 2020 earnings call, Q2 2020

earnings call, Q3 2020 earnings call, FY 2020 earnings call, and Q1 2021 earnings call; (b) Poulton made statements in the Q1 2020 earnings call, Q2 2020 earnings call, Q3 2020 earnings call, FY 2020 earnings call, Q1 2021 earnings call, Q2 2021 earnings call, Q3 2021 earnings call, FY 2021 earnings call, Q1 2022 earnings call, and Q3 2022 earnings call, and spoke and participated in the Q2 2022 earnings call; and (c) Jones made statements in the Q2 2022 earnings call and Q3 2022 earnings call.

33. Moreover, pursuant to the Sarbanes-Oxley Act of 2002 ("Sarbanes-Oxley" or "SOX"), each signed and certified false and misleading certifications pertaining to the Company's compliance with GAAP and the efficiency of its internal controls ("SOX Certifications") during the Class Period. Specifically, (a) Black signed the Q1 2020 SOX Certification, Q2 2020 SOX Certification, Q3 2020 SOX Certification, FY 2020 SOX Certification, Q1 2021 SOX Certification, Q2 2021 SOX Certification, Q3 2021 SOX Certification, and FY 2021 SOX Certification; (b) Poulton signed the Q1 2020 SOX Certification, Q2 2020 SOX Certification, Q3 2020 SOX Certification, FY 2020 SOX Certification, Q1 2021 SOX Certification, Q2 2021 SOX Certification, Q3 2021, SOX Certification, FY 2021 SOX Certification, Q1 2022 SOX Certification, Q2 2022 SOX Certification, and Q3 2022 SOX Certification; and (c) Jones signed the Q1 2022 SOX Certification, Q2 2022 SOX Certification, and Q3 2022 SOX Certification.

34. The Individual Defendants' wrongdoing during the Class Period alleged herein violated their specific responsibilities and obligations regarding the accuracy of the public reports, releases, and other statements. Accordingly, each of the Individual Defendants is liable, directly and as control persons, for the dissemination of materially false and misleading statements regarding revenue growth and related financial results, GAAP compliance, and efficiency of

Veradigm's internal controls that deceived purchasers of Veradigm's common stock during the Class Period.

35. In engaging in the wrongdoing alleged herein, including making the statements complained of herein, the Individual Defendants, who were senior officers and controlling persons of Veradigm, were acting on behalf of the Company in the regular course of business. Therefore, each of the statements made by the Individual Defendants is attributable to the Company.

### D. THE AUDITOR DEFENDANT – GRANT THORNTON LLP

36. Grant Thornton LLP, located in Chicago, Illinois, served as Veradigm's independent registered public accounting firm from 2014 through April 14, 2025. During its tenure as auditor, it was responsible for auditing the Company's financial statements and internal control over financial reporting. During the Class Period, Grant Thornton (a) issued unqualified, clean audit reports regarding FY 2020 and FY 2021 as to both the efficacy of Veradigm's internal control over financial reporting and the fairness with which Veradigm presented its financial statements; and (b) represented that it had performed its audits in accordance with the auditing standards of the Public Company Accounting Oversight Board ("PCAOB Standards"). Indeed, it issued unqualified, clean audit reports every year since it first audited Veradigm's 2014 financial statements. Grant Thornton consented to the incorporation by reference of its unqualified audit reports on the Company's financial statements and on management's assessment of internal controls in Veradigm's Forms 10-K and Forms S-8.

## IV. BACKGROUND FACTS AND SUMMARY OF THE FRAUDULENT MISCONDUCT

### A. COMPANY BACKGROUND

37. Veradigm is a healthcare technology company that offers electronic health records ("EHR"), financial management, population health management, and consumer solutions to over

300,000 U.S. healthcare providers via its "Veradigm Network." Through its significant healthcare provider-base, the Veradigm Network provides life science and health plan organizations access to de-identified patient data, provider connectivity, and analytics at scale.

38. Starting in Q3 2021, Veradigm reported its structure as operating two primary business segments: (i) the *Hospitals and Large Physician Practices* ("*HLPP*") segment and (ii) the *Veradigm* segment.

39. The *HLPP* segment, sold by Veradigm in May 2022 to Altera Digital Health Inc. (f/k/a/ Harris Dawn Holdings Inc.) ("Altera"), generated revenue through "the sale of integrated clinical and financial[-]management solutions, which primarily included EHR-related software, related installation, support and maintenance, outsourcing[,] and private cloud[-]hosting" services.[5] Before it was sold, this segment contributed what was reported to be $927 million of revenue in FY 2021, accounting for approximately 62% of the Company's total reported revenue for that year.

40. Throughout the Class Period, Veradigm described the *Veradigm* segment as "an integrated data systems and services business that combines data-driven clinical insights with actionable tools…."[6] The *Veradigm* segment derived its revenue from payer and life sciences solutions as well as the sale of software (as either a direct license sale or under a subscription delivery model)—both applications for patient engagement and EHR software to single-specialty and small- to mid-sized physician practices. In addition, Veradigm recorded revenue from various other client services (such as installation) and managed services (such as outsourcing, private cloud hosting, and revenue cycle management). The *Veradigm* segment generated what was reported to

[5] Q3 2022 Form 10-Q, at 27.

[6] *See, e.g.*, 2021 Form 10-K, at 5.

be $552 million in revenue in FY 2021, which was approximately 37% of the Company's total reported revenue for that year.

41. Starting with financial reporting for Q3 2021 on November 4, 2021, Veradigm transitioned to reporting by the aforementioned business segments—*HLPP* and *Veradigm*. The Company was focused on selling off its parts. While the reporting shift was framed by the Company as a way to offer transparency and highlight growth and momentum in the *Veradigm* segment, the timing of the reporting change from company-wide to segment was notable after the fact for having been implemented in the months leading up to the sale of the *HLPP* segment—a time where it was in the Company's strong interest to educate investors on the asserted strength of the *Veradigm* segment, which was the smaller of the two segments.

42. The sale of the *HLPP* segment was announced on March 2, 2022, when Veradigm disclosed that it had entered into a purchase agreement with Altera, a wholly owned subsidiary of Ontario corporation Constellation Software Inc., to sell substantially all of the assets of its *HLPP* business segment for $670.0 million in cash at closing and up to an additional $30.0 million at a later time based on the sold segment's revenue through calendar year 2023.[7]

43. Veradigm completed the sale of substantially all of the assets of its *HLPP* segment on May 2, 2022. The Company disclosed that its *HLPP* segment sale represented a strategic shift that had a major effect on its operations and financial results. By the end of Q1 2022—during the sale process and then after the sale of the *HLPP* segment was finalized on May 2, 2022—Veradigm's ongoing revenue stream was primarily all that remained for the Company.

[7] On August 22, 2024, Altera sued Veradigm in Delaware Superior Court for breach of contract, estimating after a post-purchase review of books and records "a $24 million dollar difference in recurring revenue based on the accounting error which would flow directly into the EBITA of the Hospital & Large Physician Practice." *Altera Digital Health Inc., v. Veradigm Inc.*, Case No. N24C-08-304 SKR (Del. Super. Ct Aug. 22, 2024), at ¶31.

## B. THROUGHOUT THE CLASS PERIOD, THE VERADIGM DEFENDANTS TOUTED ROBUST AND REGULAR GROWTH THROUGH GAAP, NON-GAAP, AND OTHER KEY FINANCIAL METRICS TO ARTIFICIALLY INFLATE VERADIGM'S STOCK PRICE

44. Throughout the Class Period, in earnings calls and press releases filed with the SEC on Forms 8-K, the Veradigm Defendants wove a narrative of success that was anchored to certain key GAAP, Non-GAAP, and Other Key Financial Metrics. For GAAP metrics, the Veradigm Defendants focused on *revenue*, *gross margins*, *assets*, *EPS*, *retained earnings*, *deferred revenue*, *contract assets*, and *accounts receivable*. For Non-GAAP metrics, the Veradigm Defendants focused on *Non-GAAP revenue*, *Non-GAAP EPS*[8], *EBITDA*, and *adjusted EBITDA*. And for Other Key Financial Metrics, the Veradigm Defendants touted *bookings*[9] and *contract backlog*[10] as key supportive indicators.

45. Quarter after quarter throughout the Class Period, the Veradigm Defendants reported strong and growing key GAAP metrics, Non-GAAP metrics, and Other Key Financial Metrics to tout strong performance in the Company's Forms 10-Q and 10-K. They did so after the Individual Defendants regularly signed SOX Certifications attesting to sound and functioning internal controls, held out as an imprimatur of reliability for performance, and reported financial

---

[8] Non-GAAP metrics are financial performance measures reported by companies that are not defined by GAAP but can be adjusted by excluding or including certain items from the most directly comparable GAAP measure.

[9] Veradigm provides the following definition for bookings: "Bookings reflect the value of executed contracts for software, hardware, other client services, private-cloud hosting, outsourcing and subscription-based services." *See, e.g.*, 2020 Form 10-K at 10 ("Backlog").

[10] Veradigm SEC filings provide the following definition for backlog: "Contract backlog represents the value of bookings and support and maintenance contracts that have not yet been recognized as revenue." *See, e.g.*, 2020 Form 10-K at 10 ("Backlog"). Veradigm further described backlog as "[t]he aggregate amount of contract transaction price related to remaining unsatisfied performance obligations (commonly referred to as 'backlog') represents contracted revenue that has not yet been recognized and includes both deferred revenue and amounts that will be invoiced and recognized as revenue in future periods." *See e.g.*, Q1 2020 Form 10-Q, at 11. While referenced as a Key Financial Metric herein, GAAP required the disclosure of the aggregate amount of the transaction price allocated to performance obligations that are unsatisfied (or partially unsatisfied) as of the end of the reporting period pursuant ASC 606.

results. They also did so with Grant Thornton's unqualified, clean audit reports affirming the efficacy of Veradigm's internal controls over financial reporting and that Veradigm's "financial statements present fairly, in all material respects, the financial position of the Company."

46. For example, the Veradigm Defendants regularly discussed revenue, gross margins, assets, EPS, retained earnings, deferred revenue, contract assets, and accounts receivable on Veradigm's quarterly earnings calls as drivers of growth and momentum, and highlighted in concurrent press releases filed with the SEC on Forms 8-K. In addition, as just one example, the Individual Defendants shared the following slides during a January 2023 investor presentation:






47. Similarly, on Veradigm's quarterly earnings calls and in press releases, the Veradigm Defendants regularly discussed bookings and contract backlog as drivers of growth and momentum. Veradigm focused on these Other Key Financial Metrics as they were used by investors during the Class Period to gauge the success of the Company and its demand growth trends.

48. These GAAP, Non-GAAP and Other Key Financial Metrics were not reported in a vacuum. They were used to demonstrate growth and momentum, crafting a consistent narrative over time.

49. For example, Poulton regularly focused on revenue growth and bookings to launch his narratives about growth and momentum.

a. During a July 30, 2020 Veradigm earnings call hosted by Black and Poulton after Veradigm's press release announcing results for the second quarter of 2020, Poulton stated, "we were pleased with the ***$188 million of bookings*** that we recorded. This reflected broad based strength across the portfolio of solutions…."

b. During an October 29, 2020 Veradigm earnings call hosted by Black and Poulton after Veradigm's press release announcing results for the third quarter of 2020, Poulton stated, "Consistent with the second quarter, we ***were able to generate $187 million of new bookings*** even as we remained in primarily a virtual sales environment."

c. During a February 25, 2021 Veradigm earnings call hosted by Black and Poulton after Veradigm's press release announcing results for the fourth quarter of 2020, Poulton stated, "***[W]e generated $220 million of new business bookings***…. [¶] ***Our revenue outlook for 2021 is $1.5 billion*** in essence, we expect trends to continue…."

d. During an April 29, 2021 Veradigm earnings call hosted by Black and Poulton after Veradigm's press release announcing results for the first quarter of 2021 (including $368 million in revenues and $67 million in EBITDA), Poulton stated, "***Generated $194 million of new bookings*** in the quarter, which was up 6% year-over-year, and 7% sequentially, in what is typically a seasonally weak bookings quarter."

e. During an August 5, 2021 earnings call to coincide with the second quarter 2021 results, Poulton stated, "***We reported $180 million of new bookings*** in the quarter, which was up 10% year- over-year…. [¶] [B]ased on this progress during the quarter, ***we expect double-digit year-over-year revenue growth***…."

f. On November 5, 2021, after announcing results for the third quarter of 2021, Poulton stated in a Veradigm earnings call: "***Veradigm revenue grew 10%***

***year-over-year….*** [¶] The strength of our adjusted EBITDA and free cash flow performance during the quarter has led us to further increase our guidance for the full year…."

g. On the Veradigm earnings call on February 24, 2022 coinciding with the release of FY 2021 financial results, Poulton highlighted revenue performance and growth: "[T]he fourth quarter was, by far, our best quarterly performance in years…. ***[L]et me highlight a few items, starting with our bookings and revenue performance***. [¶] We reported ***$219 million of new bookings*** in the quarter, which was ***up 21% year-over-year***, and ***revenue in the fourth quarter was $392 million***, which ***was up 1%*** year-over-year."

50. When Jones took over as CFO, she too touted those same metrics as drivers of growth and momentum.

a. On August 4, 2022, earnings call regarding second quarter 2022 results, Jones stated, "We saw a ***year-over-year growth in bookings, revenue, gross profit*** and ***adjusted EBITDA*** as well as an overall improvement in margin…. ***The Veradigm business segment saw a year-over-year revenue growth of 8%*** during the quarter. And on a ***consolidated basis, revenue growth was 7%.***"

b. And on November 3, 2022, when discussing third quarter 2022 results, Jones stated, "We saw ***nice year-over-year growth in revenue***, gross profit, adjusted EBITDA and non-GAAP earnings per share, as well as an overall of improvement in margin consistent with our expectations. The ***Veradigm***

***business segment saw year-over-year revenue growth of 6%*** during the quarter. ***And on a consolidated basis, revenue growth was 5%.***"

51. These growth and momentum narratives had their desired effect. Analysts and the broader market relied on the Company's representations about such things as *revenue, gross margins, adjusted EBITDA*, *EPS,* and *bookings*, among others. For example:

a. In a July 30, 2020 report, Canaccord Genuity noted that "[r]evenue performed above expectations," and *adjusted EBITDA* and *adjusted EPS* figures also beat consensus estimates. The firm reiterated its "BUY" rating and raised its price target to $13 per share from $11.

b. In a July 31, 2020 note, Colliers International found the Company's valuation "compelling," noting the beat on *EPS*, *revenue*, and *adjusted EBITDA* figures. Even though *bookings* were down, Colliers disregarded that fact "in light of the COVID pandemic which disrupted sales cycles." The firm reiterated its "buy" rating and increased its price target to $12.50 per share from $10.

c. On January 12, 2021, Cowen issued a report noting that Veradigm's Q4 2020 margin improvements and higher free cash flow expectations suggested a higher adjusted *EPS* margin profile in 2021 relative to Cowen's estimates and consensus.

d. In an April 29, 2021 report, Canaccord Genuity reflected on the Company's "[v]ery respectable margin improvements in [Q1 2021]" and stated that they "would expect investors to be satisfied."

e. On May 17, 2021, CrispIdea released a report regarding Veradigm's first quarter 2021 results, wherein analysts were impressed by Veradigm's 6% year-over-year increase in bookings and "strong gross margin performance," which "reflect[ed] … 83% growth in year-over-year adjusted EBITDA."

f. On September 1, 2021, Zacks Equity released a report wherein its analysts commented that the Company's "surge in total bookings in second-quarter 2021 is impressive" and the "[r]ise in Client services revenues in the quarter is encouraging."

g. In a November 4, 2021 report regarding Veradigm's third quarter 2021 results, Cowen commented positively on the Company's "better than expected adj. EBITDA this quarter, driven primarily by cost mgmt, resulting in adj. EBITDA margin of 19.3% (+356 bps y/y and 90 bps q/q), indicating that [management] is executing against its cost optimization initiatives."

h. In a February 24, 2022 report, SVB Leerink extolled Veradigm's fourth quarter and FY 2021 results, noting that Veradigm was a "massive outperformer since last reporting … but this print represents [Veradigm's] strongest in recent memory and has the distinction of being a true clean beat, which could solidify its newly minted label as a safe haven."

i. In a May 5, 2022 analyst report regarding Veradigm's first quarter 2022 results, Cowen "continue[d] to be positive on [Veradigm] as the company looks to be on track with revised guidance. We continue to like the company's sharpened focus on the higher-growth Veradigm, which we

believe will lead to revenue and adj. EBITDA growth acceleration and thus multiple expansion."

j. In a May 5, 2022 report, RBC Capital was pleased with Veradigm's first quarter 2022 results, commenting that they showed "meaningful [year-over-year] growth" and that "Veradigm revenue, which is ~96% of total, was up 7.8%, which is above the full year growth guidance of 6-7%. Veradigm adjusted EBITDA of $35.2M grew 23.9% [year-over-year], reflecting segment margin expansion of 330 bps."

k. In a November 3, 2022 report regarding third quarter 2022, SVB Leerink lauded "solid Veradigm results, with a meaningful margin beat" noting Veradigm's "call[] out regarding "the stability of its business … reflecting [expected] 6%-7% Veradigm revenue growth and 10%-15% EBITDA growth. We continue to see meaningful opportunity in [Veradigm's] steady, reliable earnings power…."

l. In a November 4, 2022 report, RBC Capital stated that "[b]ookings reflect demand across all three end markets." RBC Capital also viewed positively Veradigm's expanding gross margins, which "is starting to flow through to EBITDA, where margins were also up 500 [basis points] [year-over-year]." RBC Capital maintained an "[o]utperform" rating with a $22 per share price target.

52. With Veradigm's shift in Q3 2021 from companywide reporting to segment reporting of the *HLPP* and *Veradigm* segments, those metrics were further highlighted to spotlight the superior performance and anticipated growth of the *Veradigm* segment—to signal the

Company's financial strength and the demand for Veradigm's products and services. At that time, in November 2021, the Company emphasized the significance of this new more granular reporting—as visibility into the *Veradigm* segment's growth and performance. As Poulton stated on the November 5, 2021 Veradigm earnings call:

> As was the case last quarter, ***our revenue results are really a tale of two different stories***. And as such, we have modified our segment reporting this quarter to provide investors greater transparency on our business.… [¶]
>
> ***[O]ur goal is to continue to increase visibility with respect to Veradigm*** to our future quarterly calls.

53. As reported, the *Veradigm* segment was allegedly driving both growth and profitability for the Company prior to the *HLPP* segment divestiture:

| **Revenue Y-o-Y growth *(as percentage)*** | | | | | |
|---|---|---|---|---|---|
| | Q3 | | Q1 | Q2 | Q3 |
| *(As reported)* | 2021 | 2021 | 2022 | 2022 | 2022 |
| Veradigm | 9.7% | 4.6% | 7.8% | 8.4% | 6.0% |
| HLPP | -3.4% | -2.4% | | | |

| **Segment Gross Margin** | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | | Q1 | Q2 | Q3 | | Q1 | Q2 | Q3 |
| *(As reported)* | 2020 | 2021 | 2021 | 2021 | 2021 | 2022 | 2022 | 2022 |
| Veradigm | 48.2% | 46.4% | 47.7% | 47.9% | 49.4% | 50.8% | 52.1% | 54.2% |
| HLPP | 30.9% | | | 35.1% | 35.7% | | | |

54. Indeed, on the March 3, 2022 investor conference call held after announcing the sale of *HLPP* to Altera, Poulton spoke to focusing on *Veradigm because of* that momentum:

> Why did we do this? Three main reasons. So, the first was we are ***seeing a very widening gap or widening divergence and the momentum between our two core business segments***. The Hospital & Large Physician Practices segment has shrunk for three years – is expected to shrink again this year, which will make the third year in a row. … [¶] In contrast, the ***Veradigm segments growing 6% to 7% organically, and we think has a very strong competitive positioning***, particularly relative to our Hospital & Large Physician Practices segment.

55. Analysts and the broader market relied on the Company's representations about this new focus on the *Veradigm* segment. No less than 10 analysts noted the significance of this new segment reporting. For example, on November 4, 2021, Cantor Fitzgerald wrote:

> Importantly, the company again changed its reporting segments ***in order to highlight the faster growth in Veradigm***, which is its non-hospital businesses….

56. And the next day, on November 5, 2021, Morningstar Equity Research commented:

> Although Allscripts reported quarterly revenue growth of just 1% year over year, ***the stand-out performer this quarter was Veradigm***, which increased 10% versus the prior-year period thanks to 500 new practices and 2,000 additional prescribing physicians in its network.

57. On November 4, 2021, RBC Capital stated: "$19 price target…, or 18x our CY22 EPS estimate [was] supported by (1) double-digit revenue growth in its Veradigm business…."

58. A November 4, 2021 SVB Leerlink report "acknowledge[d] potential for a growth refocus as Veradigm returns to the forefront," noting the "growing market appreciation for the higher growth assets such as Veradigm" and that Allscripts "resegmented its business…with the slower growing Hospitals/Large Physician Practices business offsetting the faster growth at Veradigm."

59. In a November 5, 2021 report, Canaccord Genuity wrote:

> Allscripts created a hospitals and large physician practice business segment … and Veradigm, its faster growing and higher margin data-related businesses. The segmentation hopefully provides greater insight going forward on the company's two businesses and provides improved transparency to unlock value in the stock.…
>
> …
>
> As highlighted, the [Veradigm] segment grew 9.8%, adding 500 practices and 2000 physicians in 3Q. Veradigm yields the highest gross margins of Allscripts business with 49.3% adj-GPM realized in 3Q.

60. On a November 10, 2021 report, Argus wrote that "Allscripts continues to expand its Veradigm business, which saw 10% sales growth in 3Q21" and that "[i]n the Veradigm segment, revenue rose 10% to $137 million. The adjusted gross profit came to $68 million and the gross margin was 49.3%, up 160 basis points from 3Q20."

61. On November 22, 2021 Deutsche Bank also acknowledged the "new revenue segment reporting" and that "the company is now reporting Veradigm segment revenue that is trending towards $530mm-$540mm for 2021 as compared to our prior estimate of $210mm to $215mm" noting that "part of the revision is the company realigning some of the business segments." Deutsche Bank further stated that "we still believe Veradigm as a [standalone] business would probably carry a value of at least 3-5x forward revenue and 16x-20x forward year EBITDA."

62. Several months later, on May 10, 2022, just a week later after the deal to sell the *HLPP* segment to Altera closed, Poulton reported for Q1 2022, focusing in part on the *Veradigm* segment: "We saw strong year-over-year growth in revenue, gross profit and adjusted EBITDA as well as an overall improvement in margins…. ***The Veradigm business segment saw a year-over-year revenue growth of 8%.…***"

63. After that sale of the *HLPP* segment to Altera, the Company and analysts continued to focus on revenue, margins, and profitability and EBITDA growth as it related to Veradigm's surviving segment. For example, on the Feb. 24, 2022 Veradigm earnings call to discuss Q4 2021 financial results, Poulton responded to a question from Stephanie Demko at SVB Leerink LLC:

> Q: Continuing on that thought then[,] you have a lot of opportunity in Veradigm and in terms of more recurring revenue, which I'm assuming comes on at a healthy incremental margin, is there any reason to believe that the margin expansion pace should slow down meaningfully?

> A: No. I think[] we're going to get nice operating leverage, Stephanie. And so I think when we talk about EBITDA margins, those should continue to expand as we grow, in particular.

64. In its coverage, SVB Leerink LLC wrote on March 3, 2022:

> The payer and life sciences subsegment growth far outpaces the provider subsegment (20%-25% growth vs. provider revs of 3%-4%), with ***overall Veradigm revenues growing at 6%-7% rate in FY22. On a margin basis, the business commands an ~27% EBITDA margin profile with built in margin expansion (expected 10-15% EBITDA growth vs. 6-7% top line growth in FY22***.

65. CrispiIdea wrote on March 11, 2022:

> ***[Veradigm r]evenue increased by 8.97% to $155.22mn*** for Q4FY21 from $142.44mn for Q4FY20. ***It increased by 4.59% to $552.21mn*** for FY21 from $527.97mn for FY20.

66. Analysts responded to those tales and narratives, and the market reacted to the results reported by the Company, as evidenced by analyst reports and stock price. Indeed, the stock price increased from $6.40 at the start of the Class Period on May 8, 2020, to a high of $23.25 on April 21, 2022, shortly before the sale of its *HLPP* segment.

### C. TRUTH STARTS TO BE REVEALED

67. The idyllic picture that Veradigm painted quarter over quarter during the Class Period of momentum stemming from growing revenue, earnings, and bookings started to crack in February 2023. Over the following two-plus years, Veradigm announced—in fits and spurts—that certain financial results for 2020 through 2022 could not be relied upon and would need to be restated due to internal control failures, and that it would be unable to file financial statements from that point forward. The investigation that launched out of the February 2023 initial disclosure led to a *second* independent investigation, and then a *third*. The Company voluntarily reported findings to the SEC, later acknowledging that the SEC had opened an investigation into the matter. Black left the Company, and Poulton and Jones were forced by the Board to resign and forego

performance-based compensation. Unable to file its 2022 financials, the Company was delisted from Nasdaq and remains so today. Finally, on March 18, 2025, over two years after the problems first started coming to light, Veradigm released its long-delayed 2022 Annual Report filed on SEC Form 10-K, which restated results from 2020 through Q3 2022. In the end, Veradigm admitted that it took over two years to file its long-awaited 2022 Form 10-K because of the depth and scope of the internal control problems that plagued the Company, which rendered its Class Period financial statements materially unreliable.

### 1. Veradigm Delays the Filing of Its 2022 Form 10-K, Pointing to Internal Control Deficiencies Stemming From a Newly-Implemented Software Tool That Had "Generated Duplicative Billing"

68. On February 28, 2023, after the market closed (5:16 pm ET), Veradigm filed with the SEC a Notification of Late Filing on Form 12b-25 with respect to its 2022 Form 10-K. In the filing, Veradigm stated that it had determined that it was "unable to file" its 2022 Form 10-K "within the prescribed time period provided by the applicable rules of the [SEC] without unreasonable effort and expense." Veradigm attributed this to recently identified internal control failures:

> [R]elating to the Company's ***revenue recognition processes over the prior six quarters***, primarily stemming from a software tool the Company implemented in 2021, as testing during the current period highlighted some ***system generated duplicative transactions*** and other errors impacting the results the Company was receiving from the tool, ***resulting in a mis-statement to reported revenues*** during those periods, have created the need to conduct ***additional review and testing prior to finalizing the assessment and the audits of the effectiveness of internal control over financial reporting*** as of December 31, 2022 and of the Company's financial statements as of and for the year ended December 31, 2022. The Company is also continuing to evaluate the materiality of the mis-statement to determine whether prior periods will require adjustment, but as of the date hereof, no conclusion has been reached.

The Company further stated that the "cumulative impact of the identified internal control failures" would "be a reduction in the Company's revenue from continuing operations of approximately

$20 million from what it otherwise reported since the third quarter of 2021 and expected to report for the fourth quarter of 2022."

69. That same afternoon after the market closed (5:30 pm ET), Veradigm issued its Feb. 28, 2023 press release (attached as Ex. 99.1 to its Feb. 28, 2023 Form 8-K filed with the SEC after the market closed (5:17 pm ET)) with similar information and confirming that it "detected ***certain internal control failures related to revenue recognition*** that have occurred over the prior six quarters, result[ing] in a ***mis-statement [sic] to reported revenues during those periods***." In the Feb. 28, 2023 press release, the Company added that the tool had been implemented in the third quarter of 2021 to assist it with compliance with Financial Accounting Standards Board's ("FASB") rule ASC 606.[11] The Company said that these errors had caused revenue to be overstated by approximately $20 million from the third quarter of 2021 until the fourth quarter of 2022. As a result of the accounting misstatements, Veradigm added, it reduced its previously-provided fiscal 2023 revenue guidance by $15 million (to "between $625 million and $645 million, versus the previous range between $640 million and $660 million") and its *Non-GAAP EPS* guidance by $0.10 per share (to "between $0.80 and $0.90, from the previous range between $0.90 and $1.00").

70. Finally, in the Feb. 28, 2023 press release, Veradigm announced that its previously scheduled fourth quarter 2022 earnings release and the filing of its fiscal 2022 Form 10-K would be delayed—that at the outset, "its external auditors need to expand procedures and are filing with the SEC a Form 12b-25, extending the due date of the Company's Form 10-K by 15 days, to allow

---

[11] Approximately two years prior to the commencement of the Class Period, FASB's new Accounting Standards Codification ("ASC") Topic 606, *Revenue from Contracts with Customers* ("ASC 606"), became effective (as of December 15, 2017). ASC 606 describes principles to measure and recognize revenue and related cash flows.

for completion of those procedures," and as a result "the Company will delay its previously announced earnings call from March 1st to a later date that will be scheduled closer to its Form 10-K filing date."

**2. Veradigm Admits That Certain 2021 and 2022 Financial Statements "Should No Longer Be Relied Upon Because of Misstatements to the Company's Previously Reported Revenue Resulting From Certain Internal Control Failures"**

71. Less than one month later, after the market closed on March 22, 2023 (4:01 pm ET), Veradigm issued a press release (attached as Ex. 99.1 to its March 22, 2023 Form 8-K filed with the SEC after the market closed (4:05 pm ET)) announcing that it had determined that the size and scope of the revenue misstatements were significantly greater than previously disclosed.

72. In its Mar. 22, 2023 Form 8-K, Veradigm reiterated that its 2022 financial statements should not be relied upon, ***and expanded that admonition to its 2021 financial statements***:

> [C]onsolidated financial statements and related disclosures as of and for the year ended December 31, 2021 included in its Annual Report on Form 10-K for the fiscal year ended December 31, 2021, as of and for the interim periods ended March 31, 2021, June 30, 2021 and September 30, 2021 included in its Quarterly Reports on Form 10-Q for the fiscal quarters ended March 31, 2021, June 30, 2021 and September 30, 2021, respectively, and as of and for the interim periods ended March 31, 2022, June 30, 2022, and September 30, 2022 included in its Quarterly Reports on Form 10-Q for the fiscal quarters ended March 31, 2022, June 30, 2022, and September 30, 2022, respectively, ***should no longer be relied upon because of misstatements to the Company's previously reported revenue resulting from certain internal control failures***.

73. In the Mar. 22, 2023 Form 8-K, the Company also expanded its explanation of the causes of the previously disclosed internal control failures from "software tool" issues to "accounting processes." Veradigm's March 22 press release also provided an updated estimate of its historical revenue misstatements, stating that "the cumulative impact will increase [from $20

million] to approximately $40 million, but not exceed 5% of full year revenue from continuing operations for either 2021 or 2022."

74. Veradigm also revealed in its Mar. 22, 2023 Form 8-K that the Company would "report one or more material weaknesses as of December 31, 2022 . . . related to the recognition of revenue and certain other non-routine review controls. ***As a result, the Company concluded that its disclosure controls and procedures were not effective as of December 31, 2022 and that its internal control over financial reporting was not effective as of December 31, 2022.***"[12]

75. In both the Mar. 22, 2023 press release and the Mar. 22, 2023 Form 8-K, the Company also disclosed that it believed there would be an impact on the Company's revenue from discontinued operations for the corresponding periods. The Company in the Mar. 22, 2023 press release slashed the low end of its previously disclosed fiscal 2023 revenue guidance range by another $10 million—to "between $615 million and $635" million, from the "prior guidance of $625 million and $645 million."

76. Finally, in its Mar. 22, 2023 press release, the Company further stated that because it has not yet filed its 2022 Form 10-K, on March 20, 2023, the Company received an initial notice from Nasdaq "indicating that the Company was no longer in compliance with the timely filing requirements for continued listing under Nasdaq Listing Rule 5250(c)(1), which requires listed companies to timely file all required periodic financial reports with the SEC," and allowing the Company to come into compliance within 60 days by either filing its 2022 Form 10-K or submitting "a plan to regain compliance with Nasdaq's continued listing requirements."

[12] *See* Section IV.D.1.a. for distinction between these types of controls.

### 3. Veradigm Delays the Filing of Its Q1 2023 Form 10-Q

77. Despite the 60-day reprieve from Nasdaq for Veradigm to come into compliance with its SEC filings, the Company nonetheless delayed the filing of another SEC Form. On May 11, 2023, after the market closed (4:05 pm ET), Veradigm filed with the SEC a Notification of Late Filing on Form 12b-25, delaying the filing of its Q1 2023 Form 10-Q for the quarter ended March 31, 2023. In the filing, Veradigm stated that it was "unable to file" its Q1 2023 Form 10-Q "within the prescribed time period provided by the applicable rules of the [SEC] without unreasonable effort and expense." Veradigm also reiterated that the Board of Directors, after discussion with management, reached a determination that its 2021 and 2022 financial statements should not be relied upon **"*because of misstatements to the Company's previously reported revenue resulting from certain internal control failures*.**" The Company again described the nature and source of the internal control failures that it was continuing to explore—pointing to "accounting processes" and "a software tool" that was implemented in 2021.

78. Veradigm further stated in the filing that due to these "internal control failures," the Company had been unable to file its 2022 Form 10-K and anticipated that it would file it "on or around June 14, 2023," although "no assurance [could] be given as to the definitive date on which the Form 10-K [would] be filed." The Company said that it would "file the Form 10-Q as soon as practicable after the Form 10-K is filed."

### 4. Veradigm Admits That Misstatements Extend Back to 2020; Nasdaq Grants Veradigm 180 Days to Regain Compliance

79. On May 19, 2023, after the market closed (5:10 pm ET), Veradigm issued a press release (attached as Ex. 99.1 to its May 19, 2023 Form 8-K filed with the SEC after the market closed (5:25 pm ET)) announcing that the Company had received an additional notice from Nasdaq stating that because the Company remained delinquent in filing its fiscal 2022 Form 10-K and Q1

2023 Form 10-Q, it remained noncompliant with Nasdaq Listing Rule 5250(c)(1). Veradigm further stated that on May 18, 2023, it had submitted a compliance plan ("Compliance Plan") to Nasdaq addressing both filings and stating that, if approved, Nasdaq could grant the Company "up to 180 calendar days from the due date of the Form 10-K" to regain compliance, but that there was "no assurance that Nasdaq [would] accept the Compliance Plan or that the Company [would] be able to regain compliance within any extension period granted by Nasdaq."

80. In the May 19, 2023 press release, the Company again stated that its accounting review was ongoing and that it planned to file its fiscal 2022 Form 10-K on or around June 14, 2023, though "no assurance can be given as to the definitive date on which the Form 10-K and Form 10-Q will be filed." The Company also again described the nature and source of the internal control failures as stemming primarily from "accounting processes" and the "software tool" implemented to comply with ASC 606.

81. On June 13, 2023, after the market closed (6:23 pm ET), Veradigm issued a press release (attached as Ex. 99.1 to its June 13, 2023 Form 8-K filed with the SEC after the market closed (6:42 pm ET)). That press release announced three things; (a) its financial misstatements were not just limited to 2021 and 2022, but extended back to 2020; (b) Nasdaq had accepted the Company's Compliance Plan so it now had until September 18, 2023 to file its 2022 Form 10-K and Q1 2023 Form 10-Q; and (c) Veradigm no longer expected to file its restated 2022 Form 10-K on June 14, 2023, as "the Company's independent auditors need more time to complete their audit procedures" given "the nature and the extent of the accounting and internal control errors, and the estimates on what periods the errors impact has taken longer than previously expected." Instead, the Company reported that it "currently expects to file its Form 10-K and Form 10-Q on or prior to Nasdaq's September 18, 2023, deadline."

### 5. Delaying the Filing of Its Q2 2023 Form 10-Q, Veradigm Announces the Need to Restate the 2021 Form 10-K

82. On August 10, 2023, after the market closed (4:01 pm ET), Veradigm filed with the SEC a Notification of Late Filing on Form 12b-25 with respect to its Q2 2023 Form 10-Q for quarter ended June 30, 2023. Veradigm stated that it was "unable to file" its Q2 2023 Form 10-Q "within the prescribed time period provided by the applicable rules of the [SEC] without unreasonable effort and expense" due to its historical misstatements of its financial results.

83. For the first time, Veradigm admitted that it would need to restate its 2021 financial statements in addition to filing 2022's delinquent Form 10-K. Near the very end of the Aug. 10, 2023 Notification of Late Filing, the Company disclosed that "the impact for 2021 will require a restatement of the Company's financial statements as of and for the year ended December 31, 2021."

84. With regard to the 2022 Form 10-K, Veradigm stated that it anticipated filing it "on or prior to September 18, 2023," although "no assurance [could] be given as to the definitive date on which the Form 10-K [would] be filed."

85. The Company again cautioned that its 10-Q and 10-K filings from Q1 2021 forward "should no longer be relied upon because of misstatements to the Company's previously reported revenue resulting from certain internal control failures." The Company repeated that the internal control failures stemming primarily from the accounting processes and the ASC 606 software tool caused those financial statements to have been materially misstated such that they should not be relied upon.

86. Veradigm also framed its expected "cumulative impact of the internal control failures," noting that "the Company anticipates that [it] will be approximately $40 million, but will not exceed 5% of full year revenue from continuing operations for either 2021 or 2022. A portion

of this impact is expected to relate to 2020, and thus the impact to any single calendar year is now anticipated to be lower." The Company further stated that it "also expects that there will be an impact on the Company's revenue from discontinued operations for the corresponding periods."

### 6. Nasdaq Notifies Veradigm of Continued, Broader Non-Compliance; Veradigm Seeks Further Extension of Deadline to Regain Compliance

87. On August 18, 2023, after the market closed (4:01 pm ET), Veradigm issued a press release (attached as Ex. 99.1 to its Aug. 18, 2023 Form 8-K filed with the SEC after the market closed (4:11 pm ET)) stating that on August 16, 2023, the Company received an additional notice from Nasdaq stating that because the Company remained delinquent in filing its fiscal 2022 Form 10-K and its Q1 and Q2 2023 Forms 10-Q, it remains noncompliant with Nasdaq Listing Rule 5250(c)(1).

88. In the Aug. 18, 2023 press release, Veradigm stated that "on May 18, 2023, the Company submitted to Nasdaq its compliance plan … addressing both the Form 10-K and Q1 Form 10-Q filings, which was approved by Nasdaq." The Company further stated that it would "submit an update to the Compliance Plan on or prior to August 31, 2023 addressing its plans to file the Q2 Form 10-Q and regain compliance under the Listing Rules."

89. The Company reiterated that it was unable to file its 2022 Form 10-K and, consequently, its Q1 and Q2 2023 Forms 10-Q because of the above noted internal control failures.

90. Despite the promise to submit within days an "update to the Compliance Plan" to offer the Company relief from Nasdaq's September 18, 2023 deadline, the Company nonetheless clung to that date just 30 days away as the date by which it "hopes to file the Form 10-K and Form 10-Qs…, which is the end of the 180 day 'exception period' under the Listing Rules…." The Company further noted in its Aug. 18, 2023 press release that "there can be no assurance that the Company will be able to meet that deadline and regain compliance."

### 7. Veradigm Receives a Delisting Notice From Nasdaq and Revises Its Expected Cumulative Impact of the Misstatements

91. At the market open (9:00 am ET) on September 18, 2023, Veradigm issued a press release (attached as Ex. 99.1 to its Sept. 18, 2023 Form 8-K filed with the SEC after the market opened (9:12 am ET)) announcing that it did not expect to file its belated periodic SEC filings within the 180-day Nasdaq "exception period" expiring that day and, as a result, expected to "receive a delisting notice" from the exchange. The Company announced that the reason for the extended delay "primarily resulted from the need to build a new supplemental revenue system tool and the extensive manual work to aggregate and map the Company's historical transaction data into the new system tool."

92. In light of that update, the Company explained that it planned to seek a hearing on the matter and a stay in the interim:

> [T]he Nasdaq Listing Rules provide that the Company may request a hearing before a Nasdaq Hearings Panel … and that the request will temporarily stay any suspension or delisting action for 22 days from the date of the Nasdaq notification. Further, the Listing Rules provide that, in its hearing request, the Company may request that the stay remain in effect through the hearing and the expiration of any additional extension period granted by the Panel. Accordingly, the Company intends to make such an extended stay request.

93. At the same time, in the Sept. 18, 2023 press release, the Company announced that it was revising "the estimated cumulative impact down to approximately $20 million for these same reporting periods," down from $40 million.

94. After the market close on September 22, 2023 (4:01 pm ET), Veradigm issued a press release (attached as Ex. 99.1 to its Sept. 22, 2023 Form 8-K filed with the SEC after the market closed (4:10 pm ET)) disclosing that is it had received a delisting notice from Nasdaq due to noncompliance with exchange rules on September 20, 2023:

> The Company's shares would be delisted due to noncompliance with Nasdaq Listing Rule 5250(c)(1), because the Company did not file its Annual Report on Form 10-K for the year ended December 31, 2022…, Quarterly Report on Form 10-Q for the quarter ended March 31, 2023 … and Quarterly Report on Form 10-Q for the quarter ended June 30, 2023 … before the expiration of the 180-day 'exception period' that was previously granted by Nasdaq. Nasdaq Listing Rule 5250(c)(1) requires listed companies to timely file all periodic reports with the [SEC].

95. Veradigm detailed that it planned to appeal the delisting decision by requesting a hearing before a Nasdaq Hearings Panel, and that it would ask the Panel for a stay through the hearing, if granted.

96. In the Sept. 22, 2023 press release, the Company reiterated that it was unable to file its 2022 Form 10-K and the subsequent Q1 and Q2 2023 Forms 10-Q because of the internal control failures previously disclosed. It further reiterated that the "effort to conclude [] the accounting and internal control errors [had] taken longer than previously expected, primarily resulting from the need to build a new supplemental revenue system tool and the extensive manual work to aggregate and map the Company's historical transaction data into the new system tool."

97. Veradigm further stated that it expected "to file the Form 10-K and Form 10-Qs during the fourth quarter of 2023."

98. The Nasdaq Hearings Panel set a hearing on the delisting notice and granted the requested stay, and Veradigm appealed. After the market close on October 9, 2023 (4:02 pm ET), Veradigm issued a press release (attached as Ex. 99.1 to its Oct. 10, 2023 Form 8-K filed with the SEC after the market opened (11:29 am ET)) announcing that, "on October 6, 2023, it received a notice from Nasdaq indicating that the temporary stay of delisting of the Company's common stock has been extended pending a hearing before the Nasdaq Hearings Panel … on November 16, 2023, and the issuance of a final Panel decision."

99. In the Oct. 9, 2023 press release, the Company again reiterated that it "currently expect[ed] to file the Form 10-K and Forms 10-Q during the fourth quarter of 2023."

**8. In Delaying Filing of Its Q3 2023 Form 10-Q, Veradigm Discloses a Second Independent Investigation—Initiated by the Audit Committee and Relating to "Financial Reporting" and "Internal Controls"**

100. On November 13, 2023, Veradigm delayed yet another quarterly filing, disclosing for the first time a second, seemingly broader investigation initiated by the Audit Committee relating to "financial reporting" and "internal controls."

101. After the market closed on November 13, 2023 (5:01 pm ET), Veradigm filed with the SEC a Notification of Late Filing on Form 12b-25 with respect to its Q3 2023 Form 10-Q for quarter ended September 30, 2023, dropping new information into the disclosure: that "the Audit Committee of the Company's Board of Directors is independently investigating other matters relating to the Company's financial reporting, internal controls over financial reporting, and disclosure controls."

102. Veradigm also reported that it was "unable to file" its Q3 2023 Form 10-Q "within the prescribed time period provided by the applicable rules of the [SEC] without unreasonable effort and expense." The Company again cautioned that its Forms 10-Q and 10-K filings from Q1 2021 forward "should no longer be relied upon because of misstatements to the Company's previously reported revenue resulting from certain internal control failures."

103. The Company described the nature of those internal control failures that caused those financial statements to have been materially misstated such that they should not be relied upon: "The internal control failures identified at that time primarily stem from accounting processes and a software tool implemented by the Company in order to comply with the requirements of FASB's rule ASC 606. Testing during the fiscal quarter ended December 31,

2022 highlighted some duplicate transactions and other errors impacting the results the Company had reported."

104. The Company further explained that the "extended timeline has resulted from the need to build a new supplemental revenue system tool and the extensive manual work to aggregate and map the Company's historical transaction data into the new system tool."

105. In light of its reported financial misstatements, reporting delay, and new internal investigation, the Company reported in the Nov. 13, 2023 Notification of Late Filing that because "of the internal control failures described above and the internal investigation," it had been unable to file its 2022 Form 10-K and the Q1, Q2, and Q3 Forms 10-Q, stating that it would file them "as soon as practicable," although "no assurance [could] be given as to the definitive date on which such periodic reports [would] be filed or the final decision of the [Nasdaq] Panel regarding a delisting of the Company's common stock."

106. Regarding the expected cumulative impact of the internal control failures, the Company reported as follows: "As previously disclosed, the Company initially anticipated that the cumulative impact of the internal control failures noted above would be approximately $40 million and would not exceed 5% of full year revenue from continuing operations for either 2021 or 2022. As of the date hereof, the Company anticipates that the cumulative impact of the internal control failures noted above will be approximately $20 million and will not exceed 3% of full year revenue from continuing operations for either 2021 or 2022."

107. The Company reiterated the need to restate the financial statements for the year ending December 31, 2021, and that "a portion of this impact is also expected to relate to 2020, and thus the impact to any single calendar year is anticipated to be lower than previously estimated.

… The Company also expects that there will be an impact on the Company's revenue from discontinued operations for the corresponding periods."

### 9. Nasdaq Notifies Veradigm of Yet Broader Non-Compliance; Veradigm Stops Targeting Specific Dates for the Filing of Its Delinquent 2022 and 2023 Financial Statements

108. On November 17, 2023, after the market closed (4:05 pm ET), Veradigm issued a press release (attached as Ex. 99.1 to its Nov. 17, 2023 Form 8-K filed with the SEC after the market closed (4:07 pm ET)) announcing that on November 14, 2023, the Company received an additional notice from Nasdaq reiterating noncompliance with Nasdaq Listing Rule 5250(c)(1) due to delinquent filings of the Company's fiscal 2022 Form 10-K and its Q1 and Q2 Forms 10-Q, and extending it as well to the newly-delinquent Q3 2023 Form 10-Q that was the subject of the Nov. 13, 2023 Notification of Late Filing.

109. In the Nov. 17, 2023 press release, the Company reported that "[a] hearing before the Panel was conducted on November 16, 2023, but a final Panel decision has not yet been rendered." Further, Veradigm re-confirmed that Nasdaq had stayed its delisting from the exchange pending a final decision on the Company's appeal: "On October 6, 2023, the Company received notice from Nasdaq that the temporary stay of delisting had been extended pending a hearing before the Panel on November 16, 2023, and the issuance of a final Panel decision."

110. Moving away from promising to file its delinquent 2022 and 2023 financial statements by a particular date or fiscal quarter, the Company instead stated in the Nov. 17, 2023 press release that it would file its 2022 Form 10-K and its Q1, Q2 and Q3 2023 Forms 10-Q "as soon as practicable." However, the Company cautioned that "no assurance [could] be given as to the definitive date on which such periodic reports [would] be filed or the final decision of the Panel regarding a delisting of the Company's common stock."

**10. Veradigm's CEO and CFO "Resign" at the Request of Veradigm's Board as a Result of the Audit Committee's "Ongoing Independent Investigation"**

111. After the market opened on December 8, 2023 (8:45 am ET), Veradigm issued a press release (attached as Ex. 99.1 to its Dec. 8, 2023 Form 8-K filed with the SEC after the market closed (4:06 pm ET)) stating that Defendants Poulton and Jones had each resigned "at the request of the Board" as a direct result of Audit Committee Investigation.:

> As a result of the previously disclosed, ongoing independent investigation by the Audit Committee of the Board that relates to the Company's financial reporting, internal controls over financial reporting and disclosure controls, on December 6, 2023, Richard J. Poulton and Leah S. Jones each resigned at the request of the Board from their positions as Chief Executive Officer and Chief Financial Officer, respectively, effective immediately. Mr. Poulton also stepped down from the Board, effective December 6, 2023. Ms. Jones will continue serving the Company as a consultant for an initial period of six months.

112. The Dec. 8, 2023 press release noted that the Audit Committee Investigation was "being conducted by legal counsel and relates to the Company's financial reporting and internal controls over financial reporting and disclosure controls."

113. In laying out the separation terms for Poulton and Jones, the Dec. 8, 2023 Form 8-K expressly noted that neither Poulton nor Jones will "receive any payment with respect to the Company's 2023 annual incentive program."

114. The Dec. 8, 2023 ***press release made clear that previously-reported cumulative impact related only to the first Restatement Investigation, and not this "ongoing independent" Audit Committee Investigation.*** The Company stated that "[t]he potential impact, if any, to the financial statements for previously reported periods as a result of the independent investigation is under review by the new leadership team." The Company later also drew a clear line between the two investigations: "Unrelated to the investigation [], [and] as previously disclosed, the Company continues to estimate a reduction in revenue from continuing operations of approximately $20

million in the aggregate between the periods 2020 through the end of 2022 relating to certain revenue recognition practices."

115. In the Dec. 8, 2023 press release, newly-appointed Board Executive Chairman Greg Garrison spoke to the need to strengthen financial reporting and financial controls: "Veradigm's core business remains strong but, after careful review and consideration, it is clear that we must develop a stronger financial control environment with enhanced financial reporting policies and disclosure policies and procedures, and the leadership changes announced today reflect the importance of accountability in achieving that goal."

### 11. Nasdaq Sets a Deadline of February 27, 2024 to Either Cure Non-Compliance by Filing Delinquent SEC Filings or Face Delisting

116. After the market closed on December 13, 2023 (4:05 pm ET), Veradigm issued a press release (attached as Ex. 99.1 to its Dec. 13, 2023 Form 8-K filed with the SEC after the market closed (4:14 pm ET)) announcing that the Nasdaq Hearing Panel had "grant[ed] its request for continued listing on the Nasdaq Capital Market, subject to the Company demonstrating compliance with Nasdaq Listing Rule 5250(c)(1) … on or before February 27, 2024, and certain other conditions, including the achievement of various interim milestones."

117. The Company further noted in its Dec. 13, 2023 press release that it "plan[ned] to file its Form 10-K and the Form 10-Qs as soon as possible," although "no assurance [could] be given as to the definitive date on which such periodic reports [would] be filed."

### 12. Veradigm Reports Information About the Audit Committee Investigation Into "Financial Reporting" and "Internal Controls" to the SEC, and Discloses Further Nasdaq Non-Compliance

118. Before the market opened on January 10, 2024 (8:16 am ET), Veradigm filed with the SEC its Jan. 10, 2024 Form 8-K disclosing that it had voluntarily reported "information

concerning the Audit Committee Investigation" into financial reporting and internal control issues to the Staff of the SEC, and that it was cooperating with the SEC on the matter.

119. The Company further stated that on January 5, 2023, it had received a notice of noncompliance from Nasdaq stating that "as a result of the Company's not holding an annual meeting of stockholders within the one-year period following its fiscal year ended on December 31, 2022, the Company was not in compliance with Nasdaq Listing Rule 5620(a), which requires companies listing common stock to hold an annual meeting of stockholders no later than one year after the end of the company's fiscal year…." The Company further stated:

> While the Notice has no immediate effect on the listing of the Company's common stock on The Nasdaq Stock Market, the Notice indicates that the Annual Meeting Deficiency serves as an additional basis for delisting. The Notice also provides that the Panel will consider the Annual Meeting Deficiency in its decision regarding the Company's continued listing on The Nasdaq Stock Market. The Company plans to present its views with respect to the Annual Meeting Deficiency to the Panel in writing by January 12, 2024, as requested by the Panel in the Notice, and to hold an annual meeting of stockholders as soon as possible after it becomes timely in its financial statement reporting. The Company also plans to file its Form 10-K for the fiscal year ended December 31, 2022 and its Form 10-Qs for the fiscal quarters ended March 31, 2023, June 30, 2023 and September 30, 2023 as soon as possible; however, no assurance can be given as to the definitive date on which such periodic reports will be filed or on which an annual meeting of stockholders will be held.

120. In the Jan. 10, 2024 Form 8-K, the Company announced that the potential adjustments to the Company's previously issued financial statements that had been identified as a result of the Audit Committee's second, separate investigation were "non-cash items relating to the timing of certain impairments and accrual amounts," though "the investigation remain[ed] ongoing" and "additional adjustments" could be made.

121. Before the market open on January 10, 2024 (8:01 am ET), Veradigm issued a press release (attached as Ex. 99.1 to its Jan. 10, 2024 Form 8-K filed with the SEC before the market opened (8:16 am ET)) "provid[ing] refreshed estimated, unaudited ranges of financial information

for fiscal 2023." In the Jan. 10, 2024 press release, Veradigm announced lowered fiscal year guidance across the board from ranges previously issued on September 18, 2023.

### 13. A Year Into Its Investigations and Without Having Filed Delinquent or Restated Financials, Veradigm Common Stock is Halted From Trading on Nasdaq During the Delisting Process After Missing the Compliance Deadline

122. Before the market opened on February 27, 2024 (7:00 am ET), Veradigm issued a press release (attached as Ex. 99.2 to its Feb. 27, 2024 Form 8-K filed with the SEC before the market opened (7:16 am ET)), providing an update on its "Financial Restatement Process." As part of both the Form-8-K and press release, the Company reported that it imminently expected a delisting notice and the cessation of trading of its common stock on Nasdaq while the delisting process moves forward.

123. Specifically, the Company disclosed in its Feb. 27, 2024 press release that it did not expect to file its 2022 Form 10-K or the Q1, Q2, and Q3 2023 Forms 10-Q by the February 27, 2024 deadline (which was the date of the press release) set by Nasdaq to "regain compliance with Nasdaq Listing Rule 5250(c)(1)," and thus it "anticipates it will receive a delisting notice from Nasdaq [the next day] on February 28, 2024, and that its common stock [would] be suspended from trading on The Nasdaq Global Select Market while Nasdaq proceeds with delisting." The Company reported in the Feb. 27, 2024 Form 8-K that it:

> is working diligently to file the Form 10-K and the Form 10-Qs and ultimately to regain compliance with all of the Nasdaq Listing Rules and restore its listing as soon as practicable, [but that] no assurance [could] be given as to the definitive date on which such periodic reports [would] be filed or whether the Company [would] ultimately regain compliance with all of the Nasdaq Listing Rules and return to being listed on The Nasdaq Global Select Market in the future.

124. On February 28, 2024 before the market opened (7:00 am ET) (and following the Feb. 27, 2024 press release announcing an anticipated cessation of trading of its common stock on

Nasdaq), Veradigm issued a press release (attached as Ex. 99.1 to its Feb. 28, 2024 Form 8-K filed with the SEC before the market opened (7:07 am ET)) announcing that the Nasdaq Hearing Panel had decided to delist Veradigm's common stock and that trading in the Company's common stock would be suspended the next day—effective February 29, 2024. The decision to suspend was based on the Company's continued noncompliance with Nasdaq Listing Rule 5250(c)(1) for failing to file its 2022 Form 10-K and its Q1, Q2, and Q3 2023 Forms 10-Q, as well as on Veradigm's failure to hold an annual meeting of stockholders within one year of the end of the Company's fiscal year, as required by Nasdaq Listing Rule 5620(a).

125. In the Feb. 28, 2024 press release, the Company further announced that although its common stock was suspended from trading on Nasdaq, it expected that its shares would be quoted on an OTC market with its existing ticker symbol MDRX.

126. The Company further stated that it was "working diligently to file the [delinquent] Form 10-K and the Form 10-Qs, and ultimately to regain compliance with all of the Nasdaq Listing Rules and restore its listing as soon as practicable…." The Company noted, however, that "no assurance can be given as to the definitive date on which such periodic reports will be filed or whether the Company will ultimately regain compliance with all of the Nasdaq Listing Rules and return to being listed on The Nasdaq Global Select Market in the future."

127. On February 29, 2024, over a year into its investigations, Veradigm common stock was halted from trading on Nasdaq after missing the compliance deadlines to file its delinquent financials.

### 14. With Mounting Problems and Investigations, and Delinquent Restated and Yet-To-Be-Issued SEC Filings, Veradigm Delays the Filing of Its 2023 Form 10-K.

128. Following the admissions regarding financial misstatements, the need for the issuance of restated financials, at least two independent investigations into financial reporting and

internal controls, and delinquent SEC financial statements dating back to 2022, Veradigm failed to file yet another key SEC filing: its 2023 Form 10-K.

129. On March 1, 2024, after the market closed (4:07 pm ET), Veradigm filed with the SEC a Notification of Late Filing on Form 12b-25 with respect to its 2023 Form 10-K for the FY 2023. In the filing, Veradigm parroted past admissions, stating it was "unable to file" its 2023 Form 10-K "within the prescribed time period provided by the applicable rules of the [SEC] without unreasonable effort and expense."

130. In the Mar. 1, 2024 Notification of Late Filing, the Company yet again cautioned that its Forms 10-Q and 10-K filings from Q1 2021 forward "should no longer be relied upon because of misstatements to the Company's previously reported revenue resulting from certain internal control failures." The Company repeated the nature of those internal control failures that caused those financial statements to have been materially misstated such that they should not be relied upon and the painstaking nature of the effort to remedy the misleading financials as well as the second investigation initiated by the Audit Committee that arose out of these efforts.

131. In line with those filed financial statements that "should no longer be relied upon," the Company likewise reported in the Mar. 1, 2024 Notification of Late Filing that because "of the internal control failures described above and the ongoing Audit Committee Investigation," it had been unable to file its 2022 and 2023 Forms 10-K and the Q1, Q2, and Q3 Forms 10-Q. The Company continued to promise that it was "working diligently" to file them—to "ultimately … regain compliance with all of the Nasdaq Listing Rules and restore its listing as soon as practicable." But the Company caveated that "no assurance [could] be given as to the definitive date on which such periodic reports [would] be filed or whether the Company [would] ultimately

regain compliance with all of the Nasdaq Listing Rules and return to being listed on The Nasdaq Global Select Market in the future."

### 15. Veradigm (MDRX) is Delisted From Nasdaq

132. On April 25, 2024, after the market open (9:08 am ET), Nasdaq Stock Market LLC filed with the SEC on Form 25 a Notification of Removal from Listing and/or Registration Under Section 12(b) of the Securities Exchange Act of 1934 related to Veradigm Inc.

133. On the same day, after the market closed (4:03 pm ET), Veradigm filed with the SEC its April 25, 2024 Form 8-K announcing Nasdaq's filing of the Form 25 and stating that the "delisting [would] become effective ten days after the Form 25 was filed." The Company also reaffirmed that its "securities were suspended from trading on Nasdaq on February 29, 2024 and have not traded on Nasdaq since that time."

### 16. Veradigm Delays the Filing of Its Q1 2024 Form 10-Q

134. On May 13, 2024, Veradigm delayed yet another quarterly filing: its Q1 2024 Form 10-Q.

135. On May 13, 2024, after the market closed (5:00 pm ET), Veradigm filed with the SEC a Notification of Late Filing on Form 12b-25 with respect to its Q1 2024 Form 10-Q for quarter ended March 31, 2024. Veradigm reported that it was "unable to file" its Q1 2024 Form 10-Q "within the prescribed time period provided by the applicable rules of the [SEC] without unreasonable effort and expense."

136. The Company again cautioned that its Forms 10-Q and 10-K filings from Q1 2021 forward "should no longer be relied upon because of misstatements to the Company's previously reported revenue resulting from certain internal control failures." The Company again repeated the nature of those internal control failures that caused those financial statements to have been materially misstated such that they should not be relied upon and that the "extended timeline then

arose from the need to build a new supplemental revenue system tool and the extensive manual work to aggregate and map the Company's historical transaction data into the new system tool."

137. The Company also stated that the Audit Committee's second, independent investigation into "other matters relating to the Company's financial reporting, internal controls over financial reporting, and disclosure controls … is ongoing."

138. In light of its reported financial misstatements, reporting delay, and new internal investigation, the Company reported in the May 13, 2024 Notification of Late Filing that because "of the internal control failures described above and the ongoing Audit Committee Investigation, the Company has been unable to file" its 2022 and 2023 Forms 10-K; the Q1, Q2, and, Q3 2023 Forms 10-Q; and the Q1 2024 Form 10-Q, stating that it was "working diligently to file [them]," although "no assurance [could] be given as to the definitive date on which such periodic reports [would] be filed or whether the Company [would] ultimately return to being listed on The Nasdaq Global Select Market in the future."

139. Regarding the expected cumulative impact of the internal control failures, the Company reported as follows:

> As of the date hereof, the Company anticipates that the cumulative impact of the internal control failures noted above will not be expected to exceed $20 million and will not materially exceed 3% of full year revenue from continuing operations for 2021 and 2022. A portion of this impact is also expected to relate to 2020, and the Company is reviewing whether a restatement of the Company's financial statements as of and for the year ended 2020 will be required. The Company has determined that the impact for 2021 will require a restatement of the Company's financial statements as of and for the year ended December 31, 2021, and these restated amounts will accompany the 2022 Form 10-K filing. The Company also expects that there will be an impact on the Company's revenue from discontinued operations for the corresponding periods.

140. The Company further explained that the Audit Committee's Investigation extends into 2023, stating that: "the internal control failures noted above relate to fiscal year 2022 and

prior periods, and the anticipated adjustments due to the Audit Committee Investigation relate to fiscal year 2023 and prior periods." However, the Company noted that, as of then, the issues being addressed did not affect cash: "the potential adjustments to the Company's previously issued financial statements prepared in accordance with US generally accepted accounting principles that have been identified as a result of the Audit Committee Investigation are not affecting cash. However, the Audit Committee Investigation remains ongoing, and additional adjustments may be identified."

### 17. Veradigm Delays the Filing of Its Q2 2024 Form 10-Q

141. On August 12, 2024, after the market closed (4:07 pm ET), Veradigm filed with the SEC another Notification of Late Filing on Form 12b-25 with respect to its Q2 2024 Form 10-Q for the fiscal second quarter ending June 30, 2024. In the filing, Veradigm stated that it was "unable to file" its Q2 2024 Form 10-Q "within the prescribed time period provided by the applicable rules of the [SEC] without unreasonable effort and expense."

142. In the Aug. 12, 2024 Notification of Late Filing, the Company yet again cautioned that its Forms 10-Q and 10-K filings from Q1 2021 forward "should no longer be relied upon because of misstatements to the Company's previously reported revenue resulting from certain internal control failures."

143. The Company again repeated the nature of those internal control failures that caused those financial statements to have been materially misstated such that they should not be relied upon. It also reiterated that the second, separate investigation initiated by the Audit Committee was ongoing.

144. The Company stated that: "[b]ecause "of the internal control failures, including those described above, and the ongoing Audit Committee Investigation," it had been "unable to file its" 2022 and 2023 Form 10-K; Q1, Q2, and Q3 2023 Forms 10-Q; and Q1 and now Q2 2024

Forms 10-Q. The Company continued to promise that it was "working diligently" to file them, but the Company caveated that "no assurance [could] be given as to the definitive date on which such periodic reports [would] be filed or whether the Company [would] ultimately return to being listed on The Nasdaq Global Select Market in the future."

### 18. While Delaying the Filing of Its Q3 2024 Form 10-Q, Veradigm Discloses That "Other Matters Relating to Its Internal Controls Over Financial Reporting and Disclosure Controls" Are Being Reviewed

145. After the market closed on November 13, 2024 (4:06 pm ET), Veradigm filed with the SEC yet another Notification of Late Filing on Form 12b-25 with respect to its Q3 2024 Form 10-Q for the fiscal quarter ended September 30, 2024. In the filing, Veradigm indicated that it had determined it was "unable to file" its Q3 2024 Form 10-Q "within the prescribed time period provided by the applicable rules of the [SEC] without unreasonable effort and expense." The Company yet again cautioned that its 10-Q and 10-K filings from Q1 2021 forward "should no longer be relied upon because of misstatements to the Company's previously reported revenue resulting from certain internal control failures."

146. The Company described the nature of those internal control failures, but disclosed yet additional "other matters" relating to internal controls being reviewed:

> The internal control failures identified at that time primarily stemmed from accounting processes and a software tool implemented by the Company in order to comply with the requirements of Financial Accounting Standards Board's rule Accounting Standards Codification 606. Separately, the Audit Committee of the Board began independently investigating other matters relating to the Company's financial reporting, internal control over financial reporting and disclosure controls, which investigation (the "Audit Committee Investigation") is ongoing. **In addition, the Company began reviewing other matters relating to its internal control over financial reporting and disclosure controls.**

147. The Company indicated that it was "reviewing whether a restatement … for the year ended December 31, 2020 will be required."

148. Because "of the internal control failures, including those described above, and the ongoing Audit Committee Investigation," the Company reported that it had been unable to file its" 2022 Form 10-K; Q1, Q2, and Q3 2023 Forms 10-Q; 2023 Form 10-K; and Q1, Q2, and now Q3 2024 Forms 10-Q. The Company continued to promise that it was "working diligently" to file them, but caveated that "no assurance [could] be given as to the definitive date on which such periodic reports [would] be filed or whether the Company [would] ultimately return to being listed on The Nasdaq Global Select Market in the future."

### 19. More Than Two Years After First Announcing Internal Control Issues, and with All Delinquent Restated and Delayed SEC Filings Yet to Be Issued, Veradigm Delays the Filing of Its 2024 Form 10-K and Extends Restatements to Include 2020

149. On March 4, 2025, over two years after first calling into question its internal controls, after announcing the need to restate certain financial statements, and after delaying the filing of the 2022 Form 10-K, Veradigm announced the delay of the filing of its third delinquent Form 10-K: the 2024 Form 10-K.

150. After the market closed that day (5:16 pm ET), Veradigm filed with the SEC a Notification of Late Filing on Form 12b-25 with respect to its 2024 Form 10-K for the FY ended December 31, 2024. In the filing, Veradigm indicated that it had determined it was "unable to file" its 2024 Form 10-K "within the prescribed time period provided by the applicable rules of the [SEC] without unreasonable effort and expense."

151. The Company reiterated that its consolidated financial statements and related disclosures for FY 2021 and each of the first three quarters of 2021 and 2022 "should no longer be relied upon because of misstatements to the Company's previously reported revenue resulting from certain internal control failures." The Company reiterated that, because "of the internal control failures," it was unable to file its 2022 and 2023 Forms 10-K; Q1, Q2, or Q3 2023

Forms 10-Q; Q1, Q2, or Q3 2024 Forms 10-Q, and now its 2024 Form 10-K. It further stated, that while it was "working diligently" to file them, "no assurance can be given as to the definitive date on which such periodic reports [would] be filed or whether the Company [would] ultimately return to being listed on The Nasdaq Global Select Market in the future."

152. The Company revised its previously-disclosed adjustments to revenue from continuing operations, which it last estimated should be no more than $30 million in aggregate for three years (2020-2022). "[T]he Company anticipates that the adjustments to the Company's revenue from continuing operations will be less than an aggregate $10 million reduction for 2020 and 2021 and less than an aggregate $15 million reduction for the nine months ended September 30, 2022."

153. The Company reiterated that financial statements over two years would need restatement. However, the Company now extended the need for restatement into 2020:

> [T]he Board, after discussion with management, reached a determination on February 27, 2025 that the Company's consolidated financial statements and related disclosures as of and for the year ended December 31, 2020 included in its Annual Report on Form 10-K for the fiscal year ended December 31, 2020 (the "2020 Financial Statements") should also no longer be relied upon because of misstatements to the Company's consolidated balance sheet and income statement identified in connection with the procedures conducted by the Company in connection with the audit of the Company's financial statements as of and for the year ended December 31, 2022. All of these restated amounts will accompany the 2022 Form 10-K filing, and the Company does not anticipate that the determination to restate the 2020 Financial Statements will affect the timing of the filing of the 2022 Form 10-K. The Company also expects that there will be an impact on the Company's revenue from discontinued operations for the corresponding periods.

154. The Company noted that it "also expects that there will be an impact on the Company's revenue from discontinued operations for the corresponding periods." And, it reiterated that "anticipated adjustments to the Company's previously issued financial statements

… that were identified as a result of the Audit Committee Investigation and the Company's Internal Review did not affect cash."

155. For the first time, the Company offered a more detailed history of three separate internal Investigations that it conducted to identify and remedy the internal control deficiencies and to restate its financials and restart issuing financials. ***First***, after identifying internal control failures in February 2023, "[t]he Company commenced a review into certain accounting and internal control matters…."—the Restatement Review. ***Second***, "the Audit Committee of the Board began independently investigating … other matters relating to the Company's financial reporting, internal control over financial reporting and disclosure controls"—the Audit Committee Investigation. And ***third***, "the Company conducted an internal review…, engaging counsel as well as forensic and technical accountants"—the Internal Review. The Company further stated that, "[a]s of the date of this report, the Audit Committee Investigation and the [] Internal Review were complete, and the Restatement Review will be complete at the time the Company files the 2022 Form 10-K (as described below), although remediation work will continue with respect to all identified material weaknesses."

### 20. Veradigm Announces Its Anticipated Restatement Financial Statements and Its 2022 Form 10-K

156. On March 4, 2025, after the market closed (5:12 pm ET), Veradigm filed with the SEC its Mar. 4, 2025 Form 8-K. Therein, the Company reiterated the financial statements for 2021 and each of the three quarters of 2021 and 2022 should no longer be relied upon because of internal control problems. The Company also reiterated that it had recently determined that the 2020 Annual Report on Form 10-K for the year ending December 31, 2020 would need restatement. The Company again detailed the timing and nature of the three investigations that it had conducted over the course of the prior two years.

157. The Company then disclosed that it expected to file its restated 2022 Form 10-K, and to further report on "material weaknesses" with regard to both "disclosure controls" and "internal controls over financial reporting," which were "not effective as of December 31, 2022."

158. Veradigm also reported that the "Board and management have discussed the matters disclosed in this [Form 8-K] with the Company's independent registered public accounting firm, Grant Thornton LLP."

### 21. Veradigm Files Its 2022 Form 10-K With Restated Financials—a Filing That Provides Guidance Into the Nature, Scope, and Magnitude of the Material Misrepresentations Made

159. After the market closed on Thursday, March 13, 2025 (9:57 pm ET), Veradigm issued a press release headlined "Veradigm to Release Financial Update March 18th and Host Investor Call March 19th". Previewing an important "financial update" the following week, the Mar. 13, 2025 press release stated, "Veradigm announced today that management plans to provide a financial update after the close of regular stock market hours on March 18, 2025. Veradigm management plans to host an investor conference call and webcast to discuss the Company's update at 8:00 a.m. Eastern Time on March 19, 2025."

160. On Tuesday, March 18, 2025, after the market closed (5:24 pm ET), Veradigm filed with the SEC its Mar. 18, 2025 Form 8-K. In the Mar. 18. 2025 Form 8-K, the Company announced that it had filed its long-awaited restated 2022 comprehensive Annual Report on Form 10-K for the year ended December 31, 2022, which also contains certain restated financial information.

161. Appended to the Mar. 18. 2025 Form 8-K and "incorporated [t]herein by reference" were two press releases that were issued after the market closed. The first, attached to the Mar. 18. 2025 Form 8-K as Ex. 99.1, was headlined "Veradigm Provides Updates on Fiscal 2023 and 2024 and an Outlook for Fiscal 2025" and was issued at (4:29 pm ET). The second, attached to the

Mar. 18. 2025 Form 8-K as Ex. 99.2, was headlined "Veradigm Files Fiscal 2022 Form 10-K and Restated Financial Statements" and was issued at (4:17 pm ET).

162. Concurrent with those filings, on March 18, 2025, after the market closed (4:07 pm ET), Veradigm filed with the SEC its 2022 Form 10-K with restated financial statements.

163. The Company explained what was restated: "The restated consolidated financial statements as of and for the years ended December 31, 2021 and December 31, 2020 and the restated unaudited interim condensed consolidated financial statements for the first three quarters and interim periods of 2022 and the first three quarters and interim periods of 2021 are included in this Form 10-K." The results of this restatement and the Company's admissions therein are discussed in Section IV.D. and V.B., *infra*.

164. The Company further explained in the Restatement how three separate internal investigations were conducted at the same time:

a. The Restatement Review, which included "an analysis of our historical financial statements, accounting policies, and financial reporting, as well as our disclosure controls and procedures and our internal control over financial reporting and was conducted with the assistance of third-party forensic and technical accountants."

b. The Audit Committee Investigation, "which began independently investigating other matters relating to the Company's financial reporting, internal controls over financial reporting, and disclosure controls." "The Audit Committee retained independent counsel and an independent forensic accounting firm to advise the Audit Committee in connection with this

investigation…, which was conducted independent from the Restatement Review."

c. The Internal Review, which "re-evaluate[d] certain accounting transactions and accounting practices identified as part of the Audit Committee Investigation as well as to conduct[ed] additional review, as appropriate, independent from the Restatement Review, the Company conducted an internal review…, engaging counsel as well as forensic and technical accountants. The Company's Internal Review included evaluating each such transaction or accounting practice to determine among other things, whether any such transaction or practice may have had a material financial reporting impact." The Company explained that "[a]s part of [its] Internal Review, other accounting matters were also evaluated, focused on identifying transactions recognized in a manner that may have been inconsistent with GAAP…."

165. Together these three investigations identified additional restatement adjustments and material weaknesses in internal controls over financial reporting as discussed in Section IV.D. and V.B., *infra*. The Company finally explained what led to the Company's Internal Review:

- Commercial substance for revenue transactions with certain third parties;
- Revenue recognition with respect to certain customer matters, including customer settlements and customer terminations;
- Revenue recognition related to a certain customer's annual minimum commitments; and

- Revenue recognition arising from usage of revenue-related reserves.[13]

166. Additionally, the Company engaged counsel and technical and forensic accountants. The Company further stated that, as of the date of the Restatement report (March 18, 2025), the Internal Review was complete, and "[w]here needed, restatement adjustments were made and have been incorporated into this Form 10-K as a result of the Company's Internal Review."

167. The Company also disclosed that it had voluntarily disclosed to the Staff of the SEC information concerning the Audit Committee Investigation, and that the SEC opened an investigation as a result. The Company maintained that it was cooperating with the SEC.

168. On March 19, 2025, Veradigm held its Q4 2024 earnings call. Therein, the interim CFO Leland Westerfield stated that "[w]e do not anticipate becoming current in our financial reporting until sometime in 2026."

169. With regard to 2022, Westerfield stated:

> The impact of the internal control failures on the company's assets was a reduction of $63 million for the year ended 2020 and a reduction of $119 million for the year ended 2021. For the nine months ended September 2022, restated assets were reduced by $57 million. Deferred revenue and contract assets, goodwill and accounts receivable were the primary accounts affected on the risk statement balance sheet.

170. As of the filing of this complaint, Veradigm has still seemingly not remediated the material weakness in its financial controls, regained compliance with Nasdaq listing requirements, or filed all its overdue periodic filings with the SEC.

[13] 2022 Form 10-K, at 4.

#### 22. After Issuing Its Restatement, Veradigm Dismisses Its Auditor, Grant Thornton

171. On April 17, 2025, Veradigm filed with the SEC its Apr. 17, 2025 Form 8-K (5:02 pm ET) announcing that:

> The [Audit Committee] of the board of directors of Veradigm…, recently completed a competitive process to determine which audit firm would serve as the Company's independent registered public accounting firm for the years ended December 31, 2023, 2024 and 2025. ***On April 14, 2025, the Company notified Grant Thornton LLP … of its dismissal as the Company's independent registered public accountant, effective as of that date***. The decision to change independent registered public accounting firms was approved by the Audit Committee.

## D. THE VERADIGM DEFENDANTS' FRAUDULENT CONDUCT

### 1. Despite Their Duty to Ensure That Veradigm Had Effective Internal Controls, the Company's Controls Were Materially and Deeply Deficient

172. The Veradigm Defendants' reckless or intentional failure to implement and maintain effective internal controls and disclosure controls and procedures facilitated their far-reaching fraud alleged herein.

#### a. As They Acknowledged, Veradigm Defendants Were Required to Ensure That Veradigm's Internal Controls Were Effective

173. The securities laws and SEC regulations require that public companies maintain robust controls over both their disclosures and financial reporting. "Internal controls" are internal processes and standards that ensure that the information about a public company's business operations and financial results in public filings is complete and accurate. Thus, internal controls are critical to public companies and their investors because they provide reasonable assurance that a company's publicly reported financial results are materially accurate and that any material fraud or misstatement is detected and prevented.

174. Public companies are required to design and implement two kinds of internal controls to ensure that their representations to investors—both financial and non-financial—are accurate.

175. First, companies must adopt "Disclosure controls and procedures." Disclosure controls and procedures ensure that information required to be disclosed by a company under the Exchange Act is communicated to company management and its board sufficiently in advance of the company's filing dates to allow them ample time to consider it and disclose it to investors.

176. Second, companies must design and implement "Internal controls over financial reporting." Internal controls over financial reporting are designed to provide reasonable assurances that a company's financial statements are accurate, reliable, and prepared in accordance with GAAP before they are disclosed to investors.

177. Company management is required to review and evaluate these internal controls to determine their effectiveness at preventing or detecting material misstatements of financial statements a timely manner. Indeed, internal control over financial reporting, as defined in Rules 13a-15(f) and 15d-15(f) under the Exchange Act, is a process designed by or under the supervision of the CEO and CFO and is effected by the Board of Directors, management, and other personnel to provide investors with reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external reporting purposes in accordance with U.S. GAAP.[14]

[14] *See also*, PCAOB AS 1001.03 ("Management is responsible for adopting sound accounting policies and for establishing and maintaining internal control that will, among other things, initiate, record, process, and report transactions (as well as events and conditions) consistent with management's assertions embodied in the financial statements.").

178. Rule 13a-15(f) provides that internal control over financial reporting includes those policies and procedures that:

a. pertain to the maintenance of records that in reasonable detail accurately and fairly reflect the transactions and dispositions of the assets of the issuer;

b. provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with US GAAP, and that receipts and expenditures of the issuer are being made only in accordance with appropriate authorization of management and directors of the issuer; and

c. provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use or disposition of the issuer's assets that could have a material effect on the financial statements.[15]

179. In the Management's Report on Internal Control over Financial Reporting in each of its Class Period Forms 10-K, the Veradigm Defendants acknowledged that "[o]ur management is responsible for establishing and maintaining adequate internal control over financial reporting as defined in Rules 13a-15(f) and 15d-15(f) under the Exchange Act."

180. There are several statutes and regulations that expressly outline the responsibilities of CEOs and CFOs to maintain adequate internal controls and disclosure controls and procedures, and to either publicly certify to investors that the controls they had in place were adequate or disclose any material weaknesses.

---

[15] *See also*, 2022 Form 10-K, at 170 (Veradigm acknowledging this responsibility); Section 12(b)(2) of the Exchange Act entitled *Periodical and Other Reports.*

181. First, Section 302 of Sarbanes-Oxley requires that the CEO and CFO take a proactive role in their company's public disclosures and certify the quarterly and annual reports filed with the SEC and the procedures established by the company to prepare the company's financial statements and its disclosures generally. Among other things, they also must certify that they established and maintained disclosure controls and internal controls, they disclosed any material weaknesses in the design or operations of the internal controls, and that, to the best of their knowledge, the financials fairly present the financial condition and operations of the company. Throughout the Class Period, the Individual Defendants made such certifications without disclosing any material weaknesses.

182. Section 404 of SOX, 15 U.S.C. § 7262, also requires that management of a public company and its outside auditor annually evaluate the effectiveness of the company's internal controls over financial reporting and disclose the conclusions, including any material weaknesses, to investors. Section 404 of SOX was "intended to bring information about material weaknesses in [internal controls] into public view." SEC Release 33-8810.

183. Second, Section 404 of SOX requires management at public companies to select an internal control framework and then assess and report on the design and operating effectiveness of those internal controls on an annual basis.

184. Most companies adopt the *Internal Control—Integrated Framework* issued by the Committee of Sponsoring Organizations of the Treadway Commission (2013 framework) (the "COSO Framework") to report on their internal controls in compliance with SOX. And, in its Class Period Forms 10-K, Veradigm represented that its management, including its CEO and CFO,

conducted evaluations of its internal controls over financial reporting as of December 31, 2019, December 31, 2020, and December 31, 2021 in accordance with the COSO Framework.[16]

185. The COSO Framework defines internal control as a process "designed to provide reasonable assurance regarding the achievement of objectives" related to (a) the effectiveness and efficiency of operations; (b) the reliability of financial reporting; and (c) compliance with applicable laws and regulations.[17] It further explains that proper application of its guidelines provides stakeholders, such as investors, with greater confidence in a company's internal controls. *Id.* The COSO Framework identifies the following interrelated components of internal control:

a. The control environment. The "control environment" is the set of standards, processes, and structures that provide the basis for carrying out internal control across the organization. The board of directors and senior management establish the "tone at the top" regarding the importance of internal control including expected standards of conduct. Management reinforces expectations at the various levels of the organization. The Treadway Commission described the tone set by top management as the single "most important factor" affecting the integrity of a company's financial reporting process: "The tone set by top management – the corporate environment or culture within which financial reporting occurs –

[16] *See also*, 2022 Form 10-K, at 170.

[17] COSO Framework, Executive Summary; The term "reliable" as used in the COSO Framework requires that financial statements be fairly presented in conformity with GAAP and regulatory requirements. Reliability of financial reporting applies to published financial statements, including interim and consolidated financial statements, and selected financial data, such as earnings releases, derived from these financial statements.

is the most important factor contributing to the integrity of the financial reporting process…."[18]

b. The company's risk assessment process. "Risk is defined as the possibility that an event will occur and adversely affect the achievement of financial reporting objections. Risk assessment involves a dynamic and iterative process for identifying and assessing risks to the achievement of objectives. …. [R]isk assessment forms the basis for determining how risks will be managed. Management specifies objectives … [relating to financial reporting] with sufficient clarity to be able to identify and analyze risks to those objectives."[19]

c. Information and communication. The "information and communication" component requires that the organization (a) "obtains or generates and uses relevant, quality information to support the functioning of internal control;"[20] (b) "internally communicates information, including objectives and responsibilities for internal control, necessary to support the functioning of internal control;"[21] and (c) "communicates with external parties regarding matters affecting the functioning of internal control."[22]

d. Control activities. The "control activities" component requires that the organization (a) "selects and develops control activities that contribute to the

[18] Report of the National Commission on Fraudulent Financial Reporting, October 1987, at 32.

[19] COSO Framework, Executive Summary.

[20] COSO Framework, Executive Summary.

[21] COSO Framework, Executive Summary.

[22] COSO Framework, Executive Summary.

mitigation of risks to the achievement of objectives to acceptable levels;"[23] (b) "selects and develops general control activities over technology to support the achievement of objectives;"[24] and (c) "deploys control activities through policies that establish what is expected and procedures that put policies into action."[25] The COSO Executive Summary further explains that "[c]ontrol activities are the actions established through policies and procedures that help ensure that management's directives to mitigate risks to the achievement of objectives are carried out. [] They may be preventive or detective in nature and may encompass a range of manual and automated activities[.]"[26]

e. Monitoring of controls. The "monitoring activities" component requires that an organization (a) "selects, develops, and performs ongoing and/or separate evaluations to ascertain whether the components of internal control are present and functioning,"[27] and (b) "evaluates and communicates internal control deficiencies in a timely manner to those parties responsible for taking corrective action, including senior management and the board of directors, as appropriate."[28]

[23] COSO Framework, Executive Summary.

[24] COSO Framework, Executive Summary.

[25] COSO Framework, Executive Summary.

[26] COSO Framework, Executive Summary.

[27] COSO Framework, Executive Summary.

[28] COSO Framework, Executive Summary.

186. The COSO Framework recognizes that the CEO sets the "tone at the top" that affects integrity, ethics, and other factors of a positive control environment. "In any organization, 'the buck stops' with the chief executive. He or she has ultimate ownership responsibility for the internal control system.… The influence of the CEO on an entire organization cannot be overstated."[29] The CEO fulfills this duty by providing leadership and direction to senior managers and reviewing the way they are controlling the business. Management reinforces expectations at the various levels of the organization. The control environment comprises (a) the integrity and ethical values of the organization; (b) the parameters enabling the board of directors to carry out its governance oversight responsibilities; (c) the organizational structure and assignment of authority and responsibility; (d) the process for attracting, developing, and retaining competent individuals; and (e) the rigor around performance measures, incentives, and rewards to drive accountability for performance.[30] The resulting control environment has a pervasive impact on the overall system of internal control.[31]

187. Third, Item 307 of SEC Regulation S-K, 17 CFR § 229.307, requires that a company disclose the conclusions of its CEO and CFO regarding the effectiveness of the company's disclosure controls and procedures as of the end of the period covered by the periodic report. Item 308 of Regulation S-K, 17 CFR § 229.308(a)(3) ("Item 308"), similarly requires that a company provide annual reports on the state of its internal controls containing a statement of management's responsibility for maintaining adequate internal controls, identifying the framework used by management to evaluate the effectiveness of the internal controls, and the

[29] COSO Framework, Chapter 8, at 84; se*e also*, COSO Internal Control—Integrated Framework (2013), Chapter 5, Control Environment, Tone at the Top and Throughout the Organization.

[30] COSO Framework, Executive Summary.

[31] COSO Framework, Executive Summary.

assessment of the effectiveness of the internal controls. Under Item 308 "[m]anagement is not permitted to conclude that the registrant's internal control over financial reporting is effective if there are one or more material weaknesses in the registrant's internal control over financial reporting." A statement that internal controls over financial reporting are effective is, therefore, an assertion by management that there are no material weaknesses in such internal controls. In addition to management's annual report on internal controls over financial reporting, SEC Regulation § 240.13a-15(d) requires that companies such as Veradigm evaluate any change in its internal controls over financial reporting that occur during each of its fiscal quarters. After such evaluation, Item 308 requires that a company disclose any change to its internal controls over financial reporting during its last fiscal quarter.

188. Under the Public Company Accounting Oversight Board's ("PCAOB") Accounting Standards, a "material weakness" in internal controls over financial reporting is a control deficiency "such that there is a reasonable possibility that a material misstatement of [a] company's annual or interim financial statements will not be prevented or detected on a timely basis."[32] A "significant deficiency," by contrast, is a deficiency in internal control over financial reporting that is less severe than a material weakness, but important enough to merit attention by those responsible for oversight of a company's financial reporting.

---

[32] AS 1305: *Communications About Control Deficiencies in an Audit of Financial Statements* ¶ 3; *see also*, AS 2201: *An Audit of Internal Control Over Financial Reporting That Is Integrated with An Audit of Financial Statements*; SEC Release No. 33-8238, § II.F.1. *See also*, 2022 Form 10-K, at 171.

### b. As Veradigm Admits in the Restatement, the Company's Internal Controls Were Ineffective and Materially Deficient

189. Veradigm has acknowledged that the Company's internal controls over financial reporting were deficient during the Class Period. In its Restatement, it describes widespread deficiencies and deficiencies with respect to core issues.

190. In its Restatement, the new CEO and CFO concluded that Veradigm's "disclosure controls and procedures were not effective due to the material weaknesses in the Company's internal controls over financial reporting."[33]

191. Moreover, as the Company further explained, the Restatement Review identified other internal control deficiencies beyond those first disclosed in 2023 (which stemmed from ineffective manual accounting processes and a software tool implemented to comply with ASC 606). These included "ineffective internal controls related to manual journal entries, measurement of expected credit losses, and divestiture accounting as well as application of revenue recognition requirements to existing contracts, updates to ASC 606 accounting policies for new transaction types, and testing of system-generated reports."[34]

192. In fact, together the Restatement Review and Audit Committee Investigation identified seven material weaknesses in the Company's internal control over financial reporting, the first of which goes to the core of Veradigm's controls and the remaining six of which related to other key aspects of the Company's financial reporting.

193. The first admitted material weaknesses relates to Veradigm's "control environment," that is, the set of standards, processes, and structures that provide the basis for carrying out internal control across the organization:

---

[33] 2022 Form 10-K, at 5, 170.

[34] 2022 Form 10-K, at 4.

> ***Control Environment:*** The Company did not consistently maintain an effective control environment, including with respect to effective accounting management reviews and supporting documentation for accounting determinations and journal entries, at an appropriate level of precision in the accounting and finance organization and that the Company's internal controls over financial reporting were not effective due to material weaknesses….[35]

194. More specifically, Veradigm admitted that its control environment was deficient because of material instances of:

> (1) inappropriate communications under the then-existing senior management, particularly within the Company's finance organization, which contributed to accounting entries being recorded, in certain instances, in a manner now determined not to have been consistent with U.S. GAAP and Company accounting policies and procedures, (2) insufficient resources in the Company's accounting function of the finance organization, with insufficient technical expertise in certain subjects, and (3) the exercise of judgment within the Company's finance organization or by senior management.[36]

195. As the Restatement further explained, the material weakness in its internal control environment contributed to the second through seventh material weaknesses:

> **Revenue Recognition Accounting:** The Company did not consistently maintain effective internal controls over financial reporting with respect to the accurate recording, accounting for, and presentation of revenue and related costs, including as arising from or relating to (1) a revenue recognition software tool that was not properly configured in prior implementations and exacerbated by a lack of appropriate controls and management oversight, (2) the application of U.S. GAAP to new and/or complex matters, (3) the monitoring of key system reports for relevant control activities, and (4) the related balance sheet presentation of contract assets and deferred revenues.
>
> **Measurement of Expected Credit Losses:** The Company did not consistently maintain effective internal controls over financial reporting, including monitoring of key system reports for relevant control activities, with respect to ***measurement of expected credit losses, particularly in connection with the Company's 2022 divestiture of the HLPP business***

---

[35] 2022 Form 10-K, at 5.

[36] 2022 Form 10-K, at 171.

> ***and changes in the risk profile of the Company's trade accounts receivable*.**
>
> **Financial Reporting:** The Company did not consistently maintain effective internal controls over financial reporting, including monitoring of key system reports for relevant control activities, with respect to review and documentation supporting financial statement disclosures and manual journal entries.
>
> **Divestiture Accounting:** The Company did not consistently maintain effective internal controls over financial reporting with respect to the computation for, review of, and maintenance of appropriate support for carve-out balances for divested operations, particularly the allocation of deferred revenue and contract assets to the discontinued operations and related balance sheet reconciliations.
>
> **Impairment Accounting for Long-Lived and Intangible Assets:** The Company did not consistently maintain effective internal controls over financial reporting, including the monitoring of key system reports for relevant control activities, with respect to (1) the consideration of impairment indicators for the Company's cost method investments and right of use assets in accordance with U.S. GAAP, and (2) tradename accounting controls to operate at a sufficient level of precision to perform an assessment of whether the intangible asset was no longer indefinite-lived when required. The Company also allowed instances of the exercise of judgment within the Company's finance organization or by senior management in a manner that was inconsistent with the Company's accounting policies or that otherwise lacked sufficient support.
>
> **Bonus Accruals:** The Company did not consistently maintain effective internal controls over financial reporting with respect to the accurate recording, accounting for, and presentation of annual corporate performance bonus accruals, which in certain instances, resulted in quarterly bonus accrual amounts being adjusted and recorded based on management's inappropriate exercise of judgment.[37]

### 2. These Extensive and Material Internal Control Deficiencies Allowed Veradigm Defendants to Issue Materially False and Misleading Financials That Violated GAAP

196. The Veradigm Defendants' reckless and/or intentional exploitation of these control deficiencies allowed the Company to violate GAAP, issue the Admitted False Financial

[37] 2022 Form 10-K, at 171.

Statements, and weave its narrative of success that caused Veradigm's stock price to be artificially inflated.

### a. The Veradigm Defendants Were Responsible for Preparing Financials in Compliance with GAAP

197. As a registrant with the SEC, Veradigm and its management were responsible for issuing and fairly presenting its consolidated financial statements in accordance with GAAP and SEC Rules during the Class Period.[38]

198. GAAP are the principles recognized by the accounting profession as the conventions, rules, and procedures necessary to define accepted accounting practices at a particular time, against which financial presentations should be measured. Authoritative GAAP is promulgated by FASB and is contained within the FASB's Accounting Standards Codification ("ASC") or "FASB Codification." Rules and interpretive releases of the SEC under the authority of federal securities laws are also sources of authoritative U.S. GAAP for SEC registrants (ASC Topic 105 – Generally Accepted Accounting Principles).

199. GAAP brings consistency, conformity and, over time, comparability to financial reporting. It includes not only broad guidelines of general application but also detailed practices and procedures. Those conventions, rules, and procedures provide a standard by which to measure financial presentations. Indeed, GAAP is established in recognition of the following financial reporting objectives of providing (a) "financial information about the reporting entity that is useful to existing and potential investors, lenders and other creditors in making decisions about providing resources to the entity;" (b) "information about the financial position of a reporting entity, which

[38] *See* 17 CFR § 210.4-01. *See also*, PCOAB Auditing Standards, AS 1001*: Responsibilities and Functions of the Independent Auditor,* .03 (The financial statements are management's responsibility…. The entity's transactions and the related assets, liabilities, and equity are within the direct knowledge and control of management…. Thus, the fair presentation of financial statements in conformity with generally accepted accounting principles is an implicit and integral part of management's responsibility).

is information about the entity's economic resources and the claims against the reporting entity;" (c) information about the effects of transactions and other events that change a reporting entity's economic resources and claims;" (d) "information that is useful in making economic decisions, … which would also be helpful in assessing how management has fulfilled its stewardship responsibility;" and (e) "relevant financial information [that] is capable of making a difference in the decisions made by users."[39]

200. While companies may supplement GAAP earnings with Non-GAAP metrics, all SEC registrants must report revenue figures in compliance with GAAP. *See, e.g.*, Regulation G (17 C.F.R. §244.100). Regulation S-X also requires that interim financial statements comply with GAAP, with the exception that interim financial statements need not include disclosures that would be duplicative of disclosures accompanying annual disclosures pursuant to 17 C.F.R. §210.10-01(a).

**b. Restatements Are Made to Correct Errors**

201. Because the conceptual framework underlying GAAP recognizes that financial information should faithfully represent the phenomena that it purports to represent, a company must restate its financials when material accounting errors are identified in previously issued financial statements. SEC Regulation S-X (17 C.F.R. § 210.4-01) provides that: "Financial statements filed with the [SEC] which are not prepared in accordance with [GAAP] will be

---

[39] *See Statement of Financial Accounting Concepts No. 8*, *Conceptual Framework for Financial Reporting* – Chapter 1, *The Objective of General Purpose Financial Reporting*, and Chapter 3, *Qualitative Characteristics of Useful Financial Information* (A Replacement of FASB Concepts Statements No. 1 and No. 2), Financial Accounting Standards Board (Sept. 2010), https://www.fasb.org/resources/ccurl/515/412/Concepts%20Statement%20No%208.pdf.

*See Statement of Financial Accounting Concepts No. 8*, *Conceptual Framework for Financial Reporting*—Chapter 1, *The Objective of General Purpose Financial Reporting*, and Chapter 3, *Qualitative Characteristics of Useful Financial Information*, Financial Accounting Standards Board (Sept. 2010), at ¶¶OB2, OB12, BC1.24, QC6.

presumed to be misleading or inaccurate." 17 C.F.R. § 210.4-01(a)(1). *See also* Regulation S-X (17 C.F.R. § 210.4-01(a)(1)) (financial statements filed with the SEC that are not prepared in compliance with GAAP are presumed to be misleading or inaccurate, despite footnote or other disclosure). Indeed, as GAAP applies to items that are material, restatements are only necessary to correct material errors in previously issued financial statements.

202. Generally, a restatement is "the process of revising previously issued financial statements to reflect the correction of an error in those financial statements." ASC 250-10-20.

203. An "error in previously issued financial statements" is defined as:

> an error in recognition, measurement, presentation, or disclosure in financial statements resulting from mathematical mistakes, mistakes in the application of generally accepted accounting principles (GAAP), or oversight or misuse of ***facts that existed at the time the financial statements were prepared***. A change from an accounting principle that is not generally accepted to one that is generally accepted is a correction of an error.[40]

204. By contrast, a "change in estimate" rather than a "restatement" "result[s] from ***new information***." ASC 250-10-20.

205. Ideagen Audit Analytics notes that accounting errors can greatly impact investor confidence, threatening a foundational principle upon which our capital markets system is bent. Therefore, financial restatements are a "significant measure of financial reporting quality."[41]

206. Any error in the financial statements of a prior period discovered after the financial statements are issued or are available to be issued shall be reported as an error correction by restating the prior-period financial statements.[42]

---

[40] ASC, Master Glossary, *Error in Previously Issued Financial Statements*; ASC 250 *Accounting Changes and Error Corrections*.

[41] Financial Restatements, June 2024, Ideagen Audit Analytics, at 1.

[42] ASC 250-10-45-23.

207. With respect to misstatements, GAAP states that a misstatement or omission in financial statements is material if the magnitude of an omission or misstatement of accounting information, in the light of surrounding circumstances, makes it probable that the judgment of a reasonable person relying on the information would have been changed or influenced by the omission or misstatement.[43] ASC 250-10-S99, which includes guidance set forth in SEC Staff Accounting Bulletin Nos. 99 and 108, provides additional guidance when evaluating the materiality of a misstatement or omission: ASC 250-10-S99 explicitly recognizes that the concept of materiality "in the accounting literature is in substance identical to the formulation used by the courts in interpreting the federal securities laws."[44]

208. ASC 250-10-S99 further recognizes that evaluating the importance of a misstatement or omission to a reasonable person requires that materiality be evaluated using each of the following two lenses separately: (1) is the misstatement or omission *quantitatively* important; and (2) is the misstatement or omission *qualitatively* important. *Id.*

209. Quantitatively, ASC 250-10-S99 acknowledges the practice of applying a "rule of thumb" threshold (*e.g.*, 5% of an item) to provide a "preliminary" basis for evaluating materiality. Moreover, industry practice materials recognize that this quantitative percentage may be lower for other types of benchmarks (*e.g.*, 1.0% to 2% of total assets, 0.5% to 2.0% of total revenue).[45]

---

[43] FASB Concept Statement No 2., *Qualitative Characteristics of Accounting Information*; ASC 250-10-S99; FASB Concept Statement No. 8, Conceptual Framework for Financial Reporting-Chapter 3, *Qualitative Characteristics of Useful Financial Information*, QC11. ("Information is material if omitting it or misstating it could influence decisions that users make on the basis of the financial information of a specific reporting entity.").

[44] ASC 250-10-S99.

[45] Audit Quality Thematic Review, Materiality, December 2017, Financial Reporting Council; https://corporatefinanceinstitute.com/resources/accounting/materiality-threshold-in-audits/; https://accountinguide.com/determine-materiality-in-audit/; http://archives.cpajournal.com/old/07551376.htm.

However, GAAP emphasizes that the consideration of quantitative factors is only the beginning of a materiality analysis.[46]

210. Qualitatively, ASC 250-10-S99 states that qualitative factors may cause misstatements of quantitatively small amounts to be material:

> [Q]uantifying, in percentage terms, the magnitude of a misstatement is only the beginning of an analysis of materiality; it cannot appropriately be used as a substitute for a full analysis of all relevant considerations. Materiality concerns the significance of an item to users of financial statements.

These factors include but are not limited to: (i) "whether the misstatement concerns a segment or other portion of the registrant's business that has been identified as playing a significant role in the registrant's operations or profitability," and (ii) "whether the misstatement hides a failure to meet analysts' consensus expectations for the enterprise."[47]

**c. The Veradigm Defendants Violated Key FASB Rules, Requiring Restatement of the Admitted False Financials**

211. In its Restatement, Veradigm acknowledged that its extensive and material internal control deficiencies resulted in errors in the Company's previously issued financial statements and therefore required restatement under GAAP. In fact, Veradigm admitted that its Admitted False Financial Statements were prepared in violation of several key FASB rules, each of which related to internal control deficiencies, including, but not limited to, (a) ASC 606; (b) measurement of *expected credit losses*; (c) discontinued operations and divestitures; and (d) impairment of long-term assets.

[46] ASC 250-10-S99.

[47] ASC 250-10-S99.

**ASC 606 – Revenue Recognition**

212. Just over two years prior to the commencement of the Class Period, a new rule regarding how to measure and recognize revenue and related cash flows became effective. While FASB issued ASC Topic 606 *Revenue from Contracts with Customers* ("ASC 606") on May 28, 2014, it became effective for Veradigm as a GAAP rule for its annual and quarterly reporting periods beginning after December 15, 2017.

213. ASC 606 describes principles to measure and recognize revenue and related cash flows. At its core, Veradigm was required to recognize revenue at an amount that reflected the expected consideration Veradigm was entitled to, in exchange for transferring its goods or services to a customer.[48] To comply with this principle, Veradigm was required to follow the following five-step process prior to recognizing revenue in connection with its contracts with customers.

a. **Step 1:** *Identify the contract with a customer*.

b. **Step 2:** *Identify the performance obligations in the contract*.

c. **Step 3:** *Determine the transaction price*.

d. **Step 4:** *Allocate the transaction price to the performance obligations*.

e. **Step 5:** *Recognize revenue when (or as) the performance obligations are satisfied*.[49]

214. ASC 606 allows for both the recognition of contract assets and contract liabilities (*e.g.*, deferred revenues).[50] Contract assets are an entity's right to consideration in exchange for goods or services that the entity has transferred to a customer, when that right is conditioned on something other than the passage of time (*e.g.*, the entity's future performance). Conversely,

[48] ASC 606-10-05-3.

[49] ASC 606-10-05-4.

[50] ASC 606-10-45-1

contract liabilities (*e.g.*, deferred revenue) are an entity's obligation to transfer goods or services to a customer for which the entity has received consideration (or the amount is due) from the customer.[51]

215. Veradigm represented to the public that, "effective January 1[] of 2018, [it] adopted the new 606 revenue recognition standard using the modified retrospective approach." February 21, 2019 Veradigm earnings call (regarding Q4 2018 results). Similarly, Veradigm wrote in its 2019 Form 10-K that it had "adopted [FASB] Accounting Standards Update 2014-09, *Revenue from Contracts with Customers: Topic 606* ('ASU 2014-09') effective on January 1, 2018 using the modified retrospective method." Veradigm had also represented in its 2018 Form 10-K that it had implemented internal controls allowing the Company to comply with the new requirements.

216. Nevertheless, as noted above, Veradigm acknowledged that its internal controls over revenue recognition accounting were materially deficient in the Restatement.

217. Moreover, Veradigm admitted that its accounting for revenue and related financial statement accounts, including accounts receivable, contract assets, and deferred revenue, did not comply with ASC 606 during the Class Period, and even prior to January 1, 2020. Specifically, the Restatement disclosures illustrate that the following issues contributed to Veradigm's *revenue* and related account misstatements, which constitute violations of ASC 606:

a. Misstatements "relate[d] to revenue recognition software tool configuration issues that resulted in corrections related to duplicate transactions and other

[51] ASC 606-10-20 Master Glossary.

errors and corrections for revenue recognition related to contract settlements and terminations."[52]

b. Misstatements related to the misapplication of appropriate accounting policies to new types of transactions.[53]

c. *Balance sheet* errors related to unsupported customer balances, including duplicate transactions, contract settlements, and terminations.[54]

218. Thus, the Veradigm Defendants exploited the lack of controls over revenue recognition to report false and misleading revenue and related GAAP figures plus Other Key Financial Metrics, such as *backlog* and *bookings*, during the Class Period, as outlined in Sections IV.D.2. and V.B., *infra*.

**Measurement of Expected Credit Losses**

219. As of January 1, 2020, Veradigm was required to estimate and account for *expected credit losses* on its financial assets, including accounts receivable and contract assets under Accounting Standards Codification Topic 326, *Financial Instruments – Credit Losses* (ASC 326). This standard requires entities to estimate and recognize *expected credit losses* based on historical experience, current conditions, and reasonable forecasts, rather than waiting for an incurred loss event (as previously existed under ASC 310 and ASC 450).[55]

---

[52] 2022 Form 10-K, at 119.

[53] *See* 2022 Form 10-K, at 119.

[54] *See* 2022 Form 10-K, at 119.

[55] FASB developed the guidance in response to concerns that credit losses were identified and recorded "too little, too late" in the period leading up to the global financial crisis of 2008. ASU 2016-13, BC22.

220. Throughout the Class Period, the Veradigm Defendants assured investors that they had "implemented internal controls related to the new *credit losses* accounting standard which we adopted on January 1, 2020."[56]

221. Yet, in its Restatement, Veradigm acknowledged that it failed to consistently maintain effective internal controls over financial reporting with respective to measuring and reporting of expected credit losses, including monitoring of key system reports for relevant control activities with respect to measurement of *expected credit losses*, particularly in connection with the Company's 2022 divestiture of the *HLPP* segment and changes in the risk profile of the Company's trade accounts receivable.[57]

222. This internal control deficiency allowed the Veradigm Defendants to materially misstate Veradigm's allowance for expected losses. In fact, the Restatement illustrates that, as of December 31, 2021, the ending allowance for *expected credit losses* pertaining to Veradigm was understated by $8.3 million or 38.2%.[58]

**<u>Discontinued Operations and Divestiture</u>**

223. Companies often separate reporting of discontinued operations from continuing operations to provide investors, creditors, and others with information to help assess the effects of divestiture and disposal events on an entity's ongoing operations. GAAP provides guidance on the presentation and disclosure requirements for discontinued operations.

---

[56] *See*, *e.g.*, 2020 Form 10-K, at 111 ("Controls and Procedures" section).

[57] 2022 Form 10-K, at 171.

[58] This amount is estimated by comparing: (1) the reported beginning allowance for expected credit losses as of December 31, 2021 (as taken from the Q1 2022 Form 10-Q) of $13,360 as of December 31, 2021, and (2) the restated allowance for expected credit losses as of December 31, 2021 of $21,621.

224. In connection with the sale of the *HLPP* segment, Veradigm reported that segment as discontinued operations beginning in Q1 2022 and through Q3 2022. At the time, Veradigm reported a pre-tax gain of approximately $7.9 million from the sale the *HLPP* segment.

225. However, as noted above, the Company did not "consistently maintain effective internal controls over financial reporting with respect to the computation for, review of, and maintenance of appropriate support for carve-out balances for divested operations, particularly the allocation of deferred revenue and contract assets to the discontinued operations and related balance sheet reconciliations."

226. Accordingly, through the Restatement, Veradigm no longer reported a gain, but rather instead a loss on the sale of the *HLPP* segment of approximately $10.3 million, representing a difference of $18.3 million or 176.9% as opposed to a pre-tax gain of $7.9 million as of September 30, 2022.

**Impairment of Long-Term Investments**

227. Under GAAP and with certain exceptions, equity investments that do not have readily determinable fair values may be measured at cost, less any impairment.[59] In those circumstances, Veradigm was required to make a qualitative assessment considering impairment indicators to evaluate whether an investment is impaired.[60] If the qualitative assessment indicated that the investment is impaired, Veradigm was required to estimate the investment's fair value and, if necessary, recognize an impairment loss in net income equal to the difference between the investment's carrying value and its fair value.[61]

[59] ASC 321-10-35-2.

[60] ASC 321-10-35-3.

[61] ASC 321-10-35-4.

228. As noted above, Veradigm admitted that the Company did not consistently maintain effective internal controls over the monitoring of key system reports for relevant control activities with respect to the consideration of impairment indicators for the Company's cost method investments and right of use assets in accordance with U.S. GAAP.

229. Upon restatement, Veradigm admitted that certain of its long-term investments were impaired during 2021 and the nine months ended September 30, 2022. The company acknowledged its failure to properly record the impairments on a timely basis. These previously unreported impairments totaled $12.7 million ($5.2 million during 2021 and $7.6 million during 2022 – difference due to rounding).

#### d. The Veradigm Defendants' Revenue Manipulations Allowed the Company to Beat Revenue Consensus Estimates in All but One of the Quarters for Which It Has Provided Sufficient Information to Evaluate This

230. Veradigm's GAAP violations not only led to the misstatement of financial figures, they also allowed the Veradigm Defendants to beat S&P's "consensus estimates" for revenues.[62]

231. The Restatement reveals that the Veradigm Defendants' improper revenue figures allowed the Company to report financials that "beat," rather than "missed," analysts' revenue expectations in all but one the quarters for which the Company provided the detail to make this analysis.[63] The following illustrates how the Company "beat" instead of "missed" consensus revenue estimates in Q4, 2021, Q1 2022, and Q2 2022.

[62] Analysts' expectations are combined into what is commonly referred to as "consensus estimates."

[63] The Company missed its analyst consensus numbers in Q3 2022, but by far more than originally reported.

| Impact of Restatement on Analyst Consensus | | | | |
|---|---|---|---|---|
| *(In thousands)* | Q4 2021 | Q1 2022 | Q2 2022 | Q3 2022 |
| **Revenue** | | | | |
| S&P Consensus[64] | $390.3 | $139.7 | $148.6 | $152.8 |
| As Originally Reported[65] | $391.7 | $142.7 | $150.9 | $151.9 |
| As Restated[66] | $384.8 | $136.9 | $148.5 | $146.4 |
| Restatement Adjustment[67] | ($6.9) | ($5.7)[68] | ($2.4) | ($5.5) |
| | | | | |
| Consensus Result (As Originally Reported) | Beat | Beat | Beat | Missed |
| Consensus Result (As Restated) | Missed | Missed | Missed | Missed |
| Consensus Impact | **Yes** | **Yes** | **Yes** | No |

232. Because the Company did not provide detailed restated quarterly tables for Q1 2020 to Q4 2020 or Q1 to Q3 2021 periods, one cannot determine the impact of the revenue restatement on consensus estimates for those periods.

**e. Defendant's Earnings Manipulations Allowed the Company to Beat Non-GAAP EPS Consensus Estimates in All but One of the Quarters during the Three Respective Quarters Ended September 30, 2022**

233. The Restatement further reveals that Defendants' improper earnings figures allowed the Company to report financials that "beat," rather than "missed," analysts' earnings expectations in all but one of the three respective quarters ended September 30, 2022. The

[64] S&P Global Market Intelligence Estimates & Earnings Call Transcripts for Allscripts Healthcare Solutions, Inc. (Nasdaq: MDRX) ("S&P Global Mkt. Intelligence R.") for Feb. 24, 2022, May 5, 2022, Aug. 4, 2022, and Nov. 3, 2022.

[65] February 24, 2022 Form 8-K, Table 2; May 5, 2022 Form 8-K, Table 2; August 4, 2022, Table 2; November 3, 2022, Table 2.

[66] March 18, 2025 Form 8-K, Table 4.

[67] 2022 Form 10-K, at119, 121, 140, 142, 144, 151.

[68] Based on unrounded revenue figures.

following illustrates how the Company "beat" instead of "missed" S&P consensus *Non-GAAP EPS* estimates in Q2 2022 and Q3 2022.

| Impact of Restatement on Analyst Consensus | | | |
|---|---|---|---|
| | **Q1 2022** | **Q2 2022** | **Q3 2022** |
| **Non-GAAP EPS** | | | |
| S&P Consensus per share[69] | $0.19 | $0.15 | $0.19 |
| As Originally Reported[70] | $0.13 | $0.18 | $0.23 |
| As Restated[71] | $0.08 | $0.06 | $0.14 |
| Restatement Adjustment Impact | ($0.05) | ($0.12) | ($0.09) |
| | | | |
| Consensus Result (As Originally Reported) | Missed | Beat | Beat |
| Consensus Result (As Restated) | Missed | Missed | Missed |
| Consensus Impact | No | **Yes** | **Yes** |

Because the Company did not provide detailed restated quarterly tables for Q1 2020 to Q4 2020 or Q1 to Q4 2021 periods, one cannot determine the impact of the revenue restatement on consensus estimates for those periods.

### f. Veradigm Defendants Misled Investors Regarding Both the Growth and Profitability of the Veradigm Segment

234. As noted above, the Company changed its segment reporting during Q3 2021. The Veradigm Defendants used this segment reporting to tout that it was the Veradigm segment that was driving both growth and profitability:

| Revenue Y-o-Y growth *(as percentage)* | | | | | |
|---|---|---|---|---|---|
| *(As reported)* | Q3 2021 | 2021 | Q1 2022 | Q2 2022 | Q3 2022 |
| Veradigm | 9.7% | 4.6% | 7.8% | 4.2% | 6.0% |
| HLPP | -3.4% | -2.4% | | | |

[69] S&P Global Market Intelligence Estimates & Earnings Call Transcripts for Allscripts Healthcare Solutions, Inc. (Nasdaq: MDRX) ("S&P Global Mkt. Intelligence R.") for May 5, 2022, Aug. 4, 2022, and Nov. 3, 2022.

[70] May 5, 2022 Form 8-K, Table 4; August 4, 2022 Form 8-K, Table 4; November 3, 2022 Form 8-K, Table 4.

[71] Assumes no non-GAAP adjustment associated with Restatement adjustment.

| Segment Gross Margin | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| *(As reported)* | 2020 | Q1 2021 | Q2 2021 | Q3 2021 | 2021 | Q1 2022 | Q2 2022 | Q3 2022 |
| Veradigm | 48.2% | 46.4% | 47.7% | 47.9% | 49.4% | 50.8% | 52.1% | 54.2% |
| HLPP | 30.9% | | | 35.1% | 35.7% | | | |

235. A review of the Restatement, however, indicates that errors in Veradigm's previously issued financial statements significantly affected the reported figures for the Company's *Veradigm* segment, including its operating income and related margins. For example, as detailed in the table below, Veradigm's misstatements appear to have caused the Company's previously reported segment income to be overstated by 102% and 17% for the years ended December 31, 2020 and 2021, respectively.[72]

| Veradigm Revenue Comparison | | | | |
|---|---|---|---|---|
| | As Reported | Adjusted | As Restated | % Misstatement |
| 2020 | $527,968 | ($2,785) | $525,183 | -0.53% |
| 2021 | $552,208 | ($3,522) | $548,686 | -0.64% |
| 9 Months 2022 | $426,306 | ($13,612) | $412,694 | -3.30% |

| Veradigm Income (loss) from Operations Comparison | | | | |
|---|---|---|---|---|
| | As Reported | Adjusted | As Restated | % Misstatement |
| 2020 | $38,338 | ($19,371) | $18,967 | -102.13% |
| 2021 | $81,456 | ($11,791) | $69,665 | -16.93% |
| 9 Months 2022 | $69,796 | ($2,030) | $67,766 | -3.00% |

236. This overstated income stemmed in part from the fact that the Veradigm Defendants intentionally or recklessly misclassified expenses between reporting segments. Indeed, the Restatement includes significant reclassifications of expenses between Veradigm's reported segments. For example, while the income from operations for the year ended December 31, 2020

for the Veradigm segment was overstated by approximately $19.4 million or 102.1% (as reported on February 25, 2022 with the filing of Veradigm's 2021 Form 10-K), the Company's *HLPP* and unallocated losses from operations were lowered by approximately $17.4 million in aggregate for the YE December 31, 2020.

237. As evident in the table below, similar corrections appear evident during 2021:

| *(In thousands)* | FY 2020 (Original) | FY 2020 (As Restated) | FY 2020 $ Difference | FY 2020 % Difference | FY 2021 (Original) | FY 2021 (As Restated) | FY 2021 $ Difference | FY 2021 % Difference |
|---|---|---|---|---|---|---|---|---|
| Income (loss) from operations: **Legacy Veradigm** | **$38,338** | **$18,967** | **($19,371)** | **102.1%** | **$81,456** | **$69,665** | ($11,791) | **16.9%** |
| HLPP and Unallocated Amounts | ($169,218) | ($151,867) | $17,351 | 11.4% | ($4,257) | $22,065 | $26,323 | 119.3% |
| Total Income (loss) from operations | ($130,880) | ($132,900) | ($2,020) | 1.5% | $77,199 | $91,730 | $14,531 | 15.8% |

238. Moreover, given that the Veradigm Defendants touted the relative significance of the Company's Veradigm segment and its revenue growth and higher income margins during the Class Period, the reduction to Veradigm's segment revenue and income is qualitatively significant pursuant to ASC 205-10-S99 and further reflects the materiality of Veradigm's misstatements.

### 3. These Material Deficiencies and Financial Misstatements Had, and Continue to Have, Significant and Material Impact on Veradigm

239. As Veradigm admitted, the material internal control deficiencies "caused adverse effects on our business, financial condition and operative results."[73] Indeed, as Veradigm's admissions demonstrate, these material deficiencies:

a. caused the Admitted False Financial Statements to be unreliable and in need of restatement.

[73] *See* 2022 Form 10-K, at 17.

b. required an "extended timeline [after some internal control issues were first identified] to build a new supplemental revenue system tool and the extensive manual work to aggregate and map the Company's historical transaction data into the new system tool." March 1, 2025.

c. prevented Veradigm from issuing its 2022, 2023, and 2024 Forms 10-K, in a timely matter.

d. led to Veradigm's noncompliance with Nasdaq's listing requirements and the announcement of the delisting of the Company's stock on February 28, 2024.

e. required Veradigm to undertake three separate Investigations over the course of two years: the Restatement Review, the Audit Committee Investigation, and the Internal Review.

f. led to Veradigm notifying the SEC concerning the Audit Committee Investigation, where the SEC opened an investigation and Veradigm reported that it was voluntarily cooperating with the agency.

g. required Veradigm to spend over two years preparing restated financials for FY 2020 and FY 2021, and the first three quarters of each of 2020, 2021, and 2022.

h. required management, with oversight from the Audit Committee, develop and implement a remediation plan ("Remediation Plan") to address the control deficiencies.

i. required Veradigm to expend significant external accounting, legal, and other fees since 2023, as well as additional substantial expenses to address

the internal control deficiencies and prepare its 2022 Form 10-K with restated financials.

a. Indeed, Veradigm admitted that:

> As a result of the Restatement Review, the Audit Committee Investigation, the Company's Internal Review, our ongoing review of our accounting practices and systems, the audit of our financial statements and the remediation of deficiencies in our internal control over financial reporting, we have incurred unanticipated costs and expenses for accounting, legal, consulting and other professional fees significantly above historical levels.[74]

b. Indeed, in the March 19, 2025 earnings call, interim CFO Leland Westerfield reported that (i) for 2023 "outflows for transaction and other expenses totaled approximately $46 million, the bulk of which went towards audit, accounting and legal professional fees for the Restatement of 2022, as well as legal fees for certain other matters;" (ii) for 2024, "approximately $103 million of outflows for transaction and other expenses, the bulk of which went towards audit and accounting professional fees for the restatement of 2022 and the remainder for the strategic review process and for legal fees for certain other matters."

j. were so significant that these remediation efforts have:

> [P]lace[d] a significant burden on management and add increased pressure to our financial resources and processes. Although we have already hired additional employees and retained professional firms to assist in the restatement, as part of our continued remediation we will need to hire more employees or retain additional professional service providers in the future, which may further increase our costs and expenses. To the extent our remediation efforts are unsuccessful

[74] 2022 Form 10-K, at 17-18.

> or incomplete, or we identify additional problems requiring remediation, our management may be required to devote significant additional time to such efforts and we may be forced to incur significant additional expenses, including legal, accounting and consulting expenses, which could continue to have an adverse effect on our business, financial condition and operating results.[75]

k. were so significant that, despite the remediation efforts to date to address internal control issues, Veradigm's internal controls are still deficient, necessitating further comprehensive remediation steps for implementation in the future. Indeed, the day after the Restatement was released, on the Mar. 19, 2025 earnings call, interim CEO Leland Westerfield on behalf of Veradigm admitted that "the majority of our remediation plans are expected to be completed during 2026 in conjunction with the implementation of our new ERP designed to enhance controls." And, on that same call, interim CFO Tom Langon parroted that sentiment: "***We will focus on remediating our material weaknesses and other internal control deficiencies, becoming current and financial reporting…, and relisting our common stock.***" In its Restatement, the Company disclosed that its Remediation Plan includes **twenty-three steps** deemed necessary to "address the identified control deficiencies (including those that rise to the level of a material weakness) and enhance the Company's overall internal control environment in a timely manner."[76] These include steps to address each of the core areas of deficiency (i) its control environment; (ii) its revenue recognition accounting; (iii) its measurement of expected credit losses;

---

[75] 2022 Form 10-K, at 17-18.

[76] 2022 Form 10-K, at 171.

(iv) financial reporting; (v) its divestiture accounting; (vi) its impairment accounting for long-lived and intangible assets; and (vii) its bonus accruals.

l. were so significant that, even after two years, during the March 19, 2025 earnings call the day after the Restatement was released, Veradigm acknowledged that the Company "do[es] not anticipate becoming current in [their] financial reporting until sometime in 2026."

m. caused the Company to "terminate[] the Third Amended Credit Agreement and all Commitments … thereunder," effective August 30, 2024, in order to "avoid … an Event of Default" being triggered by its inability to timely issue financials.[77]

240. In sum, Veradigm summarized the impact that these deficiencies had as follows:

> The failures in internal controls and associated restatements of the financial statements for the Affected Periods have also caused us to fail to meet our SEC reporting obligations and the requirements to remain listed on Nasdaq and ***negatively affected investor confidence in our management and the accuracy of our financial statements and disclosures***. ***This has had a negative effect on the price of our Common Stock, adversely affected our business, financial condition and operating results and resulted in the other risks and*** uncertainties discussed herein relating to resource allocation and constraints, litigation and investigation issues, the termination of our credit facility and our access to certain capital markets.[78]

## V. THE VERADIGM DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS

241. Throughout the Class Period, the Veradigm Defendants repeatedly issued false and misleading statements regarding two main topics. First, the Veradigm Defendants issued false and misleading statements regarding the establishment, maintenance, and adequacy of efficient

[77] 2022 Form 10-K, at 18.

[78] 2022 Form 10-K, at 17.

internal controls over financial reporting and disclosure controls and procedures. Second, the Veradigm Defendants issued false and misleading statements regarding their compliance with GAAP and the accuracy of Veradigm's financial results and performance.

242. There is little doubt that each of the statements was materially false. Indeed, after roughly two years of Veradigm's Investigations (which resulted in "significant" external audit fees, legal fees, and additional expenses), the Company conceded that its internal controls were materially deficient, it did not provide reasonable assurance regarding the reliability of the Company's financial statements, and that it violated GAAP such that its Class Period financials results had to be restated.

243. The Veradigm Defendants' specific Class Period false and misleading statements and the reasons why the statements were materially misleading are set forth below.

### A. THE VERADIGM DEFENDANTS ISSUED MATERIALLY FALSE AND MISLEADING STATEMENTS REGARDING VERADIGM'S INTERNAL CONTROLS

244. Throughout the Class Period, the Veradigm Defendants repeatedly made materially false and misleading statements that they established and maintained efficient and adequate internal controls over financial reporting and disclosure controls and procedures.

245. In Veradigm's "Controls and Procedures" section of its Q1 2020 and Q2 2020 Forms 10-Q, the Veradigm Defendants represented, in relevant part:

> ***Evaluation of Disclosure Controls and Procedures***
> Under the direction of our chief executive officer and chief financial officer, we evaluated our disclosure controls and procedures pursuant to Rule 13a-15(b) of the Securities Exchange Act of 1934, as amended (the "Exchange Act"), and concluded that our disclosure controls and procedures were effective as of [March 31 / June 30], 2020.
>
> ***Changes in Internal Control over Financial Reporting***
> We have implemented, and continue to refine, internal controls related to the new credit loss accounting standard which we adopted on January 1, 2020. There have been no other changes in our internal control over

> financial reporting during the quarter ended [March 31] [June 30], 2020, which were identified in connection with management's evaluation required by paragraph (d) of Rules 13a-15 and 15d-15 under the Exchange Act, that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

246. In Veradigm's "Controls and Procedures" section of its Q3 2020 Form 10-Q, the Veradigm Defendants represented, in relevant part:

> ***Evaluation of Disclosure Controls and Procedures***
> Under the direction of our chief executive officer and chief financial officer, we evaluated our disclosure controls and procedures pursuant to Rule 13a-15(b) of the Securities Exchange Act of 1934, as amended (the "Exchange Act"), and concluded that our disclosure controls and procedures, which were designed to a level of reasonable assurance, were effective as of September 30, 2020. In the course of this evaluation, our management considered the fact that, on October 15, 2020, the Company timely filed a Form 8-K reporting the sale of our EPSi business, as further discussed in Note 17, "Subsequent Events," of the Notes to Consolidated Financial Statements in Part I, Item 1 of this Form 10-Q.
>
> The Form 8-K did not include the required pro forma financial information reflecting the sale of our EPSi business, which was subsequently included on a Form 8-K/A filed on October 30, 2020.
>
> ***Changes in Internal Control over Financial Reporting***[79]
> We have implemented, and continue to refine, internal controls related to the new credit loss accounting standard which we adopted on January 1, 2020. There have been no other changes in our internal control over financial reporting during the three months ended September 30, 2020, which were identified in connection with management's evaluation required by paragraph (d) of Rules 13a-15 and 15d-15 under the Exchange Act, that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

247. In Veradigm's "Controls and Procedures" section of its 2020 Form 10-K, the Veradigm Defendants further represented, in relevant part:

> ***Evaluation of Disclosure Controls and Procedures***
> Under the supervision and with the participation of our management, including our chief executive officer and chief financial officer, we conducted an evaluation of the effectiveness of the design and operation of

[79] The language in "Changes in Internal Control over Financial Reporting" did not change from Q2 2020 to Q3 2020.

our disclosure controls and procedures, as such term is defined under Rule 13a-15(e) promulgated under the Exchange Act, as of the end of the period covered by this Form 10-K.

Based on management's evaluation, our chief executive officer and our chief financial officer concluded that our disclosure controls and procedures are designed to, and were effective as of December 31, 2020 to, provide assurance at a reasonable level that the information we are required to disclose in reports that we file or submit under the Exchange Act is recorded, processed, summarized, and reported within the time periods specified in SEC rules and forms, and that such information is accumulated and communicated to our management, including our chief executive officer and chief financial officer, as appropriate, to allow for timely decisions regarding required disclosure.

***Management's Report on Internal Control over Financial Reporting***
Under the supervision and with the participation of our management, including our chief executive officer and chief financial officer, we conducted an evaluation of the effectiveness of our internal control over financial reporting as of December 31, 2020 based on the guidelines established in *Internal Control—Integrated Framework* issued by the Committee of Sponsoring Organizations of the Treadway Commission (2013 framework). Our internal control over financial reporting includes policies and procedures that provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external reporting purposes in accordance with GAAP.

Based on the results of our evaluation, our management concluded that our internal control over financial reporting was effective as of December 31, 2020. We reviewed the results of management's assessment with the Audit Committee of our Board….

***Changes in Internal Control over Financial Reporting***
We have implemented internal controls related to the new credit loss accounting standard which we adopted on January 1, 2020.

There have been no changes in our internal control over financial reporting during the quarter ended December 31, 2020, which were identified in connection with management's evaluation required by paragraph (d) of Rules 13a-15 and 15d-15 under the Exchange Act, that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

248. In Veradigm's "Controls and Procedures" section of its Forms 10-Q for each of three quarters of 2021 and 2022, the Veradigm Defendants represented, in relevant part:

> ***Evaluation of Disclosure Controls and Procedures***
> Under the supervision and with the participation of our management, including our chief executive officer and chief financial officer, we conducted an evaluation of the effectiveness of the design and operation of our disclosure controls and procedures, as such term is defined under Rule 13a-15(e) promulgated under the Exchange Act, as of the end of the period covered by this Form 10-Q.
>
> Based on management's evaluation, our chief executive officer and our chief financial officer concluded that our disclosure controls and procedures are designed to, and were effective as of [quarter] to, provide assurance at a reasonable level that the information we are required to disclose in reports that we file or submit under the Exchange Act is recorded, processed, summarized, and reported within the time periods specified in SEC rules and forms, and that such information is accumulated and communicated to our management, including our chief executive officer and chief financial officer, as appropriate, to allow for timely decisions regarding required disclosure.
>
> ***Changes in Internal Control over Financial Reporting***
> There have been no changes in our internal control over financial reporting during the [three months] [quarter] ended [date], which were identified in connection with management's evaluation required by paragraph (d) of Rules 13a-15 and 15d-15 under the Exchange Act, that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

249. In Veradigm's "Controls and Procedures" section of its 2021 Form 10-K, the Veradigm Defendants further represented, in relevant part:

> ***Evaluation of Disclosure Controls and Procedures***
> Under the supervision and with the participation of our management, including our chief executive officer and chief financial officer, we conducted an evaluation of the effectiveness of the design and operation of our disclosure controls and procedures, as such term is defined under Rule 13a-15(e) promulgated under the Exchange Act, as of the end of the period covered by this Form 10-K.
>
> Based on management's evaluation, our chief executive officer and our chief financial officer concluded that our disclosure controls and procedures are designed to, and were effective as of December 31, 2021 to, provide assurance at a reasonable level that the information we are required to disclose in reports that we file or submit under the Exchange Act is recorded, processed, summarized, and reported within the time periods specified in SEC rules and forms, and that such information is accumulated and communicated to our management, including our chief executive

> officer and chief financial officer, as appropriate, to allow for timely decisions regarding required disclosure.
>
> ***Management's Report on Internal Control over Financial Reporting***
> Under the supervision and with the participation of our management, including our chief executive officer and chief financial officer, we conducted an evaluation of the effectiveness of our internal control over financial reporting as of December 31, 2021 based on the guidelines established in *Internal Control—Integrated Framework* issued by the Committee of Sponsoring Organizations of the Treadway Commission (2013 framework). Our internal control over financial reporting includes policies and procedures that provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external reporting purposes in accordance with GAAP.
>
> Based on the results of our evaluation, our management concluded that our internal control over financial reporting was effective as of December 31, 2021. We reviewed the results of management's assessment with the Audit Committee of our Board.
>
> ***Changes in Internal Control over Financial Reporting***
> There have been no changes in our internal control over financial reporting during the quarter ended December 31, 2021, which were identified in connection with management's evaluation required by paragraph (d) of Rules 13a-15 and 15d-15 under the Exchange Act, that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

250. In each of the Forms 10-Q and Annual Reports on Forms 10-K filed during the Class Period, two of the Individual Defendants signed and issued SOX Certifications—most by Black and Poulton, and later ones by Poulton and Jones. In these certifications, the signing Individual Defendants attested, among other things, (a) to the purported accuracy and completeness of the Company's financial and operational reports; (b) that they were responsible for designing and maintaining the adequacy of the internal controls; (c) that they did in fact design Veradigm's internal controls such that they would provide reasonable assurances regarding the reliability of Veradigm's financial reporting; and (d) that they evaluated the effectiveness of the controls and deemed them adequate.

251. Specifically, these SOX Certifications were in all material respects nearly identical[80] and stated the following:

a. I have reviewed this [Quarterly Report on Form 10-Q or Annual Report on Form 10-K] of Allscripts Healthcare Solutions, Inc.[81]

b. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report.

c. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report.

d. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

[80] Each SOX Certification differed only in date and reference to: (1) the Quarterly Report on Form 10-Q for each of Q1, Q2, or Q3 for 2020, 2021, and 2022; or (2) the Annual Report on Form 10-K for the fiscal year ended either December 31, 2020, or December 31, 2021.

[81] Each Form 10-Q and Form 10-K filed during the Class Period refers to the Company as "Allscripts Healthcare Solutions, Inc." even after the Company changed its registered name to Veradigm, Inc. in 2022.

i. designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

ii. designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

iii. evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

iv. disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has

materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting.

e. The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's Board of Directors (or persons performing the equivalent functions):

i. all significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting, which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

ii. any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

252. In each of Veradigm's Class Period Proxy Statements, the Audit Committee reported that:

> Throughout the year ended December 31, [year], the Company's management completed documentation, testing, and evaluation of the Company's internal control over financial reporting pursuant to the requirements set forth in Section 404 of the Sarbanes-Oxley Act of 2002 and related regulations. No less than quarterly, the Company's management provided updates to the Audit Committee regarding progress made to complete management's assessment of its internal control over financial

> reporting. The Company's management concluded that the internal control over financial reporting was effective as of December 31,[ year].[82]

253. There were no qualifications or limitations in any of the Admitted False and Misleading Financial Statements indicating that the Internal Controls could no longer be relied upon. To the contrary, the Company merely noted, in its various filings and press releases, that maintaining proper and effective internal controls was one of the multitudes of risk factors affecting the Company.

254. The Veradigm Defendants' statements in ¶¶245-252 were ***materially*** false and misleading because Veradigm has since admitted that its internal controls during the Class Period were materially deficient, as described more fully *supra*, Section IV.D.1. and V.A.:

a. that "the Company's disclosure controls and procedures were not effective" when the Admitted False Financial Statements were issued.

b. that "the Company did not consistently maintain an effective control environment, including with respect to effective accounting management reviews and supporting documentation for accounting determinations and journal entries, at an appropriate level of precision in the accounting and finance organization and that the Company's internal controls over financial reporting were not effective due to material weaknesses."

255. In particular, the Restatement Review identified the following control failures during the Class Period:

a. Ineffective internal controls stemming from ineffective manual accounting processes.

[82] This statement in each Class Period Proxy Statement differed only in reference to the year and Annual Report on Form 10-K for the year ended December 31, 2020 or 2021.

b. Ineffective internal controls stemming from a software tool implemented by the Company in order to comply with the requirements of ASC 606.

c. Ineffective internal controls related to manual journal entries.

d. Ineffective internal controls related to measurement of *expected credit loss*, the very GAAP measurement that Veradigm implemented on January 1, 2020 and for which the Veradigm Defendants assured investors they adopted internal controls.

e. Ineffective internal controls related to divestiture accounting.

f. Ineffective internal controls related to the application of revenue recognition requirements to existing contracts.

g. Ineffective internal controls related to updates to ASC 606 accounting policies for new transaction types.

h. Ineffective internal controls related to testing of system-generated reports.

256. Meanwhile, the Audit Committee Investigation concluded that there were deficiencies in the Company's accounting policies and practices related to:

a. Revenue recognition accounting.

b. Impairment accounting for *long-lived* and *intangible assets*.

c. Bonus accruals.

d. Deficiencies in the Company's controls and procedures for disclosure of financial measures not consistent with GAAP or Non-GAAP financial metrics.

e. Specific instances of inappropriate communications under then senior management.

f. Insufficient resources in the finance organization.

g. Improper exercise of judgment within the finance organization or by senior management.

257. Moreover, in connection with the preparation of the 2022 Form 10-K with restated financials, auditor Grant Thornton's March 18, 2025 audit report stated that the Company "has not maintained effective internal control over financial reporting as of December 31, 2022, based on criteria established in the 2013" by COSO Framework. Grant Thornton specifically stated that:

> A material weakness is a deficiency, or combination of control deficiencies, in internal control over financial reporting, such that there is a reasonable possibility that a material misstatement of the company's annual or interim financial statements will not be prevented or detected on a timely basis. The following material weaknesses have been identified and included in management's assessment.

258. Grant Thornton continued by repeating the same summary of the control deficiencies outlined by the Company in ¶¶193-195 above regarding (a) Control Environment; (b) Revenue Recognition Accounting; (c) Measurement of *Expected Credit Losses*; (d) Financial Reporting; (e) Divestiture Accounting; (f) Impairment Accounting for *Long-Lived* and *Intangible Assets*; and (g) Bonus Accruals.

259. Given the nature, scope, and magnitude of these internal control deficiencies, the Veradigm Defendants' statements in ¶¶245-252, including the Individual Defendants' SOX Certifications, were also false and misleading because the Individual Defendants and senior management clearly had not truly designed effective internal controls, or evaluated the internal controls to determine whether they were effective or even followed, and never disclosed any control deficiencies. Indeed, the Audit Committee found (a) "specific instances of inappropriate communications under then senior management;" (b) "insufficient resources in the Finance Organization;" and (c) "improper exercise of judgment within the finance organization or by senior

management." These findings are inconsistent with the Individual Defendants' certifications of the efforts they undertook.

260. The statements regarding Veradigm's internal controls in ¶¶245-252 were also ***materially*** false and misleading. As noted above, internal control weaknesses are materially deficient when "there is a reasonable possibility that a material misstatement of [a] company's annual or interim financial statements will not be prevented or detected on a timely basis."[83] There is little doubt of that here given that, as described more fully in Section IV.D.2 and IV.D.3., *supra*, ***the Company admitted*** that these control weaknesses:

a. Related to the recognition of revenue and led to the overstatement of revenue for FY 2020 forward.

b. Caused the Admitted False Financial Statements to be unreliable and in need of restatement in the 2022 Form 10-K.

c. "[C]aused adverse effects on our business, financial condition and operative results."[84]

d. Caused the Company to fail to meet "SEC reporting obligations and the requirements to remain listed on Nasdaq and negatively affected investor confidence in our management and the accuracy of our financial statements and disclosures."[85]

[83] AS 1305: *Communications About Control Deficiencies in an Audit of Financial Statements* ¶ 3; *see also*, AS 2201: *An Audit of Internal Control Over Financial Reporting That Is Integrated with An Audit of Financial Statements*; AS 1105: *Audit Evidence*, at Appendix A ("Using the Work of a Company's Specialist as Audit Evidence") ¶ 7; SEC Release No. 33-8238, § II.F.1.; *see also*, 2022 Form 10-K, at 171.

[84] *See* 2022 Form 10-K, at 29.

[85] 2022 Form 10-K, at 17.

e. Prevented the Company from its issuing 2022, 2023, and 2024 Forms 10-K in a timely manner.

f. Resulted in the noncompliance with Nasdaq's listing requirements and the announcement of delisting of the Company's stock on February 28, 2024.

g. Caused the Company to "terminate[] the Third Amended Credit Agreement and all Commitments thereunder effective August 30, 2024" in order to avoid an event of default being triggered by its inability to timely issue financials.[86]

h. Were so extensive that, despite two years of remediation efforts, Veradigm admitted that "[a]s we continue our remediation efforts we expect to conclude that our internal control over financial reporting was ineffective as of December 31, 2023 and December 31, 2024 because we had not fully remediated all material weaknesses."

261. Moreover, the materiality of the control deficiencies is further evidenced by the nature and scope of the effort necessary to remedy the deficiencies:

a. It took roughly 24 months after the Company first disclosed the existence of control failures preventing the filing of Veradigm's 2022 10-K for Veradigm's Investigations to be completed and for the Company to file its long delayed 2022 Form 10-K with restated financials. ¶¶7, 11, 67, 149, 160.

b. Even after some of Veradigm's Investigations were completed, the Company admitted that "remediation work will continue with respect to all

[86] 2022 Form 10-K, at 18.

identified material weaknesses" in its controls and that it needed to prioritize remediating its material weaknesses.[87]

c. The Company conceded that as it continues its "remediation efforts we expect to conclude that our internal control over financial reporting was ineffective as of December 31, 2023 and December 31, 2024 because we had not fully remediated all material weaknesses."[88]

d. The Company further admitted that it "do[es] not anticipate becoming current in [its] financial reporting until sometime in 2026." *See* March 19, 2025 Earnings Call ("the majority of our remediation plans are expected to be completed during 2026 in conjunction with the implementation of our new ERP designed to enhance controls.").

e. Veradigm's interim CEO, Thomas Langan, admitted that the depth and scope of these internal control deficiencies was one of the reasons that it took so much time to prepare the 2022 Form 10-K with restated financials.[89] Additionally, he noted that "[t]hese internal control deficiencies resulted in more extensive audit procedures. This extended our timelines and significantly increased our external professional services spend."[90]

f. The Company further admitted that, "[i]f we fail to properly remediate these or any future material weaknesses or deficiencies or to maintain proper and effective internal controls, further material misstatements in our financial

---

[87] *See* 2022 Form 10-K, at 3.

[88] 2022 Form 10-K, at 17.

[89] *See* March 19, 2025 Earnings Call Transcript, at 3.

[90] March 19, 2025 Earnings Call Transcript, at 2.

statements could occur, which could continue to impair our ability to produce accurate and timely financial statements, cause adverse reputational impacts, preclude us from relisting our Common Stock on a national securities exchange and otherwise materially and adversely affect our business, financial condition and operating results."[91]

g. The Company's fraudulent actions and investigative and remediation efforts led to the significant external audit fees and legal fees in 2023-2025 and additional expenses to supplement the Company's internal auditing operations as noted in ¶239(i). Additionally, the Company conceded that there may be additional resulting expenses stating that "[it] ha[s] initiated meaningful remediation efforts … which [it] expect[s] to continue, in which case [it] will continue to incur expenses and expend management time on compliance-related matters."[92]

262. Finally, the market's reaction to the news further demonstrates the materiality of these false and misleading statements, as summarized in Section IV, *infra*. Indeed, the Company acknowledged that:

> The failures in internal controls and associated restatements of the financial statements for the Affected Periods have also caused us to fail to meet our SEC reporting obligations and the requirements to remain listed on Nasdaq and ***negatively affected investor confidence in our management and the accuracy of our financial statements and disclosures***. ***This has had a negative effect on the price of our Common Stock, adversely affected our business, financial condition and operating results and resulted in the other risks and*** uncertainties discussed herein relating to resource allocation

[91] 2022 Form 10-K, at 17.

[92] 2022 Form 10-K, at 17.

and constraints, litigation and investigation issues, the termination of our credit facility and our access to certain capital markets.[93]

## B. THE VERADIGM DEFENDANTS ISSUED MATERIALLY FALSE AND MISLEADING STATEMENTS REGARDING ITS COMPLIANCE WITH GAAP AND FINANCIAL RESULTS

### 1. The Veradigm Defendants Issued Materially False and Misleading Statements Regarding Compliance with GAAP, Including Recently-Implemented ASC 606

263. Throughout the Class Period, Veradigm made materially false and misleading statements regarding its compliance with GAAP, including recently-implemented ASC 606 as well as an array of other GAAP provisions.

264. In each of its Admitted False Financial Statements filed during the Class Period, Veradigm represented that it prepared its financials in compliance with GAAP. The Company made the following materially false and misleading statements in the Admitted False Financial Statements.

a. The 2020 and 2021 Forms 10-K each stated: "We maintain internal financial and accounting controls and procedures that are designed to provide reasonable assurance regarding the reliability of our financial reporting and the preparation of our financial statements in accordance with accounting principles generally accepted in the United States ('GAAP')."[94]

b. The quarterly 2020, 2021, and 2022 Forms 10-Q each stated:[95] "The unaudited interim consolidated financial statements as of and for the three

---

[93] 2022 Form 10-K, at 17.

[94] 2020 Form 10-K, at 27; 2021 Form 10-K, at 27.

[95] This statement in each Class Period Form 10-Q differed only in reference to date: March 31, 2020 and 2019; June 30, 2020 and 2019; September 30, 2020 and 2019; March 31, 2021 and 2020; June 30, 2021 and 2020; September 30, 2021 and 2020; March 31, 2022 and 2021; June 30, 2022 and 2021; or September 30, 2022 and 2021.

[and six] [and nine] months ended [date] have been prepared in accordance with the rules and regulations of the Securities and Exchange Commission (the 'SEC') for interim financial reporting. These interim consolidated financial statements are unaudited and, in the opinion of our management, include all adjustments, consisting of normal recurring adjustments and accruals, necessary to present fairly the consolidated financial statements for the periods presented in accordance with generally accepted accounting principles in the United States of America ('GAAP'). … [¶] They should be read in conjunction with the consolidated financial statements and related notes included in our Annual Report on Form 10-K for the year ended [December 31, 2019] [December 31, 2020] [December 31, 2021]…."[96]

265. During the Class Period, the Company issued false and misleading statements regarding its compliance with ASC 606 and other GAAP provisions. For example, discussing "Revenue from Contracts With Customers" in the context of ASC 606, the Company stated:

> Revenue Recognition
>
> We recognize revenue only when we satisfy an identified performance obligation (or bundle of obligations) by transferring control of a promised product or service to a customer. We consider a product or service to be transferred when a customer obtains control because a customer has sole possession of the right to use (or the right to direct the use of) the product or service for the remainder of its economic life or to consume the product or service in its own operations.[97]

[96] Q1 2020 Form 10-Q, at 9; Q2 2020 Form 10-Q, at 9; Q3 2020 Form 10-Q, at 9; Q1 2021 Form 10-Q, at 9; Q2 2021 Form 10-Q, at 9; Q3 2021 Form 10-Q, at 9; Q1 2022 Form 10-Q, at 9; Q2 2022 Form 10-Q, at 9; Q3 2022 Form 10-Q, at 9

[97] 2020 Form 10-K, at 66; 2021 Form 10-K, at 71.

266. The representations in each of the Admitted False Financial Statements that the Company complied with GAAP (which included recently-implemented ASC 606 as well as an array of other GAAP provisions) in recognizing product revenue were materially false and misleading because during those periods the Company did not comply with GAAP (including ASC 606 and a series of other GAAP provisions). More specifically, those representations were materially false and misleading for the following reasons, among others:

a. The Veradigm Defendants have admitted that the reported financial results in the Admitted False Financial Statements were false, did not comply with GAAP (including ASC 606), and needed to be restated. Specifically, in the 2022 Form 10-K with restated financials filed after a two-year delay on March 18, 2025, the Company admitted to internal control systemic failures that led to reporting results that were not consistent with GAAP (including ASC 606), including revenue and various GAAP line items that stemmed from that, such as *EBITDA*, *gross margins*, *EPS*, *retained earnings*, *deferred revenue*, *accounts receivable*, and *contract assets*. For example:

i. Veradigm stated in its 2022 Form 10-K with restated financials that the Company "is restating its accompanying audited historical consolidated financial statements for the years ended December 31, 2021 and 2020 to ***correct for identified errors in its accounting for revenue and certain other it.***"[98]

ii. When discussing its first of three independent investigations in its 2022 Form 10-K with restated financials—the "Restatement

[98] 2022 Form 10-K, at 114.

Review"—the Company stated, "The internal control failures identified at that time ***primarily stemmed from ineffective manual accounting processes and a software tool implemented by the Company in order to comply with the requirements of [ASC 606]*** issued by the Financial Accounting Standards Board…." The Company further stated that "[o]ther deficiencies that were identified as part of the Company's Restatement Review included ineffective internal controls related to manual journal entries, measurement of expected credit loss, and divestiture accounting ***as well as application of revenue recognition requirements to existing contracts, updates to ASC 606 accounting policies for new transaction types***, and testing of system-generated reports."[99]

iii. When discussing the second of three investigations in its 2022 Form 10-K with restated financials—the "Audit Committee Investigation"—the Company stated that it "concluded that there were ***deficiencies in the Company's accounting policies and practices relating to revenue recognition accounting, impairment accounting for long-lived and intangible assets and bonus accruals***, along with deficiencies in the Company's controls and procedures for disclosure of financial measures not consistent with [GAAP], or non-GAAP financial measures," which included "(1) inappropriate communications under then-existing senior

[99] 2022 Form 10-K, at 4.

management, particularly within the Company's finance organization, which contributed ***to accounting entries being recorded, in certain instances, in a manner now determined not to have been consistent with GAAP and Company accounting policies and procedures***, (2) insufficient resources in the Company's accounting function of the finance organization, with insufficient technical expertise in certain subjects, and (3) ***the exercise of judgment within the Company's finance organization or by senior management.***"[100]

iv. When discussing the final investigation of the three conducted in its 2022 Form 10-K with restated financials—the "Internal Review"—the Company stated that it "focused on ***identifying transactions recognized in a manner that may have been inconsistent with GAAP***, including the impact, if any, on ***retained earnings and the income statement***. The additional matters evaluated as part of the Company's Internal Review that ***resulted in adjustments***" relate to revenue recognition.[101]

v. In its 2022 Form 10-K with restated financials, the Company identified control deficiencies it had unearthed in its three Investigations that would and did affect GAAP reporting, including: "(1) inappropriate communications under the then-existing senior

[100] 2022 Form 10-K, at 4.

[101] 2022 Form 10-K, at 4.

management, particularly within the Company's finance organization, ***which contributed to accounting entries being recorded, in certain instances, in a manner now determined not to have been consistent with GAAP and Company accounting policies and procedures***, (2) insufficient resources in the Company's accounting function of the finance organization[,] … and (3) the exercise of judgment within the Company's finance organization or by senior management."[102]

vi. In its 2022 Form 10-K with restated financials, the Company identified material control weaknesses it had unearthed in its three Investigations, including: "Revenue Recognition Accounting: [t]he Company did not consistently maintain effective internal controls ***over financial reporting with respect to the accurate recording, accounting for, and presentation of revenue and related costs***, i***ncluding as arising from or relating to … (2) the application of U.S. GAAP*** to new and/or complex matters, … and (4) ***the related balance sheet presentation of contract assets and deferred revenue***."[103]

b. In the 2022 Form 10-K with restated financials—filed on March 18, 2025 after a two-year delay—the Company outlined a 23-step "Remediation Plan" that it planned to implement, which included multiple steps for

[102] 2022 Form 10-K, at 171.

[103] 2022 Form 10-K, at 171.

"Revenue Recognition Accounting" and "Financial Reporting," among others.

c. Parroting infirmities laid out by the Company in its March 18, 2025 Form 10-K with restated financials, Auditor Grant Thornton issued its March 18, 2025 Audit Report, which was included in the Form 10-K, wherein it stated, among other things:

i. "***Control Environment***: The Company did not consistently maintain an effective control environment, including with respect to effective accounting management reviews and supporting documentation for accounting determinations and journal entries, at an appropriate level of precision, due to instances of (1) inappropriate communications under the then existing senior management, particularly within the Company's finance organization, ***which contributed to accounting entries being recorded, in certain instances, in a manner now determined not to have been consistent with U.S. GAAP*** and Company accounting policies and procedures, (2) insufficient resources in the Company's accounting function of the finance organization, with insufficient technical expertise in certain subjects, and (3) the exercise of judgment within the Company's finance organization or by senior management…."[104]

ii. "***Revenue Recognition Accounting***: The Company ***did not consistently maintain effective internal controls over financial***

[104] 2022 Form 10-K, at 66.

***reporting with respect to the accurate recording, accounting for, and presentation of revenue and related costs***, including …: (2) ***the application of U.S. GAAP to new and/or complex matters.***…"[105]

d. On February 28, 2023, the Company disclosed that it was "unable to file" its 2022 Form 10-K "within the prescribed time period," and that it had recently identified ***internal control failures "relating to the Company's revenue recognition processes over the prior six quarters***"[106] as a result of attempting to ***implement a software tool*** "the Company implemented … ***to assist it with compliance with FASB's rule ASC 606***,"[107] "as testing during the current period highlighted some system generated ***duplicative transactions*** and other errors impacting the results the Company was receiving from the tool, ***resulting in a mis-statement to reported revenues during those periods***."[108]

e. On March 22, 2023, the Company filed its Mar. 22, 2023 Form 8-K with the SEC (4:05 pm ET), where it warned that financial statements from 2021 and 2022 "***should no longer be relied upon because of misstatements to the Company's previously reported revenue resulting from certain internal control failures.***"[109] Over the following two years, as investigations piled up but prior to the filing of the 2022 Form 10-K with

[105] 2022 Form 10-K, at 66.

[106] Feb. 28, 2023 Notification of Late Filing.

[107]Feb. 28, 2023 press release.

[108] Feb. 28, 2023 Notification of Late Filing.

[109] Mar. 22, 2023 Form 8-K.

restated financials, Veradigm expanded those warnings to the financial statements issued in 2020.

f. The Company caused the eleven Admitted False Financial Statements to be restated as part of the 2022 Form 10-K, where line items claimed to be reported in accordance with GAAP significantly and materially changed.

267. These false and misleading statements regarding the Company's compliance with GAAP, including ASC 606, were both qualitatively and quantitively material.

268. From a <u>qualitative</u> perspective, the false and misleading statements about the Company's compliance with GAAP, including ASC 606 and an array of other GAAP provisions, were material in a multitude of ways:

a. The Veradigm Defendants held out certain GAAP and Other Key Financial Metrics as critical—*e.g.*, *GAAP and Non-GAAP revenue*, *EBITDA and adjusted EBITDA*, *gross margins*, and *EPS*, among others. Indeed, the Veradigm Defendants used these numbers not only as quantitative metrics, but also as the foundation for a narrative spun throughout the Class Period about Company growth and *revenue*/margin growth and momentum.

b. Analysts focused on these metrics and results—both on their own and as the foundation for a narrative about the Company's strength and momentum. They considered them, posed questions about them, and based their recommendations and price targets on them.

c. As discussed in Section VIII, Loss Causation, *infra*, the market reacted to the news about the unreliability of the Admitted False Financial Statements, which they understood to have been derived at through compliance with

GAAP. The price drops were significant and based on unusually high trading volume.

d. It took roughly 24 months after the Company first disclosed the existence of control failures and cautioned investors that 2022 Financial Statements should not be relied upon for (a) the three Veradigm Investigations to be completed and (b) the Company to file on March 18, 2025, its long-delayed 2022 Form 10-K with restated financials.

e. The Company admitted that the depth of its internal control deficiencies (which required three separate internal Investigations) was one of the reasons it took so much time to prepare the 2022 Form 10-K with restated financials.

f. The scope of the problem started well before 2020. The 2022 Form 10-K with restated financials addressed errors in pre-2020-issued financial statements through a cumulative net increase to the Company's previously reported accumulated deficit of $48.5 million as of the beginning of January 1, 2020 (98.4% of Veradigm's restated accumulated deficit as of December 31, 2019). In other words, the Company's previously reported net income during periods prior to January 1, 2020 was overstated by $48.5 million.

g. Even after filing its 2022 Form 10-K on March 18, 2025, the Company admitted that the work on its controls and reporting were far from done:

i. The Company stated that "[t]he majority of our remediation plans are expected to be completed during 2026 in conjunction with the implementation of our new ERP designed to enhance controls."[110]

ii. The Company estimated that it "do[es] not anticipate becoming current in [its] financial reporting until sometime in 2026."[111]

iii. Beyond the filing of the long-delayed 2022 Form 10-K on March 18, 2025, and since first raising internal control problems in February 2023, the Company has yet to file a new Form 10-K or Form 10-Q with the SEC (such as those that are currently delinquent for delinquent for 2023, 2024, and Q1 2025).

h. On February 29, 2024, trading of Veradigm common stock on Nasdaq ceased as Nasdaq implemented the Company's delisting from the exchange announced the day prior, on February 28, 2024.

i. The Company admitted that Defendant Poulton (CEO) and Defendant Jones (CFO) "each resigned at the request of the Board from their positions" on December 6, 2023 "as a result of the Audit Committee Investigation."

j. The Company disclosed on January 10, 2024, that it had "voluntarily disclosed to the Staff of the SEC information concerning the Audit Committee Investigation. As a result, the SEC commenced an investigation regarding this matter. The Company has continued to provide additional information to the Staff of the SEC based on discussions with the SEC and

[110] Mar. 19, 2025 Business Update Call Transcript.

[111] Mar. 19, 2025 Business Update Call Transcript.

is otherwise cooperating with the SEC's ongoing investigation regarding this matter."

k. The misrepresentations and Restatement concerned both major segments of Veradigm's business during the Class Period—the *Veradigm* segment and the *HLPP* segment. Further, as the *Veradigm* segment was the only remaining segment after the sale of the *HLPP* segment to Altera in May 2022, the misrepresentations that were restated in the 2022 Form 10-K significantly affected the *Veradigm* segment, including its operating income (102% and 17% for the years ended December 31, 2020 and 2021, respectively).[112]

l. The restatement of the eleven Admitted False Financial Statements unearthed a previously-hidden failure to meet analysts' consensus targets—for at least Q4 2021, Q1 2022, and Q2 2022.

269. From a quantitative perspective, as noted *infra*, the Company's recognition of revenue and revenue-related accounts (*e.g.*, *accounts receivable*, *contract assets*, and *deferred revenue*) along with the myriad resulting GAAP Financial Report line items violated GAAP. Those line items include not just revenue and revenue-related accounts, but *gross margin*, *(loss) from operations*, *income (loss) from continuing operations*, *EPS*, *intangible assets*, *goodwill*, *total assets*, and *retained earnings*. The violations relate not just to the breadth of financial statement

[112] Altera alleges that it overpaid for *HLPP* segment because Veradigm's financials were materially false and misleading in its action against Veradigm. *See Altera Digital Health, Inc. v. Veradigm,* C.A.No. N24C-08-304-SKR-CCLD, Del. Superior Court. In its opposition to motion to dismiss, Altera stated that its "post-purchase review of Veradigm's books and records confirmed that revenue for the period ended December 31, 2024 had been overstated."

line items that were affected, but also the scope of change—many well above 5%, and some well over 100%. ¶¶415, 418.

### 2. Having Failed to Comply with GAAP, and Having Failed to Maintain Effective Internal Controls, Veradigm Defendants' Class Period Financial Statements and Related Comments Were Materially False and Misleading

#### a. Summary of the Restated Figures

270. The Veradigm Defendants' financial results during the Class Period—reported in the Admitted False Financial Statements filed with the SEC, press releases, earnings calls, and presentations—were materially false and misleading. After admitting failures to comply with GAAP and implement and maintain effective internal controls surrounding such things as revenue recognition and financial reporting, the Veradigm Defendants filed their long-delayed 2022 Form 10-K, wherein they materially restated multiple financial statement numbers, including, but not limited to, *revenue*, *gross margin*s, *EPS*, *retained earnings*, *deferred revenue*, *contract assets*, *accounts receivable*, *goodwill*, *intangible assets*, *other assets*, and *accounts payable*.

271. The Company's restated financial statements included multiple reported material corrections to its acknowledged misrepresentations, affecting many different account balances and line items across multiple financial reporting periods:

a. Many of these restated misrepresentations <u>quantitatively</u> exceeded 5% of their respective account or line item (and all, in the light of surrounding circumstances, were <u>qualitatively</u> material).

b. To demonstrate, the following provides examples and a summary of multiple restated *balance sheet* accounts and line items for the restated Admitted False Financial Statements (4 from 2020, 4 from 2021, and 3 from

2022 (Q1 – Q3)) as a result of Veradigm's acknowledged misrepresentations:

| *$ in 000s* | $ | % | $ | % | $ | % |
|---|---|---|---|---|---|---|
| | | | Increase (Decrease) | | | |
| **Balance Sheet Account/Line Item** | **12/31/2020** | | **12/31/2021** | | **9/30/2022** | |
| Cash and cash equivalents | $2,336 | 0.4% | $1,131 | 0.6% | $9,295 | 1.9% |
| Accounts receivable, net of allowance | (19,767) | 6.0% | (46,492) | 16.6% | (54,879) | 48.1% |
| Contract assets | (30,676) | 40.3% | (39,172) | 45.7% | 13,674 | 17.3% |
| Income tax receivable | 0 | 0.0% | (9,220) | 8.4% | 0 | 0.0% |
| Prepaid expenses and other current assets | (701) | 0.5% | 0 | 0.0% | 59,732 | 44.5% |
| Current assets attributable to discontinued operations | 0 | 0.0% | 0 | 0.0% | (8,000) | Elim. |
| **Total current assets** | **(48,808)** | **4.4%** | **(93,753)** | **14.0%** | **19,822** | **2.4%** |
| Software development costs, net | 0 | 0.0% | 0 | 0.0% | 2,899 | 3.6% |
| Intangible assets, net | 0 | 0.0% | 0 | 0.0% | (32,499) | 28.8% |
| Goodwill | 25,701 | 2.6% | 25,701 | 2.6% | (8,251) | 1.6% |
| Deferred taxes, net | 0 | 0.0% | 0 | 0.0% | (6) | Elim. |
| Contract assets - long-term | (37,675) | 627.2% | (47,250) | 494.9% | (26,306) | 1593.3% |
| Right-of-use assets - operating leases | 0 | 0.0% | 0 | 0.0% | (2,935) | 25.3% |
| Other assets | (1,675) | 1.9% | (3,682) | 3.8% | (10,156) | 14.9% |
| **Total assets** | **($62,457)** | **2.2%** | **($118,984)** | **5.2%** | **($57,432)** | **3.5%** |
| Accounts payable | ($487) | 1.4% | ($3,107) | 22.6% | $18,867 | 59.9% |
| Accrued expenses | 4,029 | 3.9% | 674 | 0.7% | 3,876 | 4.5% |
| Accrued compensation and benefits | 133 | 0.1% | (238) | 0.3% | (332) | 1.0% |
| Deferred revenue | (9,873) | 3.0% | (66,397) | 25.6% | 16,264 | 14.1% |
| Current liabilities attributable to discontinued operations | 0 | 0.0% | 0 | 0.0% | (18,612) | Elim. |
| **Total current liabilities** | **(6,198)** | **0.7%** | **(69,068)** | **14.5%** | **20,063** | **7.3%** |
| Long-term deferred revenue | (3,371) | 3371.0% | (4,221) | 2269.4% | (3,060) | Elim. |
| Deferred taxes, net | 0 | 0.0% | 2,063 | 11.0% | 5,608 | 41.0% |
| Other liabilities | (6) | 0.0% | 0 | 0.0% | 2,361 | 6.0% |
| **Total liabilities** | **(9,575)** | **0.8%** | **(71,226)** | **7.5%** | **24,972** | **4.6%** |
| Additional paid-in capital | 0 | 0.0% | 0 | 0.0% | (5,184) | 0.3% |
| Retained earnings | (52,888) | 9.12% | (47,761) | 6.6% | (81,027) | 12.1% |
| Accumulated other comprehensive loss | 6 | 0.3% | 3 | 0.1% | 3,807 | 4819.0% |

| | Increase (Decrease) | | | | | |
|---|---|---|---|---|---|---|
| *$ in 000s* | **$** | **%** | **$** | **%** | **$** | **%** |
| **Balance Sheet Account/Line Item** | **12/31/2020** | | **12/31/2021** | | **9/30/2022** | |
| **Total stockholders' equity** | **(52,882)** | **3.3%** | **(47,758)** | **3.5%** | **(82,404)** | **7.5%** |
| **Total liabilities and equity** | **($62,457)** | **2.2%** | **($118,984)** | **5.2%** | **($57,432)** | **3.5%** |
| **Line Items Restated** | **21** | | **21** | | **29** | |

c. To further demonstrate, the following provides examples and a summary of multiple restated *statement of operations* accounts and line items (excluding EPS figures and other comprehensive income accounts)—as a result of Veradigm's acknowledged misrepresentations:

| | Increase (Decrease) | | | | | |
|---|---|---|---|---|---|---|
| *$ in 000s* | **$** | **%** | **$** | **%** | **$** | **%** |
| **Statement of Operations Account/Line Item** | **12/31/2020** | | **12/31/2021** | | **9 mos. 9/30/2022** | |
| Provider Revenue | (8,571) | 0.6% | 7,537 | 0.5% | (16,859) | 4.9% |
| Payer and Life Science Revenue | (1,883) | 2.0% | (4,179) | 4.2% | 3,172 | 3.6% |
| **Total revenue** | **(10,454)** | **0.7%** | **3,358** | **0.2%** | **(13,687)** | **3.2%** |
| Provider | (5,502) | 0.6% | 37 | 0.0% | 2,049 | 1.2% |
| Payer and Life Science | (829) | 1.9% | (482) | 0.9% | (906) | 2.5% |
| **Total cost of revenue** | **(6,331)** | **0.7%** | **(445)** | **0.1%** | **1,143** | **0.5%** |
| **Gross profit** | **(4,123)** | **0.7%** | **3,803** | **0.6%** | **(14,830)** | **6.7%** |
| Selling, general and administrative expenses | (2,629) | 0.7% | (10,201) | 3.4% | (8,133) | 6.5% |
| Research and development | 526 | 0.3% | (527) | 0.3% | 1,057 | 1.5% |
| Asset impairment charges | 0 | 0.0% | 0 | 0.0% | 3,604 | 100.0% |
| Amortization of intangible & acquisition-related assets | 0 | 0.0% | 0 | 0.0% | 32,500 | 83.0% |
| **Income (loss) from operations** | **(2,020)** | **1.5%** | **14,531** | **15.8%** | **(43,858)** | **248.6%** |
| Interest expense | ($241) | 0.7% | $241 | 1.9% | $0 | 0.0% |
| Other income (loss), net | ($813) | 107.1% | $2,004 | 2.2% | ($26,940) | 116.4% |
| Impairment of long-term investments | 0 | 0.0% | (5,155) | 100.0% | (7,575) | 100.0% |
| Equity in net income (loss) of unconsolidated investments | 0 | 0.0% | - | 0.0% | (76) | 5.9% |
| **Income (loss) from continuing operations before income taxes** | **(3,074)** | **2.0%** | **11,621** | **6.7%** | **(78,449)** | **142.8%** |
| Income tax benefit (provision) | (2,130) | 14.6% | (6,494) | 18.9% | 52,627 | 85.2% |

| | **Increase (Decrease)** | | | | | |
|---|---|---|---|---|---|---|
| *$ in 000s* | **$** | **%** | **$** | **%** | **$** | **%** |
| **Statement of Operations Account/Line Item** | **12/31/2020** | | **12/31/2021** | | **9 mos. 9/30/2022** | |
| **Income (loss) from cont. ops., net of tax** | **(5,204)** | **3.8%** | **5,127** | **3.7%** | **(25,822)** | **-377.7%** |
| Income (loss) from discontinued operations | (2,471) | 3.6% | 0 | 0.0% | 1,502 | -19.4% |
| Gain (loss) on sale of discontinued operations | 311 | 0.0% | 0 | 0.0% | (18,266) | 176.9% |
| Income tax effect on discontinued operations | 0 | 0.0% | 0 | 0.0% | 9,320 | -19.2% |
| **Income (loss) from discontinued operations, net of tax** | **(2,160)** | **0.3%** | **0** | **0.0%** | **(7,444)** | **11.2%** |
| **Net income (loss)** | **(7,364)** | **1.1%** | **5,127** | **3.7%** | **(33,266)** | **55.5%** |
| **Line Items Restated** | 15* | | 17 | | 23 | |

* Excludes Provider and Payer and Life Sciences Revenue and Cost of Revenue not previously disclosed

d. The Restatement decreased Veradigm's diluted EPS for the year ended December 31, 2020 by $0.03 per share, the three months ended June 30, 2022 by $0.19 per share, and the three months ended September 30, 2022 by $0.13 per share.

e. Veradigm further disclosed that significant adjustments were made to the Company's opening *balance sheet* accounts as of January 1, 2020 to correct misrepresentations in its pre-Class-Period financial statements. The net impact of these adjustments to Veradigm's previously reported *retained earnings* was ***$48.5 million—a 98.4% correcting reduction***. In other words, the Company's previously reported *net income* during periods prior to January 1, 2020 was overstated by $48.5 million.

f. *Contract backlog* figures were also misrepresented. Indeed, since *deferred revenue* was misrepresented and then restated, *backlog*, which includes *retained earnings*, was likewise affected by at least that same amount.

Adjusting for those misrepresentations would quantitatively impact *backlog* by as much as 4.6% in Q2 2022.

g. *Bookings* figures were also apparently misrepresented. While Veradigm did not update *bookings* in its 2022 Form 10-K, given that significant adjustments were made to revenue related account balances (*e.g.*, *accounts receivable*, *contract assets*, and *deferred revenue*) coupled with Veradigm's admissions of duplicate transactions, *bookings* would have had to have been negatively impacted by the restatements made to Veradigm's Admitted False Financial Statements.

272. All of these misrepresentations concern both major segments of Veradigm's business during the Class Period—the *Veradigm* segment and the *HLPP* segment. As *Veradigm* was the only remaining segment after the sale of the *HLPP* segment to Altera in May 2022, the misrepresentations profoundly concern and affect the *Veradigm* segment. The Company's misrepresentations that were restated in the 2022 Form 10-K significantly affected the *Veradigm* segment, including its *operating income*, which appears to have been overstated by 102% and 17% for the years ended December 31, 2020 and 2021, respectively.

273. As noted in Section IV.D.2., *supra*, the Restatement of these misrepresentations unearthed a previously hidden failure to meet analysts' *revenue* consensus targets (for at least Q4 2021, Q1 2022, and Q2 2022), and meet analysts' *Non-GAAP EPS* consensus targets (for at least Q2 2022, and Q3 2022).

### b. The Materially False and Misleading Statements Regarding the Financial Figures and Performance

**Q1 2020**

274. On May 7 and 8, 2020, Veradigm issued several categories of materially false and misleading statements regarding its Q1 2020 financial results.

275. On May 7, 2020, after the market closed (4:01 pm ET), Veradigm issued a press release, which was also attached as Ex. 99.1 to its May 7, 2020 Form 8-K filed with the SEC after the market closed (4:02 pm ET). Therein, the Company announced financial results for Q1 2020, including: (a) *bookings* of $205 million; (b) *contract revenue backlog* totaling $4.5 billion as of March 31, 2020; (c) *revenue* of $417 million; (d) *GAAP net loss* of $20 million; and (e) *GAAP loss per share* of $0.13. Defendant Black was quoted as stating: "Our first quarter results show continued strength in new bookings, which reflects the confidence our clients have in our solutions."

276. On the same day, Veradigm held an earnings call, wherein the Defendants Black and Poulton discussed the Company's Q1 2020 financial results with analysts. Defendant Poulton framed the Company's reported losses as resulting from the COVID-19 Pandemic:

> [W]e estimate the COVID pandemic negatively impacted revenue in the first quarter by approximately $7 million to $10 million, reflecting some impact of lower revenues – excuse me, of lower volumes as well as delayed purchase decisions driving lower non-recurring revenue. Were it not for this impact, we believe our revenue results would have been right in the middle of the guidance range that we had provided for the quarter on our last earnings call.
>
> ***
>
> Overall for the first quarter, we were pleased to see sales activity exceed the high end of our guidance range. The bookings of $205 million was broad-based and very balanced across our company.
>
> ***

> Equally importantly, we had several significant client extensions that signed during the quarter[,] … altogether representing over $100 million in renewed business in our in-patient base. As a reminder, extensions of existing business do not count in our reported bookings, but they do add to our backlog, which stood at $4.5 billion at the end of the first quarter.

277. On May 8, 2020, at (9:37 am ET), Veradigm filed its Q1 2020 Form 10-Q with the SEC, which contained complete unaudited financial statements and was signed by Defendants Black and Poulton.

278. The financial statements contained within the Q1 2020 Form 10-Q confirmed the Company's financial results previously announced on May 7, 2020, and further identified *gross profit* of nearly $157 million for a margin of 37.7%.

279. In the Q1 2020 Form 10-Q, management commented on Veradigm's Q1 2020 GAAP results and Other Key Financial Metrics, including:

> Total revenue for the first quarter of 2020 was $417 million, a decrease of $15 million compared to the first quarter of 2019.… Gross profit for the first quarter was $157 million, a decrease of $17 million compared to the first quarter of 2019. Gross margin decreased to 37.7% in the first quarter of 2020 compared to a 40.3% gross margin in first quarter of 2019.
>
> Our contract backlog as of March 31, 2020 was $4.5 billion, which increased compared with our contract backlog of $4.4 billion and $4.0 billion as of December 31, 2019 and March 31, 2019, respectively.
>
> Our bookings … totaled $205 million for the three months ended March 31, 2020, which represents an decrease of 28% over the comparable prior period amount of $286 million and a decrease of 34% from the fourth quarter of 2019 amount of $312 million.

280. Analysts maintained a positive outlook on the Company despite the miss on topline *revenue* and EPS figures. For example, Cowen, in a May 7, 2020 report, stated that it believed that Veradigm's "cost reduction actions already taken improve the outlook" and were encouraged by strong *bookings* figures. Cowen maintained its "OUTPERFORM" rating.

281. RBC Capital likewise maintained a positive outlook on the Company. On May 8, 2020, it noted Veradigm's "quick and encouraging progress on its margin initiatives," which were expected to drive EBITDA margin expansion. RBC Capital also commented on "much better than expected" *bookings*, which were well above guidance. The firm maintained its "outperform" rating on the Company.

282. In a May 10, 2020 report, Canaccord Genuity acknowledged the missed revenue expectations but was still "encouraged by the longer-term opportunity to streamline the business and continued success on the new sales front." The report added that "[b]ookings [had] outperformed" and "new business was solid and exceeded our expectations." The firm maintained its "BUY" rating on the Company.

283. In a May 11, 2020 note, Dougherty & Company LLC reiterated its "buy" rating on the Company. "Strong booking atop the high end of [Veradigm's] range] was "a testament to the company's mission-critical role in IT strategy and customer up-sell potential." The firm shrugged off the missed revenue numbers as a byproduct of the COVID pandemic and stated that "[Veradigm] remains undervalued."

**Q2 2020**

284. On July 30 and 31, 2020, Veradigm issued several categories of materially false and misleading statements regarding its Q2 2020 financial results.

285. On July 30, 2020, after the market closed (4:31 pm ET), Veradigm issued a press release, which was also attached as Ex. 99.1 to its July 31, 2020 Form 8-K filed with the SEC after the market closed (8:08 pm ET). Therein, the Company announced financial results for Q2 2020, including: (a) *bookings* of $188 million; (b) *contract revenue backlog* totaling $4.4 billion as of

June 30, 2020; (c) *revenue* of $406 million; (d) *GAAP loss from operations* of $5 million; (e) *GAAP net loss* of $8 million; (f) *GAAP loss per share* of $0.05; and (g) *adjusted EBITDA* of $77 million.

286. On the same day, Veradigm held an earnings call, wherein Defendants Black and Poulton discussed the Company's Q2 2020 financial results with analysts. Defendant Poulton spoke positively of the Company's results and tried to frame any negatives as due to the ongoing COVID-19 Pandemic:

> So starting with the quarter, given the macro environment during the quarter, we were pleased with the $188 million of bookings that we recorded. This reflected broad based strength across the portfolio of solutions….
>
> ***
>
> Revenue for the quarter was $406 million, which was down $11 million from first quarter, primarily as a result of the COVID impact on patient volumes. Recall from our first quarter call how COVID impacts our revenue.
>
> ***
>
> We're very pleased with our margin performance in the quarter as we benefited from the margin improvement initiatives that we previewed last quarter. Consolidated non-GAAP gross margins increased 150 basis points sequentially. And our adjusted EBITDA margins increased 530 basis points sequentially as we dramatically improve the profitability of our client services organization and reduce low-value operating costs around the company.
>
> ***
>
> …[W]e recorded non-GAAP earnings per share of $0.18 in the quarter, which exceeded last year's second quarter non-GAAP earnings per share, even with revenue down approximately $39 million on a year-over-year basis.

287. On July 31, 2020, at (4:20 pm ET), Veradigm filed its Q2 2020 Form 10-Q with the SEC, which contained complete unaudited financial statements and was signed by Defendant Poulton.

288. The financial statements contained within the Q2 2020 Form 10-Q confirmed the Company's financial results previously announced on July 30, 2020, and further identified *gross profit* of more than $164 million for a margin of 40.5%.

289. In the Q2 2020 Form 10-Q, management commented on Veradigm's Q2 2020 GAAP results and Other Key Financial Metrics, including:

> Total revenue for the second quarter of 2020 was $406 million, a decrease of $38 million compared to the second quarter of 2019.... Gross profit for the second quarter was $164 million, a decrease of $20 million compared to the second quarter of 2019. Gross margin decreased to 40.5% in the second quarter of 2020 compared to a 41.4% gross margin in the second quarter of 2019.
>
> Our contract backlog as of June 30, 2020 was $4.4 billion, which remained consistent compared with our contract backlog of $4.4 billion as of December 31, 2019, while increasing compared with contract backlog as of June 30, 2019 of $3.9 billion.
>
> Our bookings … totaled $188 million for the three months ended June 30, 2020, which represents a decrease of 32% over the comparable prior period amount of $276 million and a decrease of 8% from the first quarter 2020 amount of $205 million.

290. Analysts responded favorably to Veradigm's Q2 2020 results. For example, in a July 30, 2020 report, Canaccord Genuity noted that "[r]evenue performed above expectations," and *adjusted EBITDA* and *adjusted EPS* figures also beat consensus estimates. The firm reiterated its "BUY" rating and raised its price target to $13 per share from $11.

291. In a July, 30, 2020 report, Cowen found "[Veradigm's] top- and bottom-line beats in 2Q20 encouraging." The firm was "optimistic" that the Company could achieve "consistent growth" and maintained its "OUTPERFORM" rating.

292. In its July 30, 2020 report, Wells Fargo Equity Research maintained its "overweight" rating and increased its price target to $14.50 per share from $12 noting that *revenue*, *EBITDA*, and *EPS* figures all beat consensus estimates.

293. In a July 31, 2020 note, Colliers International found the Company's valuation "compelling," noting the beat on *EPS*, *revenue*, and *EBITDA* figures. While *bookings* were down, Colliers wrote that off "in light of the COVID pandemic which disrupted sales cycles." The firm reiterated its "buy" rating and increased its price target to $12.50 per share from $10.

294. An July 30, 2020 report issued by Wells Fargo Equity Research highlighted Veradigm's reported beat on *revenue* and expected improvement on *EBITDA margins* by Q4 2020. The report noted that, "The only widely followed metric that came in weaker than expected was bookings of $188 (down 32%) vs. the $204 million consensus (down 26%)." The report further highlighted management's positive comments on the strength across Veradigm's physician software business.

**<u>Q3 2020</u>**

295. On October 29 and 30, 2020, Veradigm issued several categories of materially false and misleading statements regarding its Q3 2020 financial results.

296. On October 29, 2020, after the market closed (4:01 pm ET), Veradigm issued a press release, which was also attached as Ex. 99.1 to its October 29, 2020 Form 8-K filed with the SEC after the market closed (4:02 pm ET). Therein, the Company announced financial results for Q3 2020, including: (a) *bookings* of $187 million; (b) *contract revenue backlog* totaling $4.4 billion as of September 30, 2020; (c) *revenue* of $402 million; (d) *GAAP income from operations* of $9 million; (e) *GAAP net income* of $1 million; (f) *GAAP EPS* of $0.00; and (g) *adjusted EBITDA* of $81 million.

297. On the same day, Veradigm held an earnings call, wherein Defendants Black and Poulton discussed the Company's Q3 2020 financial results with analysts. Defendant Poulton

spoke positively of the Company's results and tried to frame any negatives as due to the ongoing COVID-19 Pandemic:

> So starting with the third quarter, we are pleased that our base of recurring revenue and disciplined focused on cost, allowed us to deliver an 18% year-over-year increase in our non-GAAP earnings per share, while also generating significant free cash flow. Consistent with the second quarter, we were able to generate $187 million of new bookings even as we remained in primarily a virtual sales environment.
>
> ***
>
> So with the buying environment similar to Q2, revenue for the quarter was also similar at $402 million….
>
> ***
>
> …[O]ur adjusted EBITDA margin improved another 110 basis points sequentially from Q2 and that brings us to a total of 640 basis point improvement, since we began our margin improvement program in late March. Improvement in Q3 consolidated results was largely driven by the 100 basis point improvement in our core clinical and financial solutions segment, which – which came in at an adjusted EBITDA margin of 15.9%
>
> ***
>
> Overall, we recorded a non-GAAP earnings per share of $0.20 per share and that was up 18% year-over-year, even with the lower year revenue.…

298. On October 30, 2020, at (4:29 pm ET), Veradigm filed its Q3 2020 Form 10-Q with the SEC, which contained complete unaudited financial statements and was signed by Defendant Poulton.

299. The financial statements contained within the Q3 2020 Form 10-Q confirmed the Company's financial results previously announced on October 29, 2020, and further identified *gross profit* of more than $161 million for a margin of 40.2%.

300. In the Q3 2020 Form 10-Q, management commented on Veradigm's Q3 2020 GAAP results and Other Key Financial Metrics, including:

> Total revenue for the third quarter of 2020 was $402 million, a decrease of $42 million compared to the third quarter of 2019.… Gross profit for the third quarter was $162 million, a decrease of $13 million compared to the third quarter of 2019. Gross margin increased to 40.2% in the third quarter of 2020 compared to a 39.5% gross margin in the third quarter of 2019.
>
> Our contract backlog as of September 30, 2020 was $4.4 billion, which remained consistent compared with our contract backlog of $4.4 billion as of December 31, 2019, while increasing compared with contract backlog as of September 30, 2019 of $3.9 billion.
>
> Our bookings … totaled $187 million for the three months ended September 30, 2020, which represents a decrease of 21% over the comparable prior period amount of $236 million and a decrease of less than 1% from the second quarter 2020 amount of $188 million.

301. Analysts responded favorably to Veradigm's Q3 2020 results. In a November 11, 2020 report, Argus Research raised its rating on Veradigm to a "BUY" with a $14 price target. It noted that "results may be turning a corner" after "[t]he company has topped consensus estimates for two consecutive quarters, and management is forecasting top-line growth in 4Q."

302. An October 29, 2020 Wells Fargo Equity Research report noted that Veradigm's reported *EPS* of $0.20 beat consensus estimates despite the Company missing on reported *bookings*. Wells Fargo raised its price estimate on Veradigm from $14.50 to $16.00, noting: "We believe fundamentals for MDRX are stabilizing and expect a resumption of organic top line growth in the low-to-mid singles to drive nice appreciation."

**JP MORGAN ANNUAL HEALTHCARE CONFERENCE (2021)**

303. On January 12, 2021, Defendants Black and Poulton presented on behalf of Veradigm at the JP Morgan Annual Healthcare Conference. On January 12, 2021, Veradigm filed a Form 8-K with the SEC (at 6:05 am ET) appending its presentation slides as Ex. 99.1.

304. At the conference, Black touted the Company's "substantially expanded [adjusted EBITDA] margins over the course of the last year." In accompanying slides, the Company represented that *adjusted EBITDA* was $57.2 million for the first quarter of 2020, $77.1 million

for second quarter of 2020, and $80.8 million for third quarter of 2020, for a total of $215.1 million throughout the first nine months of 2020.

305. Analysts were pleased with the results presented in Veradigm's January 12, 2021 preannouncement. Cowen, for example, issued a report on January 12, 2021 noting that expectations for Veradigm's Q4 2020 margin improvements and higher free cash flow suggested a higher *adjusted EPS* margin profile in 2021 relative to Cowen's estimates and consensus.

306. SVB Leerink similarly responded with high praise for the numbers Veradigm presented at the January 12, 2021 conference. In a report issued the same day, SVB Leerink highlighted Veradigm's "improved margin profile," updated its *EPS* estimates for Veradigm, and raised its price target for the Company from $14 to $16 based on the figures reported in Veradigm's January 12, 2021 presentation.

307. In a January 13, 2021 report, Colliers International further praised Veradigm for its *EBITDA margin* improvement, which Colliers noted came in ahead of its expectations. Colliers reiterated its $18 price target "based on a sum-of-the parts of [Veradigm's] business lines and … their cash position at 12/31 in conjunction with the recent sales of Careport and EPSi."

308. JP Morgan was similarly upbeat. In a January 13, 2021 report, JP Morgan specifically lauded Veradigm's "highly recurring revenue base," "significantly improved adjusted EBITDA margins," and "improved free cash flow generation."

309. In a January 13, 2021 report, William Blair highlighted "three positive data points" in the Veradigm Defendants' slide presentation: "a 100- to 150-basis-point improvement to adjusted EBITDA margin expectations for the fourth quarter of 2020, a statement that the company will repurchase a 'significant amount' of shares in 2021, and an expectation of $90 million to $100 million in free cash flow in 2021." Given the Company's purported improvement in cost

efficiencies, William Blair increased Veradigm's *EBITDA* and *EPS* estimates for Q4 2020 and FY 2021 accordingly.

**Q4 2020 and FY 2020**

310. On February 25 and 26, 2021, Veradigm issued several categories of materially false and misleading statements regarding its Q4 2020 and FY 2020 financial results.

311. On February 25, 2021, after the market closed (4:01 pm ET), Veradigm issued a press release, which was also attached as Ex. 99.1 to its February 25, 2021 Form 8-K filed with the SEC after the market closed (5:00 pm ET). Therein, the Company announced financial results for Q4 2020 and FY 2020, including: (a) *bookings* of $220 million in the fourth quarter of 2020; (b) *contract revenue backlog* totaling $4.1 billion as of December 31, 2020; (c) *GAAP revenue* of $386 million in the fourth quarter of 2020; (d) *GAAP net income* of $728 million in the fourth quarter of 2020; (e) *GAAP EPS* of $4.82 in the fourth quarter of 2020; and (f) *adjusted EBITDA* of $97 million in the fourth quarter of 2020.

312. On the same day, Veradigm held an earnings call, wherein Defendants Black and Poulton discussed the Company's Q4 2020 and FY 2020 financial results with analysts. Defendant Poulton extolled the Company's performance:

> …[T]he fourth quarter was by far our best quarterly performance in years and continue the steady drumbeat of improved performance throughout 2020. Our continued cost management along with the traditional seasonal strength that we experienced in Q4 for both sales and revenue resulted in significant operating leverage and very strong sequential improvement in margin performance, earnings per share, and free cash flow.
>
> ***
>
> [W]e generated $220 million of new business bookings…. [¶] Our backlog actually increased over this period to $4.1 billion at year-end. This reflects the considerable level of client renewals, we secured during the year, which as you'll recall we do not include in our reported bookings. [¶] Total non-GAAP revenue for the quarter was $415 million and was up from $402 million in the third quarter.

***

> Our consolidated adjusted EBITDA margin was 23.4% and was above our expectations…. The margin results in the quarter reflected a nearly 1000 basis point improvement from the first quarter of 2020 and a 700 basis point improvement on a year-over-year basis.

313. When prompted by one analyst to explain the increased *adjusted EBITDA margins* and why they were "well ahead of guidance," Defendant Black doubled down and stated that the increased margins were due to:

> …[a] combination of a better mix and higher revenue, along with continued cost improvement. Costs have been going in the right direction for us for several quarters now.

314. On February 26, 2021, at (4:01 pm ET), Veradigm filed its 2020 Form 10-K with the SEC, which contained complete audited financial statements and was signed by Defendants Black and Poulton.

315. The financial statements contained within the 2020 Form 10-K confirmed the Company's financial results previously announced on February 25, 2021, and further identified *gross profit* for the year of nearly $566 million for a margin of 37.6%.

316. In the 2020 Form 10-K, management commented on Veradigm's Q4 2020 and FY 2020 GAAP results and Other Key Financial Metrics, including:

> Total revenue for the year ended December 31, 2020 was $1.5 billion, a decrease of 8% compared with the year ended December 31, 2019.…
>
> Gross profit decreased during 2020 compared to 2019.… Gross margin slightly increased by 0.2% to 37.6% compared with the prior year period gross margin of 37.4%.…
>
> Our contract backlog as of both December 31, 2020 and December 31, 2019 was $4.1 billion, respectively.

317. Analysts responded favorably to Veradigm's Q4 2020 and full year 2020 financial results. In a February 25, 2021 report titled "4Q20 Beat & 2021 Guide inline; Encouraged by

Strength of MDRX's Balance Sheet," Cowen highlighted Veradigm's reported *adjusted EBITDA* and *EPS* numbers, stating:

> MDRX reported a solid beat across rev, adj. EBITDA and adj. EPS, driven by better than expected software rev and continued decline in opex … Veradigm's performance was encouraging, as it returned to growth in 4Q20 and is expected to continue to grow in 2021. Moreover, MDRX reported better than expected results in 4Q20, due to better than expected software revenue and continued decline in operating expenses. 2021 guidance of $1.5B in revenue and $240M-$260M in adj. EBITDA were inline with consensus of $1.56B and $255.1M, respectively, but implies a slightly higher margin profile.

318. Investment banking firm Colliers Securities reacted similarly, maintaining in a February 26, 2021, report its "[b]uy" rating on Veradigm "following Q4 results that beat expectations across revenue, EBITDA and EPS."

319. Deutsche Bank maintained its "[h]old" rating and raised its price target from $9 to $12 following the release of Veradigm's February 25, 2021 results. In a report dated February 26, 2021, Deutsche Bank noted Veradigm's recovery in *bookings* which were credited "mostly on the success in upselling additional products/services to existing clients and strength in Veradigm."

320. RBC Capital raised its price target to $17 following Veradigm's announcement, per their February 26, 2021 report, noting that Veradigm's *revenue* and *EPS* came in above the firm's expectations.

321. Canaccord Genuity also reiterated its "BUY" rating for Veradigm in its February 28, 2021 report, highlighting Veradigm's *Non-GAAP revenue* and *adjusted EPS*, which beat the firm's expectations.

**<u>Q1 2021</u>**

322. On April 29 and 30, 2021, Veradigm issued several categories of materially false and misleading statements regarding its Q1 2021 financial results.

323. On April 29, 2021, after the market closed (4:01 pm ET), Veradigm issued a press release, which was also attached as Ex. 99.1 to its April 29, 2021 Form 8-K filed with the SEC after the market closed (4:02 pm ET). Therein, the Company announced financial results for Q1 2021, including: (a) *bookings* of $194 million; (b) *contract revenue backlog* totaling $4.0 billion as of March 31, 2021; (c) *revenue* of $368 million; (d) *GAAP net income* of $13 million; (e) *GAAP EPS* of $0.06; and (f) *adjusted EBITDA* of $67 million.

324. On the same day, Veradigm held an earnings call, wherein Defendants Black and Poulton discussed the Company's Q1 2021 financial results with analysts. Defendant Poulton confirmed the figures disclosed in the press release:

> Overall bookings and revenue performance were in line with our plan and our continued discipline on our cost structure created significant operating leverage resulting in adjusted EBITDA, EPS and free cash flow, all coming in above our expectations for the first quarter.
>
> ***
>
> Generated $194 million of new bookings in the quarter, which was up 6% year-over-year and 7% sequentially…. [¶] … [C]onsolidated non-GAAP gross margin was 43.1%, it was up 480 basis points year-over-year.
>
> ***
>
> As a result of our strong margin performance along with the benefit from a lower share count, we reported first quarter GAAP diluted EPS of $0.19 a share, which is up from $0.02 a share that was the first quarter of 2020.

325. On April 30, 2021, at (4:01 pm ET), Veradigm filed its Q1 2021 Form 10-Q with the SEC, which contained complete unaudited financial statements and was signed by Defendant Poulton.

326. The financial statements contained within the Q1 2021 Form 10-Q confirmed the Company's financial results previously announced on April 29, 2021, and further identified *gross profit* of more than $150 million for a margin of 40.7%.

327. In the Q1 2021 Form 10-Q, management commented on Veradigm's Q1 2021 GAAP results and Other Key Financial Metrics, including:

> Total revenue for the first quarter of 2021 was $368 million, a decrease of $13 million compared to the first quarter of 2020.… Gross profit for the first quarter of 2021 was $150 million, an increase of $18 million compared to the first quarter of 2020. Gross margin increased to 40.7% in the first quarter of 2021 compared to a 34.6% gross margin in the first quarter of 2020.
>
> Our contract backlog as of March 31, 2021 was $4.0 billion, which decreased compared with our contract backlog of $4.1 billion and $4.2 billion as of December 31, 2020 and March 31, 2020, respectively.
>
> Our bookings … totaled $194 million for the three months ended March 31, 2021, which represents an increase of 6% over the comparable prior period amount of $183 million and an increase of 7% from the fourth quarter 2020 amount of $181 million.

328. Analysts responded favorably to Veradigm's Q1 2021 results. In an April 29, 2021 report, Canaccord Genuity reflected on Veradigm's "[v]ery respectable margin improvements in [Q1 2021]" and stated that "we would expect investors to be satisfied." Canaccord Genuity raised its price target to $18 per share from $17 dollars per share.

329. RBC Capital also responded positively in an April 29, 2021 analyst report. "[Veradigm management] continues to make encouraging progress on all fronts-restoring revenue growth, improving margins and cleaning up its balance sheet." Analysts further extolled the Company's "impressive margin progress," "1Q [b]ookings [w]ell [a]head of [c]onsensus," and "EBITDA & EPS [b]etter [t]han [e]xpected." RBC Capital concluded its report with an "outperform" rating.

330. SVB Leerink was impressed with Veradigm's "meaningful beat[s] in bookings" and profitability. On April 30, 2021, after hearing from Company management, SVB Leerink increased its price target to $16 per share from $15 per share, noting it was "incrementally more positive" on Veradigm.

331. In an April 29, 2021 report, Cowen stated it was "encouraged" by the Company's Q1 2021 financial results, "remain[ed] positive" on the Company overall, and believed the seemingly strong financial results reflected "effective execution."

332. In an April 29, 2021 report, Cantor Fitzgerald increased its price target to $15 per share from $13 per share based on the Q1 2021 results. Cantor Fitzgerald commended Veradigm's financial results for the quarter as "nicely ahead of our estimates" and discussed the "somewhat improved outlook" moving forward.

333. In an April 30, 3021 report, Sadif Investment Analytics upgraded the stock to "Above Average" from "Average" "mainly due to a rise in revenue per share." The report praised Veradigm's "strong financials" and stated that the Company is "likely to outperform the market" relative to its competitors.

334. On May 17, 2021, CrispIdea released a report increasing its price target on Veradigm stock to $18 per share based, in part on the Company's bookings performance and margin performance. Analysts were impressed by Veradigm's 6% year-over-year increase in bookings and "strong gross margin performance," which led to "83% growth in year-over-year adjusted EBITDA."

**Q2 2021**

335. On August 5 and 6, 2021, Veradigm issued several categories of materially false and misleading statements regarding its Q2 2021 financial results.

336. On August 5, 2021, after the market closed (4:14 pm ET), Veradigm issued a press release, which was also attached as Ex. 99.1 to its August 5, 2021 Form 8-K filed with the SEC after the market closed (4:29 pm ET). Therein, the Company announced financial results for Q2 2021, including: (a) *bookings* of $180 million; (b) *contract revenue backlog* totaling $3.9 billion

as of June 30, 2021; (c) *revenue* of $374 million; (d) *GAAP income from operations* of $10 million; (e) *GAAP net income* of $22 million; (f) *GAAP EPS* of $0.15; and (g) *adjusted EBITDA* of $69 million.

337. On the same day, Veradigm held an earnings call, wherein Defendants Black and Poulton discussed the Company's Q2 2021 financial results with analysts. Defendant Poulton confirmed the figures disclosed in the press release:

> We benefited from continued discipline in managing our cost structure and this drove significant operating leverage, allowing us to report significant year-over-year growth in adjusted EBITDA, EPS, and free cash flow.
>
> ***
>
> We reported $180 million of new bookings in the quarter which was up 10% year-over-year as we benefited from demand across our full portfolio.
>
> ***
>
> Revenue in the second quarter was $374 million, which was up 1% both year-over-year and sequentially.
>
> ***
>
> …[O]ur Veradigm business, we saw a nice double-digit year-over-year growth in the second quarter, it was a particularly strong quarter in our Life Sciences business within Veradigm….
>
> ***
>
> Consolidated non-GAAP gross margin was 42.8% which was up 330 basis points year-over-year and was primarily driven by improvements to our client services margins.
>
> ***
>
> …[W]e continue to manage our operating expenses tightly and they came in very much in line with first-quarter levels so we saw a nice operating leverage down the P&L. ***This helped drive very strong 27% year-over-year adjusted EBITDA growth in the quarter and resulted in adjusted EBITDA margin of 18.4%. Beyond those headline numbers, I am equally pleased that the quality of both our GAAP and non-GAAP earnings continue to improve.***

***

> On a per share basis, we reported non-GAAP EPS of $0.23 per share which was up 35% year-over-year ***reflecting our strong margin performance*** as well as our – as well as our lower share count.

338. On the same call, Defendant Black used Veradigm's reported *EBITDA* figures from the first half of 2021 to justify raising Veradigm's EBITDA guidance for the full year, stating:

> What's driving our EBITDA guidance modification. Well, again, I think I'll repeat what I said before, it's a function of really how we've performed in the first half of the year. You can see those numbers where we're at through two quarters….

339. Defendant Poulton also highlighted Veradigm's seemingly impressive financial performance through the first half of 2021:

> I mean you can see where we are on an EBITDA basis. First half right, first half we're at $136 million already, so we performed. I guess you care to [sic] say we've over performed where relative to our initial guidance.

340. On August 6, 2021, at (4:46 pm ET), Veradigm filed its Q2 2021 Form 10-Q with the SEC, which contained complete unaudited financial statements and was signed by Defendant Poulton.

341. The financial statements contained within the Q2 2021 Form 10-Q confirmed the Company's financial results previously announced on August 5, 2021, and further identified *gross profit* of nearly $151 million for a margin of 40.6%.

342. In the Q2 2021 Form 10-Q, management commented on Veradigm's Q2 2021 GAAP results and Other Key Financial Metrics, including:

> Total revenue for the second quarter of 2021 was $374 million, an increase of $4 million compared to the second quarter of 2020…. Gross profit for the second quarter of 2021 was $152 million, an increase of $14 million compared to the second quarter of 2020. Gross margin increased to 40.6% in the second quarter of 2021 compared to a 37.3% gross margin in the second quarter of 2020.

> Our contract backlog as of June30, 2021 was $3.9 billion, which decreased compared with our contract backlog of $4.1 billion as of December 31, 2020 and June 30, 2020.
>
> Our bookings … totaled $180 million for the three months ended June 30, 2021, which represents an increase of 10% over the comparable prior period amount of $164 million and a decrease of 7% from the first quarter 2021 amount of $194 million.

343. Analysts responded favorably to Veradigm's Q2 2021 financial results. In an August 5, 2021 report, Cowen stated "[w]e remain positive on [Veradigm], given strong bottom-line 2Q21 results and raised adj. EBITDA and FCF guidance, which we believe is an indication of effective execution." Cowen was "also encouraged by the momentum in Veradigm," citing the Company's year-over-year growth and expected "grow[th] in the double-digits for the remainder of the year."

344. In an August 5, 2021 report, Deutsche Bank commended Veradigm's "solid" financial results, citing the Company's *revenue* figures in-line with expectations. The firm was also pleased with the Company's *gross margin*, *adjusted EBITDA*, and *Non-GAAP EPS*. Deutsche Bank remained encouraged by "the strong pipeline and backlog" of deals would "serve as the solid foundation for the second half and next year." Deutsche Bank raised its price target to $18 per share from $17 per share.

345. JP Morgan was likewise impressed with the Company's financial results, and, in an August 6, 2021 report, raised its price target to $16 per share from $15 per share. JP Morgan attributed its modified guidance to the Company's strong financial results.

346. In an August 6, 2021 report, SVB Leerink reiterated its positive outlook on the Company. "We acknowledge MDRX's solid execution and are incrementally more positive on the shares as we raise our PT to $19 ($17 prior)."

347. In an August 31, 2021 report, Crispidea maintained its "buy" rating for Veradigm highlighting the Company's "[b]ookings [p]erformance" and "[m]argin [p]erformance."

348. In Zacks Equity's September 1, 2021 report, analysts commented that "[Veradigm's] surge in total bookings in second-quarter 2021 is impressive" and the "[r]ise in Client services revenues in the quarter is encouraging."

**Q3 2021**

349. On November 4 and 5, 2021, Veradigm issued several categories of materially false and misleading statements regarding its Q3 2021 financial results.

350. On November 4, 2021, after the market closed (4:01 pm ET), Veradigm issued a press release, which was also attached as Ex. 99.1 to its November 4, 2021 Form 8-K filed with the SEC after the market closed (4:05 pm ET). Therein, the Company announced financial results for Q3 2021, including: (a) *bookings* of $166 million; (b) *contract revenue backlog* totaling $3.9 billion as of September 30, 2021; (c) *revenue* of $369 million; (d) *GAAP income from operations* of $12 million; (e) *GAAP net income* of $16 million; (f) *GAAP EPS* of $0.12; and (g) *adjusted EBITDA* of $71 million.

351. The next day, Veradigm held an earnings call, wherein Defendants Black and Poulton discussed the Company's Q3 2021 financial results with analysts. About the results, Defendant Poulton stated:

> We were very pleased with our financial performance in the Third Quarter, where we saw the continuation of positive trends that we experienced all year. We benefited from continued discipline in managing our cost structure, and this drove significant operating leverage, allowing us to report significant year-over-year growth in adjusted EBITDA, earnings per share and free cash flow. It resulted in our highest quarterly adjusted EBITDA margin of the year.

***

> We reported $166 million of new bookings in the quarter, which was up 4% on a year-over-year basis. And revenue in the quarter was $369 million, up 1% year-over-year.
>
> ***
>
> Veradigm revenue grew 10% year-over-year, in line with our expectations.
>
> ***
>
> Consolidated non-GAAP gross margin was 42.4%, which was up 270 basis points year-over-year and continued a steady trend that we have seen all year. Further down the P&L, we continue to manage our operating expenses tightly, and this helped drive very strong 24% year-over-year adjusted EBITDA growth in the quarter. It resulted in an adjusted EBITDA margin of 19.3%.
>
> ***
>
> On a per share basis, we reported non-GAAP EPS of $0.27 per share, which was up 145% year-over-year and reflecting our strong margin performance as well as our lower share count.

352. Defendant Poulton used the Company's seemingly strong financial position to justify increasing guidance on certain metrics:

> The strength of our adjusted EBITDA and free cash flow performance during the quarter has led us to further increase our guidance for the full year….

353. Beginning with the release of these third quarter 2021 results, the Company also began breaking out its financial results by its *Veradigm* business segments. As Defendant Poulton stated on the Nov. 5, 2021 earnings call: "As was the case last quarter, our revenue results are really a tale of two different stories. And as such, we have modified our segment reporting this quarter to provide investors greater transparency on our business."

354. On November 5, 2021, at (4:04 pm ET), Veradigm filed its Q3 2021 Form 10-Q with the SEC, which contained complete unaudited financial statements and was signed by Defendant Poulton.

355. The financial statements contained within the Q3 2021 Form 10-Q confirmed the Company's financial results previously announced on November 4, 2021, and further identified *gross profit* of nearly $149 million for a margin of 40.3%.

356. In the Q3 2021 Form 10-Q, management commented on Veradigm's Q3 2021 GAAP results and Other Key Financial Metrics, including:

> Total revenue for the third quarter of 2021 was $369 million, an increase of $4 million compared to the third quarter of 2020.… Gross profit for the third quarter of 2021 was $149 million, an increase of $14 million compared to the third quarter of 2020. Gross margin increased to 40.3% in the third quarter of 2021 compared to a 37.0% gross margin in the third quarter of 2020.
>
> Our contract backlog as of September 30, 2021 was $3.9 billion, which decreased compared with our contract backlog of $4.1 billion as of both December 31, 2020 and September 30, 2020.
>
> Our bookings … totaled $166 million for the three months ended September 30, 2021, which represents an increase of 4% over the comparable prior period amount of $160 million and a decrease of 8% from the second quarter 2021 amount of $180 million.

357. Analysts responded favorably to Veradigm's Q3 2021 results. In a November 4, 2021 report, Cowen commented positively on the Company's "better than expected adj. EBITDA this quarter, driven primarily by cost mgmt., resulting in adj. EBITDA margin of 19.3% (+356 bps y/y and 90 bps q/q), indicating that [management] is executing against its cost optimization initiatives." Cowen maintained its "OUTPERFORM" rating on Veradigm's stock.

358. In its November 4, 2021 report, RBC Capital also pointed to Veradigm's "impressive progress," noting that the Q3 2021 results impacted the investment thesis "positively." Analysts emphasized that the Company's "recent bookings strength and tapering attrition will soon help return organic revenue to growth."

359. In its November 5, 2021 report, Canaccord Genuity highlighted the strong *adjusted EBITDA* results and increased its price target to $21 per share from $18 per share. Analysts specified, among other things, improved execution by Company management.

360. In a November 5, 2021 report, Morningstar touted Veradigm's strong quarter:

> [Veradigm] posted solid third-quarter results when looking at key margins that were better than we had expected.… The firm reported significant year-over-year growth in net income that totaled $16 million from $1 million in the third quarter of 2020, and also significant growth in operating income of $12 million compared with an $11 million loss year over year.

361. In its November 10, 2021 report, Argus increased its estimates for the Company in a November 10, 2021 report noting "the [C]ompany's strong 3Q results." Argus raised its estimates for *EPS* to $0.91 from $0.85 for 2021 and $0.93 from $0.88 for 2022.

362. In a November 22, 2021 report, Deutsche Bank also increased its *EPS* estimate for the Company to $0.82 per share from $0.58 for 2021 and to $0.99 per share from $0.61 for 2022 based on "solid Q3 results." The firm also increased the price target for Veradigm to $20 per share up from $18 per share.

363. In a November 29, 2021 report, Sadif Analytics noted Veradigm's "rise in revenue per share" in improving its rating for the Company's stock. Analysts concluded "we expect [Veradigm] to be an above average long-term investment that is likely to deliver long-term returns."

364. Zacks Equity's November 30, 2021 report was likewise bullish. "[Veradigm] exited third-quarter 2021 with better-than-expected earnings. Year-over-year uptick in the top and bottom lines, and a surge in total bookings during the quarter, is impressive. Revenue uptick in both the arms is also encouraging."

**Q4 2021 and FY 2021**

365. On February 24 and 25, 2022, Veradigm issued several categories of materially false and misleading statements regarding its Q4 2021 and FY 2021 financial results.

366. On February 24, 2022, after the market closed (4:01 pm ET), Veradigm issued a press release, which was also attached as Ex. 99.1 to its February 24, 2022 Form 8-K filed with the SEC after the market closed (4:03 pm ET). Therein, the Company announced financial results for Q4 2021 and FY 2021, including: (a) *bookings* of $219 million in the fourth quarter of 2021; (b) *contract revenue backlog* totaling $3.8 billion as of December 31, 2021; (c) *revenue* of $392 million in the fourth quarter of 2021; (d) *GAAP income from operations* of $41 million in the fourth quarter of 2021; (e) *GAAP net income* of $87 million in the fourth quarter of 2021; (f) *GAAP EPS* of $0.68 in the fourth quarter of 2021; and (g) *adjusted EBITDA* of $94 million in the fourth quarter of 2021.

367. On the same day, Veradigm held an earnings call, wherein Defendants Black and Poulton discussed the Company's Q4 2021 and FY 2021 financial results with analysts. Defendant Poulton extolled the Company's performance:

> In summary, the fourth quarter was by far our best quarterly performance in years, and it was driven by both our continued discipline and managing our cost structure[,] [a]long with the traditional seasonal strength that we experienced in Q4 for both sales and revenue. This combination of forces resulted in significant operating leverage and very, very strong sequential and year-over-year growth in margin performance, adjusted EBITDA earnings per share and free cash flow.
>
> ***
>
> We reported $219 million of new bookings in the quarter, which was up 21% year-over-year and revenue in the fourth quarter was $392 million, which was up 1% year-over-year.
>
> ***

> Consolidated non-GAAP gross margins was 45.2% which was up 120 basis points year-over-year and almost 300 basis points sequentially. This was driven largely by the revenue mix benefits that I described earlier.
>
> ***
>
> Further down the P&L, we continue to manage our operating expenses tightly, and this helped drive very strong 22% year-over-year, adjusted EBITDA growth in the quarter, and it resulted in adjusted EBITDA margin of 23.9%.
>
> ***
>
> On a per share basis, we reported non-GAAP EPS of $0.79 per share, which was up 295% year-over-year reflecting both our strong income statement performance as well as our lower share count.

368. Defendant Black similarly lauded the Company's financial condition at year's end, noting:

> [O]ur performance delivered as advertised, added recurring revenue[,] significantly improved adjusted EBITDA margins, improved free cash flow conversion and a continuous focus on returning capital while investing for growth in the existing business.

369. On February 25, 2022, at (4:53 pm ET), Veradigm filed its 2021 Form 10-K with the SEC, which contained complete audited financial statements and was signed by Defendants Black and Poulton.

370. The financial statements contained within the 2021 Form 10-K confirmed the Company's financial results previously announced on February 24, 2022, and further identified *gross profit* for the year of more than $619 million for a margin of 41.2%.

371. In the 2021 Form 10-K, management commented on Veradigm's Q4 2021 and FY 2021 GAAP results and Other Key Financial Metrics, including:

> Total revenue for the year ended December 31, 2021 was $1.5 billion, which remained relatively flat as compared with the year ended December 31, 2020.…

> Gross profit increased during 2021 compared to 2020 … Gross margin increased by 3.6% to 41.2% compared with the prior year period gross margin of 37.6%….
>
> Our contract backlog as of December 31, 2021 was $3.8 billion, a decrease of 7% compared with our contract backlog of $4.1 billion as of December 31, 2020.

372. Analysts responded favorably to Veradigm's Q4 2021 and full year 2021 results. In a February 24, 2022 report, Cowen was "encouraged by the 4Q results and 2022 guidance, given both solid top-line and much better than expected profitability." Cowen also highlighted "stronger than expected" *bookings* results.

373. SVB Leerink extolled the results in its February 24, 2022 report. The firm noted Veradigm was a "massive outperformer since last reporting … but this print represents [Veradigm's] strongest in recent memory and has the distinction of being a true clean beat, which could solidify its newly minted label as a safe haven." SVB highlighted the strong *bookings* performance, higher *revenues*, and *adjusted EBITDA* figures.

374. In a February 25, 2022 report, RBC Capital likewise praised the Company's seemingly strong financial results. "Favorable revenue mix and diligent cost control led to another strong quarter of EBITDA … on in-line revenue." The firm was also impressed with Veradigm's "21% bookings growth," which reflected "balance across all areas of the business." RBC Capital raised its price estimate to $22 per share from $19 per share.

375. In a February 27, 2022 report, Cowen maintained its "OUTPERFORM" rating for Veradigm stock while slightly revising full-year *revenue* and *adjusted EBITDA* estimates lower. Cowen further stated that "Given its high-growth and margin profile, Veradigm should accelerate top-line growth and drive margins, as [sic] become a more meaningful business segment. We expect the valuation multiple to expand as mgmt demonstrates its ability to effectively execute." Cowen also increased its price target for the Company to $26 per share from $23 per share.

376. Days later, on March 3, 2022, Veradigm held an investor conference call to discuss the announced sale of the *HLPP* segment to Veradigm. During that call, Defendant Poulton reiterated Veradigm's reported *revenue* and *EBITDA* figures: "***[W]e did $928 million of revenue and also reported adjust [sic] EBITDA of $145 million.***"

377. Defendant Poulton also touted Veradigm's *gross* and *EBITDA margins* in 2021 and used them to rationalize further growth in 2022:

> …that's what gives us our expected growth rate of 6% to 7% in 2022, ***and I would add that the gross margins that we reported in 2021 of 51% and the adjusted EBITDA margin of 27% that we reported***[—][b]oth of them are expected to expand in 2022. So the growth that we get will provide leverage down the P&L.

**Q1 2022**

378. On May 5 and 6, 2022, Veradigm issued several categories of materially false and misleading statements regarding its Q1 2022 financial results.

379. On May 5, 2022, after the market closed (4:01 pm ET) and just three days after the sale of the *HLPP* segment to Altera closed, Veradigm issued a press release, which was also attached as Ex. 99.1 to its May 5, 2022 Form 8-K filed with the SEC after the market closed (4:10 pm ET). Therein, the Company announced financial results for Q1 2022, including: (a) *revenue* of $143 million; (b) *GAAP income from operations* of $7 million; (c) *GAAP net income* of $23 million; (d) *GAAP diluted EPS* of $0.17; and (e) *adjusted EBITDA* of $34 million.

380. On the same day, Veradigm held an earnings call, wherein Defendants Black and Poulton discussed the Company's Q1 2022 financial results with analysts. Defendant Poulton stated:

> We saw strong year-over-year growth in revenue, gross profit, and adjusted EBITDA, as well as an overall improvement in margins, earnings per share and free cash flow.

***

> The Veradigm business segment saw year-over-year revenue growth of 8% during the quarter, which was consistent with our expectations.
>
> ***
>
> Veradigm non-GAAP gross margin was 52.2%, which was up 420 basis points year-over-year, reflecting good operating leverage and good balance of improvement between our end-market revenue areas.
>
> ***
>
> We held a nice operating leverage with Veradigm, reporting 24% year-over-year adjusted EBITDA growth in the quarter, and this resulted in an adjusted EBITDA margin of 25.8%, an increase of 330 basis points year-over-year.
>
> ***
>
> On a per share basis, we reported consolidated non-GAAP EPS of $0.13 per share, which was up 63% year-over-year.

381. On May 9, 2022, at 11:36 am ET, Veradigm filed its Q1 2022 Form 10-Q with the SEC, which contained complete unaudited financial statements and was signed by Defendants Poulton and Jones.

382. The financial statements contained within the Q1 2022 Form 10-Q confirmed the Company's financial results previously announced on May 5, 2022, and further identified *gross profit* of more than $73 million for a margin of 51.5%.

383. In the Q1 2022 Form 10-Q, management commented on Veradigm's Q1 2022 GAAP results and Other Key Financial Metrics, including:

> Total revenue for the first quarter of 2022 was $143 million, an increase of $9 million compared to the first quarter of 2021.… Gross profit for the first quarter of 2022 was $73 million, an increase of $11 million compared to the first quarter of 2021. Gross margin increased to 51.5% in the first quarter of 2022 compared to a 47.1% gross margin in the first quarter of 2021.

384. Analysts responded favorably to Veradigm's Q1 2022 results. In a May 5, 2022 analyst report, Cowen "continue[d] to be positive on [Veradigm] as the company looks to be on track with revised guidance. We continue to like the company's sharpened focus on the higher-

growth Veradigm, which we believe will lead to revenue and adj. EBITDA growth acceleration and thus multiple expansion."

385. In a May 5, 2022 report, RBC Capital was pleased with the Company's quarterly results, commenting that they showed "meaningful [year-over-year] growth. Veradigm revenue, which is ~96% of total, was up 7.8%, which is above the full year growth guidance of 6-7%. Veradigm adjusted EBITDA of $35.2M grew 23.9% [year-over-year], reflecting segment margin expansion of 330 bps."

**<u>Q2 2022</u>**

386. On August 4 and 8, 2022, Veradigm issued several categories of materially false and misleading statements regarding its Q2 2022 financial results.

387. On August 4, 2022, after the market closed (4:01 pm ET), Veradigm issued a press release, which was also attached as Ex. 99.1 to its August 4, 2022 Form 8-K filed with the SEC after the market closed (4:16 pm ET). Therein, the Company announced financial results for Q2 2022, including: (a) *revenue* of $151 million; (b) *GAAP loss from operations* of $5 million; (c) *GAAP net loss* of $64 million; (d) *GAAP diluted loss per share* of $0.54; and (e) *adjusted EBITDA* of $39 million.

388. On the same day, Veradigm held an earnings call, wherein Defendants Poulton and Jones discussed the Company's Q2 2022 financial results with analysts. Defendant Poulton contextualized the Company's positive *gross profit* and *adjusted EBITDA* margins:

> Consistent with our expectations, we delivered strong top line year-over-year growth. This helped fuel improvements in both gross profit and adjusted EBITDA margins and we also had another quarter of strong free cash flow generation.
>
> Our Veradigm business is uniquely positioned in today's healthcare IT landscape as one of the only companies generating meaningful top line growth, 25% plus EBITDA margins and mid-teens free cash flow yield.

389. Defendant Jones further discussed the Company's reported results in more detail:

> We saw a year-over-year growth in bookings, revenue, gross profit and adjusted EBITDA as well as an overall improvement in margin consistent with our expectations. The Veradigm business segment saw a year-over-year revenue growth of 8% during the quarter, and on a consolidated basis, revenue growth was 7%. The Veradigm provider business had top line growth of 4% in line with our expectations.
>
> ***
>
> …[T]he Veradigm and Payer Life Sciences business had year-over-year revenue growth of 26%. This top line growth also drove 46% improvement in non- GAAP gross profit and raised margin 800 basis points year-over-year. Veradigm non-GAAP gross margin was 53.5%, up 420 basis points year-over-year, yielding solid operating leverage.
>
> ***
>
> We again generated nice operating leverage with Veradigm reporting 13% year-over-year adjusted EBITDA growth in the quarter, resulting in adjusted EBITDA margin of 27.5%, an increase of 100 basis points year-over-year.

390. On August 8, 2022, at (4:01 pm ET), Veradigm filed its Q2 2022 Form 10-Q with the SEC, which contained complete unaudited financial statements and was signed by Defendants Poulton and Jones.

391. The financial statements contained within the Q2 2022 Form 10-Q confirmed the Company's financial results previously announced on August 4, 2022, and further identified *gross profit* of more than $79 million for a margin of 52.7%. The *gross profit* for the *Veradigm* segment was reported as being more than $75 million and *income from operations* was nearly $24 million.

392. In the Q2 2022 Form 10-Q, management commented on Veradigm's Q2 2022 GAAP results and Other Key Financial Metrics, including:

> Total revenue for the second quarter of 2022 was $151 million, an increase of $10 million compared to the second quarter of 2021…. Gross profit for the second quarter of 2022 was $79 million, an increase of $11 million compared to the second quarter of 2021. Gross margin increased to 52.7% in the second quarter of 2022 compared to a 48.5% gross margin in the second quarter of 2021.

393. In the Q2 2022 Form 10-Q, management also commented on the Veradigm segment's Q2 2022 GAAP results and Other Key Financial Metrics, including:

> Veradigm revenue increased for the three and six months ended June 30, 2022 compared with the prior year comparable periods.…
>
> Gross profit and gross margin increased during the three and six months ended June 30, 2022 compared with the prior year comparable periods.…
>
> Income from operations and operating margin increased during the three and six months ended June 30, 2022 compared with the prior year comparable periods, primarily due to the increase in gross profit.

394. Analysts responded favorably to Veradigm's Q2 2022 results. In an August 4, 2022 report, Cowen reflected on Veradigm's "solid" quarterly results. Analysts were impressed with revenue and bookings figures which were ahead of estimates and "improve[d] confidence." Cowen maintained its "OUTPERFORM" rating.

**Q3 2022**

395. On November 3 and 7, 2022, Veradigm issued several categories of materially false and misleading statements regarding its Q3 2022 financial results.

396. On November 3, 2022, after the market closed (4:01 pm ET), Veradigm issued a press release, which was also attached as Ex. 99.1 to its November 3, 2022 Form 8-K filed with the SEC after the market closed (4:02 pm ET). Therein, the Company announced financial results for Q3 2022, including: (a) *revenue* of $152 million; (b) *GAAP income from operations* of $25 million; (c) *GAAP net income* of $15 million; (d) *GAAP diluted EPS* of $0.12; and (e) *adjusted EBITDA* of $43 million.

397. The Company further announced that for Q3 2022, the Veradigm segment specifically recorded $145 million in *revenue* and $44 million in *adjusted EBITDA*.

398. On the same day, Veradigm held an earnings call, wherein Defendants Poulton and Jones discussed the Company's Q3 2022 financial results with analysts. Poulton touted Veradigm's top line growth:

> Our business continues to generate meaningful top line growth, 25-plus percent EBITDA margins and free cash flow conversion year-to-date of more than 20%. In terms of momentum, both gross profit and adjusted EBITDA margins expanded meaningfully on a year-over-year basis as well as sequentially from the second quarter.

399. Defendant Jones further reported on the quarter's financial results:

> We saw nice year-over-year growth in revenue, gross profit, adjusted EBITDA and non-GAAP earnings per share, as well as an overall of improvement in margin consistent with our expectations. The Veradigm business segment saw year-over-year revenue growth of 6% during the quarter. And on a consolidated basis, revenue growth was 5%. The Veradigm provider business has a top line growth of 5%, slightly above our expectations.
>
> ***
>
> The Veradigm Payer and Life Sciences business had some nice wins in the quarter, driving the year-over-year revenue growth of 10%. ***This top line growth also drove 37% improvement net [ph] in non-GAAP gross profit and raised gross margin over 1,200 basis points year-over-year. Veradigm's non-GAAP gross margin was 55.6%, up 630 basis points year-over-year, yielding another quarter of solid operating leverage.***
>
> ***
>
> Again, we generated strong operating leverage with Veradigm reporting 27% year-over-year adjusted EBITDA growth in the quarter. ***This performance yielded an adjusted EBITDA margin of 30.1%, an increase of 500 basis points year- over-year. As a result of our strong margin performance, along with a lower share count, we reported a third quarter GAAP EPS of $0.12 per share and our non-GAAP EPS was $0.23 per share, which was up 10% year-over-year.***

400. On November 7, 2022, at (4:37 pm ET), Veradigm filed its Q3 2022 Form 10-Q with the SEC, which contained complete unaudited financial statements and was signed by Defendants Poulton and Jones.

401. The financial statements contained within the Q3 2022 Form 10-Q confirmed the Company's financial results previously announced on November 3, 2022, and further identified *gross profit* of more than $83 million for a margin of 54.9%. The *gross profit* for the *Veradigm* segment was more than $78 million and *income from operations* was over $27 million.

402. In the Q3 2022 Form 10-Q, management commented on Veradigm's Q3 2022 GAAP results and Other Key Financial Metrics, including:

> Total revenue for the third quarter of 2022 was $152 million, an increase of $7 million compared to the third quarter of 2021.… Gross profit for the third quarter of 2022 was $83 million, and increase of $14 million compared to the third quarter of 2021. Gross margin increased to 54.9% in the third quarter of 2022 compared to a 48.1% gross margin in the third quarter of 2021.

403. In the Q3 2022 Form 10-Q, management also commented on the *Veradigm* segment's Q3 2022 GAAP results and Other Key Financial Metrics, including:

> Veradigm revenue increased for the three and nine months ended September 30, 2022 compared with the prior year comparable periods.…
>
> Gross profit and gross margin increased during the three and nine months ended September 30, 2022 compared with the prior year comparable periods.…
>
> Income from operations and operating margin increased during the three and nine months ended September 30, 2022 compared with the prior year comparable periods, primarily due to the increase in gross profit.

404. Analysts responded favorably to Veradigm's Q3 2022 results. In a November 3, 2022 report, SVB Leerink lauded "solid Veradigm results, with a meaningful margin beat." These results reflected "the stability of its business … reflecting 6%-7% Veradigm revenue growth and 10%-15% EBITDA growth. We continue to see meaningful opportunity in [Veradigm's] steady, reliable earnings power…."

405. RBC Capital emphasized the strong *bookings* numbers that Veradigm reported for the quarter. In a November 4, 2022 report, RBC Capital stated that "[b]ookings [r]eflect [d]emand

[a]cross [a]ll [t]hree [e]nd [m]arkets." RBC Capital also viewed positively Veradigm's expanding *gross margins*, which "is starting to flow through to EBITDA, where margins were also up 500 [basis points] [year-over-year]." RBC Capital maintained an "outperform" rating with a $22 per share price target.

406. On November 22, 2022, SeekingAlpha published an article by analyst Daniel Jones with a "buy" rating for the Company. He noted that "revenue for [Veradigm] rose nicely year over year" and highlighted the reported *revenue* and *adjusted EBITDA* results as "robust." These figures coupled with year-to-date *bookings* up 5.6% year-over-year were "reason to celebrate."

**JP MORGAN ANNUAL HEALTHCARE CONFERENCE (2023)**

407. On January 12, 2023, Defendants Poulton and Jones presented on behalf of Veradigm at the JP Morgan Annual Healthcare Conference. On January 11, 2023, Veradigm filed a Form 8-K with the SEC (at 8:16 am ET), appending its presentation slides as Ex. 99.1.

408. At the conference, Defendant Poulton doubled down on Veradigm's financial metrics:

> I want to start by just talking about revenue. Our revenue growth in 2022 is accelerating from 2021. These are – this is across the entirety of the company, the provider side of the business growing certainly a lot slower than the payer and life science side, but you can see that, that revenue growth is accelerating through the year.
>
> ***
>
> On the margin side, what these graphs are illustrating is our trailing 12-month margins over the last several quarters, and you can see they're accelerating as well. So we've moved gross margins up a little over 350 basis points over the last – what's really about 2 years now. And on the right side is our adjusted EBITDA margins, which are now approaching 30% on a trailing 12-month basis as well.

409. Analysts were pleased with the information that Veradigm presented at the JP Morgan Annual Healthcare Conference held on January 12, 2023.

*   *   *

410. The representations detailed above (¶¶274-279, 284-289, 295-300, 303-304, 310-316, 322-327, 335-342, 349-356, 365-371, 378-383, 386-393, 395-403, 407-408)—including in each of the Admitted False Financial Statements, Forms 8-K, press releases, and analyst/investor call transcripts—were materially false and misleading for the following reasons, among others:

a. The Veradigm Defendants have admitted that the reported financial results in the Admitted False Financial Statements were false, did not comply with GAAP (including recently-implemented ASC 606), and needed to be restated. Specifically, in the 2022 Form 10-K with restated financials filed after a two-year delay on March 18, 2025, the Company admitted to internal control systemic failures that led to reporting results that were not consistent with GAAP (including ASC 606), including revenue and various GAAP line items that stemmed from that, such as *EBITDA*, *gross margins*, *EPS*, *retained earnings*, *deferred revenue*, *accounts receivable*, and *contract assets*. For example:

i. Veradigm stated in its 2022 Form 10-K with restated financials that the Company "is restating its accompanying audited historical consolidated financial statements for the years ended December 31, 2021 and 2020 to ***correct for identified errors in its accounting for revenue and certain other it.***"[113]

ii. When discussing its first of three independent investigations in its 2022 Form 10-K with restated financials—the "Restatement

[113] 2022 Form 10-K, at 114.

Review"—the Company stated, "The internal control failures identified at that time ***primarily stemmed from ineffective manual accounting processes and a software tool implemented by the Company in order to comply with the requirements of [ASC 606]*** issued by the Financial Accounting Standards Board…." The Company further stated that "[o]ther deficiencies that were identified as part of the Company's Restatement Review included ineffective internal controls related to manual journal entries, measurement of expected credit losses, and divestiture accounting ***as well as application of revenue recognition requirements to existing contracts, updates to ASC 606 accounting policies for new transaction types***, and testing of system-generated reports."[114]

iii. When discussing the second of three investigations in its 2022 Form 10-K with restated financials—the "Audit Committee Investigation"—the Company stated that it "concluded that there were ***deficiencies in the Company's accounting policies and practices relating to revenue recognition accounting, impairment accounting for long-lived and intangible assets and bonus accruals***, along with deficiencies in the Company's controls and procedures for disclosure of financial measures not consistent with [GAAP], or non-GAAP financial measures," which included "(1) inappropriate communications under then-existing senior

[114] 2022 Form 10-K, at 4.

management, particularly within the Company's finance organization, which contributed ***to accounting entries being recorded, in certain instances, in a manner now determined not to have been consistent with GAAP and Company accounting policies and procedures***, (2) insufficient resources in the Company's accounting function of the finance organization, with insufficient technical expertise in certain subjects, and (3) ***the exercise of judgment within the Company's finance organization or by senior management.***"[115]

iv. When discussing the final investigation of the three conducted in its 2022 Form 10-K with restated financials—the "Internal Review"—the Company stated that it "focused on ***identifying transactions recognized in a manner that may have been inconsistent with GAAP***, including the impact, if any, on ***retained earnings and the income statement***. The additional matters evaluated as part of the Company's Internal Review that ***resulted in adjustments***" relating to revenue recognition.[116]

v. In its 2022 Form 10-K with restated financials, the Company identified control deficiencies it had unearthed in its three investigations that would and did affect GAAP reporting, including: "(1) inappropriate communications under the then-existing senior

[115] 2022 Form 10-K, at 4.

[116] 2022 Form 10-K, at 4.

management, particularly within the Company's finance organization, ***which contributed to accounting entries being recorded, in certain instances, in a manner now determined not to have been consistent with U.S. GAAP and Company accounting policies and procedures***, (2) insufficient resources in the Company's accounting function of the finance organization[,] … and (3) the exercise of judgment within the Company's finance organization or by senior management."[117]

vi. In its 2022 Form 10-K with restated financials, the Company identified material control weaknesses it had unearthed in its three investigations, including: "Revenue Recognition Accounting: [t]he Company did not consistently maintain effective internal controls ***over financial reporting with respect to the accurate recording, accounting for, and presentation of revenue and related costs***, i***ncluding as arising from or relating to … (2) the application of U.S. GAAP*** to new and/or complex matters, … and (4) ***the related balance sheet presentation of contract assets and deferred revenue***."[118]

b. In the 2022 Form 10-K with restated financials—filed on March 18, 2025 after a two-year delay—the Company outlined a 23-step "Remediation Plan" that it planned to implement, which included multiple steps for

[117] 2022 Form 10-K, at 171.

[118] 2022 Form 10-K, at 66.

"Revenue Recognition Accounting" and "Financial Reporting," among others.

c. Parroting infirmities laid out by the Company in its March 18, 2025 10-K with restated financials, Auditor Grant Thornton issued its March 18, 2025 Audit Report, which was included in the Form 10-K, wherein it stated, among other things:

i. "***Control Environment***: The Company did not consistently maintain an effective control environment, including with respect to effective accounting management reviews and supporting documentation for accounting determinations and journal entries, at an appropriate level of precision, due to instances of (1) inappropriate communications under the then existing senior management, particularly within the Company's finance organization, ***which contributed to accounting entries being recorded, in certain instances, in a manner now determined not to have been consistent with U.S. GAAP*** and Company accounting policies and procedures, (2) insufficient resources in the Company's accounting function of the finance organization, with insufficient technical expertise in certain subjects, and (3) the exercise of judgment within the Company's finance organization or by senior management…."[119]

ii. "***Revenue Recognition Accounting***: The Company ***did not consistently maintain effective internal controls over financial***

[119] 2022 Form 10-K, at 66.

***reporting with respect to the accurate recording, accounting for, and presentation of revenue and related costs***, including …: (2) ***the application of U.S. GAAP to new and/or complex matters***…."[120]

d. Though the Company's eleven Admitted False Financial Statements stated that they were prepared in accordance with GAAP, on February 28, 2023, the Company disclosed that it was "unable to file" its 2022 Form 10-K "within the prescribed time period," and that it had recently identified ***internal control failures "relating to the Company's revenue recognition processes over the prior six quarters***"[121] as a result of attempting to ***implement a software tool*** "the Company implemented … ***to assist it with compliance with FASB's rule ASC 606***,"[122] "as testing during the current period highlighted some system generated ***duplicative transactions*** and other errors impacting the results the Company was receiving from the tool, ***resulting in a mis-statement to reported revenues during those periods***."[123]

e. On March 22, 2023, the Company filed its Mar. 22, 2023 Form 8-K with the SEC (4:05 pm ET), where it warned that financial statements from 2021 and 2022 "***should no longer be relied upon because of misstatements to the Company's previously reported revenue resulting from certain internal control failures.***"[124] Over the following two years, as

[120] 2022 Form 10-K, at 66.

[121] Feb. 28, 2023 Notification of Late Filing.

[122] Feb. 28, 2023 press release.

[123] Feb. 28, 2023 Notification of Late Filing.

[124] Mar. 22, 2023 Form 8-K.

investigations piled up but prior to the filing of the 2022 Form 10-K with restated financials, Veradigm expanded those warnings to the financial statements issued in 2020.

f. The Company caused eleven financial reports (Forms 10-K and 10-Q issued during the period 2020-2022) to be restated as part of the 2022 Form 10-K, where line items claimed to be reported in accordance with GAAP significantly and materially changed.

411. These false and misleading statements detailed *supra* (¶¶274-279, 284-289, 295-300, 303-304, 310-316, 322-327, 335-342, 349-356, 365-371, 378-383, 386-393, 395-403, 407-408)—including in each of the Admitted False Financial Statements (Forms 10-K and 10-Q), Forms 8-K, press releases, and analyst/investor call transcripts—were both qualitatively and quantitively material.

412. From a qualitative perspective, the false and misleading statements about financial statement results was material in a multitude of ways.

a. The Veradigm Defendants held out certain GAAP and Other Key Financial Metrics as critical—*e.g.*, *GAAP revenue*, *gross margins*, income (loss) from operations, *EBITDA and adjusted EBITDA*, and *EPS*, among others. Indeed, the Veradigm Defendants used these numbers not only as quantitative metrics, but also as the foundation for a narrative spun throughout the Class Period about Company growth and *revenue*/*margin* growth and momentum.

b. Analysts focused on these metrics and results—both on their own and as the foundation for a narrative about the Company's strength and momentum.

They considered them, posed questions about them, and based their recommendations and price targets on them.

c. As discussed in Section VIII, Loss Causation, *infra*, the market reacted to news about the results and discussion about them. The price drops were significant and based on unusually high trading volume.

d. It took roughly 24 months after the Company first disclosed the existence of control failures and cautioned investors that 2022 financial statements should not be relied upon for (a) the three Veradigm Investigations to be completed and (b) the Company to file on March 18, 2025, its long-delayed 2022 Form 10-K with restated financials.

e. The Company admitted that the depth of its internal control deficiencies (which required three separate internal investigations) was one of the reasons it took so much time to prepare the 2022 Form 10-K, with restated financials.

f. The scope of the problem started well before 2020. The 2022 Form 10-K with restated financials addressed errors in pre-2020-issued financial statements through a cumulative net increase to the Company's previously reported accumulated deficit of $48.5 million as of the beginning of January 1, 2020 (98.4% of Veradigm's restated accumulated deficit as of December 31, 2019). In other words, the Company's previously reported net income during periods prior to January 1, 2020 was overstated by $48.5 million.

g. Even after filing its 2022 Form 10-K on March 18, 2025, the Company admitted that the work on its controls and reporting was far from done:

i. The Company stated that "[t]he majority of our remediation plans are expected to be completed during 2026 in conjunction with the implementation of our new ERP designed to enhance controls."

ii. The Company estimated that it "do[es] not anticipate becoming current in [its] financial reporting until sometime in 2026."

iii. Beyond the filing of the long-delayed 2022 Form 10-K on March 18, 2025, and since first raising internal control problems in February 2023, the Company has yet to file a new Form 10-K or Form 10-Q with the SEC (such as those that are currently delinquent for delinquent for 2023, 2024, and Q1 2025).

h. On February 29, 2024, trading of Veradigm common stock on Nasdaq ceased as Nasdaq implemented the Company's delisting from the exchange announced the day prior, on February 28, 2024.

i. The Company admitted that the CEO (Defendant Poulton) and CFO (Defendant Jones) "each resigned at the request of the Board from their positions" on December 6, 2023 "as a result of the Audit Committee Investigation."

j. The Company disclosed on January 10, 2024, that it had "voluntarily disclosed to the Staff of the SEC information concerning the Audit Committee Investigation. As a result, the SEC commenced an investigation regarding this matter. The Company has continued to provide additional information to the Staff of the SEC based on discussions with the SEC and

is otherwise cooperating with the SEC's ongoing investigation regarding this matter."

k. The misrepresentations and Restatement concerned both major segments of Veradigm's business during the Class Period—the *Veradigm* segment and the *HLPP* segment. Further, as the *Veradigm* segment was the only remaining segment after the sale of the *HLPP* segment to Altera in May 2022, the misrepresentations that were restated in the 2022 Form 10-K significantly affected the *Veradigm* segment, including its operating income (102% and 17% for the years ended December 31, 2020 and 2021, respectively).

l. The restatement of eleven financial reports—for 2020, 2021, and the first three quarters of 2022—unearthed a previously-hidden failure to meet analysts' consensus targets—for at least Q4 2021, Q1 2022, and Q2 2022.

413. From a quantitative perspective, the Company's recognition of revenue along with the myriad resulting GAAP Financial Report line items violated GAAP. Those line items include not just *revenue*, but *gross margin*, *EBITDA*, *EPS*, *deferred revenue*, and *retained earnings*, among others. The violations relate not just to the breadth of financial statement line items that were affected, but also the scope of change—many well above 5%, and some well over 100%. (¶¶415, 418).

414. Some examples from the *balance sheet* of reported metrics that were affected by more than 5% once restated are:

a. *Accounts receivables* was reduced by 6.0%, 16.6%, and 48.1% for the years ended December 31, 2020 and December 31, 2021, and the nine months ended September 30, 2022, respectively.

b. *Contract assets (current portion)* was affected by 40.3%, 45.7%, and 17.3% for the years ended December 31, 2020 and December 31, 2021, and the nine months ended September 30, 2022, respectively.

c. *Total current assets* was reduced by 14.0% for the year ended December 31, 2021.

d. *Long term contract assets* were reduced by 627.2%, 494.9%, and 1593.3% for the years ended December 31, 2020 and December 31, 2021, and the nine months ended September 30, 2022, respectively.

e. *Deferred revenue (current portion)* was affected by 25.6% and 14.1% for the year ended December 31, 2021 and the nine months ended September 30, 2022, respectively.

f. *Long-term deferred revenue* was reduced by 3371.0% and 2269.4% for the years ended December 31, 2020 and December 31, 2021, and fully eliminated for the nine months ended September 30, 2022.

415. The following summary of multiple restated *balance sheet* accounts and line items for the restated Admitted False Financial Statements (¶271, Table 1) is reproduced here with highlights identifying all accounts and line items that surpass the 5% threshold:

| | **Increase (Decrease)** | | | | | |
|---|---|---|---|---|---|---|
| *$ in 000s* | **$** | **%** | **$** | **%** | **$** | **%** |
| **Balance Sheet Account/Line Item** | **12/31/2020** | | **12/31/2021** | | **9/30/2022** | |
| Cash and cash equivalents | $2,336 | 0.4% | $1,131 | 0.6% | $9,295 | 1.9% |

| | Increase (Decrease) | | | | | |
|---|---|---|---|---|---|---|
| *$ in 000s* | $ | % | $ | % | $ | % |
| **Balance Sheet Account/Line Item** | **12/31/2020** | | **12/31/2021** | | **9/30/2022** | |
| Accounts receivable, net of allowance | (19,767) | 6.0% | (46,492) | 16.6% | (54,879) | 48.1% |
| Contract assets | (30,676) | 40.3% | (39,172) | 45.7% | 13,674 | 17.3% |
| Income tax receivable | 0 | 0.0% | (9,220) | 8.4% | 0 | 0.0% |
| Prepaid expenses and other current assets | (701) | 0.5% | 0 | 0.0% | 59,732 | 44.5% |
| Current assets attributable to discontinued operations | 0 | 0.0% | 0 | 0.0% | (8,000) | Elim. |
| **Total current assets** | **(48,808)** | **4.4%** | **(93,753)** | **14.0%** | **19,822** | **2.4%** |
| Software development costs, net | 0 | 0.0% | 0 | 0.0% | 2,899 | 3.6% |
| Intangible assets, net | 0 | 0.0% | 0 | 0.0% | (32,499) | 28.8% |
| Goodwill | 25,701 | 2.6% | 25,701 | 2.6% | (8,251) | 1.6% |
| Deferred taxes, net | 0 | 0.0% | 0 | 0.0% | (6) | Elim. |
| Contract assets - long-term | (37,675) | 627.2% | (47,250) | 494.9% | (26,306) | 1593.3% |
| Right-of-use assets - operating leases | 0 | 0.0% | 0 | 0.0% | (2,935) | 25.3% |
| Other assets | (1,675) | 1.9% | (3,682) | 3.8% | (10,156) | 14.9% |
| **Total assets** | **($62,457)** | **2.2%** | **($118,984)** | **5.2%** | **($57,432)** | **3.5%** |
| Accounts payable | ($487) | 1.4% | ($3,107) | 22.6% | $18,867 | 59.9% |
| Accrued expenses | 4,029 | 3.9% | 674 | 0.7% | 3,876 | 4.5% |
| Accrued compensation and benefits | 133 | 0.1% | (238) | 0.3% | (332) | 1.0% |
| Deferred revenue | (9,873) | 3.0% | (66,397) | 25.6% | 16,264 | 14.1% |
| Current liabilities attributable to discontinued operations | 0 | 0.0% | 0 | 0.0% | (18,612) | Elim. |
| **Total current liabilities** | **(6,198)** | **0.7%** | **(69,068)** | **14.5%** | **20,063** | **7.3%** |
| Long-term deferred revenue | (3,371) | 3371.0% | (4,221) | 2269.4% | (3,060) | Elim. |
| Deferred taxes, net | 0 | 0.0% | 2,063 | 11.0% | 5,608 | 41.0% |
| Other liabilities | (6) | 0.0% | 0 | 0.0% | 2,361 | 6.0% |
| **Total liabilities** | **(9,575)** | **0.8%** | **(71,226)** | **7.5%** | **24,972** | **4.6%** |
| Additional paid-in capital | 0 | 0.0% | 0 | 0.0% | (5,184) | 0.3% |
| Retained earnings | (52,888) | 9.12% | (47,761) | 6.6% | (81,027) | 12.1% |
| AOCI | 6 | 0.3% | 3 | 0.1% | 3,807 | 4819.0% |
| **Total stockholders' equity** | **(52,882)** | **3.3%** | **(47,758)** | **3.5%** | **(82,404)** | **7.5%** |

| | Increase (Decrease) | | | | | |
|---|---|---|---|---|---|---|
| *$ in 000s* | **$** | **%** | **$** | **%** | **$** | **%** |
| **Balance Sheet Account/Line Item** | **12/31/2020** | | **12/31/2021** | | **9/30/2022** | |
| **Total liabilities and equity** | **($62,457)** | **2.2%** | **($118,984)** | **5.2%** | **($57,432)** | **3.5%** |
| **Line Items Restated** | **21** | | **21** | | **29** | |

416. As described in Section IV.D.2, *supra*, quantitative materiality percentage may be lower than 5% for other types of benchmarks like total assets.

417. Some examples from the *statement of operations* of reported metrics that were affected by more than 5% once restated are:

a. *Gross profit* was reduced by 6.7% for the nine months ended September 30, 2022.

b. *Amortization of intangible and acquisition-related assets* was increased by 83.0% for the nine months ended September 30, 2022.

c. *Income (loss) from operations* was affected by 15.8% and 248.6% for the year ended December 31, 2021 and the nine months ended September 30, 2022, respectively.

d. *Other income (loss)* was affected by 107.1% and 116.4% for the year ended December 31, 2020 and the nine months ended September 30, 2022, respectively.

e. *Impairment of long-term investments* was affected by 100.0% and 100.0% for the year ended December 31, 2021 and the nine months ended September 30, 2022, respectively.

f. *Income (loss) from continuing operations before income taxes* was affected by 6.7% and 142.8% for the year ended December 31, 2021 and the nine months ended September 30, 2022, respectively.

g. *Net income (loss)* was affected by 55.5% for the nine months ended September 30, 2022.

418. The following summary of multiple restated *statement of operations* accounts and line items for the restated Admitted False Financial Statements (¶ 271, Table 2) is reproduced here with highlights identifying all accounts and line items that surpass the 5% threshold:

| | Increase (Decrease) | | | | | |
|---|---|---|---|---|---|---|
| *$ in 000s* | **$** | **%** | **$** | **%** | **$** | **%** |
| **Statement of Operations Account/Line Item** | **12/31/2020** | | **12/31/2021** | | **9 mos. 9/30/2022** | |
| Provider Revenue | (8,571) | 0.6% | 7,537 | 0.5% | (16,859) | 4.9% |
| Payer and Life Science Revenue | (1,883) | 2.0% | (4,179) | 4.2% | 3,172 | 3.6% |
| **Total revenue** | **(10,454)** | **0.7%** | **3,358** | **0.2%** | **(13,687)** | **3.2%** |
| Provider | (5,502) | 0.6% | 37 | 0.0% | 2,049 | 1.2% |
| Payer and Life Science | (829) | 1.9% | (482) | 0.9% | (906) | 2.5% |
| **Total cost of revenue** | **(6,331)** | **0.7%** | **(445)** | **0.1%** | **1,143** | **0.5%** |
| **Gross profit** | **(4,123)** | **0.7%** | **3,803** | **0.6%** | **(14,830)** | **6.7%** |
| Selling, general and administrative expenses | (2,629) | 0.7% | (10,201) | 3.4% | (8,133) | 6.5% |
| Research and development | 526 | 0.3% | (527) | 0.3% | 1,057 | 1.5% |
| Asset impairment charges | 0 | 0.0% | 0 | 0.0% | 3,604 | 100.0% |
| Amortization of intangible & acquisition-related assets | 0 | 0.0% | 0 | 0.0% | 32,500 | 83.0% |
| **Income (loss) from operations** | **(2,020)** | **1.5%** | **14,531** | **15.8%** | **(43,858)** | **248.6%** |
| Interest expense | ($241) | 0.7% | $241 | 1.9% | $0 | 0.0% |
| Other income (loss), net | ($813) | 107.1% | $2,004 | 2.2% | ($26,940) | 116.4% |
| Impairment of long-term investments | 0 | 0.0% | (5,155) | 100.0% | (7,575) | 100.0% |
| Equity in net income (loss) of unconsolidated Investments | 0 | 0.0% | - | 0.0% | (76) | 5.9% |

| | Increase (Decrease) | | | | | |
|---|---|---|---|---|---|---|
| *$ in 000s* | **$** | **%** | **$** | **%** | **$** | **%** |
| **Statement of Operations Account/Line Item** | **12/31/2020** | | **12/31/2021** | | **9 mos. 9/30/2022** | |
| **Income (loss) from continued operations before income taxes** | **(3,074)** | **2.0%** | **11,621** | **6.7%** | **(78,449)** | **142.8%** |
| Income tax benefit (provision) | (2,130) | 14.6% | (6,494) | 18.9% | 52,627 | 85.2% |
| **Income (loss) from continued operations, net of tax** | **(5,204)** | **3.8%** | **5,127** | **3.7%** | **(25,822)** | **-377.7%** |
| Income (loss) from discontinued operations | (2,471) | 3.6% | 0 | 0.0% | 1,502 | -19.4% |
| Gain (loss) on sale of discontinued operations | 311 | 0.0% | 0 | 0.0% | (18,266) | 176.9% |
| Income tax effect on discontinued operations | 0 | 0.0% | 0 | 0.0% | 9,320 | -19.2% |
| **Income (loss) from discontinued operations, net of tax** | **(2,160)** | **0.3%** | **0** | **0.0%** | **(7,444)** | **11.2%** |
| **Net income (loss)** | **(7,364)** | **1.1%** | **5,127** | **3.7%** | **(33,266)** | **55.5%** |
| **Line Items Restated** | 15* | | 17 | | 23 | |

* Excludes Provider Revenue and Payer and Life Science Revenue and Cost of Revenue not previously disclosed

## VI. ADDITIONAL ALLEGATIONS OF THE VERADIGM DEFENDANTS' SCIENTER

419. A host of facts regarding the Individual Defendants' motive and opportunity support a strong inference of scienter.

### A. THE INDIVIDUAL DEFENDANTS' ROLE IN THE IMPLEMENTATION, REVIEW, AND MAINTENANCE OF VERADIGM'S ADMITTED DEFICIENT INTERNAL CONTROLS AND DISCLOSURE CONTROLS, AND PROCEDURES STRONGLY SUPPORTS AN INFERENCE OF SCIENTER

420. As set forth in ¶¶33, 179, the Individual Defendants admitted that they were legally responsible for adopting, reviewing, and maintaining efficient internal controls and they each signed SOX Certifications during the Class Period attesting that they personally supervised and

participated in the evaluation of Veradigm's internal controls. And as set forth in Section VI.D.1., *supra*, the importance of internal controls over financial results and disclosure controls and procedures cannot be overstated—they are crucial to ensuring that the information about a public company's business operations and financial results in public filings is complete and accurate.

421. Given this and the fact that Veradigm's extensive internal controls suffered from material deficiencies, there is a strong inference that the Individual Defendants were aware of or reckless regarding the massive internal control deficiencies.

422. This strong inference is further bolstered by the fact that Black and Poulton expressly stated that they revised and updated certain of Veradigm's internal controls to address recent changes in two key accounting rules for which Veradigm has since admitted it lacked proper controls—namely, (i) ASC 606 which Veradigm adopted in January 2018; and (ii) ASC 326, the credit losses accounting standard that Veradigm adopted on January 1, 2020.

423. First, regarding ASC 606, Veradigm represented in its Q2 and Q3 2018 Forms 10Q that:

> We have adopted the standard effective on January 1, 2018 using the modified retrospective method. We also implemented internal controls, and continue to refine our updated processes and key systems to allow us to continue to comply with the new requirements.

424. Then, in its 2018 Form 10-K, Veradigm reassured investors that management implemented controls to address the Company's adoption of ASC 606:

> We have adopted the standard effective on January 1, 2018 using the modified retrospective method. We also implemented internal controls and updated our processes and key systems to allow us to comply with the new requirements.

425. However, the Company admitted in the Restatement that it did not maintain effective controls over accurate revenue recognition pursuant to ASC 606 relating to (a) the improper implementation of a software tool "was exacerbated by a lack of appropriate controls

and management oversight;" (b) the application of GAAP to new and/or complex matters; (c) the monitoring of key system reports for relevant control activities; and (d) the related *balance sheet* presentation of *contract assets* and *deferred revenues*.[125]

426. Second, the Veradigm Defendants reassured investors that they have implemented controls to address a new credit losses accounting standard—ASC 326. Specifically, in its Forms 10-Q for Q1, Q2, and Q3 2020, Veradigm represented that "[w]e have implemented, and continue to refine, internal controls related to the new accounting standard which we adopted on January 1, 2020." Then, in its 2020 Form 10-K, Veradigm updated this statement to assure investors that "[w]e have implemented internal controls related to the new credit losses accounting standard which we adopted on January 1, 2020."

427. However, the Company acknowledged in its Restatement that it failed to consistently maintain effective internal controls over financial reporting with respect to measuring and reporting of *expected credit losses*, particularly in connection with the Company's 2022 divestiture of the *HLPP* segment and changes in the risk profile of the Company's trade accounts receivable.[126]

428. Given their role in implementing, reviewing, and maintaining effective internal controls and the fact that the Veradigm Defendants expressly reassured investors that they reviewed and refined their existing internal controls to address these new rules further support a strong inference that the Veradigm Defendants' false and misleading statements were made with scienter. This is particularly true given the ***importance of internal controls regarding revenue***

---

[125] 2022 Form 10-K, at 171.

[126] 2022 Form 10-K, at 171.

***recognition pursuant to ASC 606—an issue that auditor Grant Thornton flagged*** as a *critical audit matter* in its 2019, 2020, and 2021 audit reports.

### B. THE NATURE, SCOPE, AND MAGNITUDE OF THE DEFICIENCIES IN BOTH THE INTERNAL CONTROLS AND DISCLOSURE CONTROLS AND PROCEDURES FURTHER BOLSTER A FINDING OF SCIENTER

429. Even more significantly, Veradigm did not suffer from a few minor control deficiencies. To the contrary, the nature, scope, and magnitude of the control deficiencies demonstrate a total failure of internal controls that the Veradigm Defendants either intentionally or recklessly created or allowed to exist.

430. ***First,*** the nature of the internal control deficiencies is probative of scienter as the deficiencies started with material deficiencies with the Company's core "control environment." As discussed *supra*, Section IV.D.1., the "control environment" is the set of standards, processes, and structures that provides the basis for carrying out internal controls across the entire organization. The board of directors and senior management establish the tone at the top regarding the importance of internal controls, including expected standards of conduct. Management reinforces expectations at the various levels of the organization. The control environment comprises the integrity and ethical values of the organization; the parameters enabling the board of directors to carry out its governance oversight responsibilities; the organizational structure and assignment of authority and responsibility; the process for attracting, developing, and retaining competent individuals; and the rigor around performance measures, incentives, and rewards to drive accountability for performance. The resulting control environment has a pervasive impact on the overall system of internal control.[127]

---

[127] COSO Framework, Executive Summary.

431. Moreover, as noted *supra*, ¶194, Veradigm also summarized how then "senior management" actively contributed to the control environment deficiencies:

a. inappropriate communications under the then existing senior management**,** particularly within the Company's finance organization, which contributed to accounting entries being recorded, in certain instances, in a manner now determined not to have been consistent with GAAP and Company accounting policies and procedures;

b. insufficient resources in the Company's accounting function of the finance organization, with insufficient technical expertise; and

c. the exercise of judgment within the finance organization or by senior management.

432. Given the importance of the "tone at the top" in establishing a proper control environment and that the Company admitted that its "then senior management" engaged in improper conduct in connection with internal controls, the inference that the Individual Defendants acted with scienter is very strong.

433. ***Second***, the scope of the internal controls deficiencies was extensive. Veradigm acknowledged that there were six additional material weaknesses in addition to the Company's deficient control environment: (a) material weakness in revenue recognition accounting; (b) material weakness in the measurement of *expected credit losses*; (c) material weaknesses in Veradigm's financial reporting; (d) material weaknesses in the Company's divesture accounting; (e) material weakness related to impairment accounting for *long-lived assets* and *intangible assets*; and (f) material weakness related to Veradigm's bonus accruals. The fact that the controls were

materially deficient across so many areas further supports the strong inference that the Individual Defendants acted with scienter.

434. ***Finally***, the magnitude of the deficiencies and the havoc they caused strongly support that the Individual Defendants acted with scienter. In particular, it took approximately 24 months after the Company first disclosed that control failures prevented the filing of Veradigm's 2022 Form 10-K for Veradigm's Investigations to be completed and for the Company to file its long delayed 2022 Form 10-K with restated financials.

435. Moreover, even after Veradigm's Investigations were completed, which was done at enormous expense, the Company admitted that "remediation work will continue with respect to all identified material weaknesses" in its controls and that it needed to prioritize remediating its material weaknesses.[128] Indeed, Veradigm further disclosed that, in order to remediate these material weaknesses, additional work is necessary.[129] Specifically, the Company disclosed its Remediation Plan, which included (or includes) ***twenty-three steps*** deemed necessary to "address the identified control deficiencies (including those that rise to the level of a material weakness) and enhance the Company's overall internal control environment in a timely manner."[130] These steps include:

a. enhancing the procedures and functioning of the disclosure committee;

b. appointing new officers and engaging a new Interim Controller;

c. engaging a third-party accounting professional services firm to strengthen the Company's accounting and finance capabilities;

---

[128] *See* 2022 Form 10-K, at 3. *See also*, *supra*, Section IV.D.3.

[129] 2022 Form 10-K, at 3.

[130] 2022 Form 10-K, at 171.

d. engaging a third-party accounting firm to assist with risk assessment, designing and implementing controls related to financial reporting, segregation of duties, and IT general controls;

e. providing ongoing training for individuals involved with internal controls over financial reporting;

f. designing and implementing controls to replace and enhance certain of the Company's accounting and other finance systems;

g. updating and clarifying the Company's revenue recognition accounting policy;

h. designing and implementing additional internal controls for identifying and evaluating variances for certain *revenue* streams;

i. enhancing the monitoring and evaluation of key system reports for relevant control activities;

j. reviewing and enhancing roles and responsibilities, as well as hiring, training and supervision of individuals responsible for revenue recognition;

k. designing and implementing additional internal controls for measurement of *expected credit losses*;

l. enhancing the monitoring and evaluation of key system reports for relevant control activities;

m. reviewing and enhancing roles and responsibilities, as well as training and supervising individuals responsible for measurement of *expected credit losses*;

n. designing and implementing additional internal controls for financial statement disclosure reviews and manual journal entries;

o. enhancing the monitoring and evaluation of key system reports for relevant control activities;

p. reviewing and enhancing roles and responsibilities, as well as training and supervising individuals responsible for creating and reviewing manual journal entries and financial statement disclosures;

q. designing and implementing additional internal controls in accounting for divestitures;

r. reviewing and enhancing roles and responsibilities, as well as training and supervision of individuals responsible for divestiture accounting;

s. implementing additional controls over the identification of potential impairment indicators and other evaluations related to asset impairments;

t. enhancing the monitoring and evaluation of key system reports for relevant control activities;

u. reviewing and enhancing roles and responsibilities, as well as training and supervising individuals in communicating information relevant to investment impairment accounting;

v. designing and implementing additional internal controls in accounting for bonus accruals; and

w. reviewing and enhancing roles and responsibilities, as well as training and supervising individuals in communicating information relevant to bonus accruals.

436. The magnitude of the control deficiencies further supports the strong inference that the Individual Defendants acted with scienter. Indeed, it is unfathomable that the CEO and CFO could ignore these control deficiencies.

### C. THE EXTENT OF THE RESTATEMENT FURTHER BOLSTERS A FINDING OF SCIENTER

437. As a direct result of these control deficiencies, Veradigm was forced to make extensive adjustments across both the Company's *balance sheets* and *statements of operations* in its restated financials for FY 2020 and 2021, and Q1, Q2, and Q3 2022, as described *supra*, Section V.B. The adjustments made in the Restatement were also material from both a quantitative and qualitative perspective. *Id.*

438. Moreover, the fact that these deficiencies allowed the Company to meet consensus estimates for *revenues* and furthered the Veradigm Defendants' efforts to tout the Veradigm segment as the engine of growth bolsters the strong inference of scienter.

### D. THE FACT THAT THE BOARD FORCED POULTON AND JONES TO "RESIGN" WITHOUT INCENTIVE PAY AFTER LEARNING OF THE AUDIT COMMITTEE'S FINDINGS, INCLUDING FINDINGS OF IMPROPER CONDUCT BY THEN SENIOR MANAGEMENT, STRONGLY SUPPORTS AN INFERENCE THAT THEY ACTED WITH SCIENTER

439. In the Restatement, immediately after highlighting how the Audit Committee reported its findings of the above-referenced instances of improper conduct by then senior management, Veradigm stated that the Board "requested" that Jones and Poulton resign:

> The Audit Committee Investigation also identified issues related to instances of (1) inappropriate communications under then-existing senior management, particularly within the Company's finance organization, which contributed to accounting entries being recorded, in certain instances, in a manner now determined not to have been consistent with GAAP and Company accounting policies and procedures, (2) insufficient resources in the Company's accounting function of the finance organization, with insufficient technical expertise in certain subjects, and (3) the exercise of judgment within the Company's finance organization or by senior

> management. The Audit Committee Investigation results were reported to the Board. As previously disclosed in a Current Report on Form 8-K filed with the SEC ***on December 8, 2023, as a result of the Audit Committee Investigation, on December 6, 2023, Richard J. Poulton and Leah S. Jones each resigned at the request of the Board from their positions as Chief Executive Officer and Chief Financial Officer, respectively.*** Mr. Poulton also stepped down from the Board, effective December 6, 2023.

440. Indeed, the appointment of a "new principal executive officer, principal financial officer and SVP Global Corporate Accounting" and engaging a "new Interim Comptroller" was Step 2 in the Remediation Plan.[131]

441. The fact that the Board "requested" that Poulton and Jones resign from all their positions at Veradigm "as a result of the Audit Committee Investigation" strongly supports a finding that they acted with scienter. This inference is further bolstered by the fact that the terms of separation for each of them expressly provided that neither would not receive any payment from the 2023 annual incentive program.

### E. THE AUDIT COMMITTEE'S DISCLOSURE OF ITS FINDINGS TO THE SEC AND THE SEC'S INVESTIGATION STRONGLY SUPPORTS AN INFERENCE OF SCIENTER

442. On January 10, 2024, Veradigm disclosed that it had reported information concerning the Audit Committee Investigation to the SEC.

443. The fact that the SEC commenced a formal investigation based on the information provided by the Audit Committee and, as the Company disclosed in its Restatement, this SEC investigation is still ongoing and the Company is voluntarily cooperating with it further bolsters an inference of scienter against each Individual Defendant.

444. That is even more true for Defendants Poulton and Jones. The fact that the Company had not reported the investigation to the SEC ***until after their forced resignations*** (or

[131] 2022 Form 10-K, at 172.

else withheld disclosure of the investigation from the public until after those forced resignations) is also supportive of a finding that Poulton and Jones acted with scienter.

### F. INDIVIDUAL DEFENDANTS WERE MOTIVATED TO ARTIFICIALLY INFLATE THE STOCK PRICE TO SIGNIFICANTLY INCREASE STOCK-SALE PROCEEDS DURING THE CLASS PERIOD

445. The Individual Defendants engaged in significant insider trading, collectively selling over 2.1 million shares for proceeds of nearly $36 million during the Class Period, many times more than they had sold in the same pre-Class Period time frame. The fact that the Individual Defendants profited from the sales of shares while the stock price was artificially inflated further bolsters a finding of scienter.

446. Black's sales during the Class Period were highly suspicious both in amount and character, as they were inconsistent with his prior trading practices. Black engaged in massive stock sales during the Class Period, selling 1,159,997 Veradigm shares between October 14, 2020 and June 10, 2022 at prices as high as $21.87 per share, and at an average price of $16.35, for a total profit of $20.3 million. By contrast, during the same time frame before the Class Period (between September 15, 2016 and March 6, 2020), Black had only sold a total of 383,659 Veradigm shares at much lower prices (the highest was $14.35 per share with an average price of $11.80), for a comparatively small profit of only $4.5 million. In addition, despite having purchased over a million shares in the pre-Class Period time frame for over $500,000, Black purchased no shares during the Class Period when the stock price was artificially inflated. The only shares he acquired during the Class Period were from performance-based restricted stock units awards or service-based restricted stock units.

447. Black's Class Period stock sales were also suspiciously timed. For example, Black's sales of (1) 12,363 shares on February 26, 2022 at $19.48 per share, for a total profit of $240,831.24; (2) 30,522 shares on February 28, 2022 at $19.46 per share, for a total profit of

$593,958.12; and (3) 27,038 shares on March 2, 2022 at $20.12 per share, for a total profit of $544,004.56 were suspiciously timed because they occurred within one week after the Veradigm Defendants' February 24, 2022 announcements regarding Veradigm's Q4 2021 and FY 2021 results and on days wherein the price of Veradigm stock trended up toward the Class Period peak of $23.25. Black's sale of 60,000 shares on March 10, 2022 at $21.87 per share, for proceeds of $1.3 million, was likewise suspiciously timed because the sale occurred within one week after Veradigm's March 3, 2022 investor conference call and on a day wherein the price of Veradigm stock neared the Class Period peak. Similarly, Black's sale of 156,000 shares on March 15, 2022 at $21.73 per share, for proceeds of over $3.3 million, was suspiciously timed because the sale occurred within two weeks of Veradigm's March 3, 2022 investor conference call and on a day wherein the price of Veradigm stock neared the Class Period peak. In addition, Black's sale of 50,000 shares on May 13, 2022 at $18.01 per share, for proceeds of over $900,000, was suspiciously timed because the sale occurred roughly one week after Veradigm's May 5, 2022 announcement regarding its first quarter 2022 results and to which financial analysts reacted favorably, and on a day wherein the price of Veradigm stock increased. Similarly, Black's sale of 50,000 shares on May 17, 2022 at $18.18 per share, for proceeds of over $900,000, was suspiciously timed because the sale occurred within two weeks of the May 5, 2022 announcement and on a day wherein the price of Veradigm stock increased. Black reaped substantial profits from artificial inflation embedded within the trading price of Veradigm common stock as a result of the Veradigm Defendants' materially false and misleading statements. Thus, Black's insider trading further supports a strong inference of his scienter.

448. While 510,000 of Black's 1,159,997 total Class Period sales were made pursuant to Rule 10b-5 stock trading plans adopted on August 4, 2020, and August 10, 2021, this fact does

not vitiate the inference that Black was motivated to commit fraud. First, these plans were adopted during the Class Period, and the August 4, 2020 plan was modified twice after the start of the Class Period, when the Individual Defendants were already inflating the stock price. Moreover, there is no evidence that the plans were enacted in "good faith" instead of for the purpose of profiting from the artificially inflated stock price. Thus, the plans may, in fact, give rise to an inference of scienter rather than negate a strong inference of scienter. Second, 649,997 of Black's Class Period sales for proceeds of $11,872,789.5 were not reported sold pursuant to a trading plan (as reported on the Form 4s), which is far more than the number allegedly sold pursuant to a trading plan. Significantly, Black did not sell any shares outside of a trading plan in the pre-Class Period time frame except for sales solely to cover withholding tax liabilities.

449. Poulton's Class Period stock sales were likewise suspicious both in amount and character, as they were inconsistent with his prior trading practices. Poulton engaged in massive selling during the Class Period, selling 952,425 Veradigm shares between August 7, 2020 and August 4, 2023 at prices as high as $20.83 per share, and at an average price of $15.83, for a total profit of $15.2 million. By contrast, in the same time period before the Class Period (between October 29, 2016 and March 6, 2020), Poulton sold only a total of 369,875 Veradigm shares at much lower prices (the highest price was $14.31 per share with an average price of $11.89) for a total profit of $4.2 million. Poulton's total sale of 369,875 shares for a profit of $4.2 million over an equal 1,358 days before the Class Period is low in amount, compared to the total of 952,425 shares sold for a profit of over $15.2 million during the Class Period. Poulton reaped substantial profits from artificial inflation embedded in the trading price of Veradigm common stock as a result of the Veradigm Defendants' materially false and misleading statements. In addition, despite having purchased nearly $800,000 shares in the pre-Class Period time frame for over

$110,000, Poulton purchased no shares during the Class Period when the stock price was artificially inflated. The only shares he acquired during the Class Period were from performance-based restricted stock units awards, service-based restricted stock units or other award of restricted stock units. Poulton's trading in Veradigm stock at a profit, while investors were being deceived regarding the Company's financial results and internal controls, further supports a strong inference of his scienter.

450. Poulton's Class Period stock sales were also suspiciously timed. For example, Poulton's sales of (a) 32,163 shares on February 26, 2021 at $15.43 per share, for proceeds of $496,275.09; (b) 25,012 shares on February 27, 2021 at $15.43 per share, for a proceeds of $385,935.16; and (c) 49,589 shares on February 28, 2021 at $15.43 per share, for proceeds of $765,158.27 were suspiciously timed because they occurred within three days of Veradigm's February 25, 2021 announcement regarding its fourth quarter and full year 2020 results. Poulton's sale of 75,000 shares on May 4, 2021 at $15.68 per share for proceeds of $1,176,637.50 was suspiciously timed because the sale occurred within five days of Veradigm's April 29, 2021 announcement regarding its first quarter 2021 results and reacted to favorably by financial analysts. Poulton's sales of (a) 11,985 shares on February 26, 2022 at $19.48 per share, for proceeds of $233,467.80; (b) 25,955 on February 28, 2022 at $19.46 per share for proceeds of $505,084.30; and (c) 24,351 shares on March 2, 2022 at $20.12 per share for proceeds of $489,942.12 were suspiciously timed because the sales occurred within six days of Veradigm's February 24, 2022 announcement regarding its fourth quarter and full year 2021 results, and on days wherein the price of Veradigm stock neared the Class Period peak. Similarly, Poulton's sale of 140,504 shares on March 15, 2022 at $21.73 per share for proceeds of $3,053,151.92 was suspicious because the sale occurred within two weeks of Veradigm's March 3, 2022 investor

conference, and on a day wherein the price of Veradigm stock increased and neared the Class Period peak. Similarly, Poulton's sales of 171,465 total shares on February 26, 2023 at $16.85 per share for total proceeds of $2,889,185.25 were suspiciously timed because these sales occurred ***just two days before*** the first partial disclosure that caused the stock price to fall nearly 13%.

451. While 140,000 of Poulton's total 952,425 Class Period sales were made pursuant to a Rule 10b-5 trading plan adopted on May 10, 2021, this fact does not vitiate the inference that Poulton was motivated to commit fraud. First, the plan was adopted after the start of the Class Period when the Individual Defendants were already inflating the stock price and there is no evidence that the plan was enacted in "good faith" instead of for the purpose of profiting from the artificially inflated stock price. As such, the plan appears to support rather than negate a strong inference of scienter. Moreover, ***812,425 of the 925,425*** Class Period shares sold during the Class Period ***were not reported as being sold pursuant to a trading plan*** on Form 4s. By contrast, less than 19% of Poulton's sales occurred outside of a trading plan in the pre-Class Period time frame.

452. Jones's stock sales were suspiciously timed in both timing and amount.[132] For example, Jones sold a total of 28,243 Veradigm shares for proceeds of over $400,000 between August 15, 2022 and May 2, 2023, none of which were sold pursuant to a trading plan. Jones's sales of (1) 24 shares on August 15, 2022 at $17.65 per share for proceeds of $423.60 and (2) 3,921 shares on August 17, 2022 at $17.65 per share for proceeds of $69,205.65 were suspiciously timed because the sales occurred within two weeks after Veradigm's August 4, 2022 announcement regarding its second quarter 2022 results, to which analysts reacted favorably, and on days wherein the price of Veradigm stock increased. In addition, Jones sold 7,000 shares for a profit of

[132] Because Jones only started working at Veradigm in August 2019, one cannot compare her Class Period trading with prior trading history.

$116,330.90 on September 13, 2022, within six months before the first corrective disclosure. None of her trades were made pursuant to a trading plan. Jones reaped substantial profits from artificial inflation embedded in the trading price of Veradigm common stock as a result of the Veradigm Defendants' materially false and misleading statements. Jones's trading in Veradigm stock at a profit, while investors were being deceived regarding the Company's financial results and internal controls, supports a strong inference of her scienter.

### G. INDIVIDUAL DEFENDANTS WERE MOTIVATED TO ISSUE THE MATERIALLY FALSE AND MILEADING STATEMENTS BY THEIR COMPENSATION PACKAGES

453. During 2020 through 2022, Defendants Black and Poulton's annual compensation was comprised of four components: (i) a guaranteed annual base salary; (ii) eligibility for cash incentive bonus opportunities ("cash bonus"), and preferred stock units (PSUs), each of which are dependent on the Company's financial or stock price performance; and (iii) eligibility for annual equity incentive compensation consisting of restricted stock units (RSUs) and other forms of equity compensation.

454. "At-Risk Compensation" is defined as "compensation where the value is either based upon the Company's financial performance or stock price" and "Performance-Based Compensation" is defined as "compensation that is dependent on achievement against pre-established quantitative performance goals." Whether and in what amount the Defendants received cash bonuses was subject to the requirements of Veradigm's Annual Incentive Plan, established by the Compensation Committee each year. Generally, bonus payments to each Individual Defendant were to be based on the Company's *Non-GAAP EPS* performance for the year, measured by a target performance range.

455. Black and Poulton's compensation for 2020 and 2021 largely depended on it: 86% of Black's compensation and 85% of Poulton's in 2020, as well as 88% of Black's compensation and 86% of Poulton's in 2021, was designed to be dependent on Company's performance.[133]

### 1. Compensation Based on Company and Individual Performance

456. In 2019, ***the year before the restated fiscal years and quarters***, Black and Poulton realized materially lower compensation than their "target total" compensation. Veradigm's reported fiscal *Non-GAAP EPS* in 2019 was only $0.67, which would have resulted in bonus payments equal to 81.3% of their target bonuses. However, due to the disappointing stock price, the Compensation Committee approved management's recommendation that the bonus payments for the executive officers be reduced to just 15% of their 2019 target bonuses. Black and Poulton therefore realized materially lower compensation in 2019 than their target total compensation. Indeed, Black's realized compensation equaled 54% of his target compensation.

457. Veradigm's improved performance and financial results in 2020, ***the first year of the Restatement***, caused a significant increase in compensation. The Company's reported fiscal *Non-GAAP EPS* in 2020 was $0.76, which resulted in bonus payments equal to 111.1% of Poulton and Black's target bonuses. Further, the "Compensation Committee adjusted Mr. Poulton and Ms. Vakharia's bonuses based on their performance in 2020. Mr. Poulton was critical to the *successful sales of [two business segments]*, as well as being the driving force behind the implementation of cost reduction initiatives across the Company during 2020," and therefore received a "discretionary performance bonus" payment of 200% of his target bonus.

[133] Because Jones only became CFO in May 2022, there were no reports regarding her compensation for 2020 or 2021 to evaluate.

458. Even more significantly, in 2021, the *Non-GAAP EPS* was $1.43, which resulted in bonus payments equal to the maximum bonus payout of 200% of Black and Poulton's target bonuses, equal to $1.25 million for Black and $1 million for Poulton. Further, when determining the amount of Black and Poulton's annual equity award for 2021, the Compensation Committee chose to increase their awards from previous years based on their strong individual performance and the Company's strong performance during 2020. The Compensation Committee chose to split the PSU awards evenly between PSUs earned based on the Company's total shareholder return compared to a peer group of broadly comparable companies and PSUs that may be earned based on Veradigm's generating free cash flow from continuing operations during 2021. The Compensation Committee chose the free cash flow metric for 2021 rather than the *EBITDA margin* metric used in 2020 to diversify performance focus in 2021 and because it believed improved cash flow performance would be critical to the Company's short- and long-term success.

459. As for 2022 executive compensation, Veradigm's delay in filing its 2022 Form 10-K left no indication as to what amounts, if any, Black and Poulton would receive in bonus payments. However, in the Company's unaudited financial statements for 2022, the stock-based compensation for the 6 months ended June 30, 2022 was $15,348,000 compared to $4,822,000 for 6 months ended June 30, 2021 just a year earlier, a 218.3% increase. Black and Poulton were therefore motivated to inflate the price of Veradigm stock as well as their own performance in maintaining effective internal controls in order to receive the increased stock-based compensation in 2022.[134]

---

[134] Only once the Company began investigating its internal controls for deficiencies did the Compensation Committee decide to delay the payment of bonus accruals for 2022. The Company also admitted that, "[d]ue to the audit and subsequent restatement of the Company's financial statements, … which was ongoing at the time bonuses for 2022 were paid, final non-GAAP adjusted EBITDA, and non-GAAP Revenue were not available when determining the payout under the 2022 Bonus Plan. As a result of that uncertainty, the Compensation Committee elected to delay the payment of bonuses initially pending the

460. Thus, Black and Poulton were highly motivated to issue false assurances that the Company's internal controls were effective in order to increase *Non-GAAP EPS* performance to hit the pre-set financial targets required to achieve the maximum compensation possible in 2020, 2021, and 2022, and in order to avoid the lower compensation awarded based on poor Company performance for 2019.

**2. Adjustments to Bonus Accruals Caused by the Restatement**

461. Veradigm's admissions in its Restatement regarding executive compensation for 2022 indicate that Black and Poulton not only had the opportunity and motivation to increase their amounts of bonus compensation, but actually received larger amounts in bonus accruals than they otherwise should have under the Company's financial performance in 2020 and 2021.

462. In fact, the Veradigm Defendants admitted in the Restatement that "[t]he Company did not consistently maintain effective internal controls over financial reporting with respect to the accurate recording, accounting for, and presentation of annual corporate performance bonus accruals, which in certain instances, resulted in quarterly bonus accrual amounts being adjusted and recorded based on management's inappropriate exercise of judgment." Included in the Company's Remediation Plan are steps to design and implement additional internal controls in accounting for bonus accruals in order to cure those deficiencies.

463. Therefore, by misstating the Company's financials and falsely assuring that its internal controls were effective during the Class Period, both Black and Poulton received

results of the audit. In May 2023, the Compensation Committee elected to use the best estimates of the Company's non-GAAP adjusted EBITDA and non-GAAP revenue available at the time to pay approx. 75% of the estimated total annual bonus to each eligible employee, including the [named executive officer]s."

significantly larger amounts in bonus accruals than they otherwise should have received under the Company's restated financial results for FY 2020 and 2021.[135]

## VII. GRANT THORNTON KNOWINGLY AND/OR RECKLESSLY VIOLATED THE EXCHANGE ACT BY FAILING TO COMPLY WITH AUDITING STANDARDS AND ISSUING CLEAN AUDIT REPORTS THAT CONTAINED MATERIALLY FALSE AND MISLEADING STATEMENTS

464. Every year since it was first retained as Veradigm's independent auditor in 2014, Grant Thornton has issued clean, unqualified audit reports representing to investors and others that Veradigm's internal controls were effective and that the financial statements complied with GAAP. However, Veradigm's controls were not effective and its Admitted False Financials did not comply with GAAP. Moreover, as described *supra*, Section IV.D.3., the internal control failures and Admitted False Financial Statements have seriously impacted the Company and investors.

465. Had it complied with the PCAOB Standards in conducting its audits, the only reasonable conclusions that Grant Thornton could have drawn would have been that Veradigm's internal controls were not effective due to material weaknesses and that Veradigm's financial statements were not prepared in accordance with GAAP. Instead, because of Grant Thornton's intentional or reckless disregard of the truth, the Veradigm Defendants were able to exploit its extensive and wide-ranging internal control deficiencies to issue the Admitted False Financial Statements.

466. Accordingly, Grant Thornton is liable for its own Class Period statements in its audit reports for the years ended December 31, 2020 and December 31, 2021 ("Class Period Audit

[135] A "Clawback Policy" in the Restatement stating that "the Company determined that no amounts are recoverable as a result of the restatements … from any current or former executive officers," does not negate an inference of Black and Poulton's scienter because the Company nonetheless admitted that corporate performance bonus accruals had to be adjusted.

Reports"). Among other things, Grant Thornton's Class Period Audit Reports misrepresented that (a) it had conducted its audits in compliance with PCAOB Standards, when that was not the case; (b) it had a reasonable basis for its conclusions that the Company's internal controls were effective and contained no material weaknesses, when that also was not true; and (c) Veradigm's financial statements complied with GAAP, when they did not.

### A. AS THE GATEKEEPER PROTECTNG VERADIGM'S INVESTORS, GRANT THORNTON WAS REQUIRED TO COMPLY WITH PCAOB AUDITING STANDARDS

467. Public investors, creditors and others rely on independent, registered public accounting firms to audit financial statements and assess internal controls when deciding whether to invest in, or to do business with, a public company. As such, the Supreme Court has described the role of an independent auditor as that of a "public watchdog" established to improve the reliability of financial statements, enhance the credibility of those statements and, thereby, support the capital markets.[136] Indeed, "a clean auditors' opinion is an indispensable tool in selling securities to investors."[137]

468. Accordingly, the SEC and its Staff have repeatedly asserted that U.S. "federal securities laws[] … make independent auditors "'gatekeepers' to the public securities markets," noting further that:

> ***Without an opinion from an independent auditor, the company cannot satisfy the statutory and regulatory requirements for audited financial statements and cannot sell its securities to the public.*** The auditor is the only professional that a company must engage before making a public offering of securities and the only professional charged with the duty to act and report independently from management.[138]

---

[136] *United States v. Arthur Young & Co.,* 465 U.S. 805, 818, 819 n.15 (1984).

[137] *Spear v. Ernst & Young*, No. Civ. A. 3:94-1150-17, 1994 WL 585815, at *7 (D.S.C. Aug. 15, 1994).

[138] SEC Securities Act Release No. 33-7870, Proposed Rule: Revision of the Commission's Auditor Independence Requirements (June 30, 2000) at Section II.A. *See also*, SEC Securities Act Release No. 33-

469. In the wake of major corporate accounting scandals involving Enron Corporation, Arthur Andersen LLP, WorldCom Inc., and other prominent businesses, SOX was enacted and signed into U.S. law on July 30, 2002. Under SOX, the PCAOB was created to oversee the independent auditors of public company issuers.

470. The PCAOB's stated mission under Sarbanes-Oxley is "to protect the interests of investors and further the public interest in the preparation of informative, accurate, and independent audit reports."[139] To achieve this objective, the PCAOB was given the responsibility for establishing professional auditing standards applicable to the audits of publicly traded companies, such as Veradigm.

471. Thus, to ensure that they are effective gatekeepers, independent auditors of public companies, such as Grant Thornton, are required by PCAOB Rules to follow the auditing standards adopted by the SEC and PCAOB.[140] Indeed, an auditor may "express an unqualified [audit] opinion" only when the auditor has formed such an opinion on the basis of an audit performed in accordance with PCAOB Standards.[141]

472. With the twentieth anniversary of SOX, Paul Munter, Acting Chief Accountant of the SEC, affirmed the importance of high-quality audits, describing them as "*critical to the process*

---

7919, Final Rule: Revision of the Commission's Auditor Independence Requirements (November 21, 2000) at Section III.A.

[139] Sarbanes-Oxley Act of 2002, Pub. L. No. 107-204, § 101(a), 116 Stat. 745 (2002) (codified at 15 U.S.C.A. § 7211(a)); https://pcaobus.org/about/mission-vision-values (As accessed September 12, 2022).

[140] PCAOB Rule 3100, Compliance with Auditing and Related Professional Practice Standards. [Effective pursuant to SEC Release No. 34-48730, File No. PCAOB-2003-05 (October 31, 2003)]

[141] AS 3101: *The Auditor's Report on an Audit of Financial Statements When the Auditor Expresses an Unqualified Opinion* ¶ 2.

*of providing decision-useful financial information* for the benefit of investors."[142] Mr. Munter further observed that "auditors serve an important gatekeeping and investor protection function by helping to ensure that issues are promptly identified and addressed."[143]

## B. GRANT THORNTON VIOLATED THE PCAOB AUDITING STANDARDS IN CONDUCTING ITS AUDITS FOR VERADIGM

473. In essence, the PCAOB Rules establish the requirements for planning, performing, and reporting on audits as well as rules for ethics, independence, and quality control.

474. During the relevant period, PCAOB Standards were organized into the following overarching categories: (i) General Auditing Standards; (ii) Audit Procedures; (iii) Auditor Reporting; (iv) Matters Relating to Filings Under Federal Securities Laws; and (v) Other Matters Associated with Audits. Individual audit standards within each category were codified and referred to with the initial designation of "AS." PCAOB Standards also require Grant Thornton to comply with specific responsibilities and/or perform specific procedures.

### 1. PCAOB Standards Applicable to Grant Thornton's Internal Control Audits

475. The primary "objective [of] an audit of internal control over financial reporting is to express an opinion on the effectiveness of the company's internal control over financial reporting."[144] Effective internal control over financial reporting provides reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for

[142] Paul Munter, *The Critical Importance of the General Standard of Auditor Independence and an Ethical Culture for the Accounting Profession*, U.S. SEC (June 8, 2022), https://www.sec.gov/newsroom/speeches-statements/munter-20220608.

[143] *Id.*

[144] AS 2201: *An Audit of Internal Control Over Financial Reporting That Is Integrated with An Audit of Financial Statements* ¶ 3.

external purposes. If one or more material weaknesses exist, a company's internal control over financial reporting cannot be considered effective.

476. PCAOB Standards recognize that "[an] audit of internal control over financial reporting should be integrated with the audit of the financial statements."[145] As such, Grant Thornton was responsible for planning and performing its audit work to satisfy each of the following objectives: (a) "obtain[ing] sufficient evidence to support [its conclusion] on internal control over financial reporting as of year-end;" and (b) "obtain[ing] sufficient evidence to support [its] control risk assessments for purposes of the audit of financial statements."[146]

477. Because a company's internal control over financial reporting "cannot be considered effective if one or more material weaknesses exist, to form a basis for expressing an opinion," Veradigm was required to "plan and perform [its] audit[s] to obtain appropriate evidence that [was] sufficient to obtain reasonable [or a high level] assurance about whether material weaknesses exist[ed] as of the date specified in [the Company's] management's assessment."[147]

478. To meet the stated objective of an audit of internal control over financial reporting, PCAOB Standards required that Grant Thornton use "a top-down approach" when identifying and selecting the internal controls to test.[148] "A top-down approach begins at the financial statement level[,] and with the auditor's understanding of the overall risks to internal control over financial

---

[145] AS 2201: *An Audit of Internal Control Over Financial Reporting That Is Integrated with An Audit of Financial Statements* ¶ 6.

[146] AS 2201: *An Audit of Internal Control Over Financial Reporting That Is Integrated with An Audit of Financial Statements* ¶ 7.

[147] AS 2201: *An Audit of Internal Control Over Financial Reporting That Is Integrated with An Audit of Financial Statements* ¶ 3.

[148] AS 2201: *An Audit of Internal Control Over Financial Reporting That Is Integrated with An Audit of Financial Statements* ¶ 21.

reporting," including fraud risk.[149] "The auditor then focuses on entity-level controls and works down to significant accounts and disclosures and their relevant assertions."[150] As such, a proper "[r]isk assessment underlies the entire [integrated] audit process[,] …, including the determination of significant accounts and disclosures and relevant assertions, the selection of controls to test, and the determination of the evidence necessary for a given control."[151]

479. PCAOB Standards impose more specific responsibilities regarding internal control audits with which Grant Thornton was required to, but failed to, comply with, as described in Sections VII.B.4. and VII.C., *infra*.

### 2. PCAOB Standards Applicable to Grant Thornton's Financial Statement Audits

480. The primary objective of Grant Thornton's financial statement audit under PCAOB Standards is the "expression of an opinion on the fairness with which [the financial statements] present, in all material respects, [the] financial position, results of operations, and [the] cash flows," in conformity with an acceptable, applicable financial reporting framework (*i.e.*, GAAP).[152]

481. To achieve this objective, Grant Thornton was required to plan and perform audit procedures to obtain "reasonable assurance" about whether Veradigm's financial statements were

---

[149] *Id.*

[150] *Id.*

[151] AS 2201: *An Audit of Internal Control Over Financial Reporting That Is Integrated with An Audit of Financial Statements* ¶ 10.

[152] AS 1001: *Responsibilities and Functions of the Independent Auditor* ¶ 1 ("The objective of the ordinary audit of financial statements by the independent auditor is the expression of an opinion on the fairness with which they present, in all material respects, financial position, results of operations, and its cash flows in conformity with generally accepted accounting principles. The auditor's report is the medium through which he expresses his opinion or, if circumstances require, disclaims an opinion.")

"free of material misstatement, whether caused by error or fraud."[153] According to relevant professional auditing standards, "reasonable assurance" means a "high" level of assurance.[154]

482. PCAOB Standards note that "reasonable assurance" is obtained by reducing "audit risk"[155] to an appropriately "low" level through the application of "due professional care, including obtaining sufficient appropriate audit evidence"[156][157] to "provide a reasonable basis for his or her opinion."[158]

483. To meet the stated objective of a financial statement audit, PCAOB Standards impose more specific responsibilities regarding financial statements audits with which Grant Thornton was required to, but failed to, comply, as described in Sections VII.B.4. and VII.C., *infra*.

---

[153] AS 1001: *Responsibilities and Functions of the Independent Auditor* ¶ 2 ("The auditor has a responsibility to plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement, whether caused by error or fraud. Because of the nature of audit evidence and the characteristics of fraud, the auditor is able to obtain reasonable, but not absolute, assurance that material misstatements are detected.")

[154] AS 1015: *Due Professional Care in the Performance of Work* ¶ 10 ("The exercise of due professional care allows the auditor to obtain reasonable assurance about whether the financial statements are free of material misstatement, whether caused by error or fraud, or whether any material weaknesses exist as of the date of management's assessment. Absolute assurance is not attainable because of the nature of audit evidence and the characteristics of fraud. Although not absolute assurance, reasonable assurance is a high level of assurance.")

[155] AS 1101: *Audit Risk* ¶ 4 ("In an audit of financial statements, audit risk is the risk that the auditor expresses an inappropriate audit opinion when the financial statements are materially misstated, i.e., the financial statements are not presented fairly in conformity with the applicable financial reporting framework. Audit risk is a function of the risk of material misstatement and detection risk.")

[156] AS 1101: *Audit Risk* ¶ 3 ("To form an appropriate basis for expressing an opinion on the financial statements, the auditor must plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement due to error or fraud. Reasonable assurance is obtained by reducing audit risk to an appropriately low level through applying due professional care, including obtaining sufficient appropriate audit evidence.")

[157] AS 1105: *Audit Evidence* ¶ 2 ("Audit evidence is all the information, whether obtained from audit procedures or other sources, that is used by the auditor in arriving at the conclusions on which the auditor's opinion is based. Audit evidence consists of both information that supports and corroborates management's assertions regarding the financial statements or internal control over financial reporting and information that contradicts such assertions.")

[158] AS 1105: *Audit Evidence* ¶ 4 ("The auditor must plan and perform audit procedures to obtain sufficient appropriate audit evidence to provide a reasonable basis for his or her opinion.")

### 3. Grant Thornton Violated Applicable PCAOB Rules in Issuing Clean Audit Reports as Evidenced by Various Red Flags and Other Facts

#### a. The Red Flags

484. Veradigm's Restatement identifies numerous red flags in the form of (a) the nature, scope, and magnitude of the material internal control deficiencies; (b) specific financial reporting issues plaguing the Company; and (c) the depth and extent of the restatements across both the Company's balance sheets and statements of operations.

485. ***First***, the ***nature***, ***scope***, and ***magnitude*** of the internal control deficiencies in of themselves constitute red flags. Veradigm did not suffer from a few minor internal deficiencies. Rather, Veradigm suffered from seven material weaknesses in internal control over financial reporting, including pervasive failures that failed to prevent or detect material misstatements in the Company's financial statements over multiple years.

486. Indeed, the ***pervasive nature of the deficiencies*** constitutes a glaring red flag because the deficiencies and resulting GAAP violations arose out of the fact that entire "control environment" was deemed deficient. As described *supra*, Section IV.D.1., the control environment is the basis for carrying out internal controls across the Company. The control environment comprises (a) "the integrity and ethical values of the organization;" (b) "the parameters enabling the board of directors to carry out its governance oversight responsibilities;" (c) "the organizational structure and assignment of authority and responsibility;" (d) "the process for attracting, developing, and retaining competent individuals;" and (e) "the rigor around performance measures, incentives, and rewards to drive accountability for performance."[159] "The resulting control environment has a pervasive impact on the overall system of internal control."[160]

---

[159] COSO Internal Control—Integrated Framework (2013), Executive Summary.

[160] *Id*.

487. Moreover, the fact that ***the scope of the internal control deficiencies*** extended across multiple areas of Veradigm's financial reporting processes is a further red flag. The Company identified numerous material weaknesses in key areas beyond the control environment deficiencies. In particular, it identified (a) material weaknesses in revenue recognition accounting; (b) material weaknesses in the measurement of *expected credit losses*; (c) material weaknesses in Veradigm's financial reporting; (d) material weaknesses in the Company's divesture accounting; (e) material weaknesses related to impairment accounting for long-lived assets and intangible assets; and (f) material weaknesses related to Veradigm's bonus accruals. The proper application of the related GAAP rules, among others, required restated figures.

488. ***The magnitude of the deficiencies*** as indicated by the Company's required remediation efforts also constituted huge red flags. In particular, it took roughly 24 months after the Company first disclosed that control failures prevented the timely filing of its 2022 10-K for the Investigations to be completed and for the Company to file its long delayed 2022 Form 10-K and Restatement. Further, Veradigm expects to require many additional months to ***remedy*** the internal control deficiencies. As outlined in the Company's Remediation Plan, the Company determined that it required twenty-three steps to address the identified control deficiencies. *See* ¶435.

489. Significantly, these twenty-three remediation actions required not only reviewing, enhancing or clarifying certain specific controls but also included ***"designing" and "implementing"*** significant controls related to GAAP reporting, demonstrating that there were no effective controls in place for important aspects of Veradigm's financial reporting. For example, the Remediation Plan included (a) "designing and implementing controls … [to] replace and enhance certain of the Company's accounting and other finance systems;" (b) "designing and

implementing additional internal controls … for identifying and evaluating variances for certain revenue streams;" (c) "designing and implementing additional internal controls for measurement of *expected credit losses*;" (d) "designing and implementing additional internal controls for financial statement disclosure reviews and manual journal entries;" (e) "designing and implementing additional internal controls … in accounting for divestitures;" and (f) "designing and implementing additional internal controls in accounting for bonus accruals." Moreover, certain of the twenty-three steps required engaging professional accounting services to remedy the control deficiencies, including (a) engaging in a third-party accounting professional services firm to strengthen the Company's accounting and finance capabilities; and (b) engaging a third-party accounting firm to assist in risk assessment, designing and implementing controls related to financial reporting, segregation of duties and IT general controls.

490. ***Second,*** the Restatement also highlighted specific red flags that Grant Thornton intentionally or recklessly ignored.

a. There were "insufficient resources in the Company's accounting function of the finance organization."

b. The resources in the accounting function of the finance organization had "insufficient technical expertise."

c. There were "inappropriate communications under the then-existing senior management, particularly within the Company's finance organization, which contributed to accounting entries being recorded, in certain instances, in a manner now determined not to have been consistent with U.S. GAAP and Company accounting policies and procedures;"

d. The organization and senior management exercised judgment in the preparation of Veradigm's Admitted False Financial Statements.

491. ***Third,*** the extent and magnitude of the GAAP violations by the Veradigm Defendants created significant red flags. As a direct result of its seven material weaknesses, Veradigm was forced to make extensive adjustments across virtually all line items in both the Company's balance sheets and statements of operations in its Restatements, as described in ¶¶414-418, *supra*. The adjustments were material from both a quantitative and qualitative perspective. *Id.* Moreover, these undisclosed material weaknesses and material GAAP violations allowed the Company to meet consensus estimates for both revenues and EPS, and furthered the Veradigm Defendants' efforts to tout the Veradigm segment as the engine of growth.

492. These red flags should have immediately put Grant Thornton on notice that there was a risk that Veradigm's internal controls were ineffective and deficient and that its Admitted False Financials were materially false and misleading.

493. Yet, despite these red flags indicating material internal control weaknesses and the pervasiveness of Veradigm's accounting misstatements, Grant Thornton issued clean audit reports as to both the effectiveness of Veradigm's internal controls and the accuracy of its Admitted False Financials. Grant Thornton thereby facilitated and concealed the Veradigm Defendants' fraudulent activity and deprived investors of critical information that would have indicated Veradigm's financial statements may not be accurate.

**b. Other Facts**

494. There are additional facts beyond these red flags that further support an inference that Grant Thornton acted with scienter.

495. As a preliminary matter, two of the internal control deficiencies related to important GAAP rules that were adopted just prior to the Class Period: (a) ASC 606, which changed how

companies are to recognize revenue; and (b) ASC 326, which addresses how companies are to estimate and account for expected credit losses on financial assets, as Grant Thornton expressly noted in its 2020 Audit Report. Controls over both these GAAP rules were admittedly deficient and are being remedied, but the Class Period deficiencies regarding controls over these GAAP rules led to material misstatements in Veradigm's Admitted False Financials.

496. Given that Veradigm represented that it had adopted new internal controls to implement these GAAP rules in 2018 and 2020, the fact that Grant Thornton failed to properly investigate and/or knew or recklessly disregarded that Veradigm's new controls were deficient is further evidence of its intentional or reckless misstatements in connection with its Audit Reports. Moreover, Grant Thornton stated in its 2020 and 2021 Financial Statement Audit Reports that revenue recognition under ASC 606 was a "critical audit matter" and, thus, material to the financial statements.[161] While Grant Thornton noted that the "distinct performance obligations" and "allocation of stand-alone selling prices" was a critical audit matter because of subjective or complex judgments, the internal controls deficiencies related to ASC 606 were not limited to such judgments. Indeed, Veradigm's material misstatements under ASC 606 resulted, in part, from the Company's improper inclusion of duplicate transactions in its financial statements and its recurring failure to properly account for contract settlements and terminations.[162]

497. Additionally, as alleged above, Grant Thornton had been auditing Veradigm's financials since 2014. Thus, it would have been intimately familiar with the way that Veradigm's finance organization functioned, its systems of internal controls, and the way the Company

---

[161] Critical audit matters are matters arising from the current period audit of the financial statements that Grant Thornton communicated or required to be communicated to Veradigm's audit committee and that: (1) relate to accounts or disclosures that are material to the financial statements and (2) involved our especially challenging, subjective, or complex judgments.

[162] 2022 Form 10-K at 115, 117, 129, 131, and 133.

prepared its Admitted False Financial Statements. AS 4105 provides that an "accountant who has audited the entity's financial statements for one or more annual periods would have acquired sufficient knowledge of an entity's internal control as it relate[d] to the preparation of annual financial information and may have acquired such knowledge with respect to interim financial information."[163] Given this longevity coupled with the nature, scope, and magnitude of the internal control violations, Grant was, at a minimum, reckless in issuing its Class Period Audit Reports.

498. Finally, Veradigm terminated and replaced Grant Thornton shortly after filing its Restatement. *See* ¶171. Indeed, two of the top actions in the Remediation Plan were to:

a. "[E]ngage a third-party accounting professional services firm with depth of expertise to augment staff accountants and to complement the Company's accounting and finance organization with respect to revenue and accounting operations in order to strengthen the Company's accounting and finance capabilities while the Company evaluates the need for additional internal resources."

b. "[E]ngag[e] a third-party accounting firm with depth of expertise to assist in risk assessment, designing and implementing controls related to period-end financial reporting, segregation of duties and IT general controls."[164]

---

[163] AS 4105: *Reviews of Interim Financial Information* ¶ 13; *see also*, AS 2110: *Identifying and Assessing Risks of Material Misstatement*; AS 2201: *An Audit of Internal Control Over Financial Reporting That Is Integrated with An Audit of Financial Statements.*

[164] 2022 Form 10-K, at 172-73.

### 4. These Red Flags and Other Facts Support a Finding That Grant Thornton Violated PCAOB Rules

499. These red flags and other facts support a strong inference that Grant Thornton violated the applicable PCAOB standards during its respective audits of Veradigm internal control over financial reporting, including those requiring that Grant Thornton:

a. "[P]lan and perform [its] audit[s] to obtain appropriate evidence that [was] sufficient to obtain reasonable [or a high level] assurance about whether material weaknesses exist as of the date specified in [the Company's] management's assessment."[165]

b. Use a "top-down approach" when selecting the internal controls to check.[166]

c. Identify relevant internal controls that are important to whether Veradigm's internal control over financial reporting "sufficiently address[es] the assessed risk of misstatement to each relevant assertion."[167]

d. "[T]est the design effectiveness" of relevant internal controls by "determining whether [Veradigm's] controls, if they are operated as prescribed by persons possessing the necessary authority and competence to perform the control effectively, satisfy[ied] the [C]ompany's control objectives and [could] effectively prevent or detect errors or fraud that could result in material misstatements in the financial statements."[168]

---

[165] AS 2201: *An Audit of Internal Control Over Financial Reporting That Is Integrated with An Audit of Financial Statements* ¶ 3.

[166] AS 2201: *An Audit of Internal Control Over Financial Reporting That Is Integrated with An Audit of Financial Statements* ¶ 21.

[167] AS 2201: *An Audit of Internal Control Over Financial Reporting That Is Integrated with An Audit of Financial Statements* ¶ 39.

[168] AS 2201: *An Audit of Internal Control Over Financial Reporting That Is Integrated with An Audit of Financial Statements* ¶ 42.

e. Test "the operating effectiveness" of relevant internal control "by determining whether the control [was] operating as designed and whether the person performing the control possesses the necessary authority and competence to perform the control effectively."[169] "For each control selected for testing, the evidence necessary to persuade the auditor that the control is effective depends upon the risk associated with the control. … As the risk associated with the control being tested increases, the evidence that the auditor should obtain also increases."[170]

f. Identify and "evaluate the severity of each control deficiency that comes to his or her attention to determine whether the deficiencies, individually or in combination, are material weaknesses as of the date of management's assessment."[171]

g. "[F]orm an opinion on the effectiveness of internal control over financial reporting by evaluating evidence obtained from all sources, including the auditor's testing of controls, misstatements detected during the financial statement audit, and any identified control deficiencies."[172]

---

[169] AS 2201: *An Audit of Internal Control Over Financial Reporting That Is Integrated with An Audit of Financial Statements* ¶ 44.

[170] AS 2201: *An Audit of Internal Control Over Financial Reporting That Is Integrated with An Audit of Financial Statements* ¶ 46.

[171] AS 2201: *An Audit of Internal Control Over Financial Reporting That Is Integrated with An Audit of Financial Statements* ¶ 62.

[172] AS 2201: *An Audit of Internal Control Over Financial Reporting That Is Integrated with An Audit of Financial Statements* ¶ 71.

h. If appropriate, issue a report on the audit of Veradigm's internal control over financial reporting.[173]

500. The red flags and other facts identified also strongly support a finding that Grant Thornton violated the applicable PCAOB Standards during its respective financial statement audits of Veradigm's financial statements, including those requiring that Grant Thornton to:

a. Plan and perform audit procedures to obtain "reasonable assurance" about whether Veradigm's "financial statements [we]re free of material misstatement, whether caused by error or fraud."[174]

b. Identify and assess risks of material misstatement (*i.e.*, the risk that the financial statements are materially misstated), including risks of material misstatement due to fraud such as the presumed risk that revenue and significant estimates maybe materially overstated due to fraud and/or management bias.[175]

c. Understand Veradigm, including but not limited to understanding and evaluating the Company's "selection and application of accounting policies."[176]

---

[173] AS 2201: *An Audit of Internal Control Over Financial Reporting That Is Integrated with An Audit of Financial Statements* ¶¶ 85 – 85F.

[174] AS 1001: *Responsibilities and Functions of the Independent Auditor* ¶ 2 ("The auditor has a responsibility to plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement, whether caused by error or fraud. Because of the nature of audit evidence and the characteristics of fraud, the auditor is able to obtain reasonable, but not absolute, assurance that material misstatements are detected.")

[175] AS 2110: *Identifying and Assessing Risks of Material Misstatement*; AS 2401: *Consideration of Fraud in a Financial Statement Audit*.

[176] AS 2110: *Identifying and Assessing Risks of Material Misstatement*.

d. Address risks of material misstatement through appropriate overall audit responses and audit procedures.[177] Of relevance, Grant Thornton was required to respond to risks of material misstatement at both the "financial statement" level and the "assertion" level.[178] "Assertion" level risk assessments pertain to assertions implicitly or explicitly made by Veradigm's management in representing the Company's financial statements are fairly presented in accordance with GAAP. Assertions can be classified into the following categories:

i. *Existence or occurrence*—Assets or liabilities of the company exist at a given date, and recorded transactions have occurred during a given period;

ii. *Completeness*—All transactions and accounts that should be presented in the financial statements are so included;

iii. *Valuation or allocation*—Asset, liability, equity, revenue, and expense components have been included in the financial statements at appropriate amounts;

iv. *Rights and obligations*—The company holds or controls rights to the assets, and liabilities are obligations of the company at a given date; and

---

[177] AS 2301: *The Auditor's Responses to the Risks of Material Misstatement*; AS 2401: *Consideration of Fraud in a Financial Statement Audit*.

[178] AS 1101: *Audit Risk* ¶ 5; AS 2110: *Identifying and Assessing Risks of Material Misstatement* ¶ 59.

v. *Presentation and disclosure*—The components of the financial statements are properly classified, described, and disclosed.[179]

d. Identify and evaluate significant accounting estimates, including evaluating whether Veradigm's accounting estimates in the financial statements were reasonable based upon appropriate available and reliable information.[180]

e. Apply due professional care, the application of "professional skepticism"[181] throughout the audit process. An auditor's professional skepticism and related requisite of "a questioning mind and a critical assessment of audit [information]" obtained, may result in the auditor's identification of contradictory or inconsistent information when compared to other audit evidence obtained.[182] These inconsistencies often raise important questions as to the reasonableness of a company's assertion or the reliability of the audit evidence.[183] In these circumstances, PCAOB Standards required Grant Thornton to "perform additional audit procedures" necessary to resolve the issue and determine what impact the information might have "on the other aspects of the audit."[184]

---

[179] AS 1105: *Audit Evidence* ¶ 11.

[180] AS 2501: *Auditing Accounting Estimates, Including Fair Value Measurements*.

[181] Professional skepticism is defined under PCAOB Standards as "an attitude that includes a questioning mind and a critical assessment of audit evidence." AS 1015: *Due Professional Care in the Performance of Work* ¶ 7.

[182] *Id*.

[183] AS 2810: *Evaluating Audit Results* ¶ 3 ("In forming an opinion on whether the financial statements are presented fairly, in all material respects, in conformity with the applicable financial reporting framework, the auditor should take into account all relevant audit evidence, regardless of whether it appears to corroborate or to contradict the assertions in the financial statements").

[184] AS 1105: *Audit Evidence* ¶ 9.

501. Significantly, Grant Thornton has a track history of preparing "unsupported" audit opinions.

502. PCAOB has conducted inspections of Grant Thornton LLP pursuant to SOX ("PCAOB Inspection Reports"). Such inspections "are designed to review portions of selected audits of public companies and to evaluate elements of a firm's system of quality control. Each PCAOB inspection results in a report, specific to the portions of each audit firm inspected, which may summarize identified deficiencies."[185]

503. From 2019 to 2023, the PCAOB inspected 145 audits in which Grant Thornton was the principal auditor.[186] These audits were generally for the fiscal financial years ending in 2018 through 2022.[187] It is unknown whether Grant Thornton's audits of Veradigm were part of the PCAOB inspections, as the PCAOB Inspection Reports do not indicate who the issuers were.

504. The PCAOB Inspection Reports note that according to the PCAOB's inspection teams, Grant Thornton issued "unsupported" audit opinions in approximately 29% (more than 1 out of every 4 audits) of the 145 audits that were reviewed:[188]

---

[185] PCAOB, *Basics of Inspections*, PCAOBUS.ORG, *https://pcaobus.org/oversight/inspections/basics-of-inspections* (last visited Apr. 29, 2025).

[186] *See e.g.*, PCAOB 2023 Inspection Grant Thornton LLP, dated May 23, 2024, PCAOB Release No. 104-2024-084-gt; p. 6; PCAOB 2021 Inspection Grant Thornton LLP, dated November 4, 2022, PCAOB Release No. 104-2022-221a-gt; p. 6.

[187] *See e.g.*, PCAOB 2023 Inspection Grant Thornton LLP, dated May 23, 2024, PCAOB Release No. 104-2024-084-gt; p. 4; PCAOB 2022 Inspection Grant Thornton LLP, dated December 8, 2023, PCAOB Release No. 104-2024-034-gt; p. 4; PCAOB 2021 Inspection Grant Thornton LLP, dated November 4, 2022, PCAOB Release No. 104-2022-221a-gt; p. 4; PCAOB 2020 Inspection Grant Thornton LLP, dated September 30, 2021, PCAOB Release No. 104-2021-152a-gt-expanded; p. 4; PCAOB 2019 Inspection Grant Thornton LLP, dated December 17, 2020, PCAOB Release No. 104-2021-001a-gt-expanded; p. 3.

[188] *See e.g.*, PCAOB 2023 Inspection Grant Thornton LLP, dated May 23, 2024, PCAOB Release No. 104-2024-084-gt; p. 6; PCAOB 2021 Inspection Grant Thornton LLP, dated November 4, 2022, PCAOB Release No. 104-2022-221a-gt; p. 6.

| Inspection Year | Audit Period Generally Ending | Audits Reviewed | Audits with Unsupported Opinions | Deficiency Rate |
|---|---|---|---|---|
| 2023 | 2022 | 28 | 15 | 54% |
| 2022 | 2021 | 26 | 8 | 31% |
| 2021 | 2020 | 31 | 7 | 23% |
| 2020 | 2019 | 29 | 5 | 17% |
| 2019 | 2018 | 31 | 7 | 23% |
| Total | | 145 | 42 | 29% |

505. The PCAOB separately described 436 individual Part 1.A Deficiencies in connection with these inspections.[189] These audit deficiencies were of such significance that it appeared to the inspection team that at the time it issued its audit reports, Grant Thornton "had not obtained sufficient appropriate audit evidence to support its opinion[s] on the issuer's financial statements and/or internal control over financial reporting […]."[190]

506. Of the 42 audits with "unsupported opinions," 25 included deficiencies in both Grant Thornton's financial statement and internal control over financial reporting audits.[191] In this regard, of the described deficiencies, 179 or 41% of the 436 listed deficiencies pertained to compliance with (or lack thereof) with PCAOB Auditing Standards ("AS") AS 2201: *An Audit of Internal Control Over Financial Reporting That Is Integrated with An Audit of Financial*

[189] Summarized from information at inspection-reports-part-1a-csv (downloaded 4/28/2025 from https://pcaobus.org/oversight/inspections/firm-inspection-reports).

[190] *See e.g.*, PCAOB 2023 Inspection Grant Thornton LLP, dated May 23, 2024, PCAOB Release No. 104-2024-084-gt; p. 1; PCAOB 2022 Inspection Grant Thornton LLP, dated December 8, 2023, PCAOB Release No. 104-2024-034-gt; p. 1; PCAOB 2021 Inspection Grant Thornton LLP, dated November 4, 2022, PCAOB Release No. 104-2022-221a-gt; p. 1; PCAOB 2020 Inspection Grant Thornton LLP, dated September 30, 2021, PCAOB Release No. 104-2021-152a-gt-expanded; p. 1; PCAOB 2019 Inspection Grant Thornton LLP, dated December 17, 2020, PCAOB Release No. 104-2021-001a-gt-expanded; p. 1.

[191] *See e.g.*, PCAOB 2023 Inspection Grant Thornton LLP, dated May 23, 2024, PCAOB Release No. 104-2024-084-gt; p. 8; PCAOB 2022 Inspection Grant Thornton LLP, dated December 8, 2023, PCAOB Release No. 104-2024-034-gt; p. 8; PCAOB 2021 Inspection Grant Thornton LLP, dated November 4, 2022, PCAOB Release No. 104-2022-221a-gt; p. 8; PCAOB 2020 Inspection Grant Thornton LLP, dated September 30, 2021, PCAOB Release No. 104-2021-152a-gt-expanded; p. 8; PCAOB 2019 Inspection Grant Thornton LLP, dated December 17, 2020, PCAOB Release No. 104-2021-001a-gt-expanded; p. 1.

*Statements*.[192] Of particular relevance to matters at issue, the most common "audit area" applicable to the 436 described audit deficiencies was revenue (202 listed findings), not including accounts receivable (40 listed items), and contract assets (21 listed findings).[193]

507. Notably, the PCAOB does not make public criticisms of, and potential defects in, an accounting firm's system of quality control, to the extent any are identified. However, if a firm does not address to the Board's satisfaction any criticism of, or potential defect in, the firm's system of quality control within 12 months after the issuance of the PCAOB's Inspection report, the PCAOB will make public any such deficiency. In this regard, the PCAOB's 2021, 2020, and 2019 Inspection Reports were expanded to disclose certain quality control criticisms of Grant Thornton LLP reflecting the firm's repeated inability to adequately address the PCAOB's criticisms or identified defects in the firm's quality control within the noted 12-month period.[194]

508. The following observations were included in Part II: Observations Related to Quality Control of the PCAOB's 2021 Inspection Report:

> The inspection results indicate that **the firm's system of quality control does not provide reasonable assurance that the work performed by the firm's personnel with respect to testing controls** will meet the requirements of AS 2201. (QC 20.03 and .17) […]
>
> The inspection results indicate that **the firm's system of quality control does not provide reasonable assurance that the work performed by the firm's personnel to establish a basis for reliance on data or reports** will meet the requirements of AS 1105, AS 2201, and AS 2501.5 (QC 20.03 and .17). […]

---

[192] Summarized from information at inspection-reports-part-1a-csv (downloaded 4/28/2025 from https://pcaobus.org/oversight/inspections/firm-inspection-reports).

[193] Summarized from information at inspection-reports-part-1a-csv (downloaded 4/28/2025 from https://pcaobus.org/oversight/inspections/firm-inspection-reports).

[194] PCAOB 2021 Inspection Grant Thornton LLP, dated November 4, 2022, PCAOB Release No. 104-2022-221a-gt; pp. 21-22; PCAOB 2020 Inspection Grant Thornton LLP, dated September 30, 2021, PCAOB Release No. 104-2021-152a-gt-expanded; pp. 20-21; PCAOB 2019 Inspection Grant Thornton LLP, dated December 17, 2020, PCAOB Release No. 104-2021-001a-gt-expanded; pp. 22-24.

> The inspection results indicate that **the firm's system of quality control does not provide reasonable assurance that the supervisory activities, including reviews of audit work, performed by the firm's engagement partners will meet the requirements** of AS 1201. (QC 20.03 and .17). [footnotes omitted][195]

509. The following observations were included in Part II: Observations Related to Quality Control of the PCAOB's 2020 Inspection Report:

> The inspection results indicate that **the firm's system of quality control does not provide reasonable assurance that the work performed by the firm's personnel with respect to testing controls** will meet the requirements of AS 2201 and AS 2301. (QC 20.03 and .17) […]
>
> The inspection results indicate that **the firm's system of quality control does not provide reasonable assurance that the work performed by the firm's personnel to establish a basis for reliance on data or reports** will meet the requirements of AS 1105, AS 2201, AS 2501, and AS 2502.4 (QC 20.03 and .17) […]
>
> The inspection results indicate that **the firm's system of quality control does not provide reasonable assurance that the supervisory activities, including reviews of audit work, performed by the firm's engagement partners will meet the requirements** of AS 1201. (QC 20.03 and .17) [footnotes omitted][196]

510. The following observations were included in Part II: Observations Related to Quality Control of the PCAOB's 2019 Inspection Report:

> The inspection results indicate that **the firm's system of quality control does not provide reasonable assurance that the work performed by the firm's personnel with respect to testing controls** will meet the requirements of AS 2201 and AS 2301. (QC 20.03 and .17) […]
>
> The inspection results indicate that **the firm's system of quality control does not provide reasonable assurance that the work performed by the firm's personnel to establish a basis for reliance on data or reports** will meet the requirements of AS 1105, AS 2201, and similar provisions of PCAOB auditing standards. (QC 20.03 and .17) […]

---

[195] PCAOB 2021 Inspection Grant Thornton LLP, dated November 4, 2022, PCAOB Release No. 104-2022-221a-gt; pp. 21-22.

[196] PCAOB 2020 Inspection Grant Thornton LLP, dated September 30, 2021, PCAOB Release No. 104-2021-152a-gt-expanded; pp. 20-21.

> The inspection results indicate that **the firm's system of quality control does not provide reasonable assurance that the supervisory activities, including reviews of audit work, performed by the firm's engagement partners will meet the requirements** of AS 1201. (QC 20.03 and .17) […]
>
> The inspection results indicate that **the firm's system of quality control does not provide reasonable assurance that the review procedures performed by the firm's engagement quality review ("EQR") partners will meet the requirements** of AS 1220. (QC 20.03 and .17). [footnotes omitted][197]

511. The pervasiveness and recurring nature these findings are significant and raise questions as to the overall quality of Grant Thornton's audit quality processes both before and during the Class Period, as well as its scienter here.

## C. GRANT THORNTON'S CLASS PERIOD STATEMENTS WERE MATERIALLY FALSE AND MISLEADING

### 1. Grant Thornton's 2020 Audit Reports

512. With respect to FY 2020, Grant Thornton issued two audit reports dated February 26, 2021 addressed to Veradigm's "Board of Directors and Shareholders," and included said reports in Veradigm's 2020 Form 10-K filed on February 26, 2021.

513. In its February 26, 2021 report on Veradigm's internal control over financial reporting for FY 2020 (the "2020 Internal Controls Audit Report"), Grant Thornton represented in relevant part that:

> **Opinion on internal control over financial reporting**
>
> We have audited the internal control over financial reporting of Allscripts Healthcare Solutions, Inc., a Delaware corporation, and subsidiaries (the "Company") as of December 31, 2020, based on criteria established in the 2013 *Internal Control—Integrated Framework* issued by the Committee of Sponsoring Organizations of the Treadway Commission ("COSO"). ***In our opinion, the Company maintained, in all material respects, effective internal control over financial reporting as of December 31, 2020, based***

[197] PCAOB 2019 Inspection Grant Thornton LLP, dated December 17, 2020, PCAOB Release No. 104-2021-001a-gt-expanded; pp. 22-24.

> ***on criteria established in the 2013 Internal Control—Integrated Framework issued by COSO.***
>
> We also have audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States) ("PCAOB"), the consolidated financial statements of the Company as of and for the year ended December 31, 2020, and our report dated February 26, 2021 expressed an unqualified opinion on those financial statements.
>
> **Basis for opinion**
>
> The Company's management is responsible for maintaining effective internal control over financial reporting and for its assessment of the effectiveness of internal control over financial reporting, included in the accompanying Management's Report on Internal Control over Financial Reporting ("Management's Report"). Our responsibility is to express an opinion on the Company's internal control over financial reporting based on our audit. We are a public accounting firm registered with the PCAOB and are required to be independent with respect to the Company in accordance with the U.S. federal securities laws and the applicable rules and regulations of the Securities and Exchange Commission and the PCAOB.
>
> ***We conducted our audit in accordance with the standards of the PCAOB. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether effective internal control over financial reporting was maintained in all material respects. Our audit included obtaining an understanding of internal control over financial reporting, assessing the risk that a material weakness exists, testing and evaluating the design and operating effectiveness of internal control based on the assessed risk, and performing such other procedures as we considered necessary in the circumstances.*** We believe that our audit provides a reasonable basis for our opinion.

514. In its February 26, 2021 report on Veradigm's financial statements for FY 2020 (the "2020 Financial Statement Audit Report"), Grant Thornton represented in relevant part:

> **Opinion on the financial statements**
>
> We have audited the accompanying consolidated balance sheets of Allscripts Healthcare Solutions, Inc., a Delaware corporation, and subsidiaries (the "Company") as of December 31, 2020 and 2019, the related consolidated statements of operations, comprehensive income, stockholders' equity, and cash flows for each of the three years in the period ended December 31, 2020, and the related notes and financial statement schedules included under Item 15(a) (collectively referred to as the "financial statements"). ***In our opinion, the financial statements present***

***fairly, in all material respects, the financial position of the Company as of December 31, 2020 and 2019, and the results of its operations and its cash flows for each of the three years in the period ended December 31, 2020, in conformity with accounting principles generally accepted in the United States of America.***

We also have audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States) ("PCAOB"), the Company's internal control over financial reporting as of December 31, 2020, based on criteria established in the 2013 *Internal Control—Integrated Framework* issued by the Committee of Sponsoring Organizations of the Treadway Commission ("COSO"), and our report dated February 26, 2021 expressed an unqualified opinion.

**Change in accounting principle**

As discussed in Note 1 to the consolidated financial statements, the Company has changed its method of accounting for measurement of credit losses on financial instruments in 2020 due to the adoption of FASB Accounting Standards Codification (Topic 326), *Financial Instruments – Credit Losses*.

**Basis for opinion**

These financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on the Company's financial statements based on our audits. We are a public accounting firm registered with the PCAOB and are required to be independent with respect to the Company in accordance with the U.S. federal securities laws and the applicable rules and regulations of the Securities and Exchange Commission and the PCAOB.

***We conducted our audits in accordance with the standards of the PCAOB. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement, whether due to error or fraud. Our audits included performing procedures to assess the risks of material misstatement of the financial statements, whether due to error or fraud, and performing procedures that respond to those risks. Such procedures included examining, on a test basis, evidence regarding the amounts and disclosures in the financial statements. Our audits also included evaluating the accounting principles used and significant estimates made by management, as well as evaluating the overall presentation of the financial statements.*** We believe that our audits provide a reasonable basis for our opinion.

### 2. Grant Thornton's 2021 Audit Reports

515. With respect to FY 2021, Grant Thornton issued two audit reports dated February 25, 2022 addressed to Veradigm's "Board of Directors and Shareholders" and included said reports in Veradigm's 2021 Form 10-K filed on February 25, 2022.

516. In its February 25, 2022 report on Veradigm's internal control over financial reporting for FY 2021 (the "2021 Internal Controls Audit Report"), Grant Thornton represented in relevant part that:

> **Opinion on internal control over financial reporting**
>
> We have audited the internal control over financial reporting of Allscripts Healthcare Solutions, Inc., a Delaware corporation, and subsidiaries (the "Company") as of December 31, 2021, based on criteria established in the 2013 Internal Control—Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission ("COSO"). ***In our opinion, the Company maintained, in all material respects, effective internal control over financial reporting as of December 31, 2021, based on criteria established in the 2013 Internal Control—Integrated Framework issued by COSO.***
>
> We also have audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States) ("PCAOB"), the consolidated financial statements of the Company as of and for the year ended December 31, 2021, and our report dated February 25, 2022, expressed an unqualified opinion on those financial statements.
>
> **Basis for opinion**
>
> The Company's management is responsible for maintaining effective internal control over financial reporting and for its assessment of the effectiveness of internal control over financial reporting, included in the accompanying Management's Report on Internal Control over Financial Reporting ("Management's Report"). Our responsibility is to express an opinion on the Company's internal control over financial reporting based on our audit. We are a public accounting firm registered with the PCAOB and are required to be independent with respect to the Company in accordance with the U.S. federal securities laws and the applicable rules and regulations of the Securities and Exchange Commission and the PCAOB.
>
> ***We conducted our audit in accordance with the standards of the PCAOB. Those standards require that we plan and perform the audit to obtain***

> ***reasonable assurance about whether effective internal control over financial reporting was maintained in all material respects. Our audit included obtaining an understanding of internal control over financial reporting, assessing the risk that a material weakness exists, testing and evaluating the design and operating effectiveness of internal control based on the assessed risk, and performing such other procedures as we considered necessary in the circumstances.*** We believe that our audit provides a reasonable basis for our opinion.

517. In its February 25, 2022 report on Veradigm's FY 2021 financial statements (the "2021 Financial Statement Audit Report"), Grant Thornton represented in relevant part:

> **Opinion on the financial statements**
>
> We have audited the accompanying consolidated balance sheets of Allscripts Healthcare Solutions, Inc., a Delaware corporation and subsidiaries (the "Company") as of December 31, 2021 and 2020, the related consolidated statements of comprehensive income, changes in shareholders' equity, and cash flows for each of the three years in the period ended December 31, 2021, and the related notes and financial statement schedule included under Item 15(a) collectively referred to as the "financial statements". ***In our opinion, the financial statements present fairly, in all material respects, the financial position of the Company as of December 31, 2021 and 2020, and the results of its operations and its cash flows for each of the three years in the period ended December 31, 2021, in conformity with accounting principles generally accepted in the United States of America.***
>
> We also have audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States) ("PCAOB"), the Company's internal control over financial reporting as of December 31, 2021, based on criteria established in the 2013 Internal Control—Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission ("COSO"), and our report dated February 25, 2022, expressed an unqualified opinion.
>
> **Basis for opinion**
>
> These financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on the Company's financial statements based on our audits. We are a public accounting firm registered with the PCAOB and are required to be independent with respect to the Company in accordance with the U.S. federal securities laws and the applicable rules and regulations of the Securities and Exchange Commission and the PCAOB.

> ***We conducted our audits in accordance with the standards of the PCAOB. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement, whether due to error or fraud. Our audits included performing procedures to assess the risks of material misstatement of the financial statements, whether due to error or fraud, and performing procedures that respond to those risks. Such procedures included examining, on a test basis, evidence regarding the amounts and disclosures in the financial statements. Our audits also included evaluating the accounting principles used and significant estimates made by management, as well as evaluating the overall presentation of the financial statements.*** We believe that our audits provide a reasonable basis for our opinion.

### 3. Grant Thornton's Class Period Audit Reports Were Materially False and Misleading

518. There are three categories of false and misleading statements in these Class Period Audit Reports. First, there are false and misleading statements regarding Grant Thornton's compliance with the PCAOB Standards. Second, there are false and misleading statements that Veradigm maintained effective controls over financial reporting. Third, there are false statements that Veradigm's financial statements complied with GAAP.

#### a. Grant Thornton' Statements That It Conducted Its Audits in Conformity with PCAOB Guidelines Were Materially False and Misleading

519. The statements highlighted in the 2020 Internal Controls Audit Report and the 2021 Internal Controls Audit Report to the effect that Grant Thornton conducted its audit in compliance with PCAOB Standards, and that this was the basis for its conclusions were false and misleading statements of actual fact because Grant Thornton did not conduct its audit in compliance with the PCAOB Standards for the reasons set forth in Section VII.B., *supra*.

520. These false statements in the 2020 Internal Controls Audit Report and the 2021 Internal Controls Audit Report to the effect that Grant Thornton conducted its audit in compliance with PCAOB Standards were ***materially*** misleading for the same reasons discussed in

Sections IV.D.1.b., VII.A., and VII.B., *supra*, including that the ineffective controls (a) caused the Admitted False Financial Statements to be unreliable and in need of Restatement; (b) caused the Company to fail to comply with its SEC reporting obligations; (c) resulted in the stock becoming delisted; (d) required and continues to require extensive remediation; (e) resulted in significant expenses; and (f) resulted in significant negative market reaction.

521. The statements highlighted in the 2020 Financial Statement Audit Report and the 2021 Financial Statement Audit Report to the effect that Grant Thornton conducted its audit in compliance with PCAOB Standards were false and misleading because Grant Thornton did not conduct its audit in compliance with the PCAOB Standards for the reasons set forth in Section VII.B., *supra*.

522. These false statements in the 2020 Financial Statement Audit Report and the 2021 Financial Statement Audit Report to the effect to the effect that Grant Thornton conducted its audit in compliance with PCAOB Standards were ***materially*** misleading for the same reasons discussed in Sections IV.D.2., VI.B., and VII.A, *supra*, including the understanding that material misstatements in Veradigm's Admitted False Financial Statements (a) caused the previously issued financial statements to be unreliable and in need of Restatement; (b) caused the Company to fail to comply with its SEC reporting obligations; (c) contributed to the Company's stock becoming delisted and ongoing failure to satisfy SEC financial reporting requirements; (d) resulted in significant expenses; and (e) resulted in significant negative market reaction.

#### b. Grant Thornton's Statements Regarding Veradigm's Internal Controls Were Materially False and Misleading

523. The statements highlighted in the 2020 Internal Controls Audit Report and the 2021 Internal Controls Audit Report to the effect that Veradigm's internal controls were effective were false and misleading because:

a. Grant Thornton did not have a reasonable basis to conclude the Company maintained, in all material respects, effective internal control over financial reporting because, as discussed in Section VII.B., *supra*, Grant Thornton did not conduct its audit in compliance with the PCAOB Standards.

b. Veradigm has effectively admitted that its internal controls were materially deficient during the Class Period.

c. In its March 18, 2025 Audit Report contained in the 2022 Form 10-k with Restated Financials, Grant Thornton did an about face and attested to the fact that the Company "has not maintained effective internal control over financial reporting as of December 31, 2022, based on criteria established in the 2013" by COSO. Grant Thornton relied on the same basis as it did in prior years for so attesting. Grant Thornton specifically stated that:

> A material weakness is a deficiency, or combination of control deficiencies, in internal control over financial reporting, such that there is a reasonable possibility that a material misstatement of the company's annual or interim financial statements will not be prevented or detected on a timely basis. The following material weaknesses have been identified and included in management's assessment.
>
> *Control Environment*: The Company did not consistently maintain an effective control environment, including with respect to effective accounting management reviews and supporting documentation for accounting determinations and journal entries, at an appropriate level of precision, due to instances of (1) inappropriate communications under the then existing senior management, particularly within the Company's finance organization, which contributed to accounting entries being recorded, in certain instances, in a manner now determined not to have been consistent with U.S. GAAP and Company accounting policies and procedures, (2) insufficient resources in the Company's accounting function of the finance organization, with insufficient technical expertise in certain subjects, and (3) the exercise of judgment within the Company's finance organization or by senior management, which together contributed to the following material weaknesses:

*Revenue Recognition Accounting:* The Company did not consistently maintain effective internal controls over financial reporting with respect to the accurate recording, accounting for, and presentation of revenue and related costs, including as arising from or relating to (1) a revenue recognition software tool that was not properly configured in prior implementations and exacerbated by a lack of appropriate controls and management oversight, (2) the application of U.S. GAAP to new and/or complex matters, (3) the monitoring of key system reports for relevant control activities, and (4) the related balance sheet presentation of contract assets and deferred revenues;

*Measurement of Expected Credit Losses:* The Company did not consistently maintain effective internal controls over financial reporting, including monitoring of key system reports for relevant control activities, with respect to measurement of expected credit losses, particularly in connection with the Company's 2022 divestiture of the HLPP business and changes in the risk profile of the Company's trade accounts receivable;

*Financial Reporting*: The Company did not consistently maintain effective internal controls over financial reporting, including monitoring of key system reports for relevant control activities, with respect to review and documentation supporting financial statement disclosures and manual journal entries;

*Divestiture Accounting:* The Company did not consistently maintain effective internal controls over financial reporting with respect to the computation for, review of, and maintenance of appropriate support for carve-out balances for divested operations, particularly the allocation of deferred revenue and contract assets to the discontinued operations and related balance sheet reconciliations;

*Impairment Accounting for Long-Lived and Intangible Assets*: The Company did not consistently maintain effective internal controls over financial reporting, including the monitoring of key system reports for relevant control activities, with respect to (1) the consideration of impairment indicators for the Company's cost method investments and right of use assets in accordance with U.S. GAAP, and (2) tradename accounting controls to operate at a sufficient level of precision to perform an assessment of whether the intangible asset was no longer indefinite-lived when required. The Company also allowed instances of the exercise of judgment within the Company's finance organization or by senior management in a manner that was inconsistent with the Company's accounting policies or that otherwise lacked sufficient support; and

> *Bonus Accruals:* The Company did not consistently maintain effective internal controls over financial reporting with respect to the accurate recording, accounting for, and presentation of annual corporate performance bonus accruals, which in certain instances, resulted in quarterly bonus accrual amounts being adjusted and recorded based on management's inappropriate exercise of judgment.

524. These false statements in the Internal Controls Audit Report and the 2021 Internal Controls Audit Report to the effect that Veradigm's internal controls were effective were ***materially*** misleading because PCAOB Standards state that if a company's internal controls have "one or more material weaknesses, the auditor must express an adverse opinion on the [C]ompany's internal control over financial reporting."[198] Moreover, Grant Thornton's clean, unqualified 2020 Internal Controls Audit Report and its 2021 Internal Controls Audit Report (a) caused the Admitted False Financial Statements to be unreliable and in need of Restatement; (b) caused the Company to fail to comply with its SEC reporting obligations; (c) resulted in the stock becoming delisted; (d) required and continues to require extensive remediation; (e) resulted in significant expenses; and (f) resulted in significant negative market reaction. *See also* Sections IV.D.1.b. and VII.A.

### c. Grant Thornton's Statements Regarding Veradigm's Financial Statements Were Materially False and Misleading

525. The statements highlighted in the 2020 Financial Statement Audit Report and the 2021 Financial Statement Audit Report to the effect that Veradigm's financial statements present fairly, in all material respects: (a) "the financial position of the Company as of December 31, 2020 and 2019, and the results of its operations and its cash flows for each of the three years in the period ended December 31, 2020;" and (b) "the financial position of the Company as of

[198] AS 2201: *An Audit of Internal Control Over Financial Reporting That Is Integrated with An Audit of Financial Statements* ¶ 90.

December 31, 2021 and 2020, and the results of its operations and its cash flows for each of the three years in the period ended December 31, 2021, in conformity with … [GAAP]" were false and misleading because:

a. Grant Thornton did not have a reasonable basis to reach these conclusions because, as discussed in Section VII.B., *supra*, Grant Thornton did not conduct its audit in compliance with the PCAOB Standards.

b. Veradigm admitted that its Admitted False Financial Statements were materially false and misleading. *See* Sections IV.D.2. and V.B., *supra*.

526. These false statements in the 2020 Financial Statement Audit Report and the 2021 Financial Statement Audit Report to the effect to the effect that Veradigm's statements complied with GAAP were ***materially*** misleading from both a quantitative and qualitative perspective for the same reasons as discussed in Sections IV.D.2., V.B., and VII.A., *supra*, including the understanding that material misstatements in Veradigm's Admitted False Financial Statements (a) caused the previously issued financial statements to be unreliable and in need of Restatement; (b) caused the Company to fail to comply with its SEC reporting obligations; (c) contributed to the Company's stock becoming delisted and ongoing failure to satisfy SEC financial reporting requirements; (d) resulted in significant expenses; and (e) resulted in significant negative market reaction.

## VIII. LOSS CAUSATION

527. As alleged above, at all relevant times, the Veradigm Defendants issued materially false and misleading statements and/or omitted to state material facts necessary to make the statements made about the Company's financial results, internal controls over financial reporting, and disclosure controls and procedures not materially misleading. And Grant Thornton issued materially false and misleading Class Period Audit Reports. As a result of these materially false

and misleading statements and omissions, Veradigm's common stock price was artificially inflated throughout the Class Period.

528. The true facts regarding Defendants' materially false and misleading statements or omissions of material fact were revealed through a series of partial disclosures starting February 28, 2023, as described *supra*, Section IV.C. As the alleged true facts regarding the misrepresentations and omissions emerged and/or the concealed risks materialized, the artificial inflation in Veradigm's common stock was gradually removed as its price declined significantly, resulting in damages to the Class members. Each partial disclosure did not, on its own, fully remove the inflation in Veradigm's stock price, as each only partially revealed the nature and extent of the fallout from the Defendants' previously concealed misconduct.

529. The corrective impact of each partial disclosure during the Class Period was tempered by the Veradigm Defendants' ongoing false and misleading statements and omissions that continued to conceal the true nature and full extent of the Veradigm Defendants' fraud. Moreover, the Veradigm Defendants' ongoing misrepresentations and omissions maintained the price of Veradigm common stock at artificially inflated levels.

530. The Veradigm Defendants' ongoing misrepresentations and omissions maintained the price of Veradigm common stock at artificially inflated levels, inducing Class members to continue purchasing artificially inflated shares in Veradigm even after the partial disclosures. As the true facts regarding the misrepresentations and concealed facts started to be revealed, the prior artificial inflation came out of its stock price and the Company's common stock declined significantly, resulting in damages to the Class members.

531. The following outlines some of the most significant stock price declines resulting from partial disclosures, described more fully *supra*, Section IV.C.

532. After market close on February 28, 2023, Veradigm issued a press release (attached as Ex. 99.1 to its Feb. 28, 2023 Form 8-K) announcing that the Company had "detected certain internal control failures related to revenue recognition that had occurred over the prior six quarters, resulting in a misstatement of reported revenues during those periods." In this Feb. 28, 2023 press release, the Company further described that the revenue misstatements were the result of recording "duplicate [sales] transactions and other errors" that had caused *revenue* to be overstated by approximately $20 million from the third quarter of 2021 through the fourth quarter of 2022. As a result of the accounting misstatements, Veradigm slashed its previously provided fiscal 2023 *revenue* guidance by $15 million and its *non-GAAP EPS* guidance by $0.10 per share. Finally, Veradigm announced that its previously scheduled fourth quarter 2022 earnings release and the filing of its fiscal 2022 Form 10-K would be delayed until its review of the accounting misstatements and internal control failures was completed. On this news, the price of Veradigm stock closed down $2.12, or nearly 13%, on March 1, 2023 on heavy trading volume.

533. After market close on June 13, 2023, Veradigm issued a press release (attached as Ex. 99.1 to its Jun. 14, 2023 Form 8-K) announcing that (a) its financial misstatements extended back to 2020; (b) "the Company's independent auditors need more time to complete their audit procedures" to reach conclusion on "the nature and extent of the accounting and internal control errors, and the estimates on what periods the errors impact has taken longer than previously expected;" and (c) the Company no longer expected to file its 2022 Form 10-K on or before June 14, 2023, and now expected to file its 2022 Form 10-K and Q1 2023 Form 10-Q on or before September 18, 2023, following Nasdaq's acceptance of the Company's plan to regain listing compliance. On this news, the price of Veradigm stock closed down $0.53, or more than 4%, on June 14, 2023 on heavy trading volume.

534. After market open on December 8, 2023, Veradigm issued a press release (attached as Ex. 99.1 to its Dec. 8, 2023 Form 8-K) announcing that (a) both its CEO Poulton and CFO Jones had resigned at the request of the Board; (b) the resignation requests were a direct result of the Audit Committee Investigation; (c) the previously reported cumulative impact related only to the Restatement Investigation, and that the potential impact, if any, to the "financial statements for previously reported periods" was "under review by the new leadership team;" and (d) Veradigm needed to "develop a stronger financial control environment with enhanced financial reporting policies and disclosure policies and procedures." On this news, the price of Veradigm stock closed down $2.52, or more than 20%, on December 8, 2023 on heavy trading volume.

535. Before the market opened on January 10, 2024, Veradigm filed Form 8-K and issued a press release (attached as Ex. 99.1 to the Form 8-K). In the Jan 10, 2024 Form 8-K, the Company disclosed that (a) it had voluntarily reported to the SEC concerning the Audit Committee Investigation and was "cooperating" with the agency; (b) it had "received a notice of noncompliance" from the Nasdaq as a result of failing to hold an annual stockholder meeting "within the one-year period following its fiscal year ended on December 31, 2022;" and (c) the Audit Committee Investigation identified issues regarding "non-cash items relating to the timing of certain impairments and accrual amounts" where additional adjustments could be made. On this news, the price of Veradigm stock closed down $1.33, or over 12%, on January 10, 2024 on heavy trading volume.

536. Before the market opened on February 27, 2024, Veradigm filed Form 8-K and issued a press release (attached as Ex. 99.2 to the Form 8-K) providing an update on its "Financial Restatement Process," disclosing that (a) it would not file its delinquent financial statements by the Nasdaq-prescribed deadline and expected "that its common stock [would] be suspended from

trading on [t]he Nasdaq Global Select Market while Nasdaq proceed[ed] with delisting;" (b) it was "working diligently to file its multiple delinquent required financial statements [in order] to regain compliance and restore its listing as soon as practicable;" and (c) the Board had "unanimously adopted a limited duration stockholder rights plan … in anticipation of notification from Nasdaq that it will suspend trading in the Company's stock." On this news, the price of Veradigm stock closed down $0.71, over 8.5%, on February 27, 2024 on heavy trading volume.

537. Before the market opened on February 28, 2024, Veradigm issued a press release (attached as Ex. 99.1 to its Feb. 28, 2024 Form 8-K) announcing that (a) the Nasdaq Hearings Panel had decided to delist the Company's common stock and that "trading in the Company's common stock [would] be suspended effective February 29, 2024," based on the Company's continued noncompliance and failure to hold an annual meeting of stockholders "no later than one year after the end of the company's fiscal year;"; (b) it "expect[ed] that its shares [would] be quoted on an [OTC] market with its existing ticker symbol (MDRX);" and (c) it continued to work diligently to file the delinquent SEC financial-statement forms and to "regain compliance with all of the Nasdaq Listing Rules and restore its listing as soon as practicable." On this news, the price of Veradigm stock closed down $0.79, or over 10%, on February 28, 2024 on exceptionally heavy trading volume, and down $0.82, or over 12%, on February 29, 2024 on heavy trading volume.

538. Finally, after nearly two years of internal investigations, after market close on March 18, 2025, Veradigm filed with the SEC the Company's 2022 Form 10-K with restated financials admitting to, among other things, (a) the extensive and wide ranging deficiencies regarding internal control over financial reporting and disclosure control described herein; and (b) the significant restatements for its consolidated financial statements for FY 2020 and 2021 and its unaudited interim condensed consolidated financial statements for the first three quarters and

interim periods of 2020, 2021, and 2022. On this news, the price of Veradigm stock closed down $0.45, or nearly 9% on March 19, 2025 on heavy trading volume, and fell another $0.17, or nearly 4%, on March 20, 2025.

539. As a result of all these partial disclosures, Veradigm's stock price fell from a Class Period high of $23.25 to $4.43 on March 20, 2025.

540. These stock price declines were predominantly, if not entirely, due to company-specific disclosures that revealed the true nature and extent of the Veradigm Defendants' fraudulent conduct, as opposed to market or industry-wide forces. Indeed, the Company admitted that

> [t]he failures in internal controls and associated restatements of the financial statements for the Affected Periods have also caused us to fail to meet our SEC reporting obligations and the requirements to remain listed on Nasdaq and ***negatively affected investor confidence in our management and the accuracy of our financial statements and disclosures***. ***This has had a negative effect on the price of our Common Stock, adversely affected our business, financial condition and operating results and resulted in the other risks and*** uncertainties discussed herein relating to resource allocation and constraints, litigation and investigation issues, the termination of our credit facility and our access to certain capital markets." (2022 Form 10-k at 17).

## IX. APPLICATION OF THE PRESUMPTION OF RELIANCE

541. Lead Plaintiff is entitled to a presumption of reliance under the fraud-on-the-market doctrine. At all times during the Class Period, the market for the Company's securities was an efficient market that promptly digested current information related to the Company from all publicly available sources and reflected such information in the prices of the Company's securities.

542. Throughout the Class Period:

a. Veradigm common stock was actively traded on Nasdaq.

b. The market price of Veradigm's common stock reacted promptly to the dissemination of public information regarding the Company.

c. The Company's stock was followed by financial analysts, including those cited in this complaint.

d. The average weekly trading volume for Veradigm's stock during the Class Period was over 1.5 million shares.

e. As a regulated issuer, Veradigm filed with the SEC periodic public reports during the Class Period.

f. Veradigm regularly communicated with public investors via established market communication mechanisms, including, but not limited to, the regular dissemination of press releases on the national circuits of major newswire services.

g. Veradigm had a minimum of over 109 million shares outstanding (and market capitalization reached as high as $2,807.3345 million).

543. Throughout the Class Period, the Company was consistently followed by the market, including securities analysts. The market relies upon the Company's financial results and management to accurately present the Company's financial results. During this period, Veradigm and the Individual Defendants continued to disseminate materially false and misleading information into the marketplace regarding the Company's financial results and efficiency of internal controls over financial reporting and disclosure controls and procedures. And Grant Thornton issued false and misleading clean Audit Reports. This information was promptly reviewed and analyzed by analysts and institutional investors, and assimilated into the price of the Company's securities.

544. As a result of the misconduct alleged herein, the market for Veradigm's common stock was artificially inflated during the Class Period. Thus, the presumption of reliance available

under the "fraud-on-the-market" theory applies and Class members are presumed to have indirectly relied upon the misrepresentations and omissions for which the Defendants are each responsible.

545. Lead Plaintiff and other Class members justifiably relied on the integrity of the market price for the Company's securities and were substantially damaged as a direct and proximate result of their purchases of Veradigm's common stock at artificially inflated prices and the subsequent decline in the price of those securities when the truth was disclosed during the Class Period.

546. Lead Plaintiff and the other Class members are also entitled to a presumption of reliance under *Affiliated Ute Citizens v. United States*, 406 U.S. 128 (1972), because the claims asserted in this complaint against Defendants are predicated upon omissions of material fact for which there was a duty to disclose. Because this action involves (a) the Veradigm Defendants' failure to disclose material adverse information regarding the Company's financial results and the effectiveness of its internal controls over financial reporting and disclosure controls and procedures—information that the Veradigm Defendants were obligated to disclose; and (b) Grant Thornton's failure to disclose the material weaknesses in Veradigm's internal controls and that Veradigm's Admitted False Financial Statements do not comply with GAAP—positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions. Given the importance of truthful financial results and effective internal controls, that requirement is satisfied here.

547. Had Lead Plaintiff and other members of the Class known of the material adverse undisclosed information or been aware of the truth behind Defendants' material misstatements, they would not have purchased Veradigm's common stock at artificially inflated prices.

## X. CLASS ACTION ALLEGATIONS

548. Lead Plaintiff brings this action as a class action pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of a Class consisting of all persons and entities who purchased or otherwise acquired Veradigm common stock during the Class Period. Excluded from the Class are: (i) Defendants; (ii) members of the immediate families of the Defendants; (iii) the subsidiaries and affiliates of the Defendants; (iv) any person who currently is or was an officer, director, or controlling person of Veradigm during the Class Period; (v) any entity in which any Defendant has a controlling interest; (vi) Veradigm Defendants' directors' and officers' liability insurance carriers, and any affiliates or subsidiaries thereof; (vii) any accountant that performed work or has been retained to perform work for Veradigm since the start of the Class Period, including Grant Thornton and BDO USA, P.C.; (viii) Altera Digital Health Inc. and any parents, subsidiaries, or affiliates thereof, or any officers, directors, or controlling persons thereof; and (ix) the legal representatives, heirs, successors, or assigns of any such excluded party.

549. The members of the Class are so numerous that joinder of all members is impracticable. While the exact number of Class members is unknown to Lead Plaintiff at this time and can only be ascertained through appropriate discovery, Lead Plaintiff believes that there are thousands of members in the proposed Class. Indeed, as of October 29, 2020, Veradigm had over 162.55 million outstanding shares of common stock.

550. Members of the Class may be identified from records maintained by Veradigm or its transfer agent and may be notified of the pendency of this action by mail, using a Form of notice customarily used in securities class actions.

551. Common questions of law and fact exist as to all members of the Class and predominate over any questions affecting solely individual members of the Class, including: (i) whether the alleged materially false or misleading statements and omissions as alleged herein violated the federal securities laws, (iii) whether the Veradigm Defendants are personably liable for the alleged false and misleading financial statements and omissions, (iv) whether Grant Thornton is personally liable for its alleged false and misleading Class Period Audit Reports; (v) whether the prices of Veradigm's securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein, and (vi) whether the members of the Class have sustained damages and, if so, what the proper measure of damages is.

552. Lead Plaintiff's claims are typical of the claims of other members of the Class, and the other members of the Class sustained damages arising out of the Defendants' wrongful conduct in violation of federal law as alleged in this complaint.

553. Lead Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class actions and securities litigation. Lead Plaintiff has no interests antagonistic to, or in conflict with, those of the Class.

554. A class action is superior to other available methods for the fair and efficient adjudication of the controversy since joinder of all members of the Class is impracticable. Furthermore, because the damages suffered by the individual Class members may be relatively small, the expense and burden of individual litigation makes it impracticable for the Class members individually to redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

555. Lead Plaintiff will rely, at least in part, on the presumption of reliance established by the fraud-on-the-market doctrine. All purchasers of Veradigm's common stock during the

Class Period suffered similar injuries, including injury through their purchase of the securities at artificially inflated prices. A presumption of reliance therefore applies.

## XI. NO SAFE HARBOR

556. The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false and misleading statements pleaded in this complaint. The statements alleged to be false and misleading all relate to historical or then-existing facts and conditions.

557. In addition, to the extent certain of the statements alleged to be false may be characterized as forward-looking, they were not adequately identified as "forward-looking statements" when made, and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.

558. Alternatively, to the extent that the statutory safe harbor is intended to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because, at the time each of those forward-looking statements was made, the particular speaker had actual knowledge that the particular forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized and/or approved by an executive officer of Veradigm who knew that those statements were false, misleading, or omitted necessary information when they were made. In addition, to the extent any of the statements set forth *supra* were accurate when made, they became inaccurate or misleading because of subsequent events, and Defendants failed to update those statements which later became inaccurate.

## XII. COUNTS

**COUNT I**
**For Violation of §10(b) of the Exchange Act and Rule 10b-5**
**Against the Veradigm Defendants**

559. Plaintiff incorporates ¶¶1-558 by reference.

560. During the Class Period, the Veradigm Defendants disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

561. The Veradigm Defendants violated §10(b) of the Exchange Act and Rule 10b-5 in that they:

a. employed devices, schemes, and artifices to defraud;

b. made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

c. engaged in acts, practices, and a course of business that operated as a fraud or deceit upon plaintiff and others similarly situated in connection with their purchases of Veradigm common stock during the Class Period.

562. Lead Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Veradigm common stock. Lead Plaintiff and the Class would not have purchased Veradigm common stock at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by the Veradigm Defendants' misleading statements.

563. By virtue of the foregoing, the Veradigm Defendants have violated §10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

564. As a direct and proximate result of the Veradigm Defendants' wrongful conduct, Lead Plaintiff and the other members of the Class suffered damages in connection with their purchases of Veradigm common stock during the Class Period.

**COUNT II**
**For Violations of §20(a) of the Exchange Act**
**Against The Veradigm Defendants**

565. Plaintiff incorporates ¶¶1-564 by reference.

566. During the Class Period, the Individual Defendants acted as controlling persons of Veradigm within the meaning of §20(a) of the Exchange Act. By virtue of their share ownership, and executive and Board positions, as alleged above, the Individual Defendants had the power to influence and control and did, directly or indirectly, influence and control the decision-making of the Company, including the content and dissemination of the various statements that Lead Plaintiff contends were false and misleading as detailed herein.

567. The Individual Defendants were provided with or had unlimited access to the Company's internal reports, press releases, public filings, and other statements alleged to be misleading prior to or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause them to be corrected. In particular, the Individual Defendants had direct involvement in and responsibility over the day-to-day operations of the Company and, therefore, are presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein.

568. The Company controlled the Individual Defendants and all of its employees.

569. By reason of such wrongful conduct, the Veradigm Defendants are liable pursuant to §20(a) of the Exchange Act.

**COUNT III**

**For Violation of §10(b) of the Exchange Act and Rule 10b-5 Against Grant Thornton**

570. Plaintiff incorporates ¶¶1-569 by reference.

571. Grant Thornton acted as independent auditor for Veradigm. Grant Thornton knew and understood that its Class Period Audit Reports issued by its firm concerning Veradigm's internal controls and financial statements would be released to the investing public, and that investors would rely, and had a right to rely, on those reports. Grant Thornton had access to Veradigm employees and continuing access to and knowledge of Veradigm's confidential corporate, financial, operating, and business information. Despite this access and knowledge, Grant Thornton knowingly or recklessly perpetrated and/or concealed the accounting manipulations and other schemes undertaken, and certified without qualification and publicly represented that (a) Veradigm's financial statements presented fairly the Company's financial position and were in conformity with GAAP; and (b) Veradigm maintained effective internal controls over financial reporting.

572. Grant Thornton violated §10(b) of the Exchange Act and Rule 10b-5 in that it:

a. employed devices, schemes, and artifices to defraud;

b. made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

c. engaged in acts, practices, and a course of business that operated as a fraud or deceit upon plaintiff and others similarly situated in connection with their purchases of Veradigm common stock during the Class Period.

573. Lead Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Veradigm common stock. Lead Plaintiff and the Class would not have purchased Veradigm common stock at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by Grant Thornton's misleading statements.

574. By virtue of the foregoing, Grant Thornton violated §10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

575. As a direct and proximate result of Grant Thornton's wrongful conduct, Lead Plaintiff and the other members of the Class suffered damages in connection with their purchases of Veradigm common stock during the Class Period.

576. On February 18, 2025, Lead Plaintiff and Grant Thornton entered into a Tolling Agreement ("Agreement") providing that the "Agreement shall run from and include February 18, 2025 ('Effective Date') and shall continue through and including August 18, 2025 ('Termination Date')." The Agreement also provides that "[a]s of the Effective Date, through and including the Termination Date of this Agreement, the running of time is tolled for purposes of any and all statutes of limitation, and any and all defenses related to the passage of time, whether legal or equitable (including, without limitation, laches, or waiver), which may be applicable with respect to any actual or potential actions, claims, or causes of action, if any, which Plaintiffs may have against Grant Thornton arising out of, based on, or relating to the allegations in the Action."

## XIII. PRAYER FOR RELIEF

577. WHEREFORE, Lead Plaintiff prays for relief and judgment as follows:

A. Determining that this action is a proper class action, certifying Lead Plaintiff as Class representative under Federal Rule of Civil Procedure 23, and appointing Lead counsel as Class Counsel;

B. Awarding compensatory damages in favor of Lead Plaintiff and the other members of the Class against all Defendants for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including pre- and post-judgment interest thereon;

C. Granting equitable and/or injunctive relief as permitted by law, equity, and federal law;

D. Awarding Lead Plaintiff and the Class their reasonable fees and expenses incurred in this action, including counsel fees and expert fees; and

E. Awarding such other and further relief as the Court may deem just and proper.

## XIV. DEMAND FOR TRIAL BY JURY

Pursuant to Federal Rule of Civil Procedure 38(d), Lead Plaintiff hereby demands a trial by jury.

Dated: April 30, 2025

Respectfully submitted,

**BERMAN TABACCO**

By: ____________________________
Nicole Lavallee (Admitted *Pro Hac Vice)*

Daniel E. Barenbaum (Admitted *Pro Hac Vice)*
425 California Street, Suite 2300
San Francisco, CA 94104
Telephone: (415) 433-3200
Email: nlavallee@bermantabacco.com
dbarenbaum@bermantabacco.com

*Counsel for Lead Plaintiff Alameda County Employees' Retirement Association and Lead Counsel for the Class*

**COHEN MILSTEIN SELLERS
& TOLL, PLLC**
Carol V. Gilden (Ill. Bar No. 6185530)
190 South LaSalle Street, Suite 1705
Chicago, IL 60603
Telephone: (312) 357-0370
Email: cgilden@cohenmilstein.com

*Liaison Counsel for the Class*