**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| JOHN M. ERWIN, Individually and on behalf of all others similarly situated, | ) | |
| Plaintiff, | ) | Case No. 23-cv-16205 |
| v. | ) | Judge Sharon Johnson Coleman |
| VERADIGM INC., PAUL M. BLACK, RICHARD J. POULTON, LEAH S. JONES, and GRANT THORNTON LLP, | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION AND ORDER**

In February 2023, healthcare technology company Veradigm Inc. announced that it would be delaying the release of its 2022 Form 10-K financial report. Two years later, the company finally released the report, along with restated versions of its 2020 and 2021 reports. From May 8, 2020 to January 26, 2024 (the "Class Period"), Veradigm's stock fell from a high of $23.25 in April 2022 to a subsequent low of $8.91 in January 2024. Lead Plaintiff Alameda County Employees' Retirement Association ("ACERA") owned Veradigm stock during this period. On their own behalf and on behalf of a putative class they accuse Veradigm, along with three of its principal officers, Paul M. Black, Richard J. Poulton, and Leah S. Jones (collectively, "the Individual Defendants," and with Veradigm, "the Veradigm Defendants"), of making material representations in the now-corrected 2020 and 2021 reports, in violation of the Securities Exchange Act of 1934, 15 U.S.C. § 78(a) *et seq*. ACERA also accuses Veradigm's auditor, Grant Thornton LLP of making material misrepresentations in its audit reports from the same period.

Before the Court today are motions to dismiss filed by the Veradigm Defendants and by Grant Thornton. Those motions also contained requests for judicial notice of voluminous accompanying

exhibits. The Court finds that ACERA has adequately stated a claim against Veradigm, Black, and Poulton, but not against Jones or Grant Thornton. As such, the Court grants in part and denies in part Veradigm's motion to dismiss [107] and grants Grant Thornton's motion to dismiss [110]. All claims against Jones and Grant Thornton will be dismissed; all other claims may proceed.

## BACKGROUND

The following information is taken from ACERA's complaint,[1] as well as the documents of which the Court has taken judicial notice. *See* Discussion, Section I, *infra*. All allegations are assumed true for the purpose of adjudicating the instant motions.

ACERA's complaint runs 236 pages and contains an enormous wealth of details. The exhibits attached to Defendants' motions come to almost 2500 pages. Suffice it to say that far more information has been presented than is necessary to decide the instant motions to dismiss. This background section, lengthy as it is, aims only to provide a high-level overview of the dispute. More granular details will be introduced as necessary in the discussion section.

The Class Period for this case runs inclusively from May 8, 2020, the day on which Veradigm published its Q1 2020 Form 10-Q, to January 26, 2024, the day ACERA sold the vast majority of its remaining Veradigm stock.[2]

[1] For ease of reading, the Court will refer to ACERA's corrected second amended complaint simply as "the complaint," unless it is necessary to distinguish between this document and previous complaints. Additionally, the various filings relevant to the instant motions will receive the following citation abbreviations:

| **Veradigm Defendants' MTD** | | **Thornton MTD** | | **Other** | |
|---|---|---|---|---|---|
| Dkt. 108 | Veradigm MTD Br. | Dkt. 110 | Thornton MTD Br. | Dkt. 75 | Compl. |
| Dkt. 114 | Veradigm MTD Resp. | Dkt. 115 | Thornton MTD Resp. | Dkt. 116 | Jud. Notice Resp. |
| Dkt. 118 | Veradigm MTD Reply | Dkt. 120 | Thornton MTD Reply | | |

Where possible, all pincites refer to internal page numbers or paragraph numbers.

[2] ACERA did not completely divest of Veradigm stock until January 29, 2024—three days after the end of the Class Period. It is not clear from the complaint why ACERA chose January 26 to close the Class Period.

**The Parties**

Defendant Veradigm Inc. ("Veradigm" or "the Company") is a healthcare technology company incorporated in Delaware and headquartered in Chicago, Illinois. Until March 2022, Veradigm was known as Allscripts Healthcare Solutions, Inc. By mutual agreement, the parties all refer to the company simply as Veradigm, regardless of date; the Court will adopt this usage as well. Veradigm was traded on the Nasdaq Global Select Market stock exchange under the symbol "MDRX" until February 28, 2024, when it was delisted; since then, Veradigm's common stock has traded on the over-the-counter Expert Market Exchange.

Defendant Paul M. Black was Veradigm's chief executive officer ("CEO") from December 19, 2012 until his resignation on May 5, 2022. He also served on the Company's Board of Directors from May 16, 2012 through June 20, 2022. After resigning as CEO, Black continued as an Executive Consultant to the Company through June 30, 2022. Defendant Richard J. Poulton was Veradigm's Vice President from October 29, 2012 to September 30, 2015, and its President from October 1, 2015 to May 6, 2022. He also served as the Company's chief financial officer ("CFO") from March 3, 2020 through May 6, 2022, when he became the Company's CEO. Poulton also became a Board member starting on June 21, 2022. On December 8, 2023, he resigned at the request of the Board. Defendant Leah S. Jones became Veradigm's CFO and principal accounting officer on May 6, 2022. She also resigned on December 8, 2023, at the request of the Board.

Defendant Grant Thornton LLP ("Thornton") is a public registered accounting firm that served as Veradigm's independent auditor from 2014 through April 14, 2025. During the Class Period, it released clean audit reports for fiscal year ("FY") 2020 and 2021 for Veradigm, and it represented that it did so in accordance with the standards of the Public Company Accounting Oversight Board ("PCAOB Standards").

Lead Plaintiff ACERA is a public pension fund that provides retirement, disability, and death benefits for Alameda County public employees. It first bought Veradigm stock on September 21, 2022 purchased a large quantity of Veradigm stock during the Class Period, with the highest price paid per share coming in at $18.47 on January 19, 2023.

**Allegations against the Veradigm Defendants**

In the years leading up to the Class Period, Veradigm was a company on the rise. In its 10-K annual reports and 10-Q quarterly reports for FY 2020, 2021, and the first three quarters of 2022, Veradigm reported significant growth in bookings, revenue, profits, and gross margins. These financial statements contained certifications, made pursuant to the Sarbanes-Oxley Act of 2002 and known as "SOX Certifications," that the Company's disclosure controls and internal controls over financial reporting were effective, and that all financial statements were prepared in accordance with US Generally Accepted Accounting Principles ("GAAP"). The FY 2020 and 2021 Forms 10-K cited and incorporated unqualified, clean audit reports issued by Thornton in its capacity as Veradigm's independent auditor. Veradigm and its principals also spoke optimistically about the Company's future, and cited specific figures in doing so, in press releases and earnings calls.

On May 8, 2020, the first day of the Class Period, Veradigm's stock was trading at $6.40.[3] By April 21, 2022, its stock was trading at $23.25, the highest price of the Class Period, as Veradigm prepared to sell a significant portion of its business, the Hospitals and Large Physician Practices ("HLPP") segment. That sale was substantially finalized in May 2022, when Veradigm sold the HLPP segment to Altera Digital Health, Inc. for $670 million in cash, plus up to $30 million more at a later point, depending on the sold segment's revenue in 2023. After the sale, the only remaining segment

[3] Most of the stock prices given in this opinion come from ACERA's complaint, but some have been derived from publicly available information of which the Court may take judicial notice. *Pugh v. Trib. Co.*, 521 F.3d 686, 691 n.2 (7th Cir. 2008) ("[Courts] may take judicial notice of documents in the public record, including publicly reported stock prices, without converting a motion to dismiss into a motion for summary judgment.").

of the Company was the "Veradigm" segment, which sold medical software and associated services to small- to medium-size physician practices. (This presumably is what prompted the Company to change its name from Allscripts Healthcare Solutions to Veradigm.) For its part, ACERA's first purchase of Veradigm stock occurred on September 21, 2022, a few months after the HLPP sale.

The rosy financial picture painted by Veradigm came to a close on February 28, 2023, about a year after the sale of the HLPP segment. On that day, Veradigm filed with the SEC a Form 12b-25 Notification of Late Filing with respect to its 2022 Form 10-K, and it issued a related press release. Veradigm claimed to have recently identified internal control failures that resulted in misstated revenues. Its SEC filing extended its 2022 Form 10-K due date by fifteen days. But, as it happened, Veradigm would not release its 2022 Form 10-K until March 18, 2025, more than two years later. When it finally did so, the 2022 Form 10-K also contained restated financial information for FY 2020, 2021, and the first three quarters of 2022.

Over the next two years, Veradigm underwent three separate and independent internal investigations. Together with its declaration that some of its financials would need to be restated, Veradigm announced a review into related "accounting and internal control matters" (the "Restatement Review"). Compl. ¶ 155. That review led to a second investigation by the Board's Audit Committee into "other matters relating to the Company's financial reporting, internal control over financial reporting and disclosure controls" (the "Audit Committee Investigation"). *Id.* And that investigation, in turn, prompted an internal review into, among other issues, Veradigm's accounting practices (the "Internal Review"). The results of the Audit Committee Investigation led the Board to demand the resignations of Poulton and Jones in December 2023. Nasdaq delisted Veradigm's stock on February 28, 2024 due to its failure to timely file its 2022 Form 10-K. The SEC also opened its own investigation into Veradigm based on information that the Company had voluntarily disclosed to

the agency. Veradigm's new management cooperated with the SEC. On February 24, 2026, the SEC closed its investigation and declined to take enforcement action. Dkt. 126.

As a result, given the turmoil, Veradigm's stock dropped significantly. The day after Veradigm announced the resignations of Poulton and Jones, its stock fell by $2.52, more than 20%. By December 11, 2023, when ACERA began to liquidate its Veradigm holdings, Veradigm's stock was trading at $10.05 per share. On January 17, 2024, the stock dropped to $8.91 per share, the lowest Class Period price after September 2020. The stock rebounded slightly after that, and on January 26, 2024—the last day of the Class Period—ACERA sold almost all of its remaining Veradigm stock for $9.42 per share. In all, from the Class Period high of $23.25 (April 22, 2022) to the lowest subsequent Class Period price of $8.91 (January 17, 2024), Veradigm's stock lost nearly 62% of its value. And for ACERA specifically, it purchased Veradigm stock at a high of $18.47 (January 19, 2023) and sold it at a low of $8.99 (January 18, 2024)—a 51% loss.

When Veradigm finally released its 2022 Form 10-K, its restated financials for 2020, 2021, and the first three quarters of 2022 adjusted some of its previously reported figures significantly. For example, for the first three quarters of FY 2022, accounts receivable was affected by 48.1%; deferred revenue was affected by 59.9%; long-term deferred revenue was eliminated entirely; income (loss) from operations was affected by 248.6%; income (loss) from continuing operations before income taxes was affected by 142.8%; and net income (loss) was affected by 55.5%. Not all figures were so dramatic; for example, the restated financial figures show that, in 2021, gross profits were actually higher than previously reported. Dkt. 109-62 at *119. But as seen above, numerous figures were adjusted substantially, and not to Veradigm's benefit.

Veradigm explained that its incorrect figures stemmed from numerous failures. It concluded that the Company's "disclosure controls and procedures were not effective due to the material weaknesses in the Company's internal controls over financial reporting." *Id.* at *171. It determined

that that company's accounting practices, in some instances, were "not… consistent with U.S. GAAP and Company accounting policies and procedures." *Id.* This led to problems, *inter alia*, with revenue recognition, measuring expected credit losses, and financial reporting. Veradigm also reported that "The Company did not consistently maintain effective internal controls over… annual corporate performance bonus accruals, which in certain instances[] resulted in quarterly bonus accrual amounts being adjusted and recorded based on management's inappropriate exercise of judgment." *Id.*

ACERA argues that these statements show that Veradigm and its principals artificially inflated the stock price of the company during the early days of the Class Period. It further argues that this inflation was punctured by the February 28, 2023 revelation of the need for restated financials and by the subsequent developments in 2023 and 2024, at which point the Company's stock fell toward its natural market price.

**Allegations against Grant Thornton**

In accordance with federal law requiring that public companies' financial statements be audited by an independent agency, Veradigm retained Thorton as its independent auditor beginning in 2014 and throughout the Class Period. As relevant here, independent auditors review the adequacy of a company's internal controls as well as the company's compliance with GAAP. Their audits must also be conducted in accordance with PCAOB Standards. *See* PCAOB Auditing Standard ("AS") 3105.05. Such audits provide investors with an assurance of a company's financial health; accordingly, an auditor may be liable under securities law if it is found to have issued audit reports containing materially false statements.

During its time with Veradigm, Thornton released clean audit reports every single year. Thornton's 2020 and 2021 audit reports presented its professional assessment that Veradigm had effective internal controls and that the Company's accounting practices complied with GAAP. We now know that Veradigm's internal controls at this time were materially flawed in multiple respects

and that its accounting did not fully comply with GAAP. During its work on its 2022 audit of Veradigm, Thornton discovered certain issues related to transactions that seemed to stem from a software problem. Veradigm announced this discovery on February 28, 2023, in a Form 8-K and press release. It appears from the complaint that this was the first official acknowledgement of any problem with Veradigm's (or Thornton's) prior financial statements. Thornton continued to audit Veradigm's 2022 financial statements, including the restated information from 2020 and 2021. On April 14, 2025, about a month after Veradigm filed its delayed 2022 Form 10-K, Veradigm dismissed Thornton as its auditor.

ACERA argues that the red flags concerning Veradigm's financial health were so obvious that Thornton cannot plausibly claim both to have complied with its auditing responsibilities and also to have been unaware of Veradigm's issues. As such, ACERA alleges that the 2020 and 2021 audits failed to comply with PCAOB Standards and that the resultant reports lacked a reasonable basis for their conclusions.

**Procedural History**

Initial Plaintiff John M. Erwin filed the first complaint in this case on November 22, 2023. Dkt. 1. In accordance with the provisions of the Private Securities Litigation Reform Act ("PSLRA"), the Court named ACERA as the lead plaintiff. 15 U.S.C. § 78u-4(a); dkt. 40. Mr. Erwin subsequently dismissed his claims from the litigation without prejudice, although he remains a member of the putative class. Dkt. 45. By mutual agreement, the parties decided to wait until Veradigm issued its financial restatements before taking further action. Dkt. 43, 49. Veradigm issued those financial restatements on February 28, 2025. ACERA then filed its corrected second amended complaint—the operative complaint for the instant motions—on May 7, 2025. Dkt. 75. The Veradigm Defendants and Grant Thornton filed their respective motions to dismiss on July 28, 2025. Dkt. 107, 110. ACERA timely responded to both motions individually, and it also filed a combined brief opposing requests

for judicial notice within each motion to dismiss. Defendants timely replied and the Court took under consideration the motions, which collectively added up to 190 pages of briefing and 3693 pages of exhibits, in addition to the 235-page complaint.

## LEGAL STANDARD

To survive a motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6), a complaint "must contain sufficient factual matter… to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A complaint is facially plausible when the plaintiff alleges "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* When considering a motion to dismiss a complaint under either Rule, courts accept all well-pleaded factual allegations as true and draw all reasonable inferences in favor of the plaintiff. *Long v. Shorebank Dev. Corp.*, 182 F.3d 548, 554 (7th Cir. 1999); *Erickson v. Pardus,* 551 U.S. 89, 93 (2007) (per curiam).

## DISCUSSION

### I. Requests for Judicial Notice

Both motions to dismiss attach voluminous exhibits and request, in a footnote, that this Court take judicial notice of their contents. Veradigm MTD Br. *5 n.1; Thornton MTD Br. at *4 n.1. ACERA largely opposes the requests as improper at the motion to dismiss stage.

As a general matter, a court may not consider extrinsic evidence when reviewing a motion to dismiss without converting it to a motion for summary judgment. *Brownmark Films, LLC v. Comedy Partners*, 682 F.3d 687, 690 (7th Cir. 2012); *see* Fed. R. Civ. P. 12(d). However, courts are permitted to take judicial notice of matters of public record from sources whose accuracy cannot reasonably be questioned. *See* Fed. R. Evid. 201(b); *Tobey v. Chibucos*, 890 F.3d 634, 647–48 (7th Cir. 2018). Additionally, courts may take judicial notice of documents that are incorporated by reference in the

complaint. *188 LLC v. Trinity Indus., Inc.*, 300 F.3d 730, 735 (7th Cir. 2002). Courts may take notice of the exhibits "for the purpose of showing what statements the documents contain, but not for the proof of the facts stated therein." *George v. Kraft Foods Glob., Inc.*, 674 F. Supp. 2d 1031, 1044 (N.D. Ill. 2009) (Castillo, J.).

As an initial matter, the Court observes that Defendants' exhibits contain far, far more information than is needed to resolve their motions to dismiss. Indeed, about two-thirds of the provided exhibits are not even cited in Defendants' respective briefs. Although the Court will take judicial notice of most of the exhibits, the vast majority of their content has not affected the Court's consideration to any significant degree.[4] *See Fabriko Acquisition Corporation v. Prokos,* 536 F.3d 605, 609 (7th Cir. 2008) ("It is not the job of this court to develop arguments for [parties]."); *White Eagle Co-opinion Ass'n v. Conner,* 553 F.3d 467, 476 n. 6 (7th Cir. 2009) ("Skeletal and unsupported arguments will not be considered and the argument will be deemed waived.")

*A. The Veradigm Defendants' Request for Judicial Notice*

The Veradigm Defendants attached to their motion a declaration by its lead counsel which contains sixty-seven exhibits, most of which are copies of Veradigm's various SEC filings. Dkt. 109. Of these exhibits, the Veradigm Defendants note that fifty-three (nos. 4–14, 16, 18–43, 45, 47–48, 50–59, and 62–63) are referenced in ACERA's complaint and are therefore properly subject to judicial notice. Dkt. 119 at *3. The Court will take judicial notice only of the content of the documents; it will not consider the content for the proof of any matter asserted. *George*, 674 F. Supp. 2d at 1044. There are twelve exhibits (nos. 2, 15, 17, 44, 46, 49, 60–61, and 64–67) for which the Veradigm Defendants offer no argument as to why judicial notice is proper, other than its blanket and conclusory assertion

[4] Ultimately, attaching such capacious exhibits at the motion to dismiss stage will rarely produce anything other than an enormous waste of everybody's time and a large pile of dead trees. Defendants' respective attorneys are urged to reconsider the practice in future cases.

in its motion brief that all exhibits "are incorporated into the SAC and/or public filings not subject to reasonable dispute." Veradigm MTD Br. *5 n.1. Because the Veradigm Defendants do not provide an individualized argument for these exhibits, the Court will not take notice of them.

Finally, the Veradigm Defendants have included two demonstrative exhibits (nos. 1 and 3). Exhibit 1 contains, in the Veradigm Defendants' description, "a true and correct copy of an appendix listing" every statement that the Veradigm Defendants understand ACERA to allege was false or misleading, along with "summary descriptions of the bases for dismissal of Plaintiff's claims challenging each such statement with references to the relevant portions of [the Veradigm Defendants' motion brief] addressing those bases for dismissal." Dkt. 109 at *1. Exhibit 3 contains, again in the Veradigm Defendants' description, "a true and correct copy of an appendix setting forth" the changes in Veradigm's stock price following various events that feature prominently in the complaint (*e.g.*, Veradigm's announcement that it would be restating some of its previous financials). *Id.* at *2.

ACERA argues that exhibits 1 and 3 should be excluded because they present arguments, not indisputable facts. Jud. Notice Resp. at *5. It accuses the Veradigm Defendants of using the exhibits, which have a combined length of nearly fifty pages, to run around the forty-five-page limit imposed by this Court on the Veradigm Defendants' motion to dismiss. *Id.* at *5–6; *see* dkt. 99. The Court agrees. the Veradigm Defendants contend that this argument is "meritless" in part because the exhibits contain information from the complaint or of which the Court may take judicial notice, namely stock prices. Dkt. 119 at *9–10; *cf. supra* note 3. The Veradigm Defendants also argue that the exhibits "add no additional arguments beyond those articulated in the brief; they simply organize and compile information to assist the Court in assessing Plaintiff's allegations and are appropriately considered for that purpose." Dkt. 119 at *10.

Some other judges in this district and around the country have agreed with similar arguments. *See, e.g., Garden City Employees' Ret. Sys. v. Anixter Int'l, Inc.*, No. 09-CV-5641, 2011 WL 1303387, at *9

(N.D. Ill. Mar. 31, 2011) (Dow, J.). However, in this Court's view, the Veradigm Defendants' demonstrative exhibits clearly constitute argumentation and a means of circumventing the already quite generously extended page limit. Exhibit 1 is a forty-three-page list stating why each complaint paragraph alleging fraudulent misrepresentation supposedly fails to do so. Even if this document only presents an expansion and application of arguments made in the brief itself, an expansion and application of argumentation is still argumentation. Exhibit 3, which shows changes in stock prices on specific days following major events during the Class Period, presents new information not contained in the brief, and the dates selected may or may not be representative of broader shifts. The fact that the exhibits contain information from other filings, or of which the Court can take judicial notice, is immaterial. It is the Veradigm Defendants' organization and presentation of the information that turns it into argumentation. *Cf. United States v. Lemire*, 720 F.2d 1327, 1349 (D.C. Cir. 1983) ("The distinction between valid summary testimony and argument is not a bright line. The task of organizing testimony can quickly turn into the marshalling of facts to support a particular position.").

Moreover, and *contra* the Veradigm's Defendants' assertion that they provided these exhibits "to assist the Court," dkt. 119 at *8, it is obvious that the reason the Veradigm Defendants prepared and filed these exhibits is that they thought it would help their case. That is not insidious behavior; it is what attorneys are supposed to do. In the context of trial advocacy, "organizing and distilling voluminous information for comprehensible presentation *to a jury* is a hallmark of effective advocacy." *United States v. Moussaoui*, 382 F.3d 453, 479 (4th Cir. 2004) (emphasis added). But such exhibits *are part of the argument*; they are not evidence itself. Fed. R. Evid. 107(b). The Court finds that exhibits 1 and 3 constitute argumentation, and they are therefore in violation of the page limit. They will be stricken pursuant to Local Rule 7.1.

To summarize: the Court takes judicial notice of the content of, but not the truth of any matter asserted in, Veradigm exhibits 4–14, 16, 18–43, 45, 47–48, 50–59, and 62–63. The Court will not take

notice of exhibits 2, 15, 17, 44, 46, 49, 60–61, and 64–67. However, regardless of whether the Court has taken notice of an exhibit, any exhibit that the Veradigm Defendants failed to cite in their briefs will not affect the Court's consideration. Finally, the Court strikes exhibits 1 and 3.

*B. Thornton's Request for Judicial Notice*

Thornton attached seven exhibits to its motion to dismiss. ACERA challenges the appropriateness of taking judicial notice of exhibits 5 and 7. Jud. Notice Resp. *7–8. Because ACERA does not present any argument against exhibits 1–4 or 6, the Court will take judicial notice of them. With respect to exhibit 5, which is cited multiple times in the complaint, ACERA's argument in opposition only points out that the Court may not consider the document as evidence of the truth of matters asserted therein. *Id.* at *8. As discussed above, the Court is fully aware of this limitation, and it therefore takes notice of exhibit 5.

Finally, ACERA argues that exhibit 7 ("PCAOB Staff Update on 2023 Inspection Activities") is beyond the scope of the complaint and also irrelevant. *Id.* Thornton replies that exhibit 7 is subject to judicial notice because its contents cannot reasonably be questioned. Thornton MTD Reply *9 n.6. However, Thornton offers no argument for why this is so. This is insufficient, particularly given that the first page of the exhibit disclaims that "This document represents the views of PCAOB staff and not necessarily those of the Board. It is not a rule, policy, or statement of the Board." Dkt. 111-7 at *2. If the document represents views of staff that cannot be attributed to the Board, then that implies that the contents of the document may, in fact, be reasonably questioned. Accordingly, the Court will not take judicial notice of exhibit 7; but it will take notice of all other Thornton exhibits.

## II. Violations of Section 10(b) and Rule 10b-5 by The Veradigm Defendants

ACERA alleges that all Defendants have violated § 10(b) and Rule 10b-5 of the Securities Exchange Act of 1934 (the "Exchange Act"), codified at 15 U.S.C. 78j(b) and 17 C.F.R. § 240.10b–5, by materially misrepresenting the state of Veradigm's internal controls and accounting.

Section 10(b) of the Exchange Act makes it unlawful for any person to "use or employ, in connection with the purchase or sale of any security... any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors." 15 U.S.C. § 78j(b). S.E.C. Rule 10b-5 implements this provision by making it illegal to make any untrue statement of a material fact, or to fail to state a material fact necessary to avoid making a misleading statement, in the context of the surrounding circumstances. 17 C.F.R. § 240.10b-5(b). Accordingly, in order to plead that the defendants made material misrepresentations or omissions in violation of section 10(b) and rule 10b-5, the plaintiffs must allege "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Stoneridge Inv. Partners, LLC v. Scientific-Atlanta,* 552 U.S. 148, 157 (2008). The Veradigm Defendants argue that ACERA has failed to plausibly allege material misrepresentation, scienter, and loss causation; the other elements are not at issue.

### *A. Puzzle / Group Pleading*

As an initial matter, the Veradigm Defendants argue that ACERA's complaint engages in improper "puzzle pleading" and "group pleading" that does not satisfy the specificity required under the PSRLA to allege a violation of § 10(b). Veradigm MTD Br. *10–11. The Veradigm Defendants argue that ACERA fails to articulate which Defendant made which allegedly false or misleading statement and also fails to specify which portion of the quoted statements are false or misleading. *Id.*

It is true that ACERA's complaint, while certainly a model of completeness, is perhaps not a model of clarity. Large portions of the complaint consist of one lengthy block quotation followed by another. ACERA rarely specifies what portions of a block quotation are false or misleading at the time that the quotation is presented, nor does it tend to give authorship information at that time. However, the complaint is not so unclear that the reader is left "to puzzle over the allegations in an attempt to piece them together." *Smykla v. Molinaroli*, 85 F.4th 1228, 1235 (7th Cir. 2023). Toward the beginning of the complaint, ACERA gives a list of every relevant statement signed by each Defendant. Compl. ¶¶ 32–33. Thus, determining the authorship of a given published statement only requires the reader to refer back to the lists that ACERA has provided.[5] And while each block quotation may not immediately make clear which aspects are false or misleading, ACERA tends to summarize the falsity at the end of a series of quotations. Although the Court would appreciate greater proximity between a given quotation and the subsequent identification of the alleged falsity contained therein, ACERA's complaint ultimately demands no more than a little cross-referencing, which is not beyond the Court's abilities. *See Van Noppen v. InnerWorkings, Inc.*, 136 F. Supp. 3d 922, 930 (N.D. Ill. 2015) (Blakey, J.) (explaining the Court's ability to follow a similar organizational structure). As such, the complaint does not engage in group or "puzzle pleading."

*B. Material Falsity*

To allege a violation of § 10(b) of the Exchange Act, a plaintiff must show with particularity that each defendant made a material misstatement or omission that contributed to the plaintiff's loss. Statements are material if, when viewed in context, they would "affect an investor's perception of the security, 'significantly altering the total mix of information.'" *Van Noppen*, 136 F.Supp. 3d at 940

[5] Even if ACERA had not provided these lists, the Veradigm Defendants have attached the documents in question to their motion to dismiss and requested that the Court take judicial notice of them. Veradigm MTD Br. *5 n.1; *see* dkt. 109; *supra* Discussion Section I. Because these documents list their authors, the Court does not have to puzzle about who is responsible for which statement.

(quoting *Searls v. Glasser*, 64 F.3d 1061, 1065–66 (7th Cir.1995)). The Private Securities Litigation Reform Act ("PSLRA") also imposes a heightened pleading standard for violations of § 10(b) of the Exchange Act. Specifically, it requires that the complaint specify each statement alleged to be misleading and the reason or reasons why it is misleading. *Cornielsen v. Infinium Cap. Mgmt., LLC*, 916 F.3d 589, 599 (7th Cir. 2019); 15 U.S.C. § 78u-4(b)(1). However, despite the heightened pleading standard, the Court must still take all facts in the complaint as true. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007). Additionally, if an allegedly false or misleading statement is a statement of opinion, then it cannot be "false"; as such, a statement of opinion is only actionable if the complaint can allege with particularity that the given opinion had no reasonable basis for its assertion, or purposefully omitted material facts, or conflicted with what the author in fact believed. *Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175, 189, 194 (2015).

As ACERA clarifies in its response brief, the complaint contains three categories of allegedly false or misleading statements, each with multiple examples. Veradigm MTD Resp. *8–9. Specifically, ACERA alleges that the Veradigm Defendants (1) made materially false and misleading statements in Veradigm's SEC filings concerning the Company's controls ("Control Statements"); (2) made materially false statements that Veradigm's accounting practices complied with GAAP ("GAAP Statements"); and (3) made materially false and misleading statements about its financial results ("Financial Results Statements"). At the motion to dismiss stage, the Court "need not parse through each and every alleged misstatement in the complaint to determine if it is actionable." *In re Spiegel, Inc. Sec. Litig.*, 382 F. Supp. 2d 989, 1025 (N.D. Ill. 2004) (Pallmeyer, J.) (quoting *Sutton v. Bernard*, No. 00 C 6676, 2001 WL 897593, at *4 (N.D. Ill. Aug. 9, 2001) (Grady, J)); *see also Ross v. Career Educ. Corp.*, No. 12 C 276, 2012 WL 5363431, at *8 (N.D. Ill. Oct. 30, 2012) (Kennelly, J.) (similar). To survive dismissal, it is sufficient for ACERA to allege that each category contains at least one statement per Defendant in violation of § 10(b). *See Van Noppen v. InnerWorkings, Inc.*, 136 F. Supp. 3d 922, 931 (N.D.

Ill. 2015) (Blakey, J.). However, as discussed further below, *see supra* Section II.C, the Court determines that Jones did not act with scienter, and therefore must be dismissed as a Defendant. Accordingly, this section will only examine the material falsity of statements by Black, Poulton, and Veradigm.

Veradigm's restated financials provide a binding declaration that certain prior statements, especially but not only in the Company's SEC filings, were incorrect. *See Fresno Cnty. Employees' Ret. Ass'n v. comScore, Inc.*, 268 F. Supp. 3d 526, 544 (S.D.N.Y. 2017). Accordingly, the Veradigm Defendants do not advance any significant argument that the statements ACERA cited in the SAC are immaterial or factually true. They instead contend that the statements in question are non-actionable statements of opinion. However, the Veradigm Defendants stretch the definition of "opinion" too far. For example, consider the following Control Statement, which appears in Veradigm's 2022 Form 10-K, signed by Black and Poulton:

> Under the supervision and with the participation of our management, including our chief executive officer and chief financial officer, we conducted an evaluation of the effectiveness of the design and operation of our disclosure controls and procedures…
>
> Based on management's evaluation, our chief executive officer and our chief financial officer concluded that our disclosure controls and procedures are designed to, and were effective as of December 31, 2020 to, provide assurance at a reasonable level that the information we are required to disclose in reports that we file or submit under the Exchange Act is recorded, processed, summarized, and reported within the time periods specified in SEC rules and forms, and that such information is accumulated and communicated to our management, including our chief executive officer and chief financial officer, as appropriate, to allow for timely decisions regarding required disclosure.

Compl. ¶ 247. This is a statement of fact: it declares that the authors have designed effective internal controls. It contains none of the hallmark flags of a statement of opinion, such as the use of words like "We think" or "We believe." *Omnicare*, 575 U.S. at 187. The Veradigm Defendants attempt to argue that this is not a statement of fact because it only contains management's *conclusion* that the controls were effective. Veradigm MTD Br. *14–15. But this argument attempts too much. A reasonable investor would read the statement above and conclude that management had designed

effective controls. The fact that a statement is management's *conclusion* could be said about nearly every sentence in any SEC filing; that is not enough to classify it legally as a statement of opinion.

The Veradigm Defendants also argue that all challenged GAAP Statements constitute non-actionable opinion. Here their arguments fail as well. Consider the following GAAP Statement from the 2020 Form 10-K, signed by Black and Poulton:

> We maintain internal financial and accounting controls and procedures that are designed to provide reasonable assurance regarding the reliability of our financial reporting and the preparation of our financial statements in accordance with accounting principles generally accepted in the United States ('GAAP').

Compl. ¶ 264(a). This passage is another statement of fact. A reasonable investor would read this passage and conclude that Veradigm's accounting complied with GAAP thanks to the Company's internal controls. This is particularly the case given that § 13(a) of the Exchange Act and SEC Regulation S-X both require financial statements to be prepared in accordance with GAAP. *See, e.g.,* 17 C.F.R. § 210.4-01. The Veradigm Defendants disagree, and they imply (with citations to out-of-circuit opinions) that statements about compliance with GAAP *always* constitute non-actionable opinion, "because GAAP standards are often subjective." *In re Hertz Global Holdings, Inc. Sec. Lit.*, 2017 WL 1536223 (D.N.J. Apr. 27, 2017); *see also New England Carpenters Guaranteed Annuity & Pension Funds v. DeCarlo*, 122 F.4th 28 (2d Cir. 2023). Inasmuch as the Veradigm Defendants may try to rely on a blanket rule that statements about compliance with GAAP are always non-actionable opinion, that effort fails. GAAP standards may have some subjectivity, but they are not so wishy-washy as to foreclose the possibility of a statement of fact concerning them. *See Hedick v. Kraft Heinz Co.*, No. 19-cv-1339, 2021 WL 3566602, at *9 (N.D. Ill. Aug. 11, 2021) (Dow, J.) (reaching same conclusion and collecting many cases); *SEC v. SBB Rsch. Grp., LLC*, No. 19-CV-06473, 2020 WL 6075873, at *3 (N.D. Ill. Oct. 15, 2020) (Coleman, J.) (same).

The Veradigm Defendants also argue that this passage cannot reasonably be construed as a statement that the Company complied with GAAP; instead, it was merely a statement informing investors that the Company designed controls to help comply with GAAP. Veradigm MTD Br. *31. But the Veradigm Defendants fare no better under this interpretation. The Company's GAAP controls were later found to be materially weak. Compl. ¶ 266(a). As such, the controls did not, in fact, provide any "reasonable assurance" that the Company's accounting procedures were GAAP-compliant. And, to the extent that this passage might be construed as a statement of opinion about what the controls were designed to do, ACERA's allegations that the Veradigm Defendants intended to deceive investors with these statements still render the statement actionable under. *Omnicare*, 575 U.S. at 189, 194 (2015).

With respect to ACERA's third category, Financial Results Statements, the Veradigm Defendants do not appear to contest that they issued material and false statements of fact. Indeed, even the Veradigm Defendants call it an "uncontroversial premise" that a restatement of financial figures provides a "sufficient basis for pleading that those statements were false when made." Veradigm MTD Reply *6 (quoting *Fresno Cnty. Employees' Ret. Ass'n*, 268 F. Supp. 3d at 544).

In summary, ACERA has alleged at least one statement of fact (or actionable opinion) attributable to Black, Poulton, and Veradigm in each of its three categories. The Veradigm Defendants do not contest that these statements were material and false or misleading, except inasmuch as they argue that the statements were non-actionable opinion. The Court finds that all statements analyzed above would have "affect[ed] an investor's perception of the security," *Van Noppen*, 136 F.Supp. 3d at 940, and thus were material. The Court also finds that the restated financial figures and accompanying explanations in the 2022 Form 10-K provide clear evidence of the statements' falsity. The Court therefore concludes that ACERA has established the material falsity element of a § 10(b) claim with respect to Black, Poulton, and Veradigm.

*C. Scienter*

To allege a violation of § 10(b), ACERA must plead, with particularity, that each Defendant made his or her challenged statement with scienter. In this context, *scienter* means "an intent to deceive, demonstrated by knowledge of the statement's falsity or reckless disregard of a substantial risk that the statement is false." *Higginbotham v. Baxter Int'l, Inc.*, 495 F.3d 753, 756 (7th Cir. 2007) (citing *Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 193 (1976). The PSLRA requires that a plaintiff plead, with particularity, facts giving rise to a "strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2). To establish a "strong inference" of scienter, the allegations must be at least as compelling as any opposing inference of non-fraudulent intent. *Tellabs*, 551 U.S. at 324; *see also Hunter v. Elanco Animal Health Inc.*, No. 23-3061, 2026 WL 2357739, at *7 (7th Cir. Aug. 14, 2026) (discussing application of the *Tellabs* standard). However, a "smoking gun" is not required; in the absence of direct evidence of scienter, a Plaintiff can still survive a motion to dismiss by pointing with particularity to strong circumstantial evidence of fraudulent intent. *Id.*

For a corporate defendant such as Veradigm, establishing liability under § 10(b) requires "look[ing] to the state of mind of the individual corporate official or officials who make or issue the statement[.]" *Makor Issues & Rts., Ltd. v. Tellabs Inc.*, 513 F.3d 702, 708 (7th Cir. 2008). As such, "A corporation is liable for statements by employees who have apparent authority to make them," *id.* at 708; and, consequently, "The scienter of the senior controlling officers of a corporation may be attributed to the corporation itself to establish liability as a primary violator of § 10(b) and Rule 10b–5 when those senior officials were acting within the scope of their apparent authority," *Adams v. Kinder–Morgan, Inc.*, 340 F.3d 1083, 1106–07 (10th Cir. 2003).

The Veradigm Defendants argue that ACERA has failed to meet the high PSLRA standard required to successfully plead scienter. As a general matter, they accuse ACERA of attempting to litigate a case of "fraud by hindsight"—in other words, of making the error of assuming that because

Veradigm's reporting contained admitted errors, that erroneous reporting must have constituted fraud. Veradigm MTD Br. *2 and *passim*. The Seventh Circuit has made quite clear that so-called "fraud by hindsight" is not a viable legal strategy, as the mere fact that financial reports needed to be restated does not, by itself, imply that the defendants in question knew that they were reporting incorrect figures. *See, e.g.*, *DiLeo v. Ernst & Young*, 901 F.2d 624, 627 (7th Cir. 1990).

ACERA denies that the complaint alleges "fraud by hindsight," or draws inferences of scienter purely on the basis of the need to restate Veradigm's financials. Veradigm MTD Resp. *24. Rather, they contend that the complaint puts forward specific evidence that the Veradigm Defendants "were either aware of or recklessly disregarded the truth when they issued their materially false and misleading statements." *Id.* (emphasis omitted). ACERA's complaint identifies several sets of circumstantial evidence, which the Court has grouped into seven categories below. The Veradigm Defendants assert that each category is insufficient alone to support an inference of scienter, and for some categories they also advance more specific counterarguments. The Court will first address separately each group of evidence, as well as the Veradigm Defendants' specific counterarguments for each group. The Court will then proceed to a holistic examination of the evidence as a whole, together with the Veradigm Defendants' broader counterarguments.

1. Individual Analysis of Scienter Evidence against the Veradigm Defendants

**The roles of the Individual Defendants.** As executive officers of the Company, the Individual Defendants were "legally responsible for implementing, reviewing and maintaining efficient internal controls." Compl ¶ 420. Additionally, each Individual Defendant "signed SOX Certifications during the Class Period attesting that they personally supervised and participated in the evaluation of Veradigm's internal controls." *Id.* These attestations of personal involvement imply that the Individual Defendants either knew the figures were false but lied about them or that they did not actually have the personal involvement claimed. *See Jones v. Corus Bankshares, Inc.*, 701 F. Supp. 2d 1014, 1029 (N.D.

Ill. 2010) (Bucklo, J.) (an individual defendant's "intimate involvement in the process gives rise to a strong inference that he was aware of [the company's] financial troubles and was aware that his statements about the corporation's financial health would be misleading to investors"). Black and Poulton also specifically attested to their work adopting effective controls to implement two new accounting rules (ASC 326 and ASC 606). Compl. ¶ 422. The 2022 Form 10-K Restatement would later admit that the controls related to these two rules were materially weak. Courts in this district and beyond have found it suggestive of scienter when an individual defendant not only oversaw but also designed internal controls later discovered to be materially weak. *See, e.g., Lowry v. RTI Surgical Holdings, Inc.*, 532 F. Supp. 3d 652, 662 (N.D. Ill. 2021) (Kennelly, J.) (finding scienter against CEO and CFO in part because of their role in "designing and supervising… internal controls over financial reporting" that were later acknowledged as deficient) (citing *In re Akorn, Inc. Sec. Litig.*, 240 F.Supp. 3d 802, 819 (N.D. Ill. 2017) (Feinerman, J.)).

Because the Individual Defendants were organizationally intertwined with Veradigm's problems, ACERA argues it is implausible that they were unaware of those problems. Veradigm MTD Resp. *31; *see Jones*, 701 F. Supp. 2d at 1029 ("While a court cannot 'presume' scienter, a strong inference of scienter may still be credited where it is almost inconceivable that an individual defendant would be unaware of the matters at issue."). The Court is inclined to agree with respect to Black and Poulton, who were responsible for overseeing the internal controls prior to and during the Class Period, when the identified weaknesses were introduced. Jones, however, only joined senior management in May 2022. She thus signed far fewer attestations as to the internal controls' efficacy than Black and Poulton, and—as the Veradigm Defendants point out—there is no allegation that she was involved in *designing* those controls. Veradigm MTD Br. *17 n.6. The Court therefore finds Black and Poulton's respective individual roles to be strongly probative of scienter, but Jones's role only weakly so.

**The nature, breadth, and depth of Veradigm's control failures.** By Veradigm's own admission, its control failures encompassed seven material weaknesses, along with other less material deficiencies. Compl. ¶ 433. The control failures were so extensive that it took three internal investigations and two years to create a remediation plan and restate the financials for 2020, 2021, and Q1–Q3 2022. *Id.* ¶¶ 11, 156, 239. Veradigm has also admitted that the pervasive control failures stemmed in part from "improper conduct" by senior management. *Id.* ¶¶ 431–32. Specifically, management (1) engaged in inappropriate communications with the Company's finance organization; (2) did not provide adequate resources or technical expertise to the finance organization; and (3) exercised poor judgment within the finance organization that was "not consistent with GAAP and Company accounting policies." *Id.* In ACERA's view, the significant breadth and depth of the weaknesses in Veradigm's controls supports an inference that the Veradigm Defendants acted with scienter because "it is unfathomable that the CEO[s] and CFO[s] could ignore these control deficiencies," *id.* ¶ 436, particularly given that the Individual Defendants all attested to the effectiveness of the controls, *id.* ¶ 251(d).

Allegations concerning the nature or the extent of a company's later-acknowledged control failures do not suffice, by themselves, to establish contemporaneous knowledge of those failures. *See, e.g.*, *In re Baxter Int'l Inc. Sec. Litig.*, 2021 WL 100457, at *15 (N.D. Ill. Jan. 12, 2021) (Ellis, J.). Without more, such evidence amounts only to an impermissible allegation of fraud by hindsight. *Id.* (citing *Higginbotham*, 495 F.3d at 759–60). However, evidence of the nature or the extent of control failures may constitute circumstantial evidence that can contribute to an overall finding of scienter. *Id.* at *18; *see Rehm v. Eagle Fin. Corp.*, 954 F. Supp. 1246, 1256 (N.D. Ill. 1997) (Moran, J.) ("The more serious the error, the less believable are defendants' protests that they were completely unaware of the… true financial status and the stronger is the inference that defendants must have known about the discrepancy."). Here, the Court agrees with ACERA that it is difficult to believe that the Veradigm

Defendants were properly complying with their oversight obligations and yet also entirely ignorant of all the problems identified in the Restatement. Or, if the Veradigm Defendants really were ignorant of everything, then that raises questions as to whether they were conducting oversight in accordance with their duties as officers—and, if not, that might render their misrepresentations reckless. The Court finds that the nature, breadth and depth of Veradigm's control failures are suggestive of scienter. However, the inference is weaker for Jones than for Black and Poulton, given that she joined senior management later, well after the identified issues with the internal controls had begun.

**The nature and breadth of the erroneously reported financial results.** As above, allegations concerning the nature and breadth of Veradigm's incorrectly reported financials can contribute to the overall scienter picture. *Rehm*, 954 F. Supp. at 1256; *see also In re ArthroCare Corp. Securities Litigation*, 726 F. Supp. 2d 696, 722 (W.D. Tex. 2010) (similar). Veradigm reported figures that painted a falsely rosy picture of its financial situation to investors and artificially inflated its stock. Compl. ¶ 196. The purchasers of the HLPP segment have alleged that Veradigm's misstated financials led them to significantly overpay for the segment. Compl. ¶ 268 n.11; *see Altera Digital Health, Inc. v. Veradigm*, No. N24C-08-304 SKR CCLD, dkt. 1 ¶ 6 ((Del. Super. Ct., August 23, 2024) ("The overstatement in revenue caused Altera to overpay for Veradigm by approximately $153 million.").[6] Because Veradigm's misrepresentations increased the value of the company and secured a better deal on the sale of its components, ACERA argues that the Veradigm Defendants were highly motivated to pull the wool over investors' eyes with respect to the true state of Veradigm's finances. Veradigm MTD Resp. *29–30. Here, the significant breadth of the misstated financials makes it more difficult to believe that the Veradigm Defendants truly had no knowledge of their statements' falsity. While hardly dispositive, the Court finds that this evidence is also suggestive of scienter.

---

[6] This allegation has survived a motion to dismiss. *See Altera Digital Health, Inc. v. Veradigm*, No. N24C-08-304 SKR CCLD, dkt. 63 (Del. Super. Ct., May 8, 2025).

**The forced resignations of Poulton and Jones.** In December 2023, as a result of the Audit Committee Investigation findings, the Veradigm Board demanded that Poulton and Jones resign. Compl. ¶ 111. The Audit Committee's findings included the issues of managerial judgment discussed above with respect to the nature of the control failures. At the time, the Company proclaimed that "the leadership changes announced today reflect the importance of accountability" to "develop a stronger control environment with enhanced financial reporting policies and disclosure policies and procedures." *Id.* ¶ 115. The terms of the resignations also precluded Poulton and Jones from receiving "any payment with respect to the Company's 2023 annual incentive program." *Id.* ¶ 113. ACERA argues that the circumstances of their resignations are probative of scienter, because it implies that the Board believed Poulton and Jones to have been aware of and personally responsible for the Company's mismanagement. Veradigm MTD Resp. *33. Put another way, ACERA contends that the complaint alleges sufficient information to overcome any competing inference that the Board fired Poulton and Jones for reasons unrelated to their alleged fraud. *See Phoenix Ins. Co., Ltd. v. ATI Physical Therapy, Inc.*, 690 F. Supp. 3d 862, 895 (N.D. Ill. Sep. 6, 2023) (Chang, J.).

The Veradigm Defendants reply that there is no evidence firmly establishing that the Board forced Poulton and Jones to resign because of concerns other than company mismanagement. Veradigm MTD Reply *11. They also contend that only unsupported conjecture supports ACERA's argument that Poulton and Jones were among those in "senior management" whose judgment the Audit Committee criticized. *Id.* Poulton and Jones were the Company's CEO and CFO, with professional obligations to implement and oversee the same internal controls that the Audit Committee found to be materially weak. Given those facts, and the fact that Poulton and Jones were asked to resign as a result of the Audit Committee's findings, the Court finds that ACERA's argument is rooted in far more than mere conjecture. *See Phoenix Ins. Co.*, 690 F. Supp. 3d at 895. The Court

finds the timing and circumstances of the resignations to be suggestive of scienter with respect to Poulton and Jones.

**Executive Bonuses.** In 2019 (before the Class Period), Veradigm's stock performed poorly, and Black and Poulton earned only 15% of their target bonus compensation. Compl. ¶ 456. In 2020, the first year of the Class Period and the first year with restated financials, Veradigm erroneously reported significant gains in Non-GAAP Earnings per Share ("EPS"). *Id.* ¶ 457. This gain in non-GAAP EPS "resulted in bonus payments equal to 111.1% of Poulton and Black's target bonuses." *Id.* ¶ 457. Poulton also received a "discretionary bonus payment of 200% of his target bonus" in part for securing the sale of the HLPP Segment at a high price, allegedly owing to the false portrait of Veradigm's financials. *Id.* ACERA alleges Black and Poulton's small 2019 bonuses gave them a significant motive to commit securities fraud so as to obtain larger bonuses[7]—and the larger bonuses that they ultimately attained were larger due in significant part to the incorrect financials that Veradigm reported. *Id.* ¶ 460. ACERA also argues that an inference of scienter is further bolstered by the Restatement's concession that these bonus payments were improper in part because they were "based on management's inappropriate exercise of judgment." Veradigm MTD Resp. *35; Compl. ¶¶ 461–62. Additionally, as noted above, Poulton and Jones agreed to forgo bonus payments for 2023 when they were asked to resign at the end of that year. Compl. ¶ 113.

The Veradigm Defendants attempt to decouple Black and Poulton's compensation from any inference of scienter by arguing that all executives are incentivized to increase their bonuses. Veradigm MTD Br. *39; *cf. Plumbers & Pipefitters Local Union 719 Pension Fund v. Zimmer Holdings, Inc.*, 679 F.3d 952, 955–56 (7th Cir. 2012) (the mere fact that a company's officer stands to benefit from making the company look good is not by itself suggestive of scienter). However, as noted above, ACERA asserts

[7] ACERA does not allege that Jones's bonus compensation is suggestive of scienter.

that the large bonus increases were driven at least in part by erroneously reported increases in non-GAAP EPS, which all Individual Defendants had claimed were accurate. Compl. ¶ 457. And although the sale of the HLPP segment was not directly related to the misstated financials, ACERA alleges that those misstated financials help Veradigm drive up the sale price, significantly increasing the size of Poulton's bonus for completing the sale. *Id.* ¶¶ 268 n.11, 457. In other words, these were no ordinary bonuses. The Court finds a plausible (and particularly alleged) link between the increased bonuses received by Black and Poulton and Veradigm's misstated financials. That link is suggestive of scienter, and it overcomes any competing inference from the fact that all executives are incentivized to increase their bonuses.[8]

**Stock Compensation and Alleged Insider Trading.** As members of senior management, all Individual Defendants owned significant quantities of Veradigm stock; they also received stock as part of their compensation packages. Compl. ¶¶ 446, 449, 452, 453. To the extent that the Veradigm Defendants' misrepresentations boosted the Company's stock price, the Individual Defendants all stood to gain significantly. ACERA argues that this provided an additional motive for all three Individual Defendants and thus is probative of scienter. Veradigm MTD Resp. *36. The Court agrees, although it finds that the inference is weak, given that an incentive to increase stock prices is common to all stockholders. *See Plumbers & Pipefitters*, 679 F.3d at 955–56. The inference is also particularly weak for Jones, given that she joined senior management later, after Veradigm's stock price had already risen significantly.

[8] The Veradigm Defendants also attempt to defang these allegations by pointing out that ACERA alleges that Black and Poulton received larger *bonus accruals*, as opposed to larger paid-out-bonuses. Veradigm MTD Br. *40; *see* Compl. ¶ 463. Because the parties discuss the issue at some length, the Court thinks it important to note that bonus accruals are a company's registration of bonus payments in its accounting books, while paid-out bonuses are the payments actually given to the recipient. Here, the Court does not find the difference between the categories to be a material distinction, as the recording of a bonus accrual indicates an intention to, at some point, pay out a bonus of that size. An increase to bonus accruals would thus normally result in an eventual increase to the bonus payments actually received. Veradigm MTD Resp *35 n.17. The motivational factor is therefore still present.

Additionally, the Individual Defendants all made significant sales of Veradigm stock while the price was near its high point. Compl. ¶ 445. In the four years preceding the Class Period, Black sold a total of 383,659 Veradigm shares, netting a profit of about $4.5 million. *Id.* ¶ 446. However, during the first two years of the Class Period, before Veradigm's price began to significantly slide, he sold 1,159,997 shares, for a total profit of about $20.3 million. *Id.* Poulton sold 369,875 Veradigm shares for a profit of $4.2 million in the four years preceding the Class Period, but he sold 952,425 shares during the Class Period for a profit of over $15.2 million. *Id.* ¶ 449. He also did not purchase *any* Veradigm shares during the period when Veradigm's stock price was allegedly artificially inflated. *Id.* Jones started working at Veradigm in 2019, and did not join senior management until 2022, so she does not have a pre-Class Period sale history for comparison; however, during the Class Period she sold 28,243 Veradigm shares for proceeds of over $400,000. *Id.* ¶ 452.

ACERA alleges that the timing of the sales for all three Individual Defendants is suspicious, as the sales generally occurred within days of financial statements or investor calls where the Company (and the relevant Individual Defendants for that point in time) touted Veradigm's erroneous financial figures. *Id.* ¶¶ 447, 450, 452. ACERA concedes that about 44% of Black's Class Period stock sales were pursuant to pre-set Rule 10b-5 stock trading plans, which are plans designed to avoid suspicion by prescheduling stock sale. *See Garden City*, 2012 WL 1068761, at *13. However, ACERA speculates that selling stocks according to a plan is not exculpatory here given that Black would have been in a position to design his plan to take advantage of his own financial misstatements. *Id.* ¶ 448. *Id.* Poulton also sold some stocks according to a plan, but at a lower rate than Black: less than 15% of Poulton's Class Period sales were pursuant to a plan. *Id.* ¶ 452. Additionally, Black modified his stock sale plans during the Class Period, and Poulton adopted his plan during the Class Period, which ACERA argues suggests that Black and Poulton were seeking to take advantage of their role in erroneously inflating the Company's stock price. Compl. ¶¶ 448, 551; Veradigm MTD Resp. *37.

On balance, the Court finds that the Individual Defendants' sales of stock *outside* of Rule 10b-5 plans is, at most, minimally suggestive of scienter. ACERA provides lots of evidence that the Individual Defendants often sold stock shortly after positive financial results were reported, Compl. ¶¶ 447, 450, 452, but the Court fails to see the significance. At that point, the positive (albeit erroneous) financial results were public knowledge, and acting on public knowledge does not constitute insider trading. *See Chandler v. Ulta Beauty, Inc.*, 2022 WL 952441, at *29 (N.D. Ill. Mar. 30, 2022) (Pacold, J.) (consistently selling stocks after positive quarterly earning reports does not indicate fraud).

On the other hand, the fact that Black modified his stock sale plan, and Poulton created his, during the Class Period suggests that Black and Poulton may have had advance knowledge that Veradigm's forthcoming financial reports would be highly positive. These facts are somewhat suggestive of scienter. However, Jones's stock sales, which do not appear to have been made according to a plan, are not suggestive of scienter. As such, the only inference of scienter related to Veradigm stock for Jones is the fairly weak inference of a motive to increase the price of the stock she owned.

**The SEC investigation.** ACERA initially argued that the SEC's choice to open an investigation was probative of scienter. Veradigm MTD Resp. *34. That investigation has since closed without recommending an enforcement action. Dkt. 126 at *1. The SEC's decision to close an investigation is not exculpatory. Dkt. 126 at *2; *see* Securities Act of 1933, Release No. 5310 (Commission's Well's Release) (Sep. 27, 1972). Nevertheless, the closure undermines any suggestion of scienter that could previously been drawn from the investigation. The Court now regards the closed SEC investigation as totally neutral, suggestive of neither scienter nor innocence.

2. <u>Holistic Analysis of Scienter Evidence against the Veradigm Defendants</u>

Looking at the allegations as a whole, ACERA has assembled a significant quantity of circumstantial evidence across a broad range of areas. Some of the evidence is specific—for example, the evidence concerning Black and Poulton's specific involvement with the implementation of

controls for new rules ASC 326 and ASC 606. Such evidence is alleged with the particularity demanded by the PSLRA. Other evidence is more contextual and serves to strengthen the implications arising from the specific evidence. Considering the breadth of this evidence, the Veradigm Defendants' repeated exhortation that any given piece of evidence is insufficient to show scienter falls flat. *See, e.g.*, Veradigm MTD Br. *18, 19, 21, 22, 34, 35, 39. Such evidence may not be enough "without more," but the question "is whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Tellabs*, 551 U.S. at 322–23. In aid of that inquiry, the Court provides the following table, which summarizes the inferences of scienter from the previous section:

| | **Black** | **Poulton** | **Jones** | **Veradigm** |
|---|---|---|---|---|
| **Individual Roles** | Strong | Strong | Weak | Strong |
| **Control Failures** | Strong | Strong | Medium | Strong |
| **Financial Reports** | Medium | Medium | Medium | Medium |
| **Forced Resignations** | N/A | Strong | Strong | Strong |
| **Bonuses** | Medium | Medium | N/A | Medium |
| **Stocks** | Medium | Medium | Weak | Medium |
| **SEC Investigation** | N/A | None | None | None |

When examining the evidence holistically, the Court finds that ACERA has plausibly alleged that Black and Poulton acted with scienter. As CEO, it was Black's job to oversee the entire company, including its financial health, and it is difficult to believe that he had no awareness of the massive and pervasive problems at the Company. He attested to personal involvement in the development of interior controls that were later found to be materially weak, which led directly to those massive and pervasive problems. He had significant incentive to make false reports, given the degree to which

doing so stood to benefit both the Company and himself personally. Finally, his modifications to his stock plan during the Class Period suggest that he had advance knowledge that future financial reports were likely to be extremely positive. This circumstantial evidence, put together, strongly suggests that Black either knew that his statements were materially false when he made them, or else that he was so deficient in his oversight duties that making such statements constituted a reckless disregard for the truth. Innocent explanations for all of the above are quite possible, but the Court finds that ACERA has carried its burden (and then some) under the PSLRA and *Tellabs*.

The inference of scienter is even stronger for Poulton, who, first as CFO and then as CEO after Black's departure, was likely the person most intimately aware of the Company's financial health. Even more so than with Black, the Court finds it more likely than not that Poulton either knew that he made materially false statements, or else neglected his oversight duties to such a degree that his statements were made with reckless disregard for the truth. Like Black, Poulton attested to being directly involved in the development of materially weak internal controls, and he had a significant motive both personally and professionally to boost the Company's value and stock price by any means. And, unlike Black, Poulton was forced to resign by the Board after it received notice of the Audit Committee's findings, a development followed shortly after by Veradigm's decision to self-report to the SEC. All of this is more than sufficient under the PSLRA to find that ACERA has plausibly alleged that Poulton acted with scienter.

For Jones, however, the evidence does not support the same conclusion. Only the circumstances of her forced resignation are strongly suggestive of scienter. The Court does not discount such evidence, but it is insufficient alone to raise a strong allegation under the PSRLA. The remaining evidence against Jones is significantly weaker than the evidence against Black and Poulton, primarily due to her later involvement with senior management. ACERA's assembled evidence is insufficient to establish that Jones acted with scienter. *See Hunter*, 23-3061, 2026 WL 2357739, at *9

("[U]nder the PSLRA, the question is whether the Plaintiffs have raised a 'strong inference' of scienter, not merely a plausible one.").

The Veradigm Defendants argue that certain holistic considerations, combined with the individual objections discussed above, establish a competing inference of non-fraudulent intent that is stronger than any inference of scienter that ACERA has alleged, even considering all the evidence together. In particular, the Veradigm Defendants argue that the company's behavior in "promptly disclos[ing]" its discovered internal control failures and in self-reporting to the SEC "demonstrat[es] a pursuit of truth rather than . . . intent to deceive." Veradigm MTD Br. *32 (quoting *Higginbotham*, 495 F.3d at 758). However, the complaint gives no reason to suppose that Veradigm's disclosures were in any way "prompt[]." Those disclosures began on February 28, 2023, apparently after Grant Thornton's 2022 audit turned up issues with internal controls. Compl. ¶¶ 68–70. The Court's analysis above indicates that Black and Poulton acted with scienter throughout the Class Period; if so, then Veradigm would have known (or should have known) about the issues for nearly three years prior to disclosure. Moreover, the Court does not see how Veradigm's pattern of self-disclosure beginning in February 2023 raises any inference of non-fraudulent intent against Black, who had already left the company at that time. The Court therefore reiterates that, when examining the large amount of circumstantial evidence as a whole, the inference that Black and Poulton acted with scienter is cogent and more compelling than any competing explanations that do not require fraudulent intent. At the motion to dismiss stage, that is enough to get over the wall erected by the PSLRA.

Finally, with respect to Veradigm itself, the findings that Black and Poulton acted with scienter are sufficient to establish that the Company also acted with scienter for the entire class period. Because there is no suggestion that Black and Poulton were not working within the scope of their authority, Veradigm the company acted with scienter *at least* to the same extent that Black and Poulton did individually. *Adams*, 340 F.3d at 1106–07.

In sum, ACERA has cobbled together sufficient circumstantial evidence under the PSRLA to plausibly allege that Black and Poulton, and by extension Veradigm, acted with scienter. However, the evidence against Jones falls short of the mark. Accordingly, Jones must be dismissed as a Defendant.

*D. Loss Causation*

To establish liability under § 10(b) of the Exchange Act, ACERA must also allege that the Veradigm Defendants' misstatements caused it to suffer financial harm. To prove loss causation, the plaintiff has "the burden to establish that the price of the securities they purchased was 'inflated'—that is, it was higher than it would have been without the false statements—and that it declined once the truth was revealed." *Glickenhaus & Co. v. Household Int'l, Inc.,* 787 F.3d 408, 415 (7th Cir. 2015). Unlike the PSRLA rules for the material falsehood and scienter elements, loss causation need not be pleaded with particularity; as such, it is subject to the ordinary notice standard of Rule 8(a). 15 U.S.C. § 78u-4(b); *see Fryman*, 2022 WL 1136577, at *32. At the motion to dismiss stage, "a plaintiff who has suffered an economic loss" need only "provide a defendant with some indication of the loss and the causal connection that the plaintiff has in mind." *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 347 (2005).

ACERA's theory of loss causation is relatively simple. First, the Veradigm Defendants' misstatements caused Veradigm's stock price to become artificially inflated. Compl. ¶ 527. Thinking that Veradigm was a company on the rise, ACERA purchased stock in reliance on the erroneous financial information that Veradigm released. Compl. ¶¶ 541–47. Then, a series of corrective disclosures beginning on February 28, 2023 caused Veradigm's stock price to decline from a Class Period high of $23.25 on April 22, 2022 to the subsequent Class Period low of $8.91, and to an eventual post-Class Period nadir of $3.90 on April 7, 20225. *Id.* ¶ 528. In all, ACERA alleges that Veradigm made seven relevant corrective disclosures between February 28, 2023 and March 18, 2025, when Veradigm released its long-delayed 2022 Form 10-K. *Id.* ¶¶ 531–38. Moreover, each disclosure

only partially corrected the inflated stock price, so the harm to Veradigm stockholders persisted throughout the Class Period and even beyond. *Id.* ¶ 528; Veradigm MTD Resp. *41–42.

1. Loss Causation in General

The Veradigm Defendants argue that ACERA's identified corrective disclosures cannot be said to have revealed new facts, unknown until the issuance of the disclosure in question, that caused Veradigm's stock price to drop and therefore caused ACERA's loss. Veradigm MTD Br. *41. However, ACERA contends that the Veradigm Defendants concede that two or three of Veradigm's disclosures (specifically, those occurring on or before June 13, 2023) revealed new information that caused Veradigm's stock to drop. Veradigm MTD Resp. *41; *see, e.g.,* Veradigm MTD Br. *42 ("the relevant 'truth' was fully revealed by no later than June 13, 2023"). ACERA further argues that, at the motion to dismiss stage, a court need not exhaustively prove that each corrective disclosure caused losses to the plaintiff. Veradigm MTD Resp. *41 (citing, *inter alia*, *Fryman*, 2022 WL 1136577, at *33). It claims that as long as some disclosures have been plausibly alleged to have caused loss to a plaintiff, then the element has been established sufficient to survive a Rule 12(b)(6) motion. *Id.*

The Veradigm Defendants rebut neither of these arguments in their reply brief. *See* Veradigm MTD Reply *15. Such silence, particularly regarding ACERA's claim of a conceded point, could be taken to indicate waiver. *See e.g., United States v. Farris*, 532 F.3d 615, 619 (7th Cir. 2008). But even if the Veradigm Defendants have not waived any opposition to such arguments, the Court still finds lacking their claims of inadequate loss causation pleading. ACERA has plausibly alleged that the Veradigm Defendants' respective admitted misstatements artificially inflated the stock price, and that ACERA purchased Veradigm stock in reliance on those misstatements. ACERA has further plausibly alleged that the revelation of these misstatements caused the price of the stock to drop. For example, on December 8, 2023, Veradigm revealed that the results of the Audit Committee Investigation contained findings so severe that the Board asked the CEO and CFO to resign. Consequently, "the

price of Veradigm stock closed down $2.52, or more than 20%, on December 8, 2023 on heavy trading volume." Compl. ¶ 534. Such allegations are more than enough to "provide a defendant with some indication of the loss and the causal connection that the plaintiff has in mind." *Dura*, 544 U.S. at 347. The Court therefore finds that ACERA has plausibly alleged that the Veradigm Defendants' actions caused ACERA's loss.

2. Standing for Post-Class Period Losses

In addition to their broader assertion that ACERA has failed to establish loss causation, the Veradigm Defendants also advance a narrower argument that ACERA cannot allege any losses after the end of the Class Period. ACERA's complaint shows that it sold the last of its Veradigm stock on January 29, 2024;[9] accordingly, the Veradigm Defendants argue that ACERA cannot have been harmed by drops in the stock price after that point. Veradigm MTD Br. *44–45. ACERA responds that the Veradigm Defendants' cited cases are inapposite, because they only stand for the proposition that a plaintiff cannot be harmed by false statements made after the plaintiff's last *purchase* of stock. But putting aside the questionable applicability of the Veradigm Defendants' citations, the Court is skeptical that ACERA has standing to pursue such claims. ACERA is right that no rule requires a corrective disclosure to occur within the class period to be relevant to a securities fraud action; but that misses the broader point that ACERA seems unlikely to be harmed by a reduction in the price of stock that it did not own. *See Dura*, 544 U.S. at 341–42 ("loss causation" means a "causal connection between the material misrepresentation and the loss"); *cf. Wong v. Accretive Health, Inc.*, 773 F.3d 859, 864–65 (7th Cir. 2014) (class members who sold defendant company's stock prior to a corrective disclosure cannot have been harmed by that disclosure). However, because ACERA's argument for loss causation here primarily relates to its desire to serve as lead plaintiff for other class members who

---

[9] The Class Period ends three days earlier, on January 26, 2024. Compl. ¶ 1. It is unclear why ACERA defined the Class Period to end three days before it sold the last of its Veradigm Stock.

still owned Veradigm stock after January 29, 2024, the Court will reserve judgment on this question until class certification.

*E. Summary*

After extensive review of ACERA's allegations that the Veradigm Defendants violated § 10(b) of the Exchange Act, the Court concludes that ACERA has successfully pleaded claims against Black, Poulton, and Veradigm, but not against Jones. Accordingly, Jones must be dismissed as a Defendant. The remaining § 10(b) claims against Black, Poulton, and Veradigm may proceed.

## III. Violation of Section 20(a) by the Veradigm Defendants

ACERA also alleges that the Veradigm Defendants violated § 20(a) of the Exchange Act for exercising control over persons committing securities fraud. Pleading a § 20(a) claim requires a plaintiff to allege (1) a primary securities violation; (2) that the defendant in question exercised general control over the individual or organization that committed the violation; and (3) that the individual defendant "possessed the power or ability to control the specific transaction or activity upon which the primary violation was predicated, whether or not that power was exercised." *Harrison v. Dean Witter Reynolds, Inc.,* 974 F.2d 873, 881 (7th Cir. 1992); *Zurich Capital Markets, Inc. v. Coglianese*, 388 F. Supp. 2d 847, 866 (N.D. Ill. 2004) (St. Eve, J.).

In a single paragraph at the end of their forty-five-page motion brief, the Veradigm Defendants advance a cursory argument that ACERA has failed to successfully allege a claim under § 20(a). Their first contention, that ACERA has failed to show an underlying securities violation, fails in light of the previous section's analysis for all Defendants other than Jones. Next, the Veradigm Defendants argue that ACERA has failed to plead any particularized facts demonstrating that Veradigm (the Company) exercised control over all Individual Defendants. However, it is bedrock law that a company exercises control over employees acting within the scope of their employment. *See Tellabs*, 513 F.3d at 708

("[T]he doctrines of respondeat superior and apparent authority remain applicable to suits for securities fraud."). The Court sees no basis in ACERA's complaint to doubt that Veradigm exercised control over Black and Poulton, and their activities, within the meaning of the *Harrison* test discussed above. 974 F.2d at 881.

Finally, the Veradigm Defendants argue that ACERA has failed to allege that each Defendant had the power to control each specific alleged securities fraud violation—particularly with respect to Black, after his resignation. However, this argument improperly seeks to apply a heightened pleading standard to an allegation of § 20(a) liability. The Veradigm Defendants have not cited any authority holding that the PSRLA, Rule 9(b), or any other heightened pleading standard applies to § 20(a) (except inasmuch as the underlying securities violation must be pleaded according to the PSLRA), nor is the Court aware of any such precedent. ACERA has more than satisfied the general pleading requirements of Rule 8(a) with respect to its allegations that Black and Poulton exercised control over the activities underlying the alleged fraud. *See, e.g.*, Compl. ¶ 251. The precise extent of their § 20(a) liability is a factual question that the Court reserves for later determination. The Court therefore finds that ACERA has plausibly alleged violations of § 20(a) with respect to Black, Poulton, and Veradigm.

## IV. Violations of Section 10(b) and Rule 10b-5 by Thornton

Finally, ACERA alleges that Thornton, in its capacity as Veradigm's auditor, is liable for securities fraud under § 10(b) of the Exchange Act. At a high level, ACERA claims that Thornton missed numerous "red flags and infirmities" in its 2020 and 2021 audit reports for Veradigm; consequently, Thornton failed to catch the material weaknesses in Veradigm's internal controls and accounting practices. ACERA alleges that Thornton's performance as an auditor was so deficient as to constitute at least reckless disregard for the truth, and that Thorton's 2020 and 2021 audit reports regarding Veradigm's financial health therefore constituted securities fraud.

The requirements to state a § 10(b) claim against Thornton are the same as those discussed above in the context of the Veradigm Defendants. *See supra* Section II. Thornton primarily argues that ACERA has failed to plead scienter with the particularity required by the PSLRA. Thornton also contends that all of its allegedly false statements are non-actionable statements of opinion.[10] The Court agrees that ACERA has not alleged scienter with sufficient particularity; accordingly, it grants Thornton's motion to dismiss on that basis and does not reach the question of whether the statements in question constituted non-actionable opinion.

As with the Veradigm Defendants, ACERA presents a collection of circumstantial evidence, rather than any sort of smoking gun. Specifically, ACERA alleges that Thornton's scienter can be inferred from (1) missed red flags indicating Veradigm's problems; (2) the fact that these control deficiencies relate to a "critical audit matter" that Thornton had identified; (3) the length of time that Thorton served as Veradigm's auditor; (4) the timing of Veradigm's dismissal of Thornton as its auditor; and (5) PCAOB identification of similar flaws to those alleged here in Thornton's audits of other companies.

The Court need not engage in such exhaustive analysis here as it did with the Veradigm Defendants. Suffice it to say that ACERA's evidence of scienter against Thornton is, on the whole, quite weak. ACERA most well-developed argument—that Thornton missed significant red flags—largely recapitulates the nature, breadth, and depth arguments against the Veradigm Defendants. Compl. ¶¶ 484–93; *see* Thornton MTD Resp. *10–17. However, in its attempt to recast the significant

[10] Thornton also adopts and incorporates the Veradigm Defendants' arguments concerning loss causation, without actually making such arguments itself. *See* Thorton MTD Br. *24. Such incorporation could arguably constitute a violation of Thorton's page limit. *Cf. Prudential Ins. Co. of Am. v. Sipula*, 776 F.2d 157, 161 n.1 (7th Cir. 1985) ("this practice results in a composite … oversized brief" which is "highly inappropriate"). However, given that Thornton has not distinguished its own loss causation argument from that of the Veradigm Defendants, the Court will not treat them any differently. The Court therefore finds that Thorton's loss causation arguments fail to the same extent and for the same reasons as the Veradigm Defendants' loss causation arguments.

extent of Veradigm's problems as a red flag that Thornton missed, ACERA misapprehends the meaning of the term. "Red flags" are "specific, highly suspicious facts and circumstances available to the auditor at the time of the audit." *Riggs Partners, LLC. v. Hub Grp., Inc.*, No. 02 C 1188, 2002 WL 31415721, at *9 (N.D. Ill. Oct. 25, 2002) (Gettleman, J.). In other words, they are an indicator of a broader problem; they are not the problem itself. ACERA's argument that the extent of Veradigm's problems constituted a missed red flag ultimately amounts only to the tautological claim that Thornton should have noticed the problem because it should have noticed the problem.

ACERA's other arguments fare no better. At most, the complaint shows that Thornton may have been negligent in its duties as an auditor. But negligence is insufficient under the PSLRA to establish § 10(b) liability. *Baxter*, 2021 WL 100457, at *15 (citing *In re Ceridian Corp. Sec. Litig.*, 542 F.3d 240, 248 (8th Cir. 2008)). For example, Thornton designated Veradigm's implementation of certain new GAAP as a "critical audit matter," yet the eventual Restatement identified the implementation of such rules as improper and a significant weakness. *See* Compl. ¶¶ 212–18. ACERA argues that if this was really a critical audit matter, then Veradigm should have been paying particularly close attention. *Id.* ¶ 496. A fair enough criticism—but what ACERA fails to allege is any evidence suggesting that Thornton *knew* that the implementation was faulty, or else recklessly disregard evidence to that effect. ACERA barely develops its arguments that Thornton's long tenure with Veradigm suggests that Thornton had operational knowledge of Veradigm's shortcomings; or that the timing of Thornton's dismissal is suggestive of scienter. *Id.* ¶¶ 497, 498. These allegations do not even come close to the particularity demanded by the PSLRA. Finally, ACERA points out that the PCAOB has publicly criticized Thorton's work auditing *other* companies, but it fails to show that any of the critical reports relate in any way to Thorton's work with Veradigm. *Id.* ¶¶ 503, 508.

Examining ACERA's evidence against Thornton as a whole, the Court is struck by its remarkable lack of specificity. The evidence against the Veradigm Defendants ranged from the specific

to the contextual; but against Thornton, ACERA has almost nothing but context to offer. While ACERA's evidence of scienter might suffice under the normal Rule 8(a) pleading standard, it falls far short of the particularity demanded under the PSRLA. The Court rules that ACERA has not established that Thornton acted with scienter. The Court therefore grants Thornton's motion and dismisses all claims against it.

## CONCLUSION

The Court grants in part and denies in part the Veradigm Defendants' motion to dismiss [107]. All claims against Defendant Jones are dismissed for failure to state a claim. Questions of ACERA's standing related to alleged losses incurred after January 29, 2024 are reserved for determination during class certification. The Veradigm Defendants' motion is otherwise denied. The Court also strikes Exhibits 1 and 3 of Veradigm's motion to dismiss [109-1], [109-3]. The Court grants Grant Thornton's motion to dismiss [110]. All claims against Grant Thornton are dismissed for failure to state a claim.

**IT IS SO ORDERED.**

Date: 8/18/2026

Entered: ______________________________
SHARON JOHNSON COLEMAN
United States District Judge